Exhibit "A"

1 UNITED STATES DISTRICT COURT

2 NORTHERN DISTRICT OF CALIFORNIA

3 ---oOo---

4

5 FERNANDO DAROSA,

6 Plaintiff,

7 vs. No. 3:07-CV-03114-SI

8 KAISER FOUNDATION HEALTH PLAN,

 INC.,

9

 Defendant.

10 _____/

11

12

13 DEPOSITION OF FERNANDO DAROSA

14 Monday, June 2, 2008

15

16

17

18 CERTIFIED COPY

19

20

21 REPORTED BY: CYNTHIA LEW, RPR, CSR No. 11999

22

23 TOOKER & ANTZ

 COURT REPORTING & VIDEO SERVICES

24 350 SANSOME STREET, SUITE 700

 SAN FRANCISCO, CALIFORNIA 94104

25 (415) 392-0650

| | | |
|---|---|---|
| 1 | Q. | Who have you spoken with about this |
| 2 | deposition or the lawsuit? | |
| 3 | A. | My girlfriend. |
| 4 | Q. | And what's her name? |
| 5 | A. | Anastacia Freitas. It's Anastacia Freitas. |
| 6 | Q. | Can you spell that for us. |
| 7 | A. | A-n-a-s-t-a-c-i-a. And the last name is |
| 8 | spelled F-r-e-i-t-a-s. | |
| 9 | Q. | How many conversations have you had with |
| 10 | her about this lawsuit or your deposition? | |
| 11 | A. | I -- I don't know. I don't know. |
| 12 | Q. | Is it more than ten? |
| 13 | A. | Yes. |
| 14 | Q. | More than 50, would you say? |
| 15 | A. | It's possible. I don't -- I've never |
| 16 | thought about keeping track of the conversations. | |
| 17 | Q. | Okay. |
| 18 | A. | So -- and we live together, so -- |
| 19 | Q. | Can you remember the nature of any |
| 20 | conversations you've had with her about this lawsuit | |
| 21 | or your deposition? | |
| 22 | A. | The majority of our conversations were |
| 23 | regarding -- what were they regarding. In what | |
| 24 | aspect? Maybe I didn't understand. | |
| 25 | Q. | I'm just asking you, can you recall the |

11

1  A. With Kaiser?

2  Q. Yes.

3  A. I believe it was May of 2000, I believe.

4  Q. And just to speed things up, I may use the

5 term "Kaiser" when referring to Kaiser Foundation

6 Health Plan, Inc.

7    Do you understand that?

8  A. Yes.

9  Q. You actually had two separate employment

10 periods with Kaiser.  Is that correct?

11  MR. FRIEDMAN:  Objection as to the word

12 "separate."  But go ahead.

13  THE WITNESS:  Two separate -- as in --

14  MR. MARTIN:  Well, in other words, you were

15 employed by Kaiser at one time.  Then that position

16 ended, and then you rejoined Kaiser at some later

17 time.

18  Q. Is that correct?

19  A. Yes.

20  Q. The first time you were employed with

21 Kaiser, are you saying that that employment began in

22 or around May of 2000?

23  A. Either May of 2000 or 2001.  I'm not 100

24 percent sure.

25  Q. What was your position during your first

33

1  employment with Kaiser?

2       A.   With member services, a member services

3  representative.

4            MR. FRIEDMAN:   Remember that the court

5  reporter needs to write all your words down, so make

6  sure you pronounce clearly and distinctly each word.

7            MR. MARTIN:   Q.   During your first period

8  of employment with Kaiser, did you have any other

9  position other than member services representative?

10      A.   Yes.

11      Q.   What position?

12      A.   I worked in the pharmacy as a pharmacy

13 administrative services supervisor.

14      Q.   How long were you a supervisor in the

15 pharmacy?

16      A.   I don't remember exactly how long.

17      Q.   When did your first period of employment

18 with Kaiser end?

19      A.   I don't remember the date.

20      Q.   Did you resign or were you terminated or

21 something else?

22      A.   I resigned.

23      Q.   Why did you resign?

24      A.   Why did I resign.   There was a number of

25 reasons why I resigned.   Do you want specific

34

| | |
|---|---|
| 1 | A. What do you mean by "problem"? |
| 2 | Q. Well, were you showing up to work on a |
| 3 | regular basis? |
| 4 | A. There was times that I had some absences. |
| 5 | Q. Were you told by anyone at Kaiser that you |
| 6 | had too many absences? |
| 7 | A. Yes, at one point. |
| 8 | Q. Did you agree with that when you were told |
| 9 | that? |
| 10 | A. I believe at that time, yes, regarding my |
| 11 | absences. |
| 12 | Q. What was the reason for your absences at |
| 13 | that time? |
| 14 | A. I don't recall specific instances. |
| 15 | Q. Did your reason for resigning from Kaiser |
| 16 | the first time have anything to do with the fact -- |
| 17 | or did you believe that you were just unable to |
| 18 | perform the job duties that were expected of you? |
| 19 | A. No. |
| 20 | Q. When did your second period of employment |
| 21 | with Kaiser begin? |
| 22 | A. Immediately after I left the first time. |
| 23 | Q. How soon after was it exactly; do you |
| 24 | remember? |
| 25 | A. My start date or when I was told that I had |

37

1    the position?

2         Q.   Well, let's start with when you were told

3    you had the position.

4         A.   I believe it was the same day.

5         Q.   So you resigned from your first period of

6    employment.  And that same day, you were told that

7    there's another position available for you?

8         A.   Nobody told me that there was a position

9    available for me.  I went and spoke with the

10   supervisor and told her that I was looking for a

11   position.  And she had an open position.

12        Q.   What was that open position?

13        A.   Member services representative.

14        Q.   Was that the same position or type of

15   position that you had initially held during your

16   first employment with Kaiser?

17        A.   Yes.

18        Q.   Can you explain why you were interested in

19   a new position with Kaiser when you previously had

20   been told that you weren't wanted there?

21        A.   Because I liked working for Kaiser, and I

22   was good at what I do.

23        Q.   Now, how long after your first employment

24   with Kaiser ended did you actually start your second

25   position at Kaiser?

38

```
 1          A.    I don't recall exactly how many days it

 2   was.

 3          Q.    Was it about a week?

 4          A.    I don't remember exactly.

 5          Q.    Was it at least within the same month or

 6   within a month's time?

 7          A.    Within a month's time?

 8          Q.    Yes.

 9          A.    Yes.

10          Q.    At the time you started your second period

11   of employment with Kaiser, who was your supervisor?

12          A.    Margie Roper.

13          Q.    Was she your direct supervisor the entire

14   time you were employed with Kaiser the second time?

15          A.    Yes.

16          Q.    What were your job duties during your

17   second period of employment with Kaiser?

18          A.    To help patients as they came in.

19          Q.    Can you be more specific as to how you

20   would help patients.

21          A.    When a -- if someone came in and there had

22   been an issue with a doctor where the patient didn't

23   get the help that they needed or the physician was,

24   in their opinion, rude or mean to them, then they

25   would come, and we would get it sorted out.  If it
```

