Exhibit "G"

```
 1                UNITED STATES DISTRICT COURT
 2               NORTHERN DISTRICT OF CALIFORNIA
 3                        ---oOo---
 4
 5   FERNANDO DAROSA,
 6                Plaintiff,
 7         vs.                        No. 3:07-CV-03114-SI
 8   KAISER FOUNDATION HEALTH PLAN,
     INC.,
 9
                 Defendant.
10   _____/
11
12
13            DEPOSITION OF ANASTACIA FREITAS
14              Tuesday, June 10, 2008
15
16
17                    CERTIFIED COPY
18
19
20
21   REPORTED BY: CYNTHIA LEW, RPR, CSR No. 11999
22
23                     TOOKER & ANTZ
              COURT REPORTING & VIDEO SERVICES
24             350 SANSOME STREET, SUITE 700
              SAN FRANCISCO, CALIFORNIA 94104
25                   (415) 392-0650
```

1    Q.    And when you say "it didn't seem right,"
2  that's your opinion, that there weren't enough
3  absences for him to be counseled for?
4    A.    Yeah, for him to be written up for.
5    Q.    Did you fear that Mr. daRosa might be
6  terminated if he didn't improve his attendance?
7    A.    No, I never thought that.  No.  I didn't
8  think that at the time, no.
9    Q.    Did Mr. daRosa express that concern to you
10  at the time?
11    A.    No, he didn't.
12    Q.    Did he tell you at the time that he was
13  going to try and improve his attendance?
14    A.    No.
15    MR. FRIEDMAN:  Objection.  Asked and
16  answered.
17    MR. MARTIN:  We'll mark the next document
18  as Defendant's Exhibit 3.
19        (Exhibit No. 3 was marked.)
20    MR. MARTIN:  Q.  Do you recognize this
21  document that we've marked as Defendant's Exhibit 3?
22    A.    Yes.
23    Q.    To your knowledge, what is this document?
24    A.    It's a work slip.
25    Q.    And to your knowledge, what was this work

1    slip for?

2    A.   It was his doctor's appointment for his

3    sleep, and he had been put off of work for two

4    months.

5    Q.   When was the first time you saw this

6    document?

7    A.   I saw it the night he brought it home.

8    Q.   What -- what was the date?

9    A.   The 24th.

10    Q.   That's January 24th, 2006?

11    A.   Yes.

12    Q.   He showed it to you that night?

13    A.   Yes.

14    Q.   This was at home that night when he showed

15    it to you?

16    A.   Yes.

17    Q.   The document that he showed to you, do you

18    remember what color it was?

19    A.   I believe it was yellow.

20    Q.   Do you remember if there were actually two

21    copies of the document?  Was it more than one page?

22    A.   It was just one page.

23    Q.   Just the one page that you believe was

24    yellow?

25    A.   Right.

1   Mr. daRosa said to you when he first called this
2   document to your attention?
3       A.   No.
4       Q.   Do you remember anything that you said to
5   him during this same conversation?
6       A.   No.
7       Q.   Before you became aware of this document,
8   had Mr. daRosa ever expressed a desire to be put off
9   work?
10      A.   No, he didn't.
11      Q.   When he asked you to fax the document, what
12  did you say in response, if anything?
13      A.   I would.
14      Q.   Did he ask you to do anything with the
15  document other than fax it?
16      A.   No.
17      Q.   Did he give you any information as to how
18  or where to fax the document?
19      A.   He gave me the number, the fax number.
20      Q.   Which fax number did he give you?
21      A.   I -- I don't recall.
22      Q.   Well, even if you don't remember maybe what
23  the actual fax number was, do you remember generally
24  where this fax machine was that you would be faxing
25  this document to?

68

1   A. To member services.
2   Q. I see. Did he write down the number for
3 you on a piece of paper?
4   A. Yes.
5   Q. Do you know what happened to that piece of
6 paper?
7   A. I don't know.
8   Q. Did Mr. daRosa give you a cover sheet to
9 fax along with the document?
10  A. No.
11  Q. Did you create a cover sheet to fax with
12 the document?
13  A. No.
14  Q. Did you put anywhere on the document any
15 indication as to whom the document was intended for?
16  A. No.
17  Q. I assume that, when you faxed it, you
18 intended it to be received by Ms. Roper. Correct?
19  A. Correct.
20  Q. When Mr. daRosa asked you to fax the
21 document, did he give you the name of any particular
22 person to fax the document to?
23  A. No.
24  Q. Did you talk about preparing a cover sheet?
25  A. No.

1    Q.  On the occasion when you faxed this
2  document that we're looking at as Defendant's Exhibit
3  3, what caused you to decide not to include with the
4  fax any indication that it was intended for Margie
5  Roper?
6        MR. FRIEDMAN:  Objection.  Assumes facts
7  not in evidence.
8        If you have an answer, you can --
9        THE WITNESS:  No.  I don't know.
10       MR. MARTIN:  Q.  You knew that other people
11  worked in the member services department.  Correct?
12    A.  Yes.
13        MR. FRIEDMAN:  Asked and answered.
14       MR. MARTIN:  Q.  So when you faxed this
15  document, what was your understanding as to how
16  anyone would know it was for Margie Roper?
17    A.  I don't know.
18    Q.  Did you consider including a cover sheet
19  with Margie Roper's name on it?
20    A.  No.
21        MR. FRIEDMAN:  I believe that's asked and
22  answered as well.
23       MR. MARTIN:  Q.  Did you consider putting
24  on the document itself some kind of indication that
25  it was intended specifically for Margie Roper?

1           MR. FRIEDMAN:  Objection.  Asked and
2    answered.
3           Go ahead.  You can answer it again, though.
4           THE WITNESS:  No.
5           MR. MARTIN:  Q.  Ultimately, you did fax
6    the document to member services.  Correct?
7      A.   Yes.
8      Q.   Do you remember the date and time that you
9    faxed it?
10     A.   Well, I started work at 8:00 in the
11   morning.  And I faxed it about two or three times,
12   and it came back failed.  It wasn't going through.
13   And I wanted to make sure it got there before they
14   opened the office -- opened member services.  So then
15   finally it was transmitted, and I got a copy showing
16   that it had been transmitted.
17     Q.   How did you know that the fax had initially
18   failed?
19     A.   Because we get confirmation after we fax
20   something.
21     Q.   So there was some kind of printed
22   confirmation that the fax had failed a couple of
23   times?
24     A.   Correct.
25     Q.   Do you remember what you did with those

CERTIFICATE OF DEPOSITION OFFICER

I, CYNTHIA LEW, CSR 11999, duly authorized to administer oaths, hereby certify that at the commencement of the foregoing deposition, the witness stated, under penalty of perjury, that he or she would testify the truth, the whole truth, and nothing but the truth in the within-entitled cause; that said deposition was taken at the time and place therein stated; that the testimony of said witness was reported by me by me and was thereafter transcribed by me or under my direction into typewriting by computer; that the foregoing is a full, complete, and true record of such testimony; and that the deponent or a party requested review of the deposition prior to the completion of the deposition; and that the deponent was given an opportunity to review the deposition.

I further certify that I am not of counsel nor attorney for either or any of the parties in the foregoing deposition and caption named, nor in any way interested in the outcome of the cause named in said caption.

_____
                    DEPOSITION OFFICER

I hereby certify this copy is a true and exact copy of the original.

_____     DATED: JUN 2 4 2008

TOOKER & ANTZ COURT REPORTING & VIDEO SERVICES
(415) 392-0650

168