1   JEREMY L. FRIEDMAN, CA Bar No. 142659
    Attorney At Law
2   2801 Sylhowe Road
    Oakland, CA 94602
3   Telephone: (510) 530-9060
    Facsimile: (510) 530-9087
4   jlfried@comcast.net

5   KELLER LAW, PC
    CHRISTOPHER J. KELLER, ESQ. (SBN 178491)
6   One Market Street, Spear Tower, 36th Floor
    San Francisco, CA  94105
7   Telephone:  (415) 293-7805
    Facsimile:   (415) 203-8001
8   ckeller@kellerlawpc.com

9   Attorneys for plaintiff Fernando daRosa

10
                    UNITED STATES DISTRICT COURT
11
                  NORTHERN DISTRICT OF CALIFORNIA
12

13  FERNANDO DAROSA,                    )   Case No. 3:07-cv-03114-SI
                                        )
14      Plaintiff,                      )   **NOTICE OF MOTION AND MOTION**
                                        )   **FOR PARTIAL SUMMARY**
15  vs.                                 )   **JUDGMENT; MEMORANDUM OF**
                                        )   **POINTS AND AUTHORITIES**
16  KAISER FOUNDATION HEALTH            )
    PLAN, INC.                          )
17                                      )   Date:  October 31, 2008
        Defendant.                      )   Time: 9:00 a.m.
18  _____    )   Crtrm: Hon. Susan Illston

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

MEMORANDUM OF POINTS AND AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . 2

   INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

   STATEMENT OF THE FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      Diagnosis in July 2005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      Dr. Dustin Ordered Medical Leave . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      Roper Informed of Leave for Medical Reasons . . . . . . . . . . . . . . . . . . . . . . . 3

      Problems During Return to Work Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      Plaintiff Informed Roper of his Narcolepsy . . . . . . . . . . . . . . . . . . . . . . . . 6

      Roper Disciplined Plaintiff for Medically-Related Absences . . . . . . . . . . . . . . 6

      Dr. Dustin Ordered Medical Leave No. 2 . . . . . . . . . . . . . . . . . . . . . . . . . 7

      Plaintiff Was Terminated January 27, 2006 for his Absences . . . . . . . . . . . . . 9

      No Leave of Absence Was Offered or Discussed by Roper . . . . . . . . . . . . . . 10

      Plaintiff Sought Return to Job . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

      Plaintiff Failed to Regain His Job . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

   SUMMARY JUDGMENT STANDARDS . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

   ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

I.   Plaintiff's Termination Was Covered by Federal and State Statutes Protecting
     Rights to Medical Leave and Barring Disability Discrimination at Work . . . . . 15

     A.   Plaintiff is a Qualified Individual with a Physical Disability . . . . . . . . 15

     B.   Plaintiff was Eligible for Medical Leave Protection . . . . . . . . . . . . . . . 19

II.  Kaiser Violated These Statutes When It Terminated Mr. daRosa Because He
     Needed a Medical Leave for His Disability and Serious Medical Condition . . . 20

III. Kaiser Violated These Statutes When It Neither Engaged Plaintiff in a
     Discussion of Reasonable Accommodations nor Offered a Leave of Absence . 22

IV. Kaiser Violated These Statutes When It Failed to Keep Plaintiff's Job Open To
     Him After He Was Able to Return to Work . . . . . . . . . . . . . . . . . . . . . . . . . 24

   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

1

**TABLE OF AUTHORITIES**

2

<u>Cases</u>

3

*American National Ins. Co. v. Fair Employment & Housing Com.*,
32 Cal.3d 603 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   17

4

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)  . . . . . . . . . . . . . . . . . . .   14

5

*Bachelder v. America West Airlines, Inc.* 259 F.3d 1112 (9th Cir. 2001) . . . . . . . . . .   21

6

*Bragdon v. Abbott*, 524 U.S. 624 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   16

7

*Brown v. Lucky Stores*, 246 F.3d 1182 (9th Cir. 2001)  . . . . . . . . . . . . . . . . . . . .   22

8

*Claudio v. Regents of the University of California*, 134 Cal.App. 4th 224 (2006) . . . . .   22

9

*Colmenares v. Braemar Country Club, Inc.*, 29 Cal. 4th 1019 (2003) . . . . . . . . . . . .   17

10

*Dudley v. Dep't of Transp.*, 90 Cal.App.4th 255 (2001) . . . . . . . . . . . . . . . . . . . . .   19

11

*Faust v. California Portland Cement Co.*, 150 Cal. App. 4th 864 (2007)  . . . . . . . . . .   21

12

*Fraser v. Goodale*, 342 F.3d 1032 (9th Cir. 2003)  . . . . . . . . . . . . . . . . . . . . . . . .   16

13

*Green v. State of California*, 42 Cal. 4th 254 (2007) . . . . . . . . . . . . . . . . . . . . .   16, 20

14

*Hanson v. Lucky Stores*, 74 Cal. App. 4th 215 (1999) . . . . . . . . . . . . . . . . . . . . . .   24

15

*Humphrey v. Mem'l Hosp. Ass'n*, 239 F.3d 1128 (9th Cir. 2001) . . . . . . . . . . . . . .   22

16

*Jensen v. Wells Fargo Bank*, 85 Cal App. 4th 245 (2000) . . . . . . . . . . . . . . . . . . . .   22

17

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)  . . . . . .   15

18

*Morgan v. Regents of University of California*,  88 Cal.App.4th 52 (2000) . . . . . . . . .   20

19

*Prilliman v. United Air Lines,* 53 Cal. App. 4th 935 (2d Dist. 1997) . . . . . . . . . . . . .   22

20

*Snead v. Metro. Prop. & Cas. Ins.*, 237 F.3d 1080 (9th Cir. 2001) . . . . . . . . . . . . . .   22

21

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) . . . . . . . . . . . . . . . . . . . . . . . .   20

22

*Toyota Motor Mfg. Ky. Inc. v. Williams*, 534 U.S. 184 (2002) . . . . . . . . . . . . . . . . . .   16

23

*TransWorld Airlines, Inc. v. Thurston* 469 U.S. 111 (1985)  . . . . . . . . . . . . . . . . . . .   20

24

*Ujagar v. Campbell's Soup Co.*, 2006 U.S. Dist. LEXIS 92131 (E.D. Cal. 2006) . . . .   22

25

*Walton v. United States Marshals Serv.*, 492 F.3d 998 (9th Cir. 2007) . . . . . . . . . . .   16

26

*Wares v. VanBebber*, 319 F. Supp. 2d 1237 (D.Kan 2004) . . . . . . . . . . . . . . . . . . .   14

27

*Wong v. Regents of Univ. of Cal.*, 379 F.3d 1097 (9th Cir. 2004), *as amended by* 410
F.3d 1052 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15

28

*Xin Liu v. Amway Corp.* 347 F.3d 1125 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . .    21

<u>Stautes</u>

Americans with Disabilities Act (ADA), 42 U.S.C. §§12101-12213  . . . . . . . .   1, 15, 16

California Family Rights Act (CFRA), Cal. Govt. Code §12945.2   . . . . . . . . . .   1, 15, 19

Fair Employment and Housing Act (FEHA),
California Government Code 12940, *et seq.*  . . . . . . . . . . . . . . . . . . . . . .  1, 15-17, 22

Family and Medical Leave Act (FMLA), 29 U.S.C. §§2601 *et seq.*  . . . . . . . . . .   1, 15, 19

Federal Rules of Civil Procedure, Rule 56 . . . . . . . . . . . . . . . . . . . . . . . . . . .   1, 14, 15

Federal Rules of Civil Procedure, Rule 56(c)  . . . . . . . . . . . . . . . . . . . . . . . . . . .   14

Local Civil Rule 56-3  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14, 15

<u>Regulations and Other Authorities</u>

2 Cal. Admin. Code §7297.10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19

29 C.F.R. §1630.2(j)(3)(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   16

Sinkler v. Midwest Prop. Mgmt. Ltd. P'ship, 209 F.3d 678 (7th Cir. 2000) . . . . . . . . .   16

William W. Schwarzer, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact,* 99 F.R.D. 465 (1984)  . . . . . . . . . . . . . . . . . . . . . . . . . . .   14

**NOTICE OF MOTION AND MOTION**

TO DEFENDANT AND ITS ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that plaintiff Fernando daRosa, on October 31, 2008, at 9:00 a.m., or as soon thereafter as the matter may be heard in the Courtroom of the Honorable Susan Illston, United States District Court Judge for the Northern District of California, will seek an order from the Court granting him partial summary judgment in this case on issues of liability..

