JEREMY L. FRIEDMAN, CA Bar No. 142659
Attorney At Law
2801 Sylhowe Road
Oakland, CA 94602
Telephone: (510) 530-9060
Facsimile: (510) 530-9087
jlfried@comcast.net

KELLER LAW, PC
CHRISTOPHER J. KELLER, ESQ. (SBN 178491)
One Market Street, Spear Tower, 36th Floor
San Francisco, CA 94105
Telephone: (415) 293-7805
Facsimile: (415) 203-8001
ckeller@kellerlawpc.com

Attorneys for plaintiff Fernando daRosa

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FERNANDO DAROSA, <br><br> Plaintiff, <br><br> vs. <br><br> KAISER FOUNDATION HEALTH PLAN, INC. <br><br> Defendant. | Case No. 3:07-cv-03114-SI <br><br> **DECLARATION OF PLAINTIFF FERNANDO daROSA IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT** <br><br> Date: October 31, 2008 <br> Time: 9:00 a.m. <br> Crtrm: Hon. Susan Illston |

I, Fernando daRosa, declare and state:

1. I am plaintiff in this action. I make the following declaration in support of the motion for partial summary judgment based upon my own personal knowledge. If called as a witness, I would and could testify to the following.

2. I began working for Kaiser in May 2001, starting out in Member Services, the department at Kaiser responsible for responding to Kaiser patient complaints. For a period of time I was a supervisor in the Pharmacy. In the fall of 2004, I resigned my job in the pharmacy but within days was rehired with full seniority back to Member Services.

3. In July 2005, my neurologist at Kaiser – Dr. Frank Dustin – diagnosed me with Narcolepsy, and began me on medications to treat the condition. For a long time, probably as early as high school, I have suffered from excessive sleepiness and sleep attacks, although I was unaware until my diagnosis that I had a physical condition which caused me to sleep. In the period of time leading up to the diagnosis, and until my termination in January 2006, my medical condition caused me to irresistibly fall asleep at unpredictable and inappropriate times. I would have sleep attacks while driving to work, at work, or at home with my family. During these attacks, I would be unable to function at all. I could not communicate with others, and because of the medical condition, I limited my social time and did not have much of a life outside of work.

4. My medical condition interfered with my ability to perform my work at Kaiser. On occasions, I would fall asleep right in the middle of conversations with patients about their complaints. When I would wake up, the member would usually be looking at me with a confused look, and I too would be confused and uncertain of what had occurred. My notes from these conversations would look like gibberish, and the entire experience would be unproductive and embarrassing. As I said during my deposition: How can I function at work if I am not awake?

5. From July 6 until September 6, 2005, Dr. Dustin ordered me to take a leave of absence from work while he tried to find the right balance of medications to treat my condition. The goal at the time was to establish a mix of medications that would allow me to function like others who do not suffer such sleep attacks. Dr. Dustin said he did not want me to work until my symptoms had improved sufficiently so that I would be able to work. He provided me with work slips for my leave of absence, which I sent to my supervisor, Margie Roper.

6. After Dr. Dustin released me to return to work in September 2005, and until the day of my termination, I continued to experience problems connected to my medical condition, and these problems continued to interfere with my ability to perform my work. Some days I would be unable to come into work at all, some days I was able to work only

partially, and sometimes I would be at work but suffered from sleep attacks at my desk. I continued to try to work as much as I could, while I followed up with Dr. Dustin as he changed my medications to treat my condition.

7. After my return from the medical leave in September 2005, I told Ms. Roper about my medical condition, the fact that it caused me to suffer from unpredictable sleep attacks, and that I was working with my physician to treat it with medications. I also provided Ms. Roper with advance notice when I knew of an absence caused by my condition (for example, the day after I was scheduled to undergo a sleep study ordered by Dr. Dustin), and a work slip when I was absent for medical reasons for more than 3 days.

8. Ms. Roper acted very cold to me after I returned from my medical leave and after times when I required time off due to my condition. On one occasion, I had a sleep attack come on my while I was asleep in my parked car, after having lunch there with girlfriend. I called into Member Services and informed Ms. Roper that I was feeling ill, that I was resting in my car, and that I would not be able to return to work. The following day, I called at mid-day to say that I was feeling well enough to return, and I did return that day. When I returned to work, however, Ms. Roper gave me a disciplinary warning about my unscheduled absences.

9. On the day Ms. Roper gave me a disciplinary warning about unscheduled absences, she showed me a written memo which listed the days I had been absent from work. Up to that point, I had given Ms. Roper notice as soon as I could for by absences and, when it was longer than three days, a work slip from the doctor. I do not recall Ms. Roper criticizing me for the lack of justification, documentation or notice for absences. Instead, she said there were too many of them and that I needed to improve or I would lose my job. I tried to explain that most if not all of the absences were due to my medical condition. I did not believe my Narcolepsy should have been part of my discipline, but I did understand Ms. Roper's point of view, and I believed it would be better for everybody if I did not have to miss work due to a medical condition. I said I would try to attend to work, and I did try, but my medical condition continued to interfere.

