00133

1              UNITED STATES DISTRICT COURT
2              NORTHERN DISTRICT OF CALIFORNIA
3                     ---oOo---
4
5   FERNANDO DAROSA,
6            Plaintiff,
7        vs.              No. 3:07-CV-03114-SI
8   KAISER FOUNDATION HEALTH PLAN,
    INC.,
9
             Defendant.
10  _____/
11
12           DEPOSITION OF FRANK DUSTIN, M.D.
13              Volume II, Pages 133 - 237
14              Monday, August 25, 2008
15
16
17
18
19
20
21  REPORTED BY: CYNTHIA LEW, RPR, CSR No. 11999
22
23              TOOKER & ANTZ
             COURT REPORTING & VIDEO SERVICES
24          350 SANSOME STREET, SUITE 700
             SAN FRANCISCO, CALIFORNIA 94104
25              (415) 392-0650

00134

```
 1              I N D E X
 2
 3  DEPOSITION OF FRANK DUSTIN, M.D.
 4
 5  EXAMINATION BY:                    PAGE
 6    MR. MARTIN                   137
 7              ---oOo---
 8
 9            E X H I B I T S
10  (For Defendant)
11  IDENTIFICATION    DESCRIPTION              PAGE
12    16   Patient progress record, dated July 1,   150
          2005
13
      17   Patient telephone message, dated July 6,  163
14         2005
15    18   Visit verification, dated July 6, 2005   166
16    19   Patient progress record, dated July 29,   170
          2005
17
      20   Patient progress record, dated August 29,  172
18         2005
19    21   Patient progress record, dated September   174
          12, 2005
20
      22   Six-page California Center for Sleep     177
21         Disorders report
22    23   Two-page patient telephone message, dated  184
          October 18, 2005
23
      24   Employment Development Department          188
24         doctor's certificate, dated February 16,
          2006
25
```

00135

1                E X H I B I T S
2   (For Defendant)
3   IDENTIFICATION       DESCRIPTION              PAGE
4      25   Two-page patient telephone message, dated  191
                March 24, 2006, Bates No. 5 and 6
5
       26   Patient note, dated January 16, 2007       193
6
       27   Letter from Frank Dustin, M.D., dated       197
7               March 27, 2007, Bates No. 11
8      28   Patient telephone message, dated May 16,   199
                2007, Bates No. 15
9
10                    ---oOo--
11
12                 CONFIDENTIAL PORTIONS
13
14      Page 154, Line 1 through Page 158, Line 23
15      Page 227, Line 19 through Page 236, Line 8
16
17                    ---oOo---
18
19
20
21
22
23
24
25

00136

1      BE IT REMEMBERED that, pursuant to Notice of
2  Taking Deposition, on Monday, August 25, 2008, commencing
3  at the hour of 8:28 o'clock a.m. thereof, at the Offices
4  of Kaiser Foundation Health Plan, Inc., 235 West
5  MacArthur Boulevard, Suite 669, Oakland, California
6  before me, CYNTHIA LEW, duly authorized to administer
7  oaths pursuant to Section 2093(b) of the California Code
8  of Civil Procedure, personally appeared for the
9  continuation of his deposition
10      FRANK DUSTIN, M.D.,
11  called as a witness on behalf of the Defendant, and the
12  said witness, having first been re-placed under oath, was
13  thereupon examined and testified further as hereinafter
14  set forth.
15
16      A P P E A R A N C E S
17    The Law Offices of Jeremy L. Friedman, 2801
18  Sylhowe Road, Oakland, California 94602, represented by
19  JEREMY L. FRIEDMAN, Attorney at Law, appeared as counsel
20  on behalf of the Plaintiff.
21    The Law Offices of Seyfarth Shaw, 560 Mission
22  Street, Suite 3100, San Francisco, California 94105,
23  represented by JONATHAN D. MARTIN, Attorney at Law,
24  appeared as counsel on behalf of the Defendant.
25

