```
00001
 1              UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF CALIFORNIA
 3                      ---oOo---
 4
 5   FERNANDO DAROSA,
 6          Plaintiff,
 7       vs.              No. 3:07-CV-03114-SI
 8   KAISER FOUNDATION HEALTH PLAN,
     INC.,
 9
            Defendant.
10   _____/
11
12          DEPOSITION OF FRANK DUSTIN, M.D.
13             Volume I, Pages 1 - 132
14              Monday, May 12, 2008
15
16
17
18
19
20
21   REPORTED BY: CYNTHIA LEW, RPR, CSR No. 11999
22
23              TOOKER & ANTZ
            COURT REPORTING & VIDEO SERVICES
24         350 SANSOME STREET, SUITE 700
           SAN FRANCISCO, CALIFORNIA 94104
25               (415) 392-0650
```

```
00002
 1                I N D E X
 2
 3  DEPOSITION OF FRANK DUSTIN, M.D.
 4
 5  EXAMINATION BY:                         PAGE
 6    MR. MARTIN                              6
 7                ---oOo---
 8
 9              E X H I B I T S
10  (For Defendant)
11  IDENTIFICATION    DESCRIPTION              PAGE
12    1    Six-page group exhibit of notice of    8
           deposition, subpoena and proof of service
13
      2    Progress record, Bates No. 8          36
14
      3    Telephone message, dated March 21, 2007,  55
15         Bates No. 13
16    4    Progress record, Bates No. 12         60
17    5    Visit verification, dated July 29, 2005   72
18    6    Visit verification, dated August 29, 2005  75
19    7    Visit verification, dated January 24,  76
           2006
20
      8    E-chart note, dated January 24, 2006  77
21
      9    Visit verification, dated March 24, 2006  91
22
     10    Two-page telephone message, dated March  91
23         13, 2006
24   11    Five-page DMV "Driver Medical         97
           Evaluation," Bates No. 18 through 22,
25         dated July 23, 2007
```

```
00003
 1                E X H I B I T S
 2  (For Defendant)
 3  IDENTIFICATION    DESCRIPTION              PAGE
 4    12    Progress record, Bates No. 16       105
 5    13    E-chart note, dated June 25, 2007   106
 6    14    E-chart note, dated April 23, 2007  120
 7    15    Telephone message, dated November 8, 127
            2007, Bates No. 45
 8
 9                    ---oOo--
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
00004
 1          BE IT REMEMBERED that, pursuant to Notice of
 2   Taking Deposition, on Monday, May 12, 2008, commencing at
 3   the hour of 8:37 o'clock a.m. thereof, at the Offices of
 4   Kaiser Foundation Health Plan, Inc., 235 West MacArthur
 5   Boulevard, Suite 669, Oakland, California before me,
 6   CYNTHIA LEW, duly authorized to administer oaths pursuant
 7   to Section 2093(b) of the California Code of Civil
 8   Procedure, personally appeared
 9               FRANK DUSTIN, M.D.,
10   called as a witness on behalf of the Defendant, and the
11   said witness, having first been placed under oath, was
12   thereupon examined and testified as hereinafter set
13   forth.
14
15               A P P E A R A N C E S
16
17          The Offices of Cornerstone Law Group, 595
18   Market Street, Suite 2360, San Francisco, California
19   94105, represented by CHRISTOPHER J. KELLER, Attorney at
20   Law, appeared as counsel on behalf of the Plaintiff.
21          The Law Offices of Seyfarth Shaw, 560 Mission
22   Street, Suite 3100, San Francisco, California 94105,
23   represented by JONATHAN D. MARTIN, Attorney at Law,
24   appeared as counsel on behalf of the Defendant.
25          Kaiser Foundation Health Plan, Inc., One Kaiser
```

00005
1  Plaza, 19th Floor, Oakland, California 94612, represented
2  by ANNE E. LIBBIN, Attorney at Law, appeared as counsel
3  on behalf of the Defendant.
4                  ---oOo---
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

```
00012
 1  lawsuit?
 2      A.  No.
 3      Q.  Let me ask you some questions about your
 4  background.  What kind of physician are you?