39

| | |
|---|---|
| 1 | was something that they had requested and the doctor |
| 2 | felt that it wasn't appropriate or that they |
| 3 | didn't -- they didn't qualify for it, then we would |
| 4 | discuss it, and we would get back to the doctor and |
| 5 | try to figure out a happy medium for everybody. |
| 6 | Q.    Was it your job to help Kaiser members |
| 7 | resolve any kind of issues they had with any aspect |
| 8 | of their medical care with Kaiser?  Is that fair to |
| 9 | say? |
| 10 | A.    Yes. |
| 11 | Q.    Were those your job duties during the first |
| 12 | time you were employed with Kaiser when you were a |
| 13 | member services representative? |
| 14 | A.    Yes. |
| 15 | Q.    So you're basically going back to the same |
| 16 | job you had had at the very beginning of your first |
| 17 | employment with Kaiser.  Is that fair to say? |
| 18 | A.    Yes. |
| 19 | Q.    Now, during your second employment with |
| 20 | Kaiser, what were your working hours? |
| 21 | A.    We started at 8:30, and the office opened |
| 22 | at 9:00 and worked until 5:00 o'clock. |
| 23 | Q.    Did those hours ever change during your |
| 24 | second period of employment with Kaiser? |
| 25 | A.    No. |

40

| | |
|---|---|
| 1 | weren't given any kind of written materials regarding |
| 2 | Kaiser policies and procedures. Is that fair to say? |
| 3 | A. I don't believe so. |
| 4 | Q. When you received these materials in |
| 5 | connection with your first employment with Kaiser, do |
| 6 | you remember generally what these materials talked |
| 7 | about? |
| 8 | A. No. It's been so long. |
| 9 | Q. At any time during your employment with |
| 10 | Kaiser -- and now I'm talking about both the first |
| 11 | and the second time -- were you aware that Kaiser had |
| 12 | a procedure for obtaining family and medical leave? |
| 13 | A. Yes. |
| 14 | Q. How did you learn about that procedure? |
| 15 | A. When I was in the pharmacy. |
| 16 | Q. And did you learn about it when you were in |
| 17 | the pharmacy because that was a time when you |
| 18 | actually requested family and medical leave? |
| 19 | A. Yes. |
| 20 | Q. So because you needed it, that's when you |
| 21 | came to learn about it. Is that fair to say? |
| 22 | A. Yes. |
| 23 | Q. At the time you requested family and |
| 24 | medical leave during your time in the pharmacy at |
| 25 | Kaiser, what was the procedure you needed to follow |

43

| 1  | July of 2004?                                         |
|----|-------------------------------------------------------|
| 2  | A.   Yes.                                              |
| 3  | Q.   This was for some kind of surgery that you       |
| 4  | had.  Correct?                                         |
| 5  | A.   Yes.                                              |
| 6  | Q.   So as of approximately June and/or July of       |
| 7  | 2004, you were familiar with the procedure for        |
| 8  | requesting and obtaining family and medical leave at  |
| 9  | Kaiser.  Correct?                                      |
| 10 | A.   Yes.                                              |
| 11 | Q.   To your knowledge, did Kaiser at any time        |
| 12 | penalize you for taking this family and medical leave |
| 13 | that you took in 2004?                                 |
| 14 | A.   I don't know.                                     |
| 15 | Q.   To your knowledge, did the company do            |
| 16 | anything to prevent from you taking this leave?       |
| 17 | A.   No.                                               |
| 18 | MR. MARTIN:  I'll introduce the next                  |
| 19 | document.                                              |
| 20 | (Exhibit No. 2 was marked.)                           |
| 21 | MR. MARTIN:  Q.  Mr. daRosa, do you                   |
| 22 | recognize this document that we've marked as          |
| 23 | Defendant's Exhibit 2?                                 |
| 24 | A.   Yes.                                              |
| 25 | Q.   What is this document, to the best of your       |

47

1    knowledge?

2        A.    It's a "Family and Medical Leave Act Rights

3    and Obligations."

4        Q.    Did you receive a copy of this document at

5    or around the time that you requested family and

6    medical leave at Kaiser in 2004?

7        A.    I'm not sure if this came with the

8    paperwork or not.

9        Q.    Do you remember when you first saw this

10   document?

11       A.    As a supervisor in the pharmacy.

12       Q.    So during the time you were supervisor at

13   the pharmacy, you were at least familiar with this

14   document.   Correct?

15       A.    Yes.

16       Q.    And you were familiar with the procedures

17   that it contained?

18       A.    Yes.

19       Q.    And Mr. daRosa, you're claiming in this

20   lawsuit that you suffer from narcolepsy.   Is that

21   correct?

22       A.    Yes.

23       Q.    And in fact, you do suffer from narcolepsy.

24   Is that what you're saying?

25       A.    Yes.

48

1          A.    Yes.

2          Q.    How long have you suffered from narcolepsy?

3          A.    My diagnosis was in 2005.  Yeah, 2005.  But

4    I've been suffering from it -- I don't know for how

5    long.

6          Q.    So you suffered from narcolepsy during your

7    employment with Kaiser.  Is that fair to say?

8          A.    Yes.

9          Q.    During both periods of your employment with

10   Kaiser?

11         A.    I believe so.

12         Q.    Is there any disability you're claiming in

13   this lawsuit other than narcolepsy?

14         A.    No.

15         Q.    Is there any illness or medical condition

16   or some other medical issue that you're claiming as

17   part of your medical leave claim in this lawsuit

18   other than narcolepsy?

19         A.    No.

20         Q.    So narcolepsy is the only medical condition

21   that's the subject of this lawsuit.  Is that fair to

22   say?

23         A.    Yes.

24         Q.    What is your understanding of what

25   narcolepsy is?

1           Q.    Did you see a medical care provider in

2    connection with your sleep or tiredness issues

3    sometime during 2001?

4           A.    I don't remember.

5           Q.    Is it -- do you believe it's possible that

6    you did during those time frames, even if you can't

7    remember exactly?

8           A.    So you would be asking me to guess.

9           Q.    Well, not guess.  I'm asking if you can

10   give a reasonable estimate as to whether you saw a

11   medical care provider for these issues during that

12   time period.

13          A.    I really don't remember when it was.

14          Q.    Okay.

15          A.    So --

16          Q.    Do you know Dr. Frank Dustin?

17          A.    Yes.

18          Q.    Who is he?

19          A.    He's my neurologist at Kaiser Oakland and

20   Alameda.

21          Q.    Have you consulted with him regarding your

22   narcolepsy?

23          A.    Yes.

24          Q.    When was the first time you consulted with

25   Dr. Dustin regarding your narcolepsy?

54

```
 1        A.    But I never thought to think about how many
 2   times it happened.
 3        Q.    Okay.  I'm just asking if you know.  That's
 4   all.
 5        A.    Okay.
 6        Q.    I'm not asking you to guess.  I'm just,
 7   again, asking you for a reasonable estimate, if you
 8   can give one.
 9              And just to make clear, are you giving a
10   reasonable estimate that you believe you fell asleep
11   during work during your second employment with Kaiser
12   more than 50 times?
13        A.    Yes.
14        Q.    Could it have been more than 100 times?
15        A.    It could have.
16        Q.    Do you believe it was more than 100 times?
17        A.    I'm not 100 percent sure.
18        Q.    Did anyone at work ever criticize or
19   counsel you for falling asleep at work?
20        A.    No.
21        Q.    Do you know if anyone else at Kaiser see
22   you -- do you know if anyone else at Kaiser ever saw
23   you fall asleep at work?
24        A.    Yes, but I don't remember their names.
25        Q.    How many people do you believe observed you
```

88

1                    AFTERNOON SESSION

2              (Whereupon, the appearances of all parties

3       having been duly noted for the record, the deposition

4       resumed at 1:23 o'clock p.m.)