This motion is brought under Rule 56 of the Federal Rules of Civil Procedure. The grounds for this motion are that, based upon the undisputed facts in this case, plaintiff is entitled to partial judgment as a matter of law that defendant violated the Americans with Disabilities Act (ADA) (42 U.S.C. §§12101-12213), the Fair Employment and Housing Act (FEHA) (California Government Code 12940, *et seq.*), the Family and Medical Leave Act (FMLA) (29 U.S.C. §§2601 *et seq.*) and the California Family Rights Act (CFRA) (Cal. Govt. Code §12945.2).  In particular, plaintiff will seek an order (1) deeming for purposes of trial that plaintiff suffers from a disability and medical condition, as covered by these statutes; and holding defendant liable for (2) terminating plaintiff due to his disability and need for medical leave, (2) failing to engage plaintiff in an interactive process over reasonable accommodations prior to his termination, (3) failing to provide medical leave, and (4) failing to keep Mr. daRosa's job open to him after he was capable of returning to his former position.

This motion is based on this notion of motion, the attached Memorandum of Points and Authorities, the declaration of plaintiff Fernando daRosa, the declaration of counsel, the deposition testimony and documents submitted therewith, the files and pleadings in this case and any additional argument or evidence presented at the hearing.

///

///

///

1

2

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

3    Plaintiff Fernando daRosa does not need a jury trial to win a judgment on Kaiser's

4    violation of federal and state laws protecting disabled workers and the right to medical

5    leave.   Instead, he should be granted partial summary judgment on liability.   In January

6    2006, Mr. daRosa was a five-year employee at Kaiser and was working in Member

7    Services, a division of Kaiser responsible for responding to inquiries and complaints by

8    patients about the quality of their care.   When plaintiff's physician took Mr. daRosa off

9    work for two periods due to his medical condition – Narcolepsy – plaintiff's supervisor

10    disciplined and then terminated him for his absences, without discussion of reasonable

11    accommodation or medical leave.   His supervisor's manager was unaware of the medical

12    reasons behind plaintiff's absences, and on this record the manager admitted he would

13    not have approved the termination had he been told the truth.   And yet for 15 months

14    after Mr. daRosa was fired, he attempted with no success to regain his job at Kaiser, as

15    defendant continued to violate and ignore its statutory responsibilities.

16    **STATEMENT OF THE FACTS**

17    **Diagnosis in July 2005**

18    July 1, 2005, was the first visit where Dr. Frank Dustin – a neurologist at Kaiser's

19    Oakland medical facility – suspected Mr. daRosa suffered from Narcolepsy (Dustin RT II

20    (Pl.'s Exh. 1), at 208:10-209:9).   Narcolepsy is a "disorder characterized by excessive

21    daytime sleepiness in the form of sleep attacks" – "overwhelming urges to sleep that

22    occur at times when most people wouldn't be necessarily prone to falling asleep" (Dustin

23    RT I (Pl.'s Exh. 2) at 16:10-17).   Dr. Dustin reached a probable diagnosis of Narcolepsy

24    on July 1 based upon Mr. daRosa's history of 20 years with irresistible sleep attacks and

25    Dr. Dustin's previous diagnosis of Cataplexy – a medical condition correlated with

26    Narcolepsy that causes loss of muscle tone upon experiencing certain emotions (Dustin

27    RT II (Pl.'s Exh. 1) at 209:13-25).   Dr. Dustin prescribed for plaintiff a medication called

28    Provigil commonly taken by patients with Narcolepsy.

**Dr. Dustin Ordered Medical Leave**

On July 6, 2005, Mr. daRosa called the neurology clinic from an internal line at Kaiser and reported that he was falling asleep at his desk. He asked "what can I do?" Dr. Dustin told plaintiff to increase his dosage of Provigil and offered to provide a work slip, or VOT – Kaiser's documentation and physician certification for medical leave.[1] That morning, Mr. daRosa stated his desire to remain at work, but by the end of the day, the Kaiser physician had provided plaintiff with a VOT requiring him to take one month off work until August 6, 2005. *See* Dustin RT II (Pl.'s Exh. 1), at 210:10-211:8; Pl.'s Exh. 8.

At a July 29, 2005 follow-up neurological visit, Dr. Dustin assessed plaintiff was still suffering sleep attacks, even on an increased dosage of Provigil, and he added another medication: Ritalin. He told plaintiff that he should not return to work until he was able after the doctor adjusted medications, and he extended the leave another month. On August 29, the leave was extended to September 6. *See* Dustin RT II (Pl.'s Exh. 1), at 212:3-213:11; daRosa Decl. at ¶5; Pl.'s Exh. 9 (VOTs from 7/29/05 and 8/29/05).

**Roper Informed of Leave for Medical Reasons**

Plaintiff sent copies of his work slips for this extended leave of absence in 2005 to Margie Roper, his immediate supervisor in Member Services (daRosa Decl. at ¶5). Ms. Roper recalls Mr. daRosa was out on medical leave, and that she had received several VOTs from him over the course of his employment. She testified it was Mr. daRosa's "normal practice" to provide her with such documentation after returning from any leave (Roper RT (Pl.'s Exh. 3), at 36:16-38:17, 41:10-42:9.[2]

---

[1]VOT stands for "verification of treatment" and provides space for the physician to state a period of leave and restrictions upon return. As explained by Kaiser Manager Ken Ayers, it comes in triplicate so that one copy can go to the medical records, one to the supervisor and one to the employee (Ayers RT (Pl.'s Exh. 4), at 44:19-46:13).

[2]In the cited testimony, and at 15:14-17:2, Ms. Roper stated she would place VOTs in the supervisory files she kept on each of her direct reports. Kaiser never produced Ms. Roper's supervisory files. Witnesses have testified that they were unable to locate Ms. Roper's supervisory files at Kaiser after Ms. Roper's termination a few months after plaintiff's termination. *See* Ayers RT (Pl.'s Exh. 4), at 10:15-12:22, 91:18-92:12

1    While Mr. daRosa was out on the extended leave, Ms. Roper required assistance

2  from Human Resources for proper coding of plaintiff's timecard (Roper RT (Pl.'s Exh.

3  2), at 45:24-46:7).  Kaiser's electronic personnel records ("Khrmit") shows this activity

4  on August 19, 2005 (Pl.'s Exh. 10, at Bates stamp K660).  Based on information known

5  to Mr. daRosa (*see* daRosa Decl. at ¶17) as well as the notations entered on April 4, 2007

6  (Pl.'s Exh. 10, at Bates Stamp K656), it appears that Ms. Roper opened a case on behalf

7  of plaintiff where coding was needed for Mr. daRosa's disability leave, but that case was

8  closed after Mr. daRosa had returned to work.[3]

9  **Problems During Return to Work Trial**

10    At the August 29, 2005 follow-up visit with Mr. daRosa, Dr. Dustin gauged

11  plaintiff was feeling better on his then-current regimen of medications, and he released

12  him to return to work on a "trial" basis.  Dr. Dustin testified that it was a "trial" return

13  because he was unsure if Mr. daRosa could really perform the work, and thought it would

14  be no big surprise if plaintiff could not do so (Dustin RT II (Pl.'s Exh. 1), at 214:15-19).