10. Because I continued to suffer sleep attacks that interfered with my ability to work and function, I made an appointment to see Dr. Dustin, which I did on January 24, 2006. On that day, Dr. Dustin told me to change my medications, to go off work starting January 25, 2006, for two months while he adjusted the medications, and to not drive during that time period. He gave me a work slip to provide to my supervisor. On January 24, I returned to my desk in Member Services to try to work the rest of the day. At the end of the day, I saw that Ms. Roper was in her office with the door closed on the telephone, so I left her a copy of the work slip in an envelope with her name on it by placing it in a plastic mailbox which was on her door.

11. The following day, January 25, 2006, I called Ms. Roper in the morning to talk to her about the doctor ordering me off work, but she did not answer and I left her a message. I never received a return call. I also asked my girlfriend, Anastasia, to fax a copy of the work slip to Member Services from her office at Kaiser's optical sales department. I had spoken with Anastasia about Ms. Roper disciplining me for missing work, and we were both concerned about Ms. Roper's reaction to this medical leave. Anastasia informed me that she had faxed it successfully a little after 8:30 a.m., she showed me the fax confirmation sheet and she told me that she had also dropped off a copy with Ms. Roper at Member Services.

12. When I received my letter of termination about a week later, I could not believe I had been terminated from my job for supposedly being a "no call, no show." Because I had given Ms. Roper notice about my medical condition and need for a leave of absence, I thought there had to have been a mistake. I tried to reach Ms. Roper that day and over the following days, but was unable to talk to her; and she did not return my phone calls.

13. Within a week of getting the letter of termination, after Ms. Roper did not call me back, I called the Human Resources department at Kaiser to get some assistance regarding my termination. I was told that I needed to speak with a consultant in the HR department named Frank Mellon. After leaving him a number of phone calls, I eventually

1  talk to him on the phone. This first conversation was in February, 2006, within a week or
2  so of the time I got my termination letter. In that conversation, I told Mr. Mellon that my
3  doctor had taken me out on medical leave prior to my termination, that I had a work slip
4  for my leave, and that I had provided this document to Ms. Roper. Mr. Mellon accused
5  me of getting the doctor's note after the fact. I explained that this was not possible, since
6  it was signed and dated by the doctor prior to the termination. I also explained that I had
7  proof that I had faxed it in to Member Services prior to my termination.  Mr. Mellon said
8  he doubted me and he was not helpful.

9       14. In February 2006, I asked my doctor's office to provide me with the forms to
10 apply for disability benefits, which I filed that month. In March 2006, I filed a claim with
11 the EEOC about my termination, stating that I had been terminated while out on disability
12 without the offer of any medical leave. In May 2006, I filed for unemployment insurance
13 benefits, where I explained that my supervisor had terminated me while my doctor had
14 me out on disability.

15       15.  For approximately 15 months after my termination, I continued to contact a
16 lot of people at Kaiser in an effort to see if my job in Member Services was still open to
17 me. I called Mr. Mellon several times, but had few actual conversations with him.  I also
18 called a supervisor in Human Resources, Gail Kato, and asked her to have Mr. Mellon
19 return my calls. Eventually, in the summer of 2006, I spoke with Mr. Mellon by
20 telephone. I repeated that I had a doctor's note putting me out on a disability leave, and
21 confirmation that it had been sent to Member Services prior to my termination. Mr.
22 Mellon stated that he did not have a copy of the documentation and he asked me to bring
23 it down to him at his office. On the appointed day, I went to Mr. Mellon's office, but
24 when I was told he was not available, I left the document for him with the receptionist.

25       16. Next I spoke with Mr. Mellon by telephone, and was left with the impression
26 that Kaiser was reviewing the documentation and would respond to my request to return
27 to my job.  By this time, Ms. Roper had been fired from Kaiser, and Mr. Mellon told me
28 my request would be discussed with and decided by Ms. Roper's supervisor. It took a

1  long time for me to speak with Mr. Mellon again, however, as he was out on vacation.
2  When he returned, he informed me that Ms. Roper's supervisor had left his position. Mr.
3  Mellon did make clear to me, however, that the termination was final, saying my status
4  was not eligible for rehire.

5      17. During my post-termination efforts to solve my termination, I also spoke to
6  people in the Human Resource Service Center, in Alameda. I asked if I had qualified for
7  FMLA leave, and was told that I did. I asked about whether an FMLA claim had been
8  opened by Ms. Roper on my behalf when I went out on medical leave for my medical
9  condition in July to September of 2005. I recall being told Ms. Roper had opened an
10 FMLA claim regarding my disability, but it had been closed due to the fact that I had
11 returned to work. I later spoke to someone else in the Human Resources department
12 about this issue, and was told that Kaiser's electronic personnel records showed the
13 opening of a disability case by Ms. Roper on my behalf in 2005. I asked for a copy of
14 those records, but the person I was speaking with declined to provide me with a copy.

15     I declare under penalty of perjury of the laws of the United States and California
16 that the foregoing is true and correct. Executed this __ day September, 2008.

                                                                 _____
                                                                 Fernando daRosa