00203
1  ask Dr. Dustin any questions about those records at this
2  time.
3        If and when the time comes that we do receive
4  those records, I would like to resume this deposition so
5  I can ask Dr. Dustin about those records.
6        So I'm not able to close the deposition at this
7  point, but for today, I have no further questions.
8        MR. FRIEDMAN:  Well, I will state on the record
9  that I disagree with counsel's characterization.  But at
10  any rate, if there is further questioning by him, I will
11  be in touch with you.  I do have some additional
12  questions, though.  Can we take a couple minutes' break?
13        MR. MARTIN:  I'm not done with my questions.
14        MR. FRIEDMAN:  You said you were.
15        MR. MARTIN:  You can ask your questions when
16  I'm done with my questions entirely, and you'll to have
17  wait.
18        MR. FRIEDMAN:  Well, but I'll be asking
19  questions at this deposition, so we'll take a break.
20        MR. MARTIN:  All right.  We're off the record.
21        (A recess was taken.)
22        EXAMINATION BY MR. FRIEDMAN
23        MR. FRIEDMAN:  We're on the record.
24        Dr. Dustin, I introduced myself to you before
25  we started the deposition.  I'm Fernando daRosa's

00204
1   attorney in this matter.
2       Q.   Can you look at Page 8 of the Volume 3 records.
3       A.   Yes.
4       Q.   Is that the patient progress records from
5   January 2007?
6       A.   Yes.
7           MR. MARTIN:  Is this an exhibit?  Has this been
8   introduced already?
9           MR. FRIEDMAN:  I don't know.
10           But can you please --
11           You have it though, Counsel.
12          MR. MARTIN:  Well --
13          MR. FRIEDMAN:  Just if you can, review it, sir.
14   And I just wanted to make sure that the record is clear
15   that you have all the records in front of you.
16          MR. MARTIN:  Well, it needs to be introduced as
17   an exhibit if you're going to ask questions about it.
18   So --
19          MR. FRIEDMAN:  Actually, Counsel, that's not
20   true.  But at any rate, I'll ask the witnesses to review
21   it.
22           And tell me when you're done.
23          THE WITNESS:  Okay.
24          MR. FRIEDMAN:  Q.  And then going forward to
25   the Page 7 before that, can you review that, too.

00205
1      A.   Yes.
2      Q.   Have you had a chance to review that?
3      A.   Yes.
4          MR. MARTIN:  All right.  We'll just be
5    photocopying these pages.  I'm going to introduce them as
6    exhibits, then.  And you're free to ask about them.  They
7    need to be part of the record if you're going to be
8    asking questions about it, so let's just flag those
9    pages.
10          MR. FRIEDMAN:  It's actually not true, Counsel.
11   Not everything that a witness gets examined on needs to
12   be made an exhibit of the deposition.  And frequently,
13   when there are medical depositions, we don't actually
14   make the medical records part of the exhibits.  And I'm
15   not going to, and we're not going to need to.
16          MR. MARTIN:  Well, I --
17          MR. FRIEDMAN:  If you have questions and you
18   wish to do it at the end, then, when it's your turn, you
19   can do that.
20          MR. MARTIN:  That's fine.  Let's go ahead.  And
21   we'll just put paper clips on those pages, and we'll mark
22   the ones that he's referring to.  That way, we can copy
23   them afterward.
24          MR. FRIEDMAN:  Q.  Have you had an opportunity
25   to look at Page 7?

00206
1     A.  Yes.
2     Q.  And the two pages before that were made an
3  exhibit already.  Can you go to Page 3 and 4.
4     A.  (Witness complies.)
5     Q.  Have you had a chance to review --
6     A.  There's not a Page 4.
7     Q.  Oh.  4 is the back side of Page 3.
8     A.  Okay.  Yes.
9     Q.  Have you had a chance to look at that?
10     A.  Yes.
11     Q.   Now, if you can have Volume 2 in front of you
12  as well.
13        MR. MARTIN:  At least as a matter of courtesy,
14  Counsel, could you give me copies of the documents you're
15  referring to.
16        MR. FRIEDMAN:  You have been given copies of
17  all the documents.
18        MR. MARTIN:  Just for purposes of the
19  deposition, like I've been doing.  You already have
20  copies of those documents, but I gave you a courtesy copy
21  for use at the deposition.  I'm asking you if you are
22  planning to extend the same courtesy.
23        MR. FRIEDMAN:  I will, of course, give you a
24  copy of anything that has not already been made an
25  exhibit.