 5      A.  A neurologist.
 6      Q.  And are you licensed as a physician in
 7  California?
 8      A.  Yes.
 9      Q.  Are you certified by the National Board of
10  Medical Examiners?
11      A.  Yes.
12      Q.  In neurology?
13      A.  Yes.
14      Q.  Any other areas?
15      A.  No.
16      Q.  Do you have any other certifications?
17      A.  No.
18      Q.  Can you tell us what it means to be board
19  certified.
20      A.  Well, it means you've passed qualifications of
21  the American Board of Psychiatry and Neurology.  It
22  usually involves a written exam, an oral examination.
23  It's difficult.
24          MR. KELLER:  Excuse me, Counsel.  Do you mind
25  if we close the door a little bit?
```

```
00013
 1         MR. MARTIN:  No.  That's okay.
 2     Q.  Are you currently a member of any professional
 3  organizations?
 4     A.  The American Academy of Neurology.
 5     Q.  Any others?
 6     A.  No.
 7     Q.  Have you ever held any offices within that
 8  organization?
 9     A.  I'm sorry.  I might be a member of the
10  California Medical Association, but I don't remember for
11  sure.
12     Q.  Okay.  Have you ever held any offices in any
13  association in which you've been a member?
14     A.  No.
15     Q.  Where are you currently employed?
16     A.  At the Permanente Medical Group, Oakland,
17  California.
18     Q.  How long have you been with the Permanente
19  Medical Group?
20     A.  I believe since 2000 or 2001.
21     Q.  Where were you employed previous to that?
22     A.  I was self-employed for approximately ten years
23  prior to that.
24     Q.  Where did you go to college?
25     A.  Stanford University.
```

```
00014
 1     Q.  And medical school?
 2     A.  Baylor College of Medicine.
 3     Q.  Is that in Texas?
 4     A.  Yes, Houston.
 5     Q.  Okay.  Where did you do your residency?
 6     A.  UC Davis.
 7     Q.  And did you have a specialty at that time?
 8     A.  Well, the residency was in neurology.
 9  Actually, prior to the residency, I did one year of
10  general and medical internship here at Kaiser Oakland.
11     Q.  Now, have you ever specialized in the study,
12  evaluation or treatment of individuals who claim to
13  suffer from narcolepsy?
14     A.  I'm sorry.  Repeat that.
15     Q.  Sure.  Have you ever specialized in the study
16  or evaluation or treatment of individuals who were
17  claiming to suffer from narcolepsy?
18     A.  Only as much as any general adult neurologist.
19  I don't have a subspecialty in sleep disorders.
20     Q.  So you haven't authored any articles on
21  narcolepsy or other sleep disorders?
22     A.  No.
23     Q.  You haven't given any speeches on narcolepsy or
24  any other sleep disorders?
25     A.  No.
```

```
00015
 1     Q.  And you've never been retained as an expert to
 2  give your opinion on narcolepsy or any other sleep
 3  disorders?
 4     A.  No.
 5     Q.  So your knowledge on what narcolepsy is is what
 6  a general medical practitioner might have?  Is that what
 7  you're saying?
 8     A.  Yes, probably more than a general internist --
 9     Q.  Okay.
10     A.  -- but no more than a general neurologist.
11     Q.  Where did you learn what you currently know
12  about narcolepsy and any other sleep disorders?
13     A.  In training from professors, in textbooks,
14  journals and professional meetings where they have
15  presentations.
16     Q.  Is there anything you feel that you don't know
17  about narcolepsy and other sleep disorders, if you can
18  generally state if there are areas of knowledge about
19  these kinds of disorders that you don't feel you'd be
20  knowledgeable to discuss with a patient?
21         MR. KELLER:  I'm just going to object to the
22  extent it calls for speculation.
23         MR. MARTIN:  Q.  If you know, you can answer.
24     A.  Well, I think there's aspects of the disorder
25  that aren't well understood by anyone, frankly.  The
```

```
00016
 1  anatomical basis of it and some of the genetics of it,
 2  you know, the specifics I would be uncomfortable with.
 3  But the general diagnosis and treatment I feel
 4  comfortable.
 5     Q.  And would you say the same as to other sleep
 6  disorders?