5              THE VIDEOGRAPHER:  This is the beginning of

6       Tape 3, Volume 1, for the deposition of Fernando

7       daRosa.  On the record at 1:23.

8              EXAMINATION BY MR. MARTIN (Resumed)

9              MR. MARTIN:  Q.  Mr. daRosa, during the --

10      during your second period of employment with Kaiser,

11      did your narcolepsy ever limit you from doing

12      anything?

13         A.   What do you mean?

14         Q.   During the -- during your second period of

15      employment with Kaiser, did your -- did your

16      narcolepsy limit you from doing or participating in

17      any kind of life activity?  For example, running,

18      walking, thinking.  So with that in mind, let me ask

19      it again.

20             During the -- during your second period of

21      employment with Kaiser, did your narcolepsy ever

22      limit -- limit you from engaging in any particular

23      activities in life?

24         A.   When -- when I was asleep, it would limit

25      me from -- I mean, I couldn't sit down and really

                                                            110

| 1 | watch TV with my kids because I'd fall asleep. I |
|---|---|
| 2 | couldn't have conversations if I'd fall asleep. I |
| 3 | mean, unless I was taking my medication, I would fall |
| 4 | asleep. So I wouldn't be -- I wouldn't fall asleep |
| 5 | running, but -- you know. So it would limit me from |
| 6 | being able to function like other people do because |
| 7 | I'd fall asleep. |
| 8 | Q. So would you say your narcolepsy limited |
| 9 | your ability to communicate with others? |
| 10 | A. If I was sleeping, yes. If I was awake, |
| 11 | no. Is that what you're asking me? |
| 12 | Q. I'm trying. During your second period of |
| 13 | employment with Kaiser, how often did your narcolepsy |
| 14 | limit your ability to communicate with others? |
| 15 | A. I -- I don't know. I -- I don't know. |
| 16 | Q. Other than communicating with others, was |
| 17 | there any other life activity that your narcolepsy |
| 18 | limited you in doing during the second period of your |
| 19 | employment with Kaiser? |
| 20 | A. I'm not sure I -- I don't understand. |
| 21 | Q. Well, I'm asking you to describe for me |
| 22 | what is it in your life that your narcolepsy has |
| 23 | limited you from doing. So far you've identified |
| 24 | communicating with others as something that your |
| 25 | narcolepsy has limited. |

111

1           Now, other than communicating with others,

2    are there any other activities in your life that your

3    narcolepsy has limited you in doing since the

4    beginning of your second period of employment with

5    Kaiser?

6           MR. FRIEDMAN:  You're limiting his prior

7    answer to just communications, but he said function.

8    So do you want him to go back and repeat the various

9    ways in which he's not functioning in life activities

10   when he's sleeping?

11          MR. MARTIN:  Well, "functioning" is not an

12   answer, but "communicating with others" is an answer

13   as to a life activity.  So he's identified that as a

14   life activity that he was limited in.

15          Q.   And I'd like to know if there were any

16   others other than communicating with others.

17          A.   Because of my narcolepsy, because I was so

18   sleepy a lot, my -- I didn't do much out of the house

19   or work.  It was either one or the other.  As far as

20   going out, I -- I didn't.  I didn't much.

21          Q.   When you say you couldn't go out, are you

22   talking just about working or also social kind of

23   situations?

24          A.   A lot of social -- I just -- because I was

25   so tired and I didn't know what it was from, I just

112

1    didn't have any energy to do anything other than

2    basically go to work.  And that became a struggle.

3    So I didn't have much of a life outside of work

4    during that period.  It had gotten progressively

5    worse.  So --

6         Q.   When did you start being unable to or

7    limited in going out socially as a result of your

8    narcolepsy?

9         A.   I don't know.

10        Q.   Do you know how many times you've been

11   prevented or limited from going out --

12        A.   No.

13        Q.   -- because of your narcolepsy?

14        A.   No.

15        Q.   You've said that your narcolepsy has

16   limited you from working.  Is that correct?

17        A.   Yes.

18        Q.   How often have you been prevented from or

19   limited in working as a result of your narcolepsy?

20        A.   I don't remember.

21        Q.   Can you identify any other life activities

22   that you've been limited in doing or prevented from

23   doing as a result of your narcolepsy, other than what

24   you've already described?

25        A.   I don't believe so.

113

1    Q.    At what point did you stop experiencing the

2    limitations and restrictions?

3    A.    I don't know a specific date.  It would

4    have been sometime in 2006.

5    Q.    So let's just talk about, as we sit here

6    today, if you take your medication as prescribed, you

7    don't experience any limitations in any of your life

8    activities.  Is that correct?

9    A.    That's correct.

10    Q.    Okay.  Other than what you've already

11    described, can you identify any other activities in

12    your life that your narcolepsy has limited or

13    restricted you in doing?  Or prevented you?

14    A.    I don't think so.

15    Q.    At any time did narcolepsy affect your

16    ability to perform your job with Kaiser?

17    A.    Yes.

18    Q.    Did it do that during your first period of

19    employment with Kaiser?

20    A.    I don't know.

21    Q.    Well, did your narcolepsy affect your

22    ability to perform your job with Kaiser during your

23    second period of employment with Kaiser?

24    A.    Yes.

25    Q.    When during your second period of

116

TOOKER & ANTZ COURT REPORTING & VIDEO SERVICES  (415-392-0650)

1    employment with Kaiser did narcolepsy affect your

2    ability to perform your job?

3        A.    You mean what day or what time or --

4        Q.    Well, just when, generally.  Are you able

5    to give a general time frame as to when that

6    occurred?

7        A.    No.

8        Q.    Was there any period of time during your

9    second period of employment with Kaiser when

10   narcolepsy did not affect your ability to perform

11   your job?

12       A.    Yes.

13       Q.    What time period was that when your

14   narcolepsy did not prevent you from performing your

15   job functions with Kaiser?

16       A.    When the doctor put me on a -- I don't know

17   what you call it.  On a regiment [sic] or --

18       Q.    On your drug regimen?

19       A.    Yeah.

20       Q.    So are you saying that, during your second

21   period of employment with Kaiser, when you were

22   taking your drugs as prescribed by your doctor, you

23   were fully able to perform all your job functions

24   with Kaiser?  Is that fair to say?