15  _____

16  (manager searched his own files and Ms. Roper's office and did not find or produce any
   supervisory files related to Mr. daRosa) Mellon RT (Pl.'s Exh. 5), at 155:9-18 (testified

17  at EDD unemployment insurance hearing in April 2007 that Kaiser was unable to locate
   Ms. Roper's supervisory file for Mr. daRosa).  The two VOTs extending plaintiff's 2005

18  medical leave, however, were produced in this case as exhibits to Kaiser's response to

19  Mr. daRosa's EEOC complaint.  *See* Decl. of Counsel, ¶9;  Pl.'s Exh. 9.

20    [3]Although plaintiff requested copies before the litigation started, and again in
   discovery, defendant deliberately withheld producing them.  In fact, Kaiser or its

21  attorneys chose to produce all of the print screens related to Khrmit entries, *except the*

22  *entry on August 19.  See* Decl. of Counsel, at ¶11; *compare* Pl.'s Exh. 10 ("This case has
   migrated from Khrmit" on 6/7/01, 6/30/03, 11/30/04, 12/1/04, 1/18/05, 8/19/05, 1/27/06

23  and 9/29/06) *with* Pl.'s Exh. 11 (Khrmit screen prints for every entry except 8/19/05).

24    Practice Leader Gail Kato had supervisory authority over disability management
   and knew how to search for records at the Work Absence Management (WAM) group –

25  both entities within HR – but she searched neither.  She also did not know why this very
   important entry from August 2005 was withheld from Kaiser's production (Kato RT

26  (Pl.'s Exh. 6), at 67:8-71:9, 89:21-90:21.  *See also* Ayers RT (Pl.'s Exh. 4), at 47:16-51:5

27  (Kaiser manager describes procedures Ms. Roper – his direct report at the time – would
   have used to open a case of disability for plaintiff's timecard coding during plaintiff's

28  medical leave in July-September 2005, as reflected in the Khrmit records).

Plaintiff was able to return to work for a time, but his medical condition continued to interfere with his job.

> After Dr. Dustin released me to return to work in September 2005, and until the day of my termination, I continued to experience problems connected to my medical condition, and these problems continued to interfere with my ability to perform my work.  Some days I would be unable to come into work at all, some days I was able to work only partially, and sometimes I would be at work but suffered from sleep attacks at my desk.   I continued to try to work as much as I could, while I followed up with Dr. Dustin as he changed my medications to treat my condition.  daRosa Decl. at ¶6.

Dr. Dustin's records confirm plaintiff's continuing difficulties, as Mr. daRosa revisited the neurology clinic within two weeks, on September 12, 2005.  Dr. Dustin evaluated plaintiff as continuing to be too sleepy, that he would fall asleep very easily in unstimulating situations and that it was hard to drive if he was bored.  At that visit, the Kaiser physician changed plaintiff's medications again, but he did not take Mr. daRosa off of work.  *See* Dustin RT II (Pl.'s Exh. 1) at 215:2-216:10.

Dr. Dustin also referred plaintiff to undergo a sleep study, which was requested on July 15 but did not get scheduled until September 20, 2005.  Dr. Dustin explained that a sleep study will measure objectively the amount of time it takes for a patient to fall asleep (sleep latency) and the amount of time from sleep until REM (REM latency).  He further spelled out that a patient with Narcolepsy will usually fall asleep and enter REM quicker than those without the condition.  In this overnight study, it took Mr. daRosa 0.0 minutes to fall asleep, where it normally takes 10-20 minutes; and it took him 4.9 minutes to enter REM, where it normally takes several hours.  Dr. Dustin found these results significant and consistent with Narcolepsy (Dustin RT II (Pl.'s Exh. 1) at 216:11-217:18).[4]  Plaintiff gave advance notice for the day he took off work following the sleep study, and had to call in sick for other days missed as a result of his continuing sleep attacks.

---

[4]Plaintiff was also shown by the study to have obstructive sleep apnea.  Dr. Dustin added that condition to the diagnoses, but he did not order a day-time Multi Sleep Latency Study to assist in his clinical diagnosis.  After arranging for his staff to go over the results of the sleep study with plaintiff, Dr. Dustin did not change his underlying diagnosis of Narcolepsy and did not order any changes to plaintiff's medications (Dustin RT II (Pl.'s Exh. 1), at 217:5-11).

**Plaintiff Informed Roper of his Narcolepsy**

Ms. Roper was informed about plaintiff's medical condition after he return from the leave of absence in September 2005. Mr. daRosa told Ms. Roper that his Narcolepsy caused unpredictable sleep attacks, and he stated he was working with the doctor to treat it with medications. On one particular day – December 6, 2005 – plaintiff experienced a sleep attack in a parked car after lunch. He called to work and reported he was not feeling well and was unable to come back in; and he called the following day at noon when he was feeling well enough to return. *See* daRosa Decl. at ¶¶7 & 8. At the end of the work day on December 6, his girlfriend Anastasia found him still asleep in the parked car (Freitas RT (Pl.'s Exh. 7) at 51:14-52:15).

Ms. Roper testified that plaintiff informed her of his Narcolepsy diagnosis at some point in time after he returned from the medical leave in 2005. She knew he was on medications for the condition. *See* Roper RT (Pl.'s Exh. 3), at 55:25-57:11.[5] But she expressly disavowed wanting to know anything more about his condition.

> When he told me he had that diagnosis, I advised him, you know, you need to go to the doctor and do whatever they say and take whatever.   [Roper RT (Pl.'s Exh. 3), at 58:6-10.]

She also acknowledged that she knew the unscheduled absences Mr. daRosa had were related to a medical condition. *See* Roper RT (Pl.'s Exh. 3), at 87:7-25.

**Roper Disciplined Plaintiff for Medically-Related Absences**

Plaintiff states Ms. Roper was cold to him whenever he missed work due to his medical condition (daRosa Decl. at ¶8). On December 7, 2005 – the half-day Mr. daRosa returned to work after the sleep attack in the parked car – the supervisor gave plaintiff a "first-level warning" for unscheduled absences, pursuant to Kaiser's progressive disciplinary policies. *See* Pl.'s Exh. 12. Therein, Ms. Roper criticized Mr. daRosa for the time he missed work for medical reasons, which she called "unscheduled absences."

---

[5]Ms. Roper testified she knew plaintiff had medical justification for his July to September 2005 leave of absence, and she recalled speaking to a provider during the time of plaintiff's leave; but she did not recall that leave as associated with the Narcolepsy. On this record, the association between the two is undisputed.

1    Expressly included in the disciplinary warning were 32 work days plaintiff missed in July

2    and August of 2005, when Dr. Dustin took him off work for his medical condition; the

3    day following the September 20 sleep study; and the partial days missed due to sleep

4    attacks on December 6 and 7.  *See* Roper RT (Pl.'s Exh. 3), at 66:10-68:25.

5        Mr. daRosa thought that his medically-related absences should not be part of his

6    discipline, and he "tried to explain" this to Ms. Roper.  But he "did understand Ms.

7    Roper's point of view" and agreed "it would be better for everybody if I did not have to

8    miss work due to a medical condition."  Plaintiff said he would try to attend his work in

9    the future, and he did in fact try to the best that his medical condition would allow, but he

10   also continued to experience problems with sleep attacks.  *See* daRosa Decl. at ¶9.

11       Ms. Roper confirmed she disciplined plaintiff for the fact of the absences – not

12   their justifications or lack of advance notice (Roper RT (Pl.'s Exh. 3), at 71:8-73:8).

13       My memo ... was based on the fact that he was not at work. [Medical
         reason for absences] was not an issue that I could deal with, because I did
14       not need to know [nor] could do anything regarding his medical conditions.
         This was based on the fact that he was not at work (*id*. at 87:14-20).

15   Ms. Roper also testified she did not think being home sick is an "accommodation," saying

16   she did not discuss plaintiff's sick time with him, and did not interact with him regarding

17   whether he would be able to perform his job duties after coming back from his extended

18   leave of absence (*id*., at 20:6-21:17, 58:11-19).[6]

19   **Dr. Dustin Ordered Medical Leave No. 2**

20       Because of his continuing problems with Narcolepsy, plaintiff made a return

21   neurology appointment and saw Dr. Dustin on January 24, 2006.  Dr. Dustin noted Mr.