00207
1        So if you're looking at Page -- the one that's
2    dated 7/1/05 --
3        It's Exhibit 16, Counsel.
4        MR. MARTIN:  Okay.
5        MR. FRIEDMAN:  Q.  Review that, please.  We've
6    already asked you questions about that today.
7    A.  Yes.
8    Q.  Okay.  And let's see.  There's one more.  Is
9    there a computer -- do the records here include your --
10   that you brought to the deposition today include the
11   computer printouts?
12   A.  It appears that the computer printouts are
13   generally not in the paper chart.
14   Q.  Do you believe it's in any of the other charts?
15   A.  Which date?
16   Q.  Well, I'm looking at one that was run starting
17   on January 14th, 2005, going to December 27th, 2005, a
18   computer printout that would look like this (indicating).
19   A.  Oh, no.  Those would not be in the chart.
20   Q.  And do you know whether they would be in any of
21   the other records here?
22   A.  I don't believe they would be in any of the
23   other records.
24       MR. FRIEDMAN:  Counsel, do you want to take a
25   look at this before I show it to the witness?  It's

00208
1  already been produced here.
2      MR. MARTIN:  Okay.  Will you be asking
3  questions about that?
4      MR. FRIEDMAN:  Yes, I will, so we can make a
5  copy of this as an exhibit.
6      MR. MARTIN:  Great.
7      MR. FRIEDMAN:  Actually, I do not wish to give
8  you a copy of the exhibit, but I will make it available
9  during the questioning.
10     Q.  So do you see on this computer printout that
11 there is a date of July 1st, 2005, an entry?
12     A.  Yes.
13     Q.  And is that when you stated that there was a
14 probable diagnosis of narcolepsy?
15     A.  Yes.
16     Q.  Is that what's sometimes referred to as a
17 differential diagnosis?
18     A.  Well, this could be part of a differential
19 diagnosis.  A differential just simply means there are
20 several possibilities, among which you need to decide one
21 or more than one.
22     Q.  And then does that record indicate for you when
23 you would have made a diagnosis of narcolepsy?
24     A.  Well, I wrote "probable" on July 1st, so that
25 doesn't indicate a definite diagnosis.  On July 29th, it

00209
1  says "narcolepsy with cataplexy."  But I remember we
2  looked at those notes, and I think -- I think it was this
3  one that I was firmly decided.  That would be August
4  29th.
5     Q.   Okay.  Thank you.  Now, on July 1st, 2005, you
6  saw Mr. daRosa?
7     A.   Yes.
8     Q.   And what did you suspect that he suffered from?
9     A.   Narcolepsy.
10    Q.   Was this the first visit, to your knowledge,
11 where you had suspected that Mr. daRosa had narcolepsy?
12    A.   I believe so.
13    Q.   What did you base your diagnosis upon?
14    A.   He relayed a history of falling asleep
15 constantly for 20 years.
16    Q.   Did you also -- what did -- did he report to
17 you that he was suffering from irresistible sleep?
18    A.   Yes.
19    Q.   And Mr. daRosa had already been diagnosed with
20 cataplexy at that time?
21    A.   Correct.
22    Q.   And I believe you testified in the prior
23 deposition that cataplexy and narcolepsy can frequently
24 occur together.  Is that correct?
25    A.   Yes.