 7     A.  Yes.
 8     Q.  Such as sleep apnea?
 9     A.  Yes.
10     Q.  What is narcolepsy?
11     A.  It's a disorder characterized by excessive
12  daytime sleepiness in the form of sleep attacks.
13     Q.  And what do you mean by the term "sleep
14  attack"?
15     A.  Well, they are overwhelming urges to sleep that
16  occur at times when most people wouldn't be necessarily
17  prone to falling asleep.
18     Q.  What is "sleep apnea"?
19     A.  Sleep apnea is a disorder that's also
20  characterized by excessive daytime sleepiness, but it's
21  due to improper breathing during the night.  Apneas are
22  essentially breath-holding spells.  Most commonly, it's
23  due to obstruction in the upper airway region.
24     Q.  What is the interrelationship, if any, between
25  narcolepsy and sleep apnea?
```

```
00017
 1     A.  Well, they're separate disorders, but they can
 2  co-exist.  Sleep apnea is very common, so it's not that
 3  unusual to see both disorders in some cases.
 4     Q.  Is it possible for someone to have sleep apnea
 5  without having narcolepsy?
 6     A.  Yes.
 7     Q.  If someone is unable to sleep normally because
 8  of sleep apnea, how would you determine whether
 9  narcolepsy may also be playing a role in the individual's
10  sleep problems?
11        MR. KELLER:  Objection to the extent it's a
12  hypothetical.
13        THE WITNESS:  How would I tell if someone has
14  narcolepsy on top of sleep apnea?
15        MR. MARTIN:  Q.  Right.
16     A.  Usually that would require laboratory
17  confirmation in the form of a multiple sleep latency
18  test.
19     Q.  And can you tell me a little bit more about
20  what this test would entail.
21     A.  Well, one of the features of narcolepsy is
22  going into REM sleep very rapidly after falling asleep,
23  which is not normally what happens.  And multiple sleep
24  latency test means you take multiple naps, usually five
25  naps.  And they measure the latency or the time it takes
```

```
00018
 1  for you to reach REM sleep.  And if you reach that
 2  rapidly in three out of the five naps, then that helps
 3  confirm the diagnosis of narcolepsy.  The other way you
 4  could do it is clinically.  If someone has cataplexy or
 5  sleep paralysis or some of these other hallmarks of
 6  narcolepsy that you wouldn't expect to find in sleep
 7  apnea, that would also lead to probability of narcolepsy
 8  on top of sleep apnea.
 9      Q.  You just used the term "cataplexy."  What is
10  that?
11      A.  That's a condition where with an emotional -- I
12  think any sort of intense emotional state -- like
13  laughing, crying, anger, fear -- a person will lose
14  muscle tone and sometimes collapse or just slump
15  (indicating) but not necessarily lose consciousness.
16  It's not a sleep attack.
17      Q.  But it's something that can be associated with
18  narcolepsy or sleep apnea?
19      A.  Not with sleep apnea.  It also can occur
20  completely on its own, but it is something that does have
21  a tendency to occur with narcolepsy, so it would raise
22  the suspicion of that disorder.
23      Q.  What are the causes of narcolepsy?
24      A.  Well, it's --
25          MR. KELLER:  I'm just going to object on the
```

```
00019
 1  basis of an improper hypothetical.
 2          THE WITNESS:  It's -- how do I put this --
 3  sleep intruding into wakefulness.  The exact mechanism I
 4  can't explain well.  It's not a disorder that's caused by
 5  multiple other things, though.  It's sort of a genetic
 6  component, and you either have it or you don't.
 7          MR. MARTIN:  Q.  Is there a physiological
 8  component to it?
 9      A.  Yes.
10      Q.  Can you describe what that would be, if you
11  know?
12      A.  It's not a disorder of the mind or a mental
13  disorder, if that's what you're getting at.  It's a
14  physiologic disorder thought to be in the brain stem with
15  the parts of the brain stem there that are important for
16  causing sleep and dreaming sleep.
17      Q.  And you said it could have a genetic
18  foundation?
19      A.  Yes.
20      Q.  Now, what's the difference between having
21  narcolepsy and just being sleepy at inconvenient times,
22  which happens to all of us sometimes?