25       A.    At what point?

117

| | |
|---|---|
| 1 | Q. I'm saying at any time during your second |
| 2 | period of employment with Kaiser, when you were |
| 3 | taking your medications as prescribed, were you able |
| 4 | to perform all of your job functions with Kaiser? |
| 5 | A. On a day or -- |
| 6 | Q. I'm just saying generally, when you're |
| 7 | taking your medications as your doctor has instructed |
| 8 | you, were you able to perform your job functions with |
| 9 | Kaiser, during your second period of employment |
| 10 | there? |
| 11 | A. I mean, there would be periods where I |
| 12 | could function. I mean, I didn't -- it wasn't |
| 13 | something that I'd fall asleep eight hours a day, |
| 14 | five days a week. So there were times that I |
| 15 | functioned. So is that what you're asking me? |
| 16 | Q. Well, during the time that you were taking |
| 17 | your drugs as you were supposed to, according to your |
| 18 | doctor -- okay? Do you understand that part so far? |
| 19 | A. Yes. |
| 20 | Q. During any of those times, did you have any |
| 21 | trouble performing your job functions at Kaiser? |
| 22 | A. At some points, no. |
| 23 | Q. But at some times yes? |
| 24 | A. Yes. |
| 25 | Q. Do you know how often you would have |

118

1   trouble performing your job functions at Kaiser, even

2   though you were following your drug regimen?

3       A.   I don't know.

4       Q.   During your second period of employment

5   with Kaiser, what aspect of your job was affected by

6   your narcolepsy?  I know you talked about that a

7   little bit, but I want to get into some more detail

8   now.  So if you could, explain that.

9       A.   If I couldn't stay awake, I couldn't talk

10  to patients.  I couldn't help patients.  If I fell

11  asleep, I couldn't be on the phone talking to

12  someone.  So is that what you're looking for?  I

13  mean, I'd fall asleep.  I couldn't do my job or I

14  would fall asleep talking to somebody so I wouldn't

15  help the person that had come in for help.

16      Q.   Okay.

17      A.   That's how it would affect me.

18      Q.   So would you suffer sleep attacks as part

19  of your narcolepsy?

20      A.   Yes.

21      Q.   And when you're suffering from a sleep

22  attack, you're saying you can't perform any of your

23  job functions.  Is that fair to say?

24      A.   Yes.

25      Q.   During your second period of employment

119

1   with Kaiser, do you know how many times you had a

2   sleep attack at work?

3       A.   I don't know.

4       Q.   Do you have a reasonable estimate?  Say,

5   once a week? twice a week? anything like that that

6   you can give me?

7       A.   I -- I don't know.

8       Q.   Okay.

9       A.   I -- you know, on a day, it could be more

10  than once a day.  So -- but it may not have been

11  every day of the week.  So I'm not sure to try to --

12  I have no idea.

13      Q.   Okay.  Let me try to ask it this way.  Was

14  there any period during your second period of

15  employment with Kaiser when you were having as many

16  as ten sleep attacks a week?

17      A.   I don't know.

18      Q.   Okay.

19      A.   I mean, it's not unreasonable for me to say

20  "yes."  But I'm not 100 percent sure.  Yeah.  I'm

21  just --

22      Q.   Now, does the term "sleep attack"

23  meaning -- does that mean just falling asleep during

24  work because of narcolepsy?  Is there anything more

25  to it than that?

120

```
 1    you asked someone at Kaiser Foundation Health Plan

 2    for an accommodation?

 3         A.    Yeah.

 4         Q.    Could it have been more than 100 times?

 5         A.    It's possible, but I -- I'm not going to

 6    give you a -- yes.  It's possible.

 7         Q.    Did you ever request an accommodation from

 8    anyone other than Margie Roper?

 9         A.    No.

10         Q.    So all these requests, however many there

11    were, you made all these requests toward Margie Roper

12    only.  Is that correct?

13         A.    Yes.

14         Q.    All right.  When was the first time you

15    asked Ms. Roper for an accommodation?

16         A.    I don't remember.

17         Q.    Well, even if you can't remember an exact

18    date, are you able to tie it to some other event?

19    For example, was it one week after some event or one

20    week before another event?  Are you able to place it

21    in time at all that way?

22         A.    I don't know.  I really don't remember.

23         Q.    Well, presumably it would have been after

24    you first notified Ms. Roper that you had narcolepsy.

25    Right?
```

127

1        MR. FRIEDMAN:  Objection.  That assumes

2    facts not in evidence.

3        THE WITNESS:  I had asked before, not

4    knowing it was related to a condition or what it was.

5    So I had asked her long before that.

6        MR. MARTIN:  Q.  Okay.  When was the first

7    time you asked Ms. Roper for an accommodation

8    relating to any sleep issues you were having,

9    regardless of whether you knew it was narcolepsy or

10   not?

11       A.    Sometime after I started at member

12   services, but I don't remember specifically when.

13       Q.    What accommodations did you ask for from

14   Ms. Roper?

15       A.    The temperature in the office was usually

16   pretty high heat-wise, and that makes it worse.

17       Q.    Any other --

18       A.    So --

19       Q.    I'm sorry.  Go ahead.

20       A.    I had asked her if we could turn down the

21   thermostat.

22       Q.    Okay.  Did you ask for any other

23   accommodations from Ms. Roper?

24       A.    I don't remember.  Yeah.  I don't remember

25   if I asked for any specific.

128

1    Q.  So as you sit here today, the only

2    accommodation you can remember asking Ms. Roper for

3    was for the temperature to be lowered in the office.

4    Is that right?

5        A.  Yes.

6        Q.  How many times did you ask Ms. Roper about

7    having the temperature lowered in the office?

8        A.  That was the other question, where -- I

9    don't know how many times.  Over the course of my

10   employment there, it could have easily have been over

11   100.  But I can't give you a specific number.

12       Q.  Okay.  But you think it could have been

13   over 100 times that you asked Ms. Roper for the

14   temperature to be lowered in the office?

15       A.  It's reasonable, yes.

16       Q.  So how did Ms. Roper respond when you asked

17   her for this accommodation?

18       A.  I can't tell you specifically the responses

19   because there was -- there was more than one.  Most

20   of them were that she couldn't adjust it.  And

21   sometimes she would just ignore me and keep walking.

22   But I would say something in passing her.  Sometimes

23   I would go to her office if it was extremely hot, and

24   I would tell her.  And she said, "Well, there's

25   nothing I can do about it."

129

TOOKER & ANTZ COURT REPORTING & VIDEO SERVICES (415-392-0650)

1      Q.   Did you ever talk with anyone in

2   engineering about getting the temperature lowered?

3      A.   I don't believe so.

4      Q.   How much lower did you want the temperature

5   to be?

6      A.   I don't know.  I don't think I had a

7   specific number in my mind.

8      Q.   Well, when you asked Ms. Roper for the

9   temperature to be lowered, did you tell her how much

10  lower you needed the temperature to be?

11     A.   No.

12     Q.   Do you have any idea how she would know how

13  much to lower the temperature if you didn't tell her

14  how much you wanted it lowered by?

15          MR. FRIEDMAN:  Calls for speculation.

16          THE WITNESS:  The question was?

17          MR. MARTIN:  Can you read that back,

18  please.

19               (Record read.)

20          THE WITNESS:  How would I know if she knew

21  how much?  I'm sorry.  One more time.  I'm sorry.

22               (Record read.)

23          THE WITNESS:  I don't know how she would

24  know.

25          MR. MARTIN:  Q.  What was the temperature

132

1    in the office that was apparently too high for you?

2    Do you know what the temperature was?

3         A.    I don't remember.

4         Q.    Did you have an idea as to what you wanted

5    the temperature to be?

6         A.    Just lower.

7         Q.    But you don't know how much lower?

8         A.    No.

9         Q.    Okay.  Well, would one degree lower have

10   helped you?