22   daRosa was still getting overwhelming sleep attacks, every few days, which was causing

23   him to function poorly at work.  His progress reports record a discussion of the incident

24   when plaintiff fell asleep in a parked car.  Mr. daRosa was advised to change his

25

26       [6]Ms. Roper believed she gave plaintiff another disciplinary warning on January 13,
     2006, for medically-related absences in late December, 2005.  Because Kaiser never
27   produced the supervisory file, records have been produced to support this claim.
     Plaintiff disputes e was ever given this warning.  But whether or not it occurred, it does
28   not create a conflict of evidence over any material issue precluding summary judgment.

1    medications from an as-needed basis to around the clock, and Dr. Dustin adjusted the

2    dosages and combinations.  Dr. Dustin also ordered plaintiff to take another leave of

3    absence, and to stay off work until his medications were properly adjusted.  *See* Dustin

4    RT II (Pl.'s Exh. 1), at 218:3-221:1.  The physician ordered a medical leave because, in

5    his opinion, Mr. daRosa was unable to work due to his physical condition (*id*. at 221:5).

6        On January 24, 2006, Dr. Dustin provided Mr. daRosa with a VOT verifying the

7    visit that day, and taking him off work for two months, from January 25 until March 25,

8    2006 (Pl.'s Exh. 13).  Mr. daRosa returned to his desk to work the rest of the day, but up

9    until 5:00 p.m., Ms. Roper was unavailable to talk to him.  So he put a copy of his work

10   slip in an envelope with her name on it, and left it in a plastic mailbox that hung on the

11   outside of her office door.  *See* daRosa Decl. at ¶10.

12       The following day – January 25, 2006 – plaintiff called Ms. Roper and left her a

13   message about his medical leave, but Ms. Roper did not call back.  He also asked his

14   girlfriend to fax a copy of the work slip to Member Services (*id*. at ¶11).  Ms. Freitas

15   testified she faxed a copy successfully to the Member Services fax number, and she

16   retained a copy of the confirmation record (Pl.'s Exh. 14) showing it was faxed at 8:48

17   a.m.  *See* Freitas RT (Pl.'s Exh. 7) at 74:5-16.  Just to be sure she also walked across the

18   street and provided Ms. Roper with another copy (*id*. at 78:9-22).

19       Confirmation that the fax was received in Member Services is also found in a

20   document (Pl.'s Exh. 15) which was attached to Kaiser's attorney's letter to the EEOC in

21   response to plaintiff's administrative complaint.  *See* Decl. of Counsel, at ¶15.  This is a

22   copy of the received January 25, 2006 VOT, with a post-it note to Margie Roper from a

23   Member Services representative, Josephine Davila.[7]  No question exists, then, the

24   January 25 fax went through to Member Services and was directed to Ms. Roper.

25

26       [7]Kaiser never produced the supervisory file of Ms. Roper from which this
     document was presumably retrieved for defendant's EEO attorneys, and despite
27   substantial prior notice it refused to produce Ms. Davila for deposition in time to be
     included in this filing.  Plaintiff anticipates that open questions about the receipt-end of
28   the faxed VOT will be answered by the time of the reply.

1    **Plaintiff Was Terminated January 27, 2006 for his Absences**

2          On January 27, 2006 – while Mr. daRosa was out on medical leave – Ms. Roper

3    determined to fire him for "job abandonment". As shown in the termination documents

4    produced by Kaiser (Pl.'s Exh. 16), Ms. Roper requested a "same-day termination" on the

5    basis of Mr. daRosa being a "no-call, no-show" on January 25, 26 and 27, and his

6    previous attendance issues for which he had been counseled by Ms. Roper.  *See* Roper

7    RT (Pl.'s Exh. 3), at 77:21-79:7.   Knowing that plaintiff's absences were related to his

8    medical condition did not interfere with her decision to terminate (*id*. at 87:7-25).

9          Plaintiff's termination was approved by Ms. Roper's immediate supervisor, Ken

10   Ayers – a manager at Kaiser who terminated Ms. Roper only a few months after plaintiff

11   was fired (Ayers RT (Pl.'s Exh. 4), at 14:6-7, 21:14-23:1).   Mr. Ayers testified: when he

12   approved Mr. daRosa's termination, he relied upon Ms. Roper to provide information,

13   and he conducted no independent investigation (*id*. at 36:11-17).   Although he discussed

14   plaintiff's absences with Ms. Roper, she did not inform him that there were medical

15   reasons connected to the absences (*id*. at 28:5-13, 74:8-25).

16         As Mr. Ayers explained, had he knowledge that Mr. daRosa had given Ms. Roper

17   medical reasons for his absences, it would have played into the decision to terminate (*id*.

18   at 92:18-93:8).  Had he known of Mr. daRosa's efforts to deliver the January 24, 2006

19   VOT, plaintiff would not have been a "no-call, no-show" (*id*. at 94:4-24).[8]  Had he

20   known that the prior absences were caused by a medical condition, he would have re-

21   looked at the entire discipline of Mr. daRosa.  And had he known the facts established

22   here,  he would not have approved of plaintiff's termination (*id*. at 95:10-96:14).   He

23   said it would have been not appropriate for Ms. Roper to keep from him information

24   about a medical condition in connection with Mr. daRosa's attendance (*id* at 96:16-22).

25   _____

26         [8]Ms. Roper also said she would not have terminated plaintiff if she had received
     the fax on January 25.  Asked whether she blamed Mr. daRosa for having his VOT faxed,
27   Ms. Roper testified that she does "not blame Fernando for anything" and does not fault
     him specifically for using the fax.  *See* Roper RT (Pl.'s Exh. 3), at 85:6-87:5.  She also
28   never previously disciplined him for being a "no call, no show" (*id*. at 89:23-90:10).

**No Leave of Absence Was Offered or Discussed by Roper**

In the termination request form (Pl.'s Exh. 16, at Bates stamp K420), Ms. Roper stated no leave of absence was either offered or granted to Mr. daRosa. At deposition, she testified that she did not discuss medical leave issues with Mr. daRosa, and had no memory of filling out FMLA paperwork for *any* of her employees (Roper RT (Pl.'s Exh. 3), at 21:18-22, 52:14-53:16). She also stated she did not know that a VOT form was a physician certification under FMLA (although it states this is so on the back side), and she was unaware of federal and state laws having to do with employee medical leave (*id*. at 32:20-34:23, 53:8-54:2). She explains FMLA leave was not discussed with plaintiff because, at the time, the supervisor did not believe that plaintiff qualified for protection under FMLA. This belief was based on her own – incorrect – assumption that plaintiff had not satisfied some requirement under FMLA to have worked in the same position for more than a year (*id*. at 54:6-55:22).[9]

**Plaintiff Sought Return to Job**

After receipt of the termination letter (mailed January 31, 2006), an astonished Mr. daRosa tried repeatedly to reverse the decision. Over 15 months – up until the time he retained counsel – Mr. daRosa repeatedly contacted Kaiser seeking to return to his job in Member Services. He also filed for various administrative remedies, each of which gave notice to Kaiser that plaintiff had been wrongfully terminated while he was supposed to be out on a medical leave. These efforts included the following:

– In February 2006, in the days after receipt of his letter, plaintiff tried to reach Ms. Roper by telephone, but his voice messages went unanswered (daRosa Decl. at ¶12).

---

[9] Plaintiff had in fact worked at Kaiser for more than a year, and he was told by Kaiser's Human Resources Service Center he was eligible for FMLA (daRosa Decl. at ¶17). Moreover, Human Resources would not determine an employee was outside the protection of the medical leave statutes "without first doing a counseling with our legal department." Mellon RT (Pl.'s Exh. 5), at 27:25-28:4. In this case, no witness recalls the legal department getting involved in Mr. daRosa's termination prior to this litigation.