00210
1     Q.   And when you told him not to take the Provigil
2  around the time of the MSLT, did you mean for a period of
3  time prior to the testing?
4     A.   Yes.  I don't recall if I told him an exact
5  time period, but especially before the test not to take
6  it.
7     Q.   Okay.  Now, Mr. daRosa called you on July 6th,
8  2005? called to the clinic?
9     A.   Yes.
10    Q.   And he was using a Kaiser's internal number at
11  the time?
12    A.   Yes.
13    Q.   Indicates that he works at Kaiser or did at the
14  time?
15    A.   Yes.
16    Q.   Did you know that?  Did he tell you he was an
17  employee?
18    A.   I believe so.
19    Q.   And his message to you was that he was falling
20  asleep at his desk?
21    A.   Yes.
22    Q.   And he asked what can he do about it?
23    A.   Yes.
24    Q.   And he was already taking Provigil?
25    A.   Yes.

00211
1     Q.    What did you tell him?
2     A.    To increase the dose of Provigil.
3     Q.    Did you offer him a work slip if he needed time
4  off?
5     A.    Yes.
6     Q.    Did he communicate to your office that he was
7  trying to keep working at that time?
8     A.    Yes.
9     Q.    On July 15th --
10          MR. MARTIN:  If you could, just put a paper
11  clip on the green page there.
12          THE WITNESS:  (Witness complies.)
13          MR. FRIEDMAN:  On July 5th, he showed you a
14  computer record that indicated a sleep order.
15     Q.    Do you know what that referred to?  An order
16  for a sleep test?
17     A.    Presumably the polysomnogram outside referral.
18     Q.    How do you go about doing that kind of
19  ordering?
20     A.    We fill out a form requesting authorization to
21  refer a patient to a facility outside of Kaiser.
22     Q.    And you did that in connection with
23  Mr. daRosa's medical condition?
24     A.    Yes.
25     Q.    Do you know approximately how long it takes for

00212
1  such a test to be arranged?
2      A.  Longer than I thought.
3      Q.  On July 29th, Mr. daRosa came in and had a
4  follow-up neurological review with you.  Correct?
5      A.  Yes.
6      Q.  And that was after the July 6th work slip that
7  you had wrote for him that you testified previously to.
8  Correct?
9      A.  Yes.
10      Q.  So you had already put him off work at that
11  time.  Correct?
12      A.  Yes.
13      Q.  And what did he report to you on July 29th?
14      A.  Still falling asleep on 400 milligrams a day of
15  Provigil.
16          MR. MARTIN:  And for the record, he's looking
17  at what we've marked as Defendant's Exhibit 19.
18          MR. FRIEDMAN:  Q.  And did you change anything
19  in his medications at that time?
20      A.  Yes.  I added Ritalin to his regimen.
21      Q.  And you told him to return in four weeks?
22      A.  Yes.
23      Q.  And do you have a record there of a work slip
24  on September 1st, 2005?
25      A.  No.

00213
1    Q.  Do you have a work slip August 29th extending
2  it to September 5th?
3    A.  Yes.
4    Q.  And is that in your handwriting?
5    A.  Yes.
6    Q.  So did you extend Mr. daRosa's leave of absence
7  until September 6th?
8    A.  Yes.
9    Q.  And that was your order for him not to go back
10  to work until he was able to?
11    A.  Yes.
12      MR. MARTIN:  And for the record, I believe that
13  would be Defendant's Exhibit 6.
14      MR. FRIEDMAN:  Q.  I see.  I was getting ahead
15  of myself.  If you can, look to work slip that was dated
16  July 29th.
17    A.  Yes.
18    Q.  When -- that was the day he came and saw you?
19    A.  Yes.
20    Q.  And you gave him a work slip until September
21  1st?
22    A.  Yes.
23      MR. MARTIN:  That's Defendant's Exhibit 5.
24      MR. FRIEDMAN:  Q.  And you were putting him off
25  of work until that time?