23      A.  Well, sleep attacks in narcolepsy would tend to
24  occur more when you're in a boring situation.  But they
25  also occur when most of us wouldn't necessarily be
```

```
00020
 1  falling asleep.  And so it can become very problematic
 2  for our normal life.  We're working or driving, it can
 3  become nonproductive and dangerous.
 4      Q.  And just to clarify, what are the symptoms of
 5  narcolepsy?
 6      A.  Excessive daytime sleepiness usually in the
 7  form of sleep attacks.  Usually if you take a nap, you're
 8  temporarily refreshed.  You also tend to wake up
 9  refreshed as opposed to sleep apnea, where you would not
10  wake up refreshed.  And often but not all the time, there
11  are these associated symptoms of cataplexy, sleep
12  paralysis, hypnogogic and hypnopompic hallucinations.
13  And there's laboratory findings you can find, sleep
14  studies.
15      Q.  What are the symptoms of sleep apnea?
16      A.  Excessive daytime sleepiness, although usually
17  a patient will wake up unrefreshed because they're not
18  getting oxygen properly through the night.  They usually
19  don't have those other associated symptoms that I
20  mentioned with narcolepsy.  And at night, they'll tend to
21  snore loudly and have pauses in their breathing.
22      Q.  So sleep apnea specifically relates to a
23  breathing issue.  Is that right?
24      A.  Yes.
25      Q.  Some kind of obstruction in the breathing
```

```
00131
 1  resume on another date that will be mutually agreed to by
 2  the parties and Dr. Dustin.
 3        MR. KELLER:  Yes.  And I would like to reserve
 4  my right to ask questions as well because I have
 5  follow-up questions --
 6        MR. MARTIN:  That's fine.
 7        MR. KELLER:  -- to ask of the doctor.
 8        MR. MARTIN:  That's fine.  Okay.  We're done
 9  for today.
10        THE WITNESS:  All right.  Thanks.
11          (The deposition recessed at 12:28
12           o'clock p.m.)
13
14        I certify under penalty of perjury that the
15  foregoing is true and correct.
16
17  Executed at                on              .
                (Place)            (Date)
18
19                                   .
              (FRANK DUSTIN, M.D.)
20
21
22
23
24
25
```

```
00132
 1         CERTIFICATE OF DEPOSITION OFFICER
 2      I, CYNTHIA LEW, CSR 11999, duly authorized to
 3  administer oaths, hereby certify that at the commencement
 4  of the foregoing deposition, the witness stated, under
 5  penalty of perjury, that he or she would testify the
 6  truth, the whole truth, and nothing but the truth in the
 7  within-entitled cause; that said deposition was taken at
 8  the time and place therein stated; that the testimony of
 9  said witness was reported by me by me and was thereafter
10  transcribed by me or under my direction into typewriting
11  by computer; that the foregoing is a full, complete, and
12  true record of such testimony; and that the deponent or a
13  party requested review of the deposition prior to the
14  completion of the deposition; and that the deponent was
15  given an opportunity to review the deposition.
16         I further certify that I am not of counsel nor
17  attorney for either or any of the parties in the
18  foregoing deposition and caption named, nor in any way
19  interested in the outcome of the cause named in
20  said caption.
21
                    DEPOSITION OFFICER
22
    I hereby certify this copy is a
23  true and exact copy of the original.
24              DATED:
        DEPOSITION OFFICER
25
```

```
00133
 1
 2
 3
 4
 5
 6
 7  Frank Dustin, M.D.
    Alameda Medical Offices
 8  2417 Central Avenue
    Alameda, California 94501
 9
    Re: Fernando Darosa v. Kaiser Foundation Health
10     Plan, Inc.
    Date of Deposition: May 12, 2008
11
    Dear Dr. Dustin,
12
    Your deposition taken in the above-entitled matter
13  has been transcribed.  This deposition will be
    available at our offices for reading and signing by
14  you for a period of thirty (30) days from the date
    of this letter, after which time the original will
15  be sealed and sent to the office which noticed the
    deposition, in accordance with section 30(e) of the
16  Federal Rules of Civil Procedure.
17  Sincerely,
18
19  Tooker & Antz
20  cc: All Counsel
21
22
23
24
25
```