11        A.    I don't know.

12        Q.    Five degrees you don't know either?

13        A.    No, I don't know.

14        Q.    Okay.  Did any medical care provider tell

15   you that having the temperature lowered in your work

16   area could help you with your sleep issues?

17        A.    I don't know.  I don't remember.

18        Q.    Do you remember learning from any source

19   that lowering the temperature in your surrounding

20   area might help you with your sleep issues?

21        A.    I don't remember how I came to know that.

22        Q.    Any of these conversations you've had with

23   Ms. Roper where you requested an accommodation, did

24   you ever document any of those communications in

25   writing?

133

1      Q.   Do you remember what coworkers you may have

2     spoken to about your narcolepsy?

3      A.   It would have been the same ones as

4     earlier.  I don't remember their names.

5      Q.   The same ones who you think saw you falling

6     asleep?

7      A.   Yes.

8      Q.   During your second period of employment

9     with Kaiser, did anyone at Kaiser say anything

10    derogatory to you about your narcolepsy or relating

11    to your sleep issues in any way?

12     A.   Not that I'm aware of.

13     Q.   During your second period of employment

14    with Kaiser, did you ever miss any work as a result

15    of any sleep issue, including narcolepsy?

16     A.   Did I ever miss any work?

17     Q.   Yes.

18     A.   Yes.

19     Q.   How many times?

20     A.   I don't remember how many times.

21     Q.   Would it have been more than five times?

22          MR. FRIEDMAN:  Are you saying days or

23    periods of time?

24          MR. MARTIN:  I'm talking about times he was

25    out of work.  Whether that be a group of hours or a

139

1   Q. Did you include a fax cover sheet with this

2 document?

3   A. I don't know.

4   Q. Why did you write "Attention Margie" at the

5 top?

6   A. Because I was sending it to Margie.

7   Q. So you wanted to make sure that it actually

8 got to her; correct?

9   A. Yeah. I was sending it to her, yes.

10   Q. What other documents would normally get

11 faxed to the fax machine that you sent this to at

12 member services?

13   A. What other documents?

14   Q. Right.

15   A. Member complaints, some grievances at this

16 point when this was sent. And any number of things

17 that were health plan-related could be sent to that

18 number.

19   Q. So would you say that was a pretty busy fax

20 machine?

21   A. At times, yes.

22   Q. Is it fair to say that you wrote "Attention

23 Margie" on the top of this document because you

24 wanted to make sure that this document got to her,

25 and you didn't want it to be mixed up with any other

156

 1   particular occasion.  What was the first thing she

 2   said to you on this particular occasion?

 3       A.   I don't remember the specifics of the

 4   conversation.

 5       Q.   Do you remember anything she said to you

 6   during this conversation?

 7       A.   Specifically?  I'm sorry.

 8       Q.   Yeah.  Let's go in order here.  Do you

 9   remember anything she said to you during this

10   conversation?

11       A.   Not specifically.

12       Q.   Do you remember generally anything she said

13   to you during this conversation?

14       A.   Something to the extent of that I had too

15   many absences and that I needed to get better or

16   improve.

17       Q.   Do you remember anything that you said

18   during this conversation?

19       A.   I don't remember any specifics.

20       Q.   How about generally?  Do you remember

21   generally anything you said during this conversation?

22       A.   I tried explaining what my absences -- or

23   why I had the absences.  And -- but I don't remember

24   exactly.  I don't remember how I did it.  But I

25   remember talking about it.  And somewhere along the

163

```
 1   what your thought is.
 2            MR. FRIEDMAN:  Well, without more specifics
 3   about what he's signing and what it supposedly says
 4   when he signs it, I think it's overbroad and
 5   ambiguous.
 6            But despite that objection, if you have an
 7   answer to that question --
 8            THE WITNESS:  I don't know if I would or
 9   not.
10            MR. FRIEDMAN:  -- you can give it.
11            MR. MARTIN:  We'll mark the next document.
12   This will be Defendant's Exhibit 5.
13                 (Exhibit No. 5 was marked.)
14            MR. MARTIN:  Q.  Mr. daRosa, do you
15   recognize this document that we've marked as
16   Defendant's Exhibit 5?
17       A.   Yes.
18       Q.   What is this document?
19       A.   It's a -- it's regarding my work attendance
20   record.
21       Q.   Did Ms. Roper give you this document in the
22   course of your communication with her regarding your
23   attendance issues?
24       A.   Did she give me a copy of this?
25       Q.   Yes.
```

1         A.   Yes.

2         Q.   Did she give you this at the beginning of

3    the meeting? at the end? at the middle?  Do you

4    remember when it was?

5         A.   When she actually gave me the copy?

6         Q.   Yes.

7         A.   I believe a copy was at the end.

8         Q.   Does this document refresh your

9    recollection that your meeting with Ms. Roper about

10   your attendance was December 7th, 2005?

11        A.   I mean, yes.  I signed it and dated it

12   December 7th, yes.

13        Q.   Okay.  To your knowledge, is that

14   Ms. Roper's signature on the bottom right?

15        A.   I believe so, yes.

16        Q.   Is that your signature on the bottom left?

17        A.   Yes.

18        Q.   And did you date this document December

19   7th, 2005, right next to your signature?

20        A.   Yes.

21        Q.   Now, you'll see, if you look at this

22   document, there is a list of dates there.

23             Do you see that?

24        A.   Yes.

25        Q.   And each of those dates purports to relate

1     Q.   Did you sign the document in Ms. Roper's

2   presence?

3     A.   Yes.

4     Q.   Then did you give that immediately to

5   Ms. Roper and she gave you a copy of it? How did

6   that work where you were able to get a copy of it?

7     A.   I don't remember exactly when she gave me

8   the copy, if it was -- I don't remember exactly when

9   she gave it to me.

10    Q.   Did you read this document before you

11  signed it?

12    A.   Yes.

13    Q.   Did you tell Ms. Roper at any time that you

14  felt that anything in this document was incorrect?

15    A.   I don't remember.

16    Q.   Did you tell Ms. Roper at any time that you

17  felt anything in this document was inappropriate in

18  any way?

19    A.   I don't remember the exact specifics of the

20  conversation.

21    Q.   As you read this document today -- and you

22  can go ahead and read it if you haven't read it -- is

23  there anything incorrect in this document?

24    A.   Regarding the dates?

25    Q.   Is there anything incorrect?

170

1              MR. MARTIN:  Q.  But as you sit here today,

2     you don't remember what caused you to be absent from

3     July 7th, 2005 through August 22nd, 2005.  Is that

4     correct?

5         A.    That's correct.

6         Q.    What about September 21st, 2005?  Why were

7     you absent that day; do you remember?

8         A.    I don't remember.

9         Q.    Do you remember ever submitting any

10    paperwork to Kaiser in connection with that absence

11    on September 21st, 2005?

12        A.    I don't remember.

13        Q.    Did you ever discuss that absence with

14    anyone at Kaiser?

15        A.    I don't remember.

16        Q.    How about October 3rd, 2005?  Do you

17    remember why you were absent that day?

18        A.    No.

19        Q.    Did you submit any paperwork to Kaiser in

20    connection with that absence?

21        A.    I don't know.

22        Q.    Do you remember discussing that absence

23    with anyone at Kaiser at that time?