1
2
3
4
5
6
7

–     In February 2006, within a week of the letter, plaintiff called to Kaiser's Human Resources department and was directed to consultant Frank Mellon. Both plaintiff and Mr. Mellon confirm Mr. daRosa spoke to Mr. Mellon the first time in February.[10]  They both confirm that plaintiff said his doctor had put him out on disability, he had a document from the doctor, and he had provided the document to Ms. Roper prior to his termination.  *See* daRosa Decl. at ¶13; Mellon RT (Pl.'s Exh. 5) 151:25-153:13, 158:8-15, 162:1-7.

8
9
10
11

–     In February 2006, plaintiff requested Dr. Dustin to complete an EDD form for plaintiff to claim disability benefits (Dustin RT II (Pl.'s Exh. 1), at 222:7-224:17.  Plaintiff then filed for disability, for which Kaiser was notified on March 13, 2006.  *See* Pl.'s Exh. 17, at 1-2.

12
13
14
15
16
17
18
19
20
21
22

–     On March 15, plaintiff spoke to Mr. Mellon again, repeating his inquiry into his termination and his claim that he had proof he provided notice of his medical leave.  Plaintiff testified that Mr. Mellon accused him of getting a doctor's note after the fact (daRosa Decl. at ¶13).  At his deposition, the Human Resources consultant re-expressed his doubts over authenticity of the medical documentation (Mellon RT (Pl.'s Exh. 5), at 166:7-168:5), and he admitted telling plaintiff it was "finished," and it was too late to get his job back even if he did have proof he faxed in his medical note before his termination (*id.* at 181:18-22).  In an email to his supervisor, Mr. Mellon confirmed he told plaintiff: "you exhausted your chances, your employment is terminated."  *See* Pl.'s Exh. 18, at K496 (7/24/2006 email at 2:58 PM).

23
24
25
26
27
28

[10]Mr. Mellon testified falsely at first, saying that there was no call in February, and the first call was March 15 (Mellon RT (Pl.'s Exh. 5), at 69:1-2, 114:12-15. Mr. Mellon had asserted his own legal objection and refused to answer any questions about regarding Mr. daRosa's unemployment insurance case, including his prior testimony before an Administrative Law Judge (*id.* at 6:11-7:21).  After reconsideration of his refusal (*id.* at 133:2-22), the witness listened to a recording of his prior testimony, where he answered the judge's own question and confirmed the first call was in February (*id.* at 149:1-151:15).  So impeached, Mr. Mellon admitted in the testimony cited in the text that his prior testimony was true, and that Mr. daRosa had indeed spoken to him in February.

1    –    Plaintiff filed his administrative claim with the EEOC, stating that Kaiser
2         had unlawfully terminated his employment due to his disability without
3         offering him medical leave.  Kaiser received notice and a copy of the claim
4         on April 24, 2006 (Pl.'s Exh. 19).  Mr. Mellon testified that he was tasked
5         to search for Mr. daRosa's personnel records and provide them to Kaiser's
6         EEO counsel (Mellon RT (Pl.'s Exh. 5) at 63:25-65:8).
7    –    Plaintiff filed for unemployment insurance benefits, stating that Kaiser had
8         terminated him while his doctor had him out on disability.  Kaiser received
9         notice and copy of the claim on May 10, 2006 (Pl.'s Exh. 17, at 3-4).
10   –    On June 29, 2006, plaintiff was recorded calling Kaiser again to inquire
11        about how he could get his job back.  *See* Pl.'s Exh. 10, at K661.
12   –    In July 2006, plaintiff spoke to Gail Kato, Mr. Mellon's direct supervisor in
13        Human Resources.  Ms. Kato confirmed plaintiff told her what he had told
14        Mr. Mellon "several months ago" – that he had proof he faxed a doctor's
15        statement to Ms. Roper (Kato RT (Pl.'s Exh. 6) at 107:20-109:5).  *See* Pl.'s
16        Exh. 18, at K496-97 (712/06 email at 6:35 PM).  Ms. Kato directed Mr.
17        Mellon to hear plaintiff out, check his rights under a Dispute Resolution
18        policy and provide the information to Ms. Roper's former manager – Mr.
19        Ayers – who would decide whether Mr. daRosa could return (*id*, at K494
20        (7/25/2006 email at 9:49 PM)).   Although Mr. Mellon had told plaintiff in
21        March that the termination was final and there was no further chances, Ms.
22        Kato said to Mr. Mellon that this was not his decision to make (*id*.).
23   –    At Mr. Mellon's request, on July 31, 2006, plaintiff went to Kaiser to meet
24        with Mr. Mellon and hand deliver a copy of the confirmation fax (Pl.'s Exh.
25        14).  Mr. Mellon was not available, and he left it with the receptionist
26        (daRosa Decl. at ¶15).  In his email to Ayers and Kato, Mellon confirmed
27        the document proved plaintiff had faxed to Member Services his VOT form
28        with an order for medical leave until March 2006 (Pl.'s Exh. 18, at K493).

**Plaintiff Failed to Regain His Job**

Although he believed Kaiser was reviewing his request for his job back in light of his resubmitted documentation, Mr. daRosa did not hear back from Mr. Mellon for some time after their discussion in August.   Plaintiff thought Mr. Mellon had gone on vacation. The two spoke again in March or April 2007, in connection with Mr. daRosa's request for a copy of his personnel files.  Mr. Mellon told plaintiff that the decision to terminate him would stand and he was not eligible for rehire (*id.* at ¶16).  Mr. Mellon confirmed he told plaintiff he was not "re-hirable" (Mellon RT (Pl.'s Exh. 5), at 217:2.)

On this record, it appears Mr. Mellon reached this decision himself even though he was expressly told it was not his to make.   Kaiser has never produced any documents showing that an investigation was made into Mr. daRosa's post-termination requests, that Mr. Mellon discussed the matter with Mr. Ayers, or that the manager had decided plaintiff could not return to his job.  The only information comes from Mr. Mellon, who claims to have talked to Mr. Ayers about it, but made no record and took no notes (Mellon RT (Pl.'s Exh. 5), at 183:11-184:17, 216:14-217:12, 218:17-219:2).

At his deposition, Mr. Ayers testified he did not recall any conversation with Mr. Mellon about plaintiff's request and made no decision regarding  Mr. daRosa's rehire. According to the Kaiser manager, had he been asked to make such a decision, and had he done so, he would have supported it with documentation and would recall it today. Given that he did not even have the information necessary to make such a decision, the manager was very clear the question of whether Mr. daRosa's job was kept open was never presented for him to decide.  *See* Ayers RT (Pl.'s Exh. 4), at 112:10-119:16.[11]

---

[11]It also appears Kaiser would have rehired him if it followed its own policies.  Mr. Ayers agreed they require Kaiser to honor requests for medical leave, accommodate disabled employees with leaves or extensions of leave, and keep jobs open for disabled employees when they return. *See* Ayers RT (Pl.'s Exh. 4), at 57:20-58:5, 62:16-64:13, 66:23-67:4, 70:23-71:11.  Ms. Kato testified similarly as to Kaiser's policies regarding interactions and accommodations (Kato RT (Pl.'s Exh. 6), at 27:7-29:10, 34:4-7, 45:6-47:24).   Unfortunately, in July 2006, Ms. Kato did not think to inquire into plaintiff's rights under Kaiser's EEO complaint process (*id.* at 114:14-119:18).

# SUMMARY JUDGMENT STANDARDS

Summary judgment is appropriate if there is "no genuine issue as to any material fact" and the moving party is "entitled to a judgment as a matter of law."  Rule 56(c).  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Under Rule 56(a), summary judgment may be had "upon all [claims] or any part thereof."  Moreover, under Rule 56(d):

> If on a motion under this rule judgment is not rendered upon the whole case or for all the relief asked and a trial is necessary, the court at the hearing of the motion, by examining the pleadings and the evdience before it and by interrogating counsel, shall if practicable ascertain what material facts exist without substantial controversy and what material facts are actually and in good faith controverted.  It shall thereupon make an order specifying the facts that appear without substantial controversy ... and directing such further proceedings in the action as are just.  Upon the trial of the action the facts so specified shall be deemed established, and the trial shall be conducted accordingly.