00214
1     A.   Yes.
2     Q.   And that was in connection with his narcolepsy?
3     A.   Yes.
4     Q.   And then on August 29th, he visited you again?
5     A.   Yes.
6     Q.   And that was per your request?
7     A.   Yes.
8     Q.   Did you assess how he was doing at that time?
9     A.   Yes.  He felt better.
10         MR. MARTIN:  And for the record, he's referring
11   to Defendant's Exhibit 20.
12         MR. FRIEDMAN:  Q.  He stated he felt better.
13   You assessed that he felt better on this current regimen.
14    A.   Yes.
15    Q.   And why didn't you write just "return to work"
16   as opposed to "return to work trial"?
17    A.   Even though he was better, I guess I was unsure
18   as to whether he could really do it.  So I wanted to see.
19   And if he couldn't, it wouldn't be a big surprise.
20    Q.   And if he wasn't doing well enough to work, he
21   was to report to you again?
22    A.   Yes.
23    Q.   And then it's the following page in the record
24   that indicates that you put him off until September 6th.
25   Correct?

00215
1      A.   Yes.
2      Q.   And did Mr. daRosa come back on the 17th of
3    September?  I'm sorry.  The 12th of September?
4      A.   Yes, the 12th.
5      Q.   And that's two weeks later.
6      A.   Yes.
7      Q.   And did you assess how he was doing at that
8    time?
9      A.   Yes.
10     Q.   What did you conclude?
11     A.   Well, he felt that he was, again, too sleepy,
12   and I wanted to try a different medication.
13        MR. MARTIN:  The witness is referring to
14   Defendant's Exhibit 21.
15        MR. FRIEDMAN:  Q.  What were you basing your
16   assessment on?
17     A.   His report.
18     Q.   And what was that?
19     A.   That he was still too sleepy.  He was falling
20   asleep in unstimulating situations very easily.  He found
21   it hard to drive if he was bored.
22     Q.   Did he ask to be taken off work again at that
23   time?
24     A.   I don't recall if he did or I offered or -- if
25   either of those happened.

00216
1     Q.   Is there anything in your record showing that
2  he was taken off work at that time, on that day?
3     A.   No.
4     Q.   And what did you prescribe -- did you prescribe
5  any medications for him on September 12th?
6     A.   At this point, I wanted to try Dexedrine
7  instead of Ritalin.  So I gave him 30 milligrams
8  Dexedrine twice a day.
9     Q.   So that was a change in medication?
10     A.   Yes.
11     Q.   If you could, look at the September 20th sleep
12  study.
13     A.   Mm-hmm.
14         MR. MARTIN:  It's Defendant's Exhibit 22.
15         MR. FRIEDMAN:  Q.  There's a sleep latency and
16  an REM latency.  Can you explain what a "sleep latency"
17  is.
18     A.   Sleep latency is how long it takes to fall
19  asleep.
20     Q.   And for patients that have narcolepsy, what
21  would you expect to see?
22     A.   Well, they fall asleep quickly.  So it could be
23  shortened, but it might be long.
24     Q.   And in this case for Mr. daRosa's test, what
25  did it show for you?

00217
1     A.   Zero minutes.
2     Q.   Does that mean he fell asleep -- from the time
3   it took from lights out to falling asleep, 0.0 minutes?
4     A.   Yes.
5     Q.   And the norm is 10 to 20 minutes?
6     A.   Yes.
7     Q.   And the REM latency, what does that refer to?
8     A.   The time after falling asleep that it takes to
9   reach REM sleep.
10     Q.   And what's the norm for that?
11     A.   Usually on the order of several hours.
12     Q.   And how long did it take Mr. daRosa on this
13   test?
14     A.   4.9 minutes.
15     Q.   Did you find these significant?
16     A.   Yes.
17     Q.   And it's consistent with narcolepsy.  Correct?
18     A.   Consistent with.
19     Q.   Now, Mr. daRosa called you again on -- or
20   called your clinic again on October 18th.  Correct?
21     A.   Yes.
22     Q.   And he was continuing to ask questions about --
23   about the sleep study.  Correct?
24     A.   Yes.  He wanted to know the results.
25          MR. MARTIN:  Referring to Defendant's Exhibit

00218

1  23.