24        A.    I don't remember.

25        Q.    How about October 11th, 2005?  Do you

1  remember why you were absent that day?

2      A.   No, I don't.

3      Q.   Did you submit any paperwork to Kaiser in

4  connection with your absence on that day?

5      A.   I don't remember.  I mean --

6           MR. FRIEDMAN:  That's fine.  That's all

7  he's asking for.

8           THE WITNESS:  I don't remember any of them,

9  unfortunately.

10          MR. MARTIN:  Q.  Okay.  Do you remember why

11  you were absent on November 7th, 2005?

12     A.   No.

13     Q.   Did you submit any paperwork to Kaiser in

14  connection with that absence?

15     A.   I don't remember.

16     Q.   Did you discuss that absence with anyone at

17  Kaiser at any time?

18     A.   I don't remember.

19     Q.   Do you recall why you were absent on

20  November 21st, 2005?

21     A.   No, I don't.

22     Q.   Did you submit any paperwork to Kaiser in

23  connection with that absence?

24     A.   I don't remember.

25     Q.   Did you discuss that absence with anyone at

178

1    Kaiser at any time?

2        A.    I don't remember.

3        Q.    Now, next to December 6th, 2005, it says,

4    "Fernando left the department at 12:30 and did not

5    return.  He called and advised he was ill and was

6    going to rest in his car; he later called to inform

7    me that he was still ill and going home."

8            Is that what occurred on December 6th,

9    2005, to the best of your recollection?

10       A.    To the best of my recollection, yes.

11       Q.    Do you remember why you left work at 12:30

12   that day?

13       A.    No, not specifically.

14       Q.    And it says that you called and advised

15   that you were ill.  Do you remember being more

16   specific than that at the time with Ms. Roper?

17       A.    No.  I don't recall the conversation.

18       Q.    The conversation was with Ms. Roper,

19   though; correct?

20       A.    I'm not 100 percent sure.  I don't know.

21       Q.    Okay.

22       A.    I believe so, but --

23       Q.    Did you then tell her that you were going

24   to rest in your car?

25       A.    I don't remember exactly what I told her.

179

TOOKER & ANTZ COURT REPORTING & VIDEO SERVICES  (415-392-0650)

1      Q.   Did you later call to inform Ms. Roper that

2   you were still ill and that you were going home?

3        A.   Yes.  Yes.

4      Q.   At any time when you discussed this

5   attendance issue on December 6th, 2005 with

6   Ms. Roper, did you mention narcolepsy or any

7   sleep-related disorder?

8        A.   I don't remember.

9      Q.   It says for December 7th, 2005, "Fernando

10   called in at approximately noon and advised he was

11   coming to work.  He arrived at approximately

12   1:00 o'clock."

13            Is that a fair description of what

14   happened?

15        A.   I believe so.

16      Q.   Do you know what caused you on that day not

17   to report to work until about 1:00 o'clock?

18        A.   I believe I just didn't -- that morning, I

19   didn't wake up.  I slept until noon, I believe.  I

20   mean, normally -- yeah.  I -- I'm making an

21   assumption.

22      Q.   Okay.  Well, I'm just asking you for your

23   recollection now.

24        A.   I slept that morning.  And as soon as I

25   woke up, I called her.

180

1          Q.    You called Ms. Roper; correct?

2          A.    I don't remember if I called and spoke with

3     her directly or if I spoke with someone else.  I

4     don't remember if it was with her.

5          Q.    Well, whoever you spoke with on this

6     occasion, did you mention narcolepsy or any other

7     sleep-related disorder?

8          A.    I don't remember.

9          Q.    Then if you look at the last paragraph of

10    this memo, starting with the words "Fernando was

11    advised" -- do you see that?

12         A.    Yes.

13         Q.    Looking at the first sentence of that

14    paragraph where it says, "Fernando was advised that

15    he needed to show a marked improvement in his

16    unscheduled time away from work within the next 90

17    days" -- do you see that?

18         A.    Yes.

19         Q.    Did Ms. Roper say that to you during your

20    meeting with her about your attendance issues?

21         A.    I don't remember she discussed that first

22    sentence.  I believe it was just a general

23    conversation about the -- this memorandum.

24         Q.    Then the next sentence says, "Fernando was

25    advised that this is a first level warning, and if

181

```
 1              (Exhibit No. 8 was marked.)
 2              MR. MARTIN:  Q.  Do you recognize this
 3    document that we've marked as Defendant's Exhibit 8?
 4         A.   It's another "Visit Verification/Family
 5    Leave."
 6         Q.   And this document -- I'm sorry.  Go ahead.
 7         A.   Go ahead.
 8         Q.   Okay.  This document pertains to you;
 9    correct?
10         A.   Yes.
11         Q.   Is that to your knowledge Dr. Dustin's
12    signature at the bottom?
13         A.   Yes, I believe.
14         Q.   Did you meet with Dr. Dustin on January
15    24th, 2006?
16         A.   Yes.
17         Q.   Was that a scheduled appointment?
18         A.   Yes.
19         Q.   How far in advance had you scheduled it; do
20    you remember?
21         A.   I don't remember.
22         Q.   Did you regularly schedule appointments in
23    advance with Dr. Dustin?
24         A.   Yes.
25         Q.   Was there anything that caused you to see
```

190

1   Dr. Dustin on January 24th, 2006 other than the fact

2   that you had previously made an appointment with him

3   for that day?

4        A.    Because the medication -- I was falling

5   asleep at work again.  Well, I was falling asleep,

6   not just at work.  But -- so it was talking about my

7   medication.

8        Q.    So at some point before January 24th, 2006,

9   you made an appointment to see Dr. Dustin on January

10  24th, 2006.  Is that correct?

11       A.    Yes.

12       Q.    And the reason why you made that

13  appointment, whenever that may have been, was because

14  you were continuing to fall asleep and your

15  medication wasn't working?

16       A.    That's correct.

17       Q.    But between the time that you made the

18  appointment and January 24th, 2006, you continued to

19  report to work.  Correct?

20       A.    I believe so.

21       Q.    Did you miss any work during the time

22  between you scheduled this appointment and you

23  actually attended the appointment?

24       A.    I'm not sure.

25       Q.    Now, at this appointment with Dr. Dustin on

191

1    January 24th, 2006, what did you tell him?

2         A.    I told him that I was having a hard time

3    staying awake and I didn't know what to do.  So --

4         Q.    Anything else?

5         A.    No.  I mean, that's what I told him.

6         Q.    Did you ask to be put off work at this

7    time?

8         A.    No, I did not.

9         Q.    Did you want to be put off work at this

10   time?

11        A.    No, I did not.

12        Q.    Were you able to work full-time at this

13   time?

14        A.    Was I able to work full-time on January

15   24th?

16        Q.    Yeah.  As of that date, were you able to

17   work full-time?

18        A.    No.

19        Q.    Why not?

20        A.    Because I would fall asleep, and I couldn't

21   control when I fell asleep.

22        Q.    At the time you got this visit verification

23   form from Dr. Dustin, when was the last time you had

24   fallen asleep during working hours?