*But see* Local Civil Rule 56-3 ("Statements contained in an order of the Court denying a motion for summary judgment or summary adjudication shall not constitute issues deemed established for purposes of the trial of the case, unless the Court so specifies").

As plaintiff is the moving party and the one with the burden of proof at trial, to be entitled to partial summary judgment "his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party."  William W. Schwarzer, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465, 487-488 (1984).  At this stage, the Court is not asked to make credibility determinations or weigh conflicting evidence, and it must draw all reasonable inferences in favor of the nonmoving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).  A mere disagreement does not preclude summary judgment, however, and when the nonmoving party's claims are factually implausible, that party must "come forward with more persuasive evidence than otherwise would be necessary." *Wong v. Regents of Univ. of Cal.*, 379 F.3d 1097 (9th Cir. 2004), *as amended by* 410 F.3d 1052, 1055 (9th Cir. 2005).

**ARGUMENT**

**I.    Plaintiff's Termination Was Covered by Federal and State Statutes Protecting Rights to Medical Leave and Barring Disability Discrimination at Work**

Mr. daRosa suffers from a serious medical condition – Narcolepsy – which at the time of his termination substantially limited his ability to perform major life activities and for which he was receiving continuing treatment from his physician.  As such, plaintiff qualifies for protection under ADA, FEHA, FMLA and CLRA.  In the event partial summary judgment is denied, plaintiff requests that the Court expressly bypass Local Rule 56-3, and pursuant to Rule 56(d) deem coverage established for purposes of trial.

**A.    Plaintiff is a Qualified Individual with a Physical Disability**

Under the ADA, 42 U.S.C. §12112(a):

> No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

An individual is disabled if he has "a physical or mental impairment that substantially limits one or more of [his] major life activities" or if his employer regards him "as having such an impairment" (§§12102(2)(A), (C)).   A "qualified individual with a disability" means "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires" (§12111(8)).  "[T]o be substantially limited in performing manual tasks, an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives." *Toyota Motor Mfg. Ky. Inc. v. Williams*, 534 U.S. 184, 197-98 (2002).

"'Major life activities" ... "refers to those activities that are of central importance to daily life" (*id.*, at 197).  *See also Fraser v. Goodale*, 342 F.3d 1032, 1039 (9th Cir. 2003) (*quoting Bragdon v. Abbott*, 524 U.S. 624 (1998)).

> To determine whether a proposed activity is a major life activity, we begin with the illustrative list in the implementing regulations which describes major life activities as "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and

working." Because "[t]he plain meaning of the word 'major' denotes comparative importance," we then compare the proposed activity with the major life activities enumerated in the regulations, noting that "the touchstone for determining an  activity's inclusion under the statutory rubric is its significance." *Walton v. United States Marshals Serv.*, 492 F.3d 998, 1002 (9th Cir. 2007) (citations omitted).

In 29 C.F.R. §1630.2(j)(3)(i), the implementing regulations specify that a person is "substantially limited" in the major life activity of working if she is "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." *See also Walton*, 492 F.3d at 1002 ("'getting to and from work' is not of equal significance to enumerated major life activities and thus is not a major life activity; 'rather ... [it] is a sub-species of the activity of "working" or of "driving"'")(*quoting Sinkler v. Midwest Prop. Mgmt. Ltd. P'ship*, 209 F.3d 678, 684-85 (7th Cir. 2000)).

Under California's statute –  enacted in 1973 prior to ADA – plaintiff must still "show that he ... is a qualified individual under the FEHA (*i.e.*, that he ... can perform the essential functions of the job with or without reasonable accommodation)." *Green v. State of California*, 42 Cal. 4th 254, 260 (2007).   But California's law departs from ADA's standards on some key provisions.  When it amended FEHA in 1992, California's legislature stated an intent "to strengthen California law where it is weaker" than the ADA "and to retain California law when it provides more protection for individuals with disabilities than" the ADA (Stats. 1992, ch. 913, §§ 1, p. 4282).

While the federal act described a disabled individual as one whose disability "*substantially limits* one or more major life activities" (42 U.S.C. §§ 12102(2)(A), italics added), the 1992 amendment to the FEHA defined physical disability as an impairment that merely "*[l]imits* an individual's ability to participate in major life activities." (Stats. 1992, ch. 913, §§ 21.3, p. 4308, amending §§ 12926, subd. (k), italics added.) That definition, the Legislature stated at the time of the 1992 amendment to the FEHA, "shall have the same meaning as the term 'physical handicap' . . . construed in *American National Ins. Co. v. Fair Employment & Housing Com.* [(1982)] 32 Cal.3d 603." (Stats. 1992, ch. 913, §§ 21.3, p. 4308.) There, this court held that a physical handicap was not confined to a major physical ailment or defect; instead, we construed "physical handicap" to be "a condition of the body" that has the "disabling effect" of making a "achievement unusually difficult.'" [*Colmenares v. Braemar Country Club, Inc.*, 29 Cal. 4th 1019, 1026 (2003) (citation omitted).]

1      FEHA was amended again by the Poppink Act in 2000.  There, FEHA's

2  requirement that a physical disease or condition limit "major life activities" was changed

3  to the singular "a major life activity."  The act explained that a qualifying disease or

4  condition "limits a major life activity if it makes the achievement" of the activity

5  "difficult." 5 (§§ 12926, subd. (k)(1)(B)(ii).)   That and other provisions of the Poppink

6  Act compels the "conclusion that in 2000 the Legislature intended not to make a

7  retroactive change, but only to clarify the degree of limitation required for physical

8  disability under the FEHA."  *Colmenares*, 29 Cal. 4th at 1028.  Moreover, the Poppink

9  Act made two other clarifications important here, §12926(k)(B)(i) & (iii) :

> (i) 'Limits' shall be determined without regard to mitigating measures such
> as medications, assistive devices, prosthetics, or reasonable
> accommodations, unless the mitigating measure itself limits a major life
> activity.
>
> (iii) 'Major life activities' shall be broadly construed and includes physical,
> mental, and social activities and working.

14  Thus, notwithstanding more conservative interpretations under ADA, in establishing

15  liability under FEHA, plaintiff need not show "substantial" limitations, his medical

16  condition must only make it unusually difficult to achieve a single major life activity, and

17  such limitation should be broadly construed and made without regard to mitigation.

18      Fine distinctions between federal and state law do not come into play in this case,

19  however, as plaintiff clearly meets both statutory definitions for disabled employee.

20      Narcolepsy, in Dr. Dustin's words, is "sleep intruding into wakefulness" – a

21  "physiologic disorder thought to be in the brain stem with the parts of the brain stem there

22  that are important for causing sleep and dreaming sleep" (Dustin RT I (Pl.'s Exh. 2) at

23  19:3-16).  The Kaiser physician explained:

> sleep attacks in narcolepsy would tend to occur more when you're in a
> boring situation.  But they also occur when most of us wouldn't necessarily
> be falling asleep.  And so it can become very problematic for our normal
> life.  We're working or driving, it can become nonproductive and dangerous
> (*id*. at 19:23-20:3)

27  *See also id*. at 19:5-6 (Narcolepsy has a genetic component, and "you either have it or

28  you don't").

1    Plaintiff had suffered sleep attacks from Narcolepsy for over 20 years prior to his

2    diagnosis in the summer of 2005.