2      MR. FRIEDMAN:  Q.  And you had your office

3  staff go over those results with him.  Correct?

4      A.  Yes.

5      Q.  Did you change any of his medication regime at

6  that time?

7      A.  No.

8      Q.  Did you change your diagnoses at that time?

9      A.  I don't believe I changed any preexisting

10  diagnoses.  I certainly added the diagnosis of sleep

11  apnea and wanted him to try CPAP.

12      Q.   Now, in Volume 3 -- I'm sorry.  Make sure I

13  have the right -- do you have your January 24th visit?

14      A.  2006?

15      Q.  Yes.

16      A.   Only the handwritten note that says it's in the

17  computer.

18      MR. FRIEDMAN:  Okay.  I believe that was made

19  an exhibit to the prior deposition.

20      Do you have that, Counsel?

21      MR. MARTIN:  Well, you tell me.  You tell me

22  what document it is.  If it's an exhibit, tell me the

23  exhibit number, and I'll tell you.

24      MR. FRIEDMAN:  Well, I'm handing the patient a

25  copy of the computer record.

00219
1         MR. MARTIN:  You're handing who?
2         MR. FRIEDMAN:  The witness.  What did I say?
3    Q.  Do you see your -- did Mr. daRosa come and see
4  you on January 24th, 2006?
5    A.  Yes.
6    Q.  Did the -- was this another follow-up for his
7  neurological visit?
8    A.  Yes.
9         MR. MARTIN:  And for the record, by the way,
10  this is Defendant's Exhibit 8 that he was looking at.
11         MR. FRIEDMAN:  Q.  What were you following up
12  on?
13    A.  Narcolepsy/cataplexy and sleep apnea.
14    Q.  Did you assess how he was doing at the time?
15    A.  Yes.
16    Q.  What did you conclude?
17    A.  That he was still getting overwhelming sleep
18  attacks, which were occurring every few days, functioning
19  poorly at work, once fell asleep after parking the car.
20  He was taking his medication on an as-needed basis three
21  to five times a day, but sometimes he would go days
22  without it.  And so I recommended that he take the
23  medicine on an around-the-clock basis, not an as-needed
24  basis, and to add back in the Provigil, stay off work and
25  don't drive until he's appropriately treated.

00220
1      Q.   Now, the reference to falling asleep in the
2   parked car, there's some testimony so far in this case
3   that Mr. daRosa and his girlfriend were at lunchtime in
4   the car.  And the girlfriend left and Mr. daRosa remained
5   in the car.  And then she came back in the afternoon, and
6   he was sleeping in the car.
7          There's also a reference on a specific date,
8   December 6th, where -- in the employment records,
9   indicating that Mr. daRosa had -- was unable to come into
10   work.  He was feeling ill that day, and he was in his car
11   at that time.
12          Do you recall any of the specifics of your
13   discussion with him of the time he had fallen asleep in a
14   parked car?
15      A.   No.
16      Q.   And did you order him to take time off from
17   work at that time?
18      A.   Yes.
19      Q.   That was your order?
20      A.   Yes.
21      Q.   And he was supposed to stay off work until his
22   medications were properly adjusted.  Correct?
23      A.   Yes.
24      Q.   And when you use the word "titration" or
25   "titrated," that's what you're referring to?

00221
1      A.   Yes.
2      Q.   Was it your opinion that, based on the records
3   that you've reviewed and his history at the time, that he
4   was unable to return to work due to his health condition?
5      A.   Yes.
6      Q.   And did it appear to you that -- in these phone
7   calls and in the visits that he was trying to work as
8   best he could?
9      A.   I felt so.
10      Q.   Do you -- can you tell what time of day that
11   visit was?
12      A.   In the paper chart, it appears it was 10:15 in
13   the morning.
14      Q.   And do you have a present memory of it?
15      A.   No.
16      Q.   There was -- there's some testimony that there
17   was a fire drill that day, and a lot of people needed to
18   leave the offices, and that -- do you recall there being
19   a fire drill and seeing Mr. daRosa out on the street?
20           MR. MARTIN:  Objection.  Misstates the
21   evidence.
22           You can answer.
23           THE WITNESS:  Not specifically.
24           MR. FRIEDMAN:  Q.  Do you recall a fire drill?
25      A.   I recall fire drills, but I don't know if I