25        A.    I don't remember specifically when it was.

192

```
 1              MR. FRIEDMAN:  Objection.  That misstates
 2   the testimony.
 3              THE WITNESS:  It was 5:00 o'clock.  Her
 4   door was shut.  It wasn't customary for us to
 5   interrupt her with her door closed, so I did the next
 6   best thing.
 7              MR. MARTIN:  Q.  Have you ever confirmed
 8   that Ms. Roper did, in fact, receive this copy of the
 9   note that you left in her mailbox?
10        A.   I have never spoken with Ms. Roper since
11   this incident, since that day.
12        Q.   So that means no, you've never confirmed
13   that.  Correct?
14        A.   Correct.
15        Q.   Was this verification form that we're
16   looking at, Defendant's Exhibit 8 -- was it also
17   transmitted to Kaiser Foundation Health Plan by fax?
18        A.   Yes, it was, this Exhibit 8.
19        Q.   Did you fax it?
20        A.   No, I did not.
21        Q.   Who did?
22        A.   My girlfriend.
23        Q.   Did you ask her to fax it?
24        A.   Yes.
25        Q.   Now, if you had already hand-delivered it
```

211

1          A.    I had my girlfriend fax it.

2          Q.    Okay.  Did she do anything to ensure that

3     the document would actually be sent to Ms. Roper

4     specifically?

5               MR. FRIEDMAN:  Calls for speculation.

6               THE WITNESS:  She faxed it to the number

7     that I gave her.  So --

8               MR. MARTIN:  Q.  Well, if you knew

9     previously to write "Attention Margie" on a similar

10    document before, why didn't you do that this time?

11              MR. FRIEDMAN:  Assumes facts not in

12    evidence.

13              Go ahead.

14              THE WITNESS:  I didn't physically fax it,

15    so I didn't write it on there.

16              MR. MARTIN:  Q.  But did anything stop you

17    from writing "Attention Margie" or something like

18    that on top of the document before you gave it to

19    your girlfriend to fax?

20         A.    Did anything stop me?  No, nothing stopped

21    me from doing it.

22         Q.    So is there a reason why you didn't do

23    that?

24         A.    No.

25         Q.    Now, after this document was faxed, did you

216

1    that it was faxed to member services.

2              MR. MARTIN:  Q.  But --

3         A.   So to me, it was a confirmation that she

4    received it.

5         Q.   Is there something on that document that

6    says Ms. Roper actually received it?

7         A.   No.  There's nothing on this piece of paper

8    that says --

9         Q.   In fact, there nothing on that document

10   that even indicates that it's intended for Ms. Roper.

11   Right?

12        A.   That's correct.

13        Q.   So have you ever received any confirmation

14   that Ms. Roper actually received that document in any

15   form?

16        A.   At some point, I received a confirmation

17   that she received it.

18        Q.   And when was that?

19        A.   I don't remember the specific date.

20        Q.   Well, how long after your termination was

21   it, if it was after your termination?

22        A.   It was.  I don't remember the specific

23   dates.

24        Q.   Okay.  Was it a month after your

25   termination?  Was it two months?

222

| | |
|---|---|
| 1 | anyone at Kaiser Foundation Health Plan about |
| 2 | anything other than the voicemail that you say you |
| 3 | left for Ms. Roper? |
| 4 | A.    I don't believe so. |
| 5 | Q.    Did anyone at Kaiser Foundation Health Plan |
| 6 | contact you or attempt to contact you, to your |
| 7 | knowledge? |
| 8 | A.    Not to my knowledge, no. |
| 9 | Q.    Obviously, you were terminated from your |
| 10 | employment at Kaiser Foundation Health Plan; correct? |
| 11 | A.    Yes. |
| 12 | Q.    Do you have any basis for believing that, |
| 13 | at the time you were terminated, Ms. Roper knew that |
| 14 | your doctor had put you on a leave of absence, other |
| 15 | than what we've already described? |
| 16 | A.    Do I believe that she knew? |
| 17 | Q.    Well, I'm asking what basis you have, if |
| 18 | any, for believing that, at the time you were |
| 19 | terminated, Ms. Roper actually knew that your doctor |
| 20 | had put you on a leave of absence. |
| 21 | MR. FRIEDMAN:  Other than what he already |
| 22 | testified to? |
| 23 | MR. MARTIN:  Yes, yes.  We don't have to go |
| 24 | through that again. |
| 25 | THE WITNESS:  No, nothing. |

226

```
 1    it was faxed, so I don't know who picked it up from
 2    the fax machine.  When she took it in, she said that
 3    she dropped it off on the door, on her door.  So I
 4    don't believe that she had any conversation.  Other
 5    than her, I don't know who else would know other than
 6    the doctor and myself and Anastacia and Margie Roper.
 7         Q.   Anyone in management at Kaiser Foundation
 8    Health Plan other than Ms. Roper?  Any reason to
 9    believe that anyone in such a management position
10    knew about the verification form that you say you
11    left for Ms. Roper and had faxed?
12              MR. FRIEDMAN:  Objection.  Vague as to
13    time.  In terms of --
14              MR. MARTIN:  Okay.  At the time that he was
15    terminated.
16              MR. FRIEDMAN:  Okay.
17              THE WITNESS:  I don't know who knew about
18    the verification form at the time I was terminated.
19    I don't know who knew.
20              MR. MARTIN:  Okay.  We'll mark the next
21    document as Defendant's Exhibit 9.
22                   (Exhibit No. 9 was marked.)
23              MR. MARTIN:  Q.  Mr. daRosa, do you
24    recognize this document that we've marked as
25    Defendant's Exhibit 9?
```

228

|    |    |                                                       |
|----|----|-------------------------------------------------------|
| 1  | A. | Yes.                                                  |
| 2  | Q. | What is this document?                                |
| 3  | A. | It's a termination letter.                            |

4        Q.   Does this appear to be a true and correct

5   copy of the termination letter you received that

6   ended your employment with Kaiser Foundation Health

7   Plan?  Other than the number stamp at the bottom that

8   says "0077," which obviously wouldn't have existed at

9   the time.  Other than that number, does this appear

10  to be a true and correct copy of your termination

11  letter?

12       A.   It appears to be, yes.

13       Q.   On what date did you receive this letter?

14       A.   I'm not sure.

15       Q.   Do you remember how long it was after

16  January 31st, 2006?

17       A.   I don't remember specifically.  I -- I

18  don't remember the specific amount of days.

19       Q.   The address that's listed for you on here,

20  2818 East Avenue in Hayward, was that your address as

21  of January 31st, 2006?

22       A.   Yes, it was.

23       Q.   And that was your address as of the time

24  you received this letter.  Correct?

25       A.   Yes.

229

1    you seen it before right now?

2         A.   Yes.

3         Q.   To your knowledge, is this a true and

4    correct copy of the amended complaint that's been

5    filed on your behalf in this lawsuit?

6         A.   Yes.

7         Q.   Did you review this document before it was

8    filed?

9         A.   I don't know.

10        Q.   Do you recall that there was an original

11   complaint that was filed on your behalf in this case?

12        A.   I don't know.  I'm not a -- I don't know.

13        Q.   Well, Defendant's Exhibit 16 is an amended

14   complaint.  Did you understand when you reviewed this

15   document that it was amending something?

16        A.   I don't remember.

17        Q.   Other than what you've already described,

18   is there any other way you feel Kaiser mistreated you

19   due to your disability?