3        For a long time, probably as early as high school, I have suffered from
         excessive sleepiness and sleep attacks, although I was unaware until my
4        diagnosis that I had a physical condition which caused me to sleep.  In the
         period of time leading up to the diagnosis [in July 2005], and until my
5        termination in January 2006, my medical condition caused me to irresistibly
         fall asleep at unpredictable and inappropriate times.  I would have sleep
6        attacks while driving to work, at work, or at home with my family.  During
         these attacks, I would be unable to function at all.  I could not communicate
7        with others, and because of the medical condition, I limited my social time
         and did not have much of a life outside of work.  daRosa Decl. at ¶3

8    In Mr. daRosa's particular case, for two two-month periods (July-September 2005

9    and January-March 2006), sleep attacks from the Narcolepsy were so incapacitating that

10   plaintiff was unable to perform the functions of his job, and he was ordered by Dr. Dustin

11   off work. *See* Pl.'s Exhs. 8, 9 & 13.[12]   That the Kaiser physician ordered plaintiff off

12   work even while he was receiving treatment, and to remain off work until the medications

13   had been properly adjusted, makes undisputable truth out of Mr. daRosa's disability.

14   While not every individual who has the condition suffers disabling effects, there is no

15   genuine dispute that in Mr. daRosa the medical condition at the time of his termination

16   substantially limited his ability to perform major life activities.

17       There is also no dispute that plaintiff was qualified for his job as a representative

18   in Member Services.  Having worked at Kaiser since 2001, plaintiff had been a supervisor

19   in the Pharmacy and had years of experience responding to patient inquiries and

20   complaints in Member Services (daRosa Decl. at ¶2).   Defendant has produced no

21   negative performance evaluations for plaintiff and, except of his attendance issues, has

22   never asserted that Mr. daRosa was not qualified to be a Member Services representative.

23   Ms. Roper admitted the only reasons for his discipline and termination were the

24   medically related unscheduled absences (Roper RT (Pl.'s Exh. 3) at 87:14-16.  With the

25   required medical leave, plaintiff could have performed the essential functions of his job.

26

27       [12]Time at work in between the two medical leaves was on a "trial" basis.  In
     addition, when plaintiff's sleep attacks were out of control, Dr. Dustin also ordered him
28   to not drive (Dustin RT II (Pl.'s Exh. 1) at 214:15-19, 219:25).

## B.    Plaintiff was Eligible for Medical Leave Protection

Under FMLA, 29 U.S.C. §2611(2)(A), the term "eligible employee" means an "employee who has been employed for at least 12 months by the employer ... and for at least 1,250 hours of service with such employer during the previous 12-month period." CFRA has the same eligibility requirements.  *See* Govt. Code §12954.2(a).  Indeed, CFRA was modeled on FMLA, and it incorporates FMLA regulations to the extent that they do not conflict with California law. *See* 2 Cal. Admin. Code §7297.10.

Although Ms. Roper was confused on these requirements as they applied to Mr. daRosa, she also stated her ignorance regarding legal protection over medical leave.  *See* Roper RT (Pl.'s Exh. 3) at 53:17-23.  Here, the record establishes that Mr. daRosa was eligible under the state and federal leave statutes.  He began working for Kaiser in May 2001, and although his employment was discontinuous for a few days after he left the Pharmacy in the summer of 2004, he was rehired with full seniority rights going back to his original start date (daRosa Decl. at ¶2).  At any rate, the 12-month period runs backwards from the date of the requested medical leave.  *See, e.g.*, *Dudley v. Dep't of Transp.*, 90 Cal.App.4th 255, 262 (2001).  Since plaintiff was terminated when he sought a medical leave in January 2006, there is no dispute that plaintiff's employment was continuous for a 12-month period.

Moreover, there is also no dispute plaintiff met the statutory requirements that he need leave "because of a serious health condition that makes the employee unable to perform the functions of the position of such employee" (29 U.S.C. §2612(a)(1)(D); Govt. Code §12945.2(c)(3)(C)).  A "serious health condition" is "an illness, injury, impairment, or physical or mental condition that involves [continuing treatment or continuing supervision by a health care provider" (29 U.S.C. §2611(11); Govt. Code §12945.2(c)(8)).  That plaintiff meets the ADA and FEHA definition for disability, and the undeniable record that Mr. daRosa had been under Dr. Dustin's continuing treatment and care of his Narcolepsy, establish beyond genuine dispute that plaintiff was entitled to protections of the medical leave statutes.

## II.    Kaiser Violated These Statutes When It Terminated Mr. daRosa Because He Needed a Medical Leave for His Disability and Serious Medical Condition

Under the disability statutes, it was unlawful to terminate plaintiff because of his disability.  Given that plaintiff's termination was based expressly upon his "unscheduled absences," that those "unscheduled absences" were leaves ordered by Dr. Dustin and time missed due to sleep attacks, and that Kaiser knew plaintiff suffered from Narcolepsy and was having difficulty performing his work, as a matter of law Kaiser terminated plaintiff *because* of his disability in violation of ADA and FEHA.

When there is direct evidence of discriminatory intent, this Court need not engage in *McDonnell Douglas* burden-shifting analysis.  *TransWorld Airlines, Inc. v. Thurston* 469 U.S. 111, 121 (1985) ("the *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination"]; *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002); *Morgan v. Regents of University of California,* 88 Cal.App.4th 52, 68 (2000).  *See also Green*, 42 Cal.4th at 275 (Werdegar, J., dissenting) (*McDonnell Douglas* test is vehicle used to "assure that the 'plaintiff [has] his day in court despite the unavailability of direct evidence.'  It does not define the elements of the cause of action and 'does not apply in every employment discrimination case. For instance, if a plaintiff is able to produce direct evidence of discrimination, he may prevail without proving all the elements of a prima facie case'") (citations omitted).

Moreover, in claiming Kaiser violated the medical leave statutes, plaintiff need only show he was denied entitlement.  As explained by the California appellate court in *Faust v. California Portland Cement Co.*, 150 Cal. App. 4th 864, 879 (2007):

> An interference claim under the FMLA (and thus the CFRA) does not involve the burden-shifting analysis articulated by the United States Supreme Court in *McDonnell Douglas* [citation]. As stated in *Bachelder v. America West Airlines, Inc*. (9th Cir. 2001) 259 F.3d 1112, 1131 (*Bachelder*), "there is no room for a *McDonnell Douglas* type of pretext analysis when evaluating an 'interference' claim under this statute." A violation of the FMLA "simply requires that the employer deny the employee's entitlement to FMLA leave." (*Xin Liu v. Amway Corp.* (9th Cir. 2003) 347 F.3d 1125, 1135.)

In his claim that Kaiser interfered with his rights under the medical leave statutes, the

1    material fact issue is whether request for FMLA leave was impermissibly considered as a

2    factor in her termination.  *See Xin Liu*, 347 F.3d at 1136.

3         On the undisputed record here, there is no question Mr. daRosa was terminated

4    due to his disability and request for medical leave.  Plaintiff advised his supervisor he

5    suffered from Narcolepsy and was being treated with medications under the supervision

6    of a physician.  Both plaintiff and Ms. Roper testify to these facts (*see* above at 6).  He

7    documented each extended leave of absence with a VOT form (Pl.'s Exhs. 8, 9 & 13),

8    and even Ms. Roper said it was plaintiff's "normal practice" to deliver medical

9    documentation whenever he was out for more than three days (Roper RT (Pl.'s Exh. 3), at

10   36:16-38:17, 41:10-42:9).  Ms. Roper even opened up a claim within Kaiser's Human

11   Resources to classify plaintiff as being out on a "disability" leave (*see* above at 4 & n.3).

12   Although she did not want to know more, Ms. Roper clearly knew that there were

13   medical reasons behind his absences; she simply did not let that knowledge interfere with

14   her determination to terminate plaintiff's employment (*id*. at 87:7-25).

15        Whether or not Ms. Roper had personal animus against Mr. daRosa is not at issue.

16   Kaiser's supervisor knew plaintiff suffered from a medical condition requiring absences

17   and medical leaves, and she knowingly fired Mr. daRosa because of them.  That she

18   might not have remembered which medical condition caused which leave of absence, or

19   that she understood plaintiff to be unprotected by the federal and state statutes, provide

20   no defenses to this case of intentional discrimination.