00222
1  recall this specific one.
2      Q.   Okay.  So talking about the fire drill doesn't
3  jog your memory as to that particular visit that day any
4  more than we've got on the record?
5      A.   I know I've run into him on the street, but I
6  don't remember if it was at a fire drill.
7      Q.   Okay.  Counsel showed you a record dated
8  February 16th, dealing with Mr. daRosa's disability
9  claim.
10     A.   Yes.
11     Q.   And that claim came out of your office, to your
12  knowledge?
13     A.   Wait a minute.  February --
14     Q.   February 16th, 2006.
15         MR. MARTIN:  It's Defendant's Exhibit 24.
16         THE WITNESS:  This is March 24th, so this is
17  January 24th.
18         MR. MARTIN:  You can look at the prior
19  exhibits.  It's Exhibit 24.
20         THE WITNESS:  Oh.
21         MR. FRIEDMAN:  Q.  Ah.  Actually, do you have
22  Volume 2 in front of you (indicating)?  I think the last
23  page.  No.  Below that, below that (indicating).  Right
24  here (indicating).
25     A.   Oh.  Yes.

00223
1      Q.   And is that a document that came out of your
2  office?
3      A.   Well, it came out of a Kaiser office, not the
4  neurology department.
5      Q.   But it has your name on it?
6      A.   Yes.
7      Q.   And it reports that he had been under your care
8  from January 25th, 2006 to 2/16/2006?
9      A.   Yes.
10     Q.   And he was -- had been ordered off work,
11  rest --
12     A.   Yes.
13     Q.   -- at that time?
14          And all of that is true.  Correct?
15     A.   Yes.
16     Q.   Below that is a form that's dated February
17  13th, 2006.
18          Do you see that?
19     A.   You mean directly underneath?
20     Q.   Yes.  Directly underneath it, a form filled out
21  by Dr. daRosa.
22     A.   Yes.
23     Q.   And Mr. daRosa dated that February 1st, 2006?
24     A.   Yes.
25          MR. MARTIN:  If you could, mark that document

00224
1  with a paper clip.  Thank you.
2      MR. FRIEDMAN:  Q.  Does this indicate that --
3  what are these forms; do you know?
4      A.  I think it's a disability application.
5      Q.  Okay.  And did you believe that he suffered
6  from narcolepsy at that time?
7      A.  Yes.
8      Q.  And that it disabled him from working at that
9  time?
10     A.  Yes.
11     Q.  And the time of disability -- the period of
12  disability went back to the date you had seen him on
13  January 24th, beginning on January 25th?
14     A.  Yes.
15     Q.  And so Mr. daRosa was telling the truth when he
16  answered, "Why did you stop working?"  "Doctor's orders"?
17     A.  Yes.
18     Q.  Now, you testified about the March 24th
19  telephone message, that he was still having problems and
20  needed to be taken off work for -- and needed to extend
21  his disability for another month.
22         Do you recall the testimony in the last
23  deposition?
24     A.  March 24th, 2005?
25     Q.  2006.