20        A.   No.  I don't believe so, no.

21        Q.   Now, you're claiming in this lawsuit that

22   Kaiser denied you leave.  Is that correct?

23        A.   That's correct.

24        Q.   And the leave you're claiming you were

25   denied was the leave that Dr. Dustin put you on

1    effective January 25th, 2006?

2        A.    Yes.

3        Q.    Is there any other leave you're claiming

4    that Kaiser denied you?

5        A.    No.

6        Q.    Other than what you've already described,

7    is there any other way Kaiser mistreated you with

8    respect to any leave issue?

9        A.    I don't believe so.

10            MR. FRIEDMAN:    That's inclusive of the

11    things he's testified to about today.

12            MR. MARTIN:    Well, I said other than what

13    he's already described.

14            MR. FRIEDMAN:    All right.

15            MR. MARTIN:    Q.    Now, you're claiming in

16    this case that Kaiser wrongfully terminated you.

17    Correct?

18        A.    Correct.

19        Q.    Do you have an understanding as to what you

20    believe Kaiser's wrongful basis was for terminating

21    you?

22        A.    Do I have a belief?

23        Q.    Right.

24        A.    On why they did it?

25        Q.    What was their -- what was you -- what do

276

1    you believe was the wrongful basis Kaiser used to

2    terminate you?

3              MR. FRIEDMAN:  I would instruct you not to

4    answer to the extent that it reveals things that I've

5    talked to you about.  But other than -- if you can

6    have some independent basis to answer that without

7    divulging attorney-client privilege, then you can do

8    it.  But otherwise, don't discuss what I said about

9    it.

10             THE WITNESS:  Not anything other than what

11   was on this piece of paper, what was on my

12   termination letter.

13             MR. MARTIN:  Q.  Okay.  Do you believe that

14   Kaiser terminated you as some kind of punishment for

15   requesting leave?

16        A.   I don't know why.

17        Q.   Do you believe that Kaiser terminated you

18   as punishment for being disabled?

19        A.   I don't know why.

20        Q.   Do you believe that Kaiser terminated you

21   as punishment for seeking an accommodation for a

22   disability?

23        A.   Again, I don't know why.

24        Q.   So is it fair to say that you don't know

25   why Kaiser terminated you?

277

```
 1          A.   I know why they terminated me.  Well, I
 2    know what it says in this letter.
 3          Q.   Okay.
 4          A.   Because it's the letter that I received.
 5          Q.   Do you believe that that letter, the
 6    termination letter -- the reason contained in that
 7    letter is not the real reason why you were
 8    terminated?
 9          A.   No.
10               MR. MARTIN:  Could you read back that
11    question and answer, please.
12                    (Record read.)
13               MR. FRIEDMAN:  You got a double negative.
14               MR. MARTIN:  Yeah.  All right.  So let me
15    rephrase.
16          Q.   Do you believe you were terminated for any
17    reason other than the reason that's stated in that
18    letter?
19          A.   I believe there's another reason.  The
20    reason, I don't know why.
21          Q.   Okay.  So you believe there's another
22    reason, but you don't know what the reason is.  Is
23    that correct?
24          A.   Yes.
25          Q.   Okay.  You're claiming that Kaiser
```

278

1    stresses other than what you claim to have

2    experienced from Kaiser since your termination?

3         A.    I don't think so.

4         Q.    Have you had any problems with your family

5    since you were terminated from Kaiser?

6              MR. FRIEDMAN:  Objection.  It's vague.

7              THE WITNESS:  In -- what do you mean?

8              MR. MARTIN:  Q.  Well, you're talking about

9    having experienced emotional distress since your

10   termination.  What I'm trying to find out is if

11   you've had any issues or problems with your family

12   that have also caused you emotional distress during

13   this same time period.

14        A.    No.

15        Q.    Has your emotional distress -- at any time

16   since your employment with Kaiser, since your

17   termination from Kaiser, has it ever prevented you

18   from working?

19        A.    No.

20        Q.    By the way, at some point, did any

21   physician clear you to return to work full-time?

22        A.    I believe Dr. Dustin did.

23        Q.    Do you remember when that was that you were

24   cleared to return to work?

25        A.    I don't remember the exact date.

1          Q.    He put you on a leave of absence for two

2    months starting toward the end of January 2006.

3    Correct?

4          A.    Yes.

5          Q.    Did he -- and eventually extend that leave

6    by another month?  Do you recall?

7          A.    I'm not sure if it was a whole month or --

8    but he extended it.

9          Q.    At some point, did he tell you that you

10   were free to return to full-time work or any kind of

11   work?

12         A.    Yes.

13         Q.    When did he tell you that?

14         A.    I don't remember exactly when.

15         Q.    How long after you were terminated from

16   Kaiser was it, if you can remember?

17         A.    I don't remember.

18         Q.    Was it sometime in 2006?

19         A.    Yes.

20         Q.    And you don't remember more specifically

21   when it was in 2006?

22         A.    Somewhere near the beginning of 2006.

23         Q.    Well, it couldn't have been before, say,

24   the end of April 2006 because that was when

25   Dr. Dustin had you on leave from work.  Correct?

1       A.    That's correct.

2       Q.    Okay.

3             MR. FRIEDMAN:  Well, I thought it was

4    March.

5             MR. MARTIN:  Well, March was the first two

6    months, and then it was extended for some other

7    period of time, about a month.

8       Q.    So what I'm trying to figure out is when

9    Dr. Dustin finally told you that you could return to

10   work.

11      A.    I don't remember exactly when he told me.

12      Q.    But you remember it was sometime in 2006?

13      A.    Yes.

14      Q.    Before your termination, had you ever been

15   treated for emotional distress by any medical

16   practitioner?

17      A.    No.

18      Q.    Have you taken any medication for your

19   emotional distress as allegedly caused by Kaiser?

20      A.    No.

21      Q.    Are there any symptoms of emotional

22   distress that you experienced following your

23   termination as caused by Kaiser that you feel you

24   don't experience anymore?

25      A.    Um, that first feeling of -- that -- of --

293

TOOKER & ANTZ COURT REPORTING & VIDEO SERVICES  (415-392-0650)

```
 1              CERTIFICATE OF DEPOSITION OFFICER

 2              I, CYNTHIA LEW, CSR 11999, duly authorized

 3    to administer oaths, hereby certify that at the

 4    commencement of the foregoing deposition, the witness

 5    stated, under penalty of perjury, that he or she

 6    would testify the truth, the whole truth, and nothing

 7    but the truth in the within-entitled cause; that said

 8    deposition was taken at the time and place therein

 9    stated; that the testimony of said witness was

10    reported by me by me and was thereafter transcribed

11    by me or under my direction into typewriting by

12    computer; that the foregoing is a full, complete, and

13    true record of such testimony; and that the deponent

14    or a party requested review of the deposition prior

15    to the completion of the deposition; and that the

16    deponent was given an opportunity to review the

17    deposition.

18              I further certify that I am not of counsel

19    nor attorney for either or any of the parties in the

20    foregoing deposition and caption named, nor in any

21    way interested in the outcome of the cause named in

22    said caption.

23                                    DEPOSITION OFFICER

24    I hereby certify this copy is a
      true and exact copy of the original.
25                                    DATED: JUN 11 2008
```