21   **III.   Kaiser Violated These Statutes When It Neither Engaged Plaintiff in a
         Discussion of Reasonable Accommodations nor Offered a Leave of Absence**

22
         Both ADA and FEHA require the employer to engage in an interactive process

23   whenever there is a need for reasonable accommodation of an employee's disability.

24   Under ADA, after "an employer becomes aware of the need for accommodation, that

25   employer has a mandatory obligation under the ADA to engage in an interactive process

26   with the employee to identify and implement appropriate reasonable accommodations."

27   *Humphrey v. Mem'l Hosp. Ass'n*, 239 F.3d 1128, 1137 (9th Cir. 2001).  *See also Snead v.*

28

1   *Metro. Prop. & Cas. Ins.*, 237 F.3d 1080, 1096-97 (9th Cir. 2001).  An employer's

2   obligation to engage in this process is triggered either by a request for accommodation or

3   by the employer's recognition of the need for one.  *Brown v. Lucky Stores*, 246 F.3d 1182,

4   1188 (9th Cir. 2001).  This must include communication and "a good-faith exploration of

5   possible accommodations between employers and individual employees" (*id*).

6        FEHA expressly imposes this requirement, making it unlawful for an employer

7
8
9
> to fail to engage in a timely, good faith, interactive process with the employee or applicant to determine effective reasonable accommodations, if any, in response to a request for reasonable accommodation by an employee or applicant with a known physical or mental disability or known medical condition  protective of this process.  Cal. Gov. Code § 12940(n).

10   *See Claudio v. Regents of the University of California*, 134 Cal.App. 4th 224 (2006);

11   *Jensen v. Wells Fargo Bank*, 85 Cal App. 4th 245, 256 (2000).  Judge Karlton explains:

12
13
14
15
> By the plain wording of the FEHA statute, an employer must engage in a good faith, interactive process "in response to a request for reasonable accommodation by an employee." Cal. Gov. Code § 12940(n).  However, this request need not include any particular "magic words" to trigger an employer's duty to engage in the interactive process.  *Prilliman v. United Air Lines*, 53 Cal. App. 4th 935, 954 (2d Dist. 1997). [*Ujagar v. Campbell's Soup Co.*, 2006 U.S. Dist. LEXIS 92131 (E.D. Cal. 2006), at 22-23.]

16        This legal requirement to engage in an interactive process is also part of Kaiser's

17   own policies and practices.  As recounted by Ms. Kato, under Kaiser's guidelines the

18   employer must engage in a discussion with the employee whenever a request for

19   accommodation is made, and the employee does not have to use specific words such as

20   "accommodation" or "disability."  Instead, once a supervisor is on notice that an

21   employee cannot perform the job as a result of a medical condition, the process has been

22   triggered (Kato RT (Pl.'s Exh. 6) at 28:9-29:10; 45:6-46:6).  Moreover, defendant's own

23   guidelines recognize that courts will find that the interactive process triggered whenever

24   circumstances indicate the need for such a discussion, for example when an employee out

25   on leave requests either an extension or seeks to return to work (*id*. at 38:1-39:17).  Once

26   engaged in such a discussion, Kaiser requires consideration of accommodations such as

27   leaves of absences and extensions of leaves (*id*. at 46:11-21).  *See also* Ayers RT (Pl.'s

28   Exh. 4) at 63:9-64:11 (need to engage in process depending on reasons for absences).

On this record, there is no question that, prior to terminating him for unscheduled absences, Ms. Roper failed to engage in any interactive process with Mr. daRosa over the accommodation of a leave of absence – the very accommodation plaintiff had requested. Ms. Roper made clear that she never engaged in any such discussions..

> Q. Did you have a place where you would maintain records regarding any of the employees who you discussed accommodations for disabilities? ...
>
> THE WITNESS:  I can't answer that.  I don't –  I did not discuss – I'm not sure what your question is.  I'm not sure that I've ever discussed accommodations for disability.
>
> BY MR. FRIEDMAN:  Q. Okay.  In your employment at Kaiser you don't recall ever discussing with any employee reasonable accommodations for disabilities?
>
> A. No. [Roper RT (Pl.'s Exh. 3), at 19:1-14]

Indeed, the Kaiser supervisor made it clear that, despite knowledge that plaintiff suffered from a medical condition that was interfering with his work, it was Ms. Roper who ended the discussion, believing that it was not necessary to talk to plaintiff any further about it:

> When somebody tells me what their diagnosis is, I try not to get into detail, because I don't want to even begin to give medical advice or questions, anything like that.  He told me he had to go to the doctor, that was his diagnosis, *end of discussion*.  I didn't want to go into any more. [*Id.* at 57:6-11 (emphasis supplied).]

Moreover, despite the fact that a leave of absence is recognized – under both statutes and Kaiser's policy – as a reasonable accommodation for an employee with a disability, and even though a leave of absence is exactly what Dr. Dustin had ordered, Ms. Roper in the termination documents (Pl.'s Exh. 16) expressly checked the boxes stating that no leave was offered or granted to Mr. daRosa upon his firing.  A leave of absence can be a reasonable accommodation under both ADA and FEHA.  *See Hanson v. Lucky Stores*, 74 Cal. App. 4th 215, 226 (1999).  In this case, Kaiser's denial of plaintiff's request for a medical leave, and its failure to even engage in a discussion about his need for medical leave, not only violated FMLA and CFRA, but also constituted a denial of reasonable accommodation in breach of ADA and FEHA.  As a matter of law, plaintiff is entitled to partial summary judgment on these statutory violations.

**IV.    Kaiser Violated These Statutes When It Failed to Keep Plaintiff's Job Open To Him After He Was Able to Return to Work**

Under the disability statutes, the medical leave statutes and Kaiser's own policies, plaintiff was entitled to return to his job in Member Services after his doctor determined he was able to go back to work.  Although defendant may claim that it misplaced plaintiff's January 24, 2006 VOT when he faxed it to Member Services on January 25, and otherwise did not know of plaintiff's need for a medical leave at the precise time of termination, on this record it is clear that Mr. daRosa gave notice to Kaiser that he wanted to keep his job open to him after he learned of it.  Dfendant's attorneys wanted the facts to be other than they are, but there is no dispute that plaintiff called Ms. Roper after he received his letter; spoke to Human Resources and Mr. Mellon in February 2006 – within a week or so of his termination; spoke again to Mr. Mellon in March; filed for and gave notice to Kaiser about his disability claim in March, his EEOC claim in April and his claim for unemployment insurance in May; called Kaiser again in June; spoke with human resources again in July and August; and delivered more copies of his doctor's note believing Kaiser was considering his eligibility for rehire.  Despite these 15 months of effort, Kaiser told him his job was over and he was not "re-hirable."

Kaiser cannot claim that it was ignorant of plaintiff's disability and need for accommodation in all of these post-termination efforts.  Internal emails and documents produced in litigation show undeniably that Kaiser's Human Resources personnel were aware of the medical documentation associated with plaintiff's leave of absence, and his official filings for disability, equal employment opportunity and unemployment insurance each repeated the fact that he suffered from a disability and was terminated for it.  Although Mr. Mellon has no records of any discussions with Mr. Ayers (or plaintiff), and although the manager certainly never decided against plaintiff's request, no dispute exists Kaiser denied plaintiff the opportunity to return to work.  As such, defendant undeniably violated the ADA and FEHA requirements of reasonable accommodations and FMLA and CFRA protections over employee's positions while out on medical leave.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CONCLUSION**

For the foregoing reasons, plaintiff requests that the Court grant partial summary judgment in his favor, and determine that, as a matter of law based upon undisputed facts, Kaiser violated ADA, FEHA, FMLA and CFRA in this case.  In the alternative, plaintiff requests that the Court expressly hold he meets the statutory eligibility requirements for each of these statutes, and deem those facts established for purposes of trial.

Respectfully submitted,

Dated: September 5, 2008            JEREMY L. FRIEDMAN
                                   CHRISTOPHER J. KELLER


By: /s/Jeremy L. Friedman
    Jeremy L. Friedman
    Attorneys for plaintiff Fernando daRosa