00225
1     A.   2006?
2     Q.   Yeah.
3     A.   Yes.
4     Q.   He was still having problems at that time?
5     A.   Yes.
6     Q.   Did you speak to him or only through an
7   assistant?
8     A.   I believe only through an assistant.
9     Q.   Did you know at that time that Mr. daRosa had
10  been terminated from member services and was speaking
11  with Kaiser's human resources department about trying to
12  get his job back?
13    A.   I don't think I knew that.  I'm not sure.
14    Q.   Would you expect a patient to follow up with
15  you in getting additional work slips if he wasn't
16  employed at that time?
17    A.   No.
18        MR. MARTIN:  By the way, the March 24th message
19  is Defendant's Exhibit 25.
20        MR. FRIEDMAN:  Q.  Okay.  And then just to
21  briefly touch on points of contact, there was a -- you
22  have no records of communicating with him until the
23  January 16th call when -- not call.  Visit, when he
24  stated he had not seen you in a while because he had lost
25  his job and insurance but had recently gotten his

00226
1  insurance back?
2      A.  Yes.
3      Q.  Did you know that he had been scheduled for a
4  hernia operation at the same time?
5      A.  No.
6      Q.  Or around the same time?
7      A.  No.
8      Q.  You don't recall talking to him about that?
9      A.  No.
10      Q.  And then you had another follow-up with him
11  April 23rd, 2007?
12      A.  Yes.
13      Q.  And he mentioned to you that he might be moving
14  to the Azores?
15      A.  Yes.
16      Q.  And he reported to you that he was -- that his
17  excessive daytime sleepiness had improved significantly
18  since he had increased his Provigil every morning?
19      A.  Oh, yes.
20      Q.  And your diagnosis continued with narcolepsy,
21  cataplexy and obstructive sleep apnea?
22      A.  Yes.
23      Q.  And then you had a follow-up June 25th, 2007,
24  follow-up where he was doing well on his medicine and
25  wanted to try to get a professional driver's license?

00236
1        MR. FRIEDMAN:  Thank you very much.  That's all
2   I have for you today.
3        MR. MARTIN:  All right.  Well, subject to the
4   circumstances I described earlier, it looks like we're
5   finished with the deposition for today.  We may be
6   returning at some point in the future.
7        We're off the record.
8           (End of confidential record.)
9           (The deposition recessed at 11:04
10          o'clock a.m.)
11
12       I certify under penalty of perjury that the
13   foregoing is true and correct.
14   Executed at                on            .
                 (Place)             (Date)
15
16                                  .
                     (FRANK DUSTIN, M.D.)
17
18
19
20
21
22
23
24
25

00237

1               CERTIFICATE OF DEPOSITION OFFICER

2          I, CYNTHIA LEW, CSR 11999, duly authorized to

3     administer oaths, hereby certify that at the commencement

4     of the foregoing deposition, the witness stated, under

5     penalty of perjury, that he or she would testify the

6     truth, the whole truth, and nothing but the truth in the

7     within-entitled cause; that said deposition was taken at

8     the time and place therein stated; that the testimony of

9     said witness was reported by me by me and was thereafter

10    transcribed by me or under my direction into typewriting

11    by computer; that the foregoing is a full, complete, and

12    true record of such testimony; and that the deponent or a

13    party requested review of the deposition prior to the

14    completion of the deposition; and that the deponent was

15    given an opportunity to review the deposition.

16          I further certify that I am not of counsel nor

17    attorney for either or any of the parties in the

18    foregoing deposition and caption named, nor in any way

19    interested in the outcome of the cause named in

20    said caption.

21               DEPOSITION OFFICER

22    I hereby certify this copy is a
      true and exact copy of the original.

23
                    DATED:

24          DEPOSITION OFFICER

25

00238
1
2
3
4
5
6
7   Frank Dustin, M.D.
    Alameda Medical Offices
8   2417 Central Avenue
    Alameda, California 94501
9
    Re: Fernando DaRosa v. Kaiser Foundation Health
10      Plan, Inc.
    Date of Deposition: August 25, 2008
11
    Dear Dr. Dustin,
12
    Your deposition taken in the above-entitled matter
13  has been transcribed.  This deposition will be
    available at our offices for reading and signing by
14  you for a period of thirty (30) days from the date
    of this letter, after which time the original will
15  be sealed and sent to the office which noticed the
    deposition, in accordance with section 30(e) of the
16  Federal Rules of Civil Procedure.
17  Sincerely,
18
19  Tooker & Antz
20  cc: All Counsel
21
22
23
24
25