1      UNITED STATES DISTRICT COURT IN AND FOR THE

2         NORTHERN DISTRICT OF CALIFORNIA

3           ---oOo---

4  FERNANDO DAROSA,

5     Plaintiff,

6  vs.            No. C07-03114SI

7  KAISER FOUNDATION HEALTH PLAN, INC.,

8

     Defendants.

9          /

10

11

12      DEPOSITION OF MARGIE ROPER

13

14

15

16

17    Taken before KIMBERLY R. JENSEN, RPR

18        CSR No. 12552

19        August 28, 2008

20

21

22

23

24

25

2

1               I N D E X

2                         PAGE

3   EXAMINATION BY MR. FRIEDMAN          4

4   EXAMINATION BY MR. MARTIN          109

5

6

7

8

9

10

11               E X H I B I T S

12   PLAINTIFF'S                    PAGE

13   14  Memorandum to Margie Roper from     81
        Fernando daRosa
14

15

16

17

18

19

20

21

22

23

24

25

Aiken & Welch Reporters     M. Roper   8/28/08

3

1          DEPOSITION OF MARGIE ROPER

2

3     BE IT REMEMBERED, that pursuant to Notice, and on

4   the 28th day of August 2008, commencing at the hour of

5   9:09 a.m., in the offices of AIKEN & WELCH, One Kaiser

6   Plaza, Suite 505, Oakland, California 94612, before me,

7   KIMBERLY R. JENSEN, a Certified Shorthand Reporter,

8   personally appeared MARGIE ROPER, produced as a witness

9   in said action, and being by me first duly sworn, was

10   thereupon examined as a witness in said cause.

11

12                    ---oOo---

13

14     JEREMY L. FRIEDMAN, Attorney at Law, 2801 Sylhowe

15   Road, Oakland, California 94602, appeared on behalf of

16   the Plaintiff.

17

18     JONATHAN D. MARTIN, Seyfarth Shaw LLP, 560 Mission

19   Street, Suite 3100, San Francisco, California 94105,

20   appeared on behalf of the Defendant.

21

22

23

24

25

Aiken & Welch Reporters     M. Roper   8/28/08

4

1              MARGIE ROPER,

2              sworn as a witness,

3              testified as follows:

4    EXAMINATION BY MR. FRIEDMAN:

5        Q. Even though you just did it, would you mind

6    stating your name and spelling it for the record.

7        A. Margie Roper, M-A-R-G-I-E, R-O-P-E-R.

8        Q. Ms. Roper, have you ever had your deposition

9    taken before?

10       A. Yes, about 25, 30 years ago.

11       Q. 25 or 30 years?

12       A. Uh-huh.

13       Q. Was it one occasion?

14       A. Yes.

15       Q. Was it a case involving Kaiser?

16       A. No.

17       Q. What kind of case did it involve?

18       A. It was a disability case where I was the --

19   what was I called?  I went and interviewed someone that

20   was on long-term disability.

21       Q. Were you represented by an attorney back then?

22       A. No.

23       Q. Have you -- let me go over some of the ground

24   rules for deposition so that you know what this is

25   about.

14

1      Q. Well, let's try it this way.  What kind of

2   records did you keep when an employee under your

3   supervision called in and said they were sick or unable

4   to attend work?

5          MR. MARTIN:  Objection.  Lacks foundation.

6          THE WITNESS:  I would indicate on the

7   time-keeping system that they were out that day.

8   BY MR. FRIEDMAN:

9      Q. Would you do anything else?

10      A. No.

11      Q. Did you keep a record of what employees told

12   you in advance whether they were going to be out?

13      A. I'm not sure what you meant.  When people told

14   you they were going to be out in advance, that would

15   mean they were taking vacation.  Yes, I took records of

16   a vacation calendar, who was scheduled to be on

17   vacation.

18      Q. How did you keep the records of people who

19   were going to be out on vacation?

20      A. It was a calendar, kept on a calendar, online

21   in Word.

22      Q. That's a word processing document on your

23   system?

24      A. Yes.

25      Q. And where was that when you left Kaiser, that

Aiken & Welch Reporters      M. Roper   8/28/08

15

1  document?

2      A. Should have still been on the hard drive.  I

3  believe all the staff had a copy of that document, too.

4  I sent it to them.  So they all had a copy.  I kept it

5  updated.

6      Q. What about when somebody called in sick, would

7  the only notation you would make would be an indication

8  on the system that he was out or she?

9      A. Yes.  Yes.

10      Q. Did you keep any records as to the reasons why

11  people had called in sick?

12      A. Not necessarily, because I did not ask them

13  their diagnoses when they called in sick.

14      Q. What about the work slips?  Have you ever seen

15  any work slips?

16      A. People would bring work slips when they were

17  out from work.

18      MR. MARTIN:  Objection.  Vague and ambiguous

19  as to the term "work slips."

20  BY MR. FRIEDMAN:

21      Q. What would they do, give you these work slips

22  when they were in?

23      MR. MARTIN:  Objection.  Vague and ambiguous

24  as to the term "work slips."

25  BY MR. FRIEDMAN:

16

1    Q. They would hand these to you or leave them for

2  you?

3      MR. MARTIN:  Objection.  Vague and ambiguous,

4  compound.

5      THE WITNESS:  Kaiser physicians had a form

6  called verification of absence or something like that.

7  If employees were out sick, sometimes they would bring

8  me that form.

9  BY MR. FRIEDMAN:

10    Q. What would they do when they gave you that

11  form?

12    A. Place it in their file.

13    Q. Where -- when you say "place it in the file"?

14    A. The supervisory file.

15    Q. How were those supervisory files maintained in

16  terms of employees?  Did you have a separate file for

17  each employee?

18    A. Yes.

19    Q. And you had one file for each one of your

20  employees?

21    A. Yes.

22    Q. And if somebody brought in a work slip, your

23  testimony is that you would put it into that file?

24    A. Yes.

25    Q. What else would you do with that work slip, if

17

1  anything?

2      A. Nothing.

3      Q. What about records related to disciplinary

4  warnings given to employees under your supervision?

5  Did you have any records relating to that?

6      A. That would be in the supervisory file if there

7  was one.

8      Q. How would you maintain those kinds of records?

9  How would you track when you gave disciplinary

10  warnings?

11      A. I would put a copy in their supervisory file

12  and the employee would receive a copy.

13      Q. A copy of what?

14      A. The memo.  I thought that was your question.

15      Q. So if there was a written memo --

16      A. Correct.

17      Q. -- you would put a copy in the file.  Did you

18  make any notations at all about conversations in your

19  direct reports in connection with those written memos?

20  Did you keep a file where you kept track of your

21  conversations of your direct reports in connection with

22  disciplinary warnings?

23      A. I kept record of their absences in there, in

24  the supervisory file.

25      Q. You kept record of absences.  Would you also

Aiken & Welch Reporters    M. Roper   8/28/08

18

1  keep record of discussions that you had with employees

2  regarding their employment?

3      A. Yes.

4      Q. And those records were maintained where?

5      A. In the supervisory file.

6      Q. Did you have any other computer records like

7  you had with your calendar where you'd keep a computer

8  record of conversations, say a file?

9      A. No.

10     Q. Per employee?

11     A. No.

12     Q. If you wanted to look at anything that you

13  said or that one of your employees said to you relating

14  to years ago, how would you go about finding out

15  whether somebody said something or you said something

16  back to them?

17     A. I'd look in the supervisory file.

18     Q. Where in the supervisory file would you find

19  that kind of information?

20     A. Just in the file.

21     Q. What kind of information would you find?

22     A. The information you just asked me about.

23     Q. Would that include discussions with employees,

24  like you would make notations?

25     A. If I made notations, it would be there.

19

1    Q. Okay.  Did you have a place where you would

2  maintain records regarding any of the employees who you

3  discussed accommodations for disabilities?

4      MR. MARTIN:  Objection.  Calls for legal

5  conclusion as to "accommodations" and "disabilities."

6      THE WITNESS:  I can't answer that.  I don't --

7  I did not discuss -- I'm not sure what your question

8  is.  I'm not sure that I've ever discussed

9  accommodations for disability.

10  BY MR. FRIEDMAN:

11    Q. Okay.  In your employment at Kaiser you don't

12  recall ever discussing with any employee reasonable

13  accommodations for disabilities?

14    A. No.

15    Q. Do you ever recall discussing reasonable

16  accommodations for medical conditions?

17    A. No.  I'm not -- I may not be understanding

18  what your question is.

19    Q. Okay.  Is that because you don't know what it

20  means to provide reasonable accommodations in

21  connection with disabilities or health conditions?

22      MR. MARTIN:  Objection.  Calls for a legal

23  conclusion.

24  BY MR. FRIEDMAN:

25    Q. Sorry.  I was trying to understand.

Aiken & Welch Reporters    M. Roper   8/28/08

20

1    A. I'm trying to understand what you mean.

2    Q. Well, I was asking you why you didn't -- what

3  part of my question you didn't understand.

4    A. Your question was did I discuss

5  accommodations.

6    Q. Have you ever discussed with an employee a

7  reasonable accommodation for a disability or a health

8  condition?

9      MR. MARTIN:  Objection.  Calls for legal

10  conclusion.

11      THE WITNESS:  If an employee told me they were

12  sick and they weren't feeling well and they needed to

13  go sit in their car or lay down for some time, if you

14  consider that an accommodation, those things happened.

15  BY MR. FRIEDMAN:

16    Q. Did you maintain any records with respect to

17  those types of discussions?

18    A. No.

19    Q. Other than what you just said in terms of

20  somebody calling in sick or saying they needed to go

21  lay down in their car, are there any other discussions

22  that you can recall that you ever had with any of your

23  direct reports about reasonable accommodation for

24  either a medical condition or a disability?

25    A. No.

Aiken & Welch Reporters    M. Roper  8/28/08

21

1      MR. MARTIN:  Objection.  Calls for legal

2  conclusion.

3  BY MR. FRIEDMAN:

4     Q. And since you don't recall it, do you also

5  believe that there was no records other than what you

6  said about employees resting in their car or being home

7  sick?  There are no records about your direct reports

8  and any accommodation that you talked with them about;

9  is that correct?

10     A. You said "accommodations."  I indicated going

11  to their car for an hour or whatever.  Being home sick

12  is not an accommodation.  If you're home sick, you're

13  sick.  There's no discussion involved there.  If

14  they're sick, they're sick.

15     Q. Do you believe there's any records of

16  discussions of accommodations?

17     A. No.

18     Q. What about FMLA time?  Did you have any

19  records?  Did you ever maintain any records with

20  respect to your employees taking off medical leave

21  time?

22     A. No, I didn't have any employees that did that.

23     Q. What about records with respect to disability

24  leave?  Did you maintain any records with respect to

25  any employee who requested a disability leave?

Aiken & Welch Reporters     M. Roper   8/28/08

32

1  BY MR. FRIEDMAN:

2      Q. And no others?

3      A. Those are the ones I felt were most important.

4        MR. FRIEDMAN:  Okay.  Let's take a one-minute

5  break.  Or let's say five-minute break.

6        (Break taken.)

7  BY MR. FRIEDMAN:

8      Q. Ms. Roper, I'm handing you what's been

9  previously identified as Deposition Exhibit 10.

10        You previously said there was some sort of

11  visit verification or a work slip that your employees

12  could bring in?

13      A. Right.

14      Q. Is this a visit verification form?

15      A. Yes.

16      Q. Can you explain what this document is?

17      A. This is the form that Kaiser doctors normally

18  give to members after they've seen them to verify what

19  days they'd still be off work.

20      Q. And if you look at the second page, at the top

21  it says that the information meets the medical

22  certification requirements for the Family and Medical

23  Leave Act.

24        Was it your understanding when you were a

25  supervisor in the member services department that that

Aiken & Welch Reporters      M. Roper   8/28/08

33

1   was the case?

2        MR. MARTIN:  Objection.  Calls for a legal

3   conclusion.

4   BY MR. FRIEDMAN:

5        Q. Go ahead.

6        A. I don't know.  I don't know what the -- is

7   this the backside of the form?

8        Q. Yes.

9        A. And you're asking me if it meets the

10  definition of family?

11       Q. I'm asking whether you understood at the time

12  that you worked as a supervisor in member services that

13  these forms met the medical certification --

14       A. No, I didn't understand that.

15       MR. MARTIN:  Objection.  Calls for a legal

16  conclusion.

17  BY MR. FRIEDMAN:

18       Q. You didn't understand at the time that it was

19  a medical certification?

20       MR. MARTIN:  Objection.  It calls for a legal

21  conclusion.

22       THE WITNESS:  You asked me something that did

23  I understand that it met the Family Medical Leave

24  something?  I -- I previously answered your question as

25  to what I said this form is.

Aiken & Welch Reporters    M. Roper   8/28/08

34

1  BY MR. FRIEDMAN:

2     Q. But --

3     A. That's what I thought the form was.  That's my

4  understanding of the form.

5     Q. Is it your understanding that it was a medical

6  certification?

7       MR. MARTIN:  Objection.  Calls for a legal

8  conclusion.

9       THE WITNESS:  I already answered it.

10  BY MR. FRIEDMAN:

11     Q. I'm sorry?

12     A. I answered that question initially.

13     Q. I know.  But you need to answer it.

14     A. Answer it again?

15     Q. Yes.

16     A. It is a form that the Kaiser physician fills

17  out to verify that someone has been off.  When they go

18  to Kaiser to see the doctors, this is what they give

19  the members.

20     Q. And did you understand that it met the

21  certification requirements?

22       MR. MARTIN:  Objection.  Calls for legal --

23       THE WITNESS:  No, I don't understand that.

24       MR. MARTIN:  Objection.  Calls for legal

25  conclusion.  Asked and answered.

Aiken & Welch Reporters     M. Roper   8/28/08

35

1   BY MR. FRIEDMAN:

2       Q. In your capacity as a supervisor in member

3   services, did you have an understanding that employees

4   needed to provide you with medical documentation from

5   time to time upon request?

6       MR. MARTIN:  Objection.  Calls for a legal

7   conclusion.

8       THE WITNESS:  My understanding was that I

9   would need a medical release if they had been out for

10  an extended period of time, more than three days.

11  BY MR. FRIEDMAN:

12      Q. And did you understand that this document was

13  a certification by the doctor that, in fact, the

14  patient -- the patient who was an employee was out for

15  medical reasons?

16      MR. MARTIN:  Objection.  Calls for a legal

17  conclusion.

18      THE WITNESS:  Yes.

19  BY MR. FRIEDMAN:

20      Q. And if an employee was going to be able to

21  return to work but with limitations, this is the type

22  of document that the employee would provide?

23      MR. MARTIN:  Objection.  Calls for

24  speculation.

25      THE WITNESS:  I've never had that occur.

Aiken & Welch Reporters    M. Roper  8/28/08

36

1  BY MR. FRIEDMAN:

2     Q. Okay.  Do you recall receiving notice in July

3  of 2005 that Fernando daRosa had been told by his

4  doctor to take a medical leave of absence?

5     A. July of 2005?  Fernando was out, but I forget

6  the time that he was out.  Out for an extended period.

7        MR. MARTIN:  By the way, objection.  Vague and

8  ambiguous.

9        THE WITNESS:  I don't know what this is.

10       MR. MARTIN:  Objection.  Vague and ambiguous

11  as to the term "medical leave of absence."

12       MR. FRIEDMAN:  I'm sorry.  Can I have her

13  answer read back.

14       (Record read.)

15       MR. FRIEDMAN:  I'm not sure if the record is

16  clear.  Looking at Exhibit 10, this is a document that

17  talks about Fernando daRosa and says he has been ill

18  and unable to attend work, school/physical education,

19  7/6/05 through 8/6/05.

20  BY MR. FRIEDMAN:

21     Q. Do you recall receiving notice in July and

22  August of 2005 that Fernando daRosa had been told by

23  his physician to take a medical leave of absence?

24       MR. FRIEDMAN:  Objection.  Vague and ambiguous

25  as to the term "medical leave of absence."

Aiken & Welch Reporters     M. Roper  8/28/08

37

1       THE WITNESS:  When was Fernando terminated?

2   BY MR. FRIEDMAN:

3       Q. In January 2006, so this was approximately six

4   months before, five or six months.

5       A. I received several forms from Fernando

6   regarding him being off work.  This may have been one I

7   received when he was off then.  I don't recall the

8   exact dates he was off.  I have to look at the memo

9   saying -- that I prepared saying what dates he was off.

10  I don't know what dates he was off.  But this may be

11  one that I received.  I received several.

12      Q. You prepared a memo for Mr. daRosa in

13  connection with the time that he had off?

14      A. Correct.  That he had been off several days

15  and I indicated the days he had been off, I prepared a

16  memo, and I believe it was in December.

17      Q. And you recall seeing some medical -- some of

18  these VOT forms?

19      A. I had some of those when I was completing the

20  memo that I was writing.

21      Q. And that was in connection with the time that

22  Mr. daRosa had missed?

23      A. Uh-huh.

24      Q. Is that correct?

25      A. Yes.

38

1     Q. And you mentioned earlier that when you got

2   visit verification forms, you would put them -- it was

3   your practice to put them in the supervisory file.

4         Do you believe that with respect to the visit

5   verification forms that Mr. daRosa gave to you in

6   connection with those times that he was absent, do you

7   believe you put them in the supervisory file?

8     A. I believe I did.

9     Q. But as you sit here today, you don't recall

10  Exhibit 10?

11     A. This exact form, no, I do not.

12     Q. If I can show you Exhibit 11.  These are

13  documents that were produced from Kaiser's records

14  relating to Mr. daRosa, so at least there's some

15  indication that these came from Kaiser.

16         Have you ever seen them before?

17     A. I probably have.

18     MR. MARTIN:  Objection.  Vague and ambiguous

19  in terms of the preamble to the question.

20  BY MR. FRIEDMAN:

21     Q. Go ahead.

22     A. I don't know.

23     Q. You don't know?

24     A. As I mentioned before, I received several

25  forms from Mr. daRosa when he was out.  For me to look

Aiken & Welch Reporters     M. Roper   8/28/08

41

1   don't know.

2   BY MR. FRIEDMAN:

3       Q. Okay.  Do you know any reason why this

4   wouldn't be?  Is there any reason for you to doubt it?

5       MR. MARTIN:  Objection.  Calls for

6   speculation.

7       THE WITNESS:  I'm not understanding your

8   question.

9   BY MR. FRIEDMAN:

10      Q. Is there any reason for you to doubt that

11  these are the records, Exhibits 10 and 11, are the

12  exhibits -- are the documents that you got in

13  connection with Mr. daRosa?  Is there any reason for

14  you to doubt it?

15      MR. MARTIN:  Objection.  Calls for

16  speculation.

17      THE WITNESS:  I don't know.  I don't know if I

18  saw them or not.

19      MR. MARTIN:  Asked and answered.

20  BY MR. FRIEDMAN:

21      Q. Is there some part of my question that you

22  don't understand?  I'm not asking for you memory, I'm

23  asking whether there's any reason for you to doubt it?

24      A. That I got them?  I don't know if I got them

25  or not, because Fernando would have given them to me, I

Aiken & Welch Reporters    M. Roper  8/28/08

42

1  don't know.  I don't know if there's a document he

2  wouldn't give to me.  I don't know.  Normally when he

3  came back to work, he gave me a document, and that was

4  his normal practice.

5  BY MR. FRIEDMAN:

6      Q. When he gave you those documents normally,

7  those are the documents you put in the supervisory

8  file?

9      A. Yes.

10      MR. MARTIN:  Objection.  Vague and ambiguous

11  as to the term "those documents."

12  BY MR. FRIEDMAN:

13      Q. Do you recall in the extent of leave that

14  Mr. daRosa had in this time period, July and August of

15  2005, do you recall him extending the time that he --

16  this doctor originally put off?

17      A. You know, I'm not sure we're talking about the

18  same time periods here that -- because he was off for

19  two different periods of time for a long time, so I'm

20  not sure what we're talking about.  There was a time

21  when he was off -- I believe that he was off initially.

22  He was going to return one day and the doctor had him

23  returning at a later date.

24  BY MR. FRIEDMAN:

25      Q. When Mr. daRosa was out initially in this

Aiken & Welch Reporters    M. Roper  8/28/08

45

1  extended period, and that he wanted that person to call

2  me and let me know.

3      Q. Was it his physician?

4      A. I don't know.

5      Q. Do you know Dr. Dustin?

6      A. No.

7      Q. Was it somebody from the neurology department?

8      A. It wasn't the neurology department, it was

9  the -- I forget the name of the facility.  It was not

10  at the hospital.  It's a rehabilitation.  It's drug and

11  rehab center, the facility that called me.

12      Q. Did you make any notations of this discussion?

13      A. No, I just noted that I received the call that

14  someone had called me and he was going to be off.

15      Q. Did you make any record of that discussion?

16      A. No.

17      Q. You didn't include anything in your

18  supervisory files in connection with Mr. daRosa?

19      A. No, not that I recall. .  There was nothing

20  that I -- to include, to put that.

21      Q. Do you recall any other conversations with

22  anybody in connection with Mr. daRosa's leave of

23  absence in July and August?

24      A. No, other than calling WAM to fill out his

25  time card.

Aiken & Welch Reporters    M. Roper  8/28/08

46

1    Q. What does that mean?  What did you do?

2    A. I had to call and find out how to code his

3  absence.

4    Q. How were you to code?

5    A. I don't recall.  It would be -- they would

6  have told me, you know, code five hours, number 73109

7  or something like that.

8    Q. Did you provide WAM with any other records at

9  all in connection with Mr. daRosa?

10    A. I don't remember doing that.

11    Q. At the time that Mr. daRosa was out in July

12  and August of 2005, what was Kaiser's policies and

13  procedures to your understanding about contact between

14  supervisors and their direct reports while their direct

15  reports were out on medical leave?

16    MR. MARTIN:  Objection.  Lacks foundation.

17    THE WITNESS:  I don't know what you mean by

18  that question.  Was there a policy while they're off

19  on -- while they're off on medical leave?

20  BY MR. FRIEDMAN:

21    Q. What was -- to your understanding what was

22  Kaiser's policies and procedures about contact between

23  supervisors?

24    A. I wasn't aware of any policy.  I'm not sure

25  what you're referencing.

Aiken & Welch Reporters     M. Roper   8/28/08

52

1    Q. Do you recall in connection with Mr. daRosa's

2  employment and the contacts that you had with the WAM

3  department that his claim for the coding had been

4  closed because the employee had returned to work?

5    A. I don't recall.

6    Q. Do you recall ever closing any claim on behalf

7  of Mr. daRosa with respect to the time that he had

8  missed off after he had returned?

9    A. I wouldn't close a claim.  They would open a

10  claim.  I wouldn't have a claim to close.

11    Q. Would you have any information about what they

12  did?

13    A. No.

14    Q. Did you fill out any paperwork with respect to

15  any FMLA for any of your direct reports?

16    MR. MARTIN:  Objection.  Vague and ambiguous

17  as to time.

18    THE WITNESS:  I don't recall.

19  BY MR. FRIEDMAN:

20    Q. Do you recall what the process was when a

21  employee under your supervision needed to take off

22  medical leave under the FMLA?

23    A. I don't recall the exact procedures.  If I

24  would have had an employee that had an FMLA, then I

25  would have had to review the procedures.

Aiken & Welch Reporters     M. Roper   8/28/08

53

1      Q. So you don't recall doing that for any of the

2  employees and you don't have any memory of the policies

3  and procedures?

4      A. Not any employees at Kaiser.

5      Q. I'm sorry.  I need to remind us to -- for both

6  of us to try not to speak on top of each other.

7      A. Oh, okay.

8      Q. Did you recall discussing with anybody at

9  Kaiser about FMLA accounts for any of your direct

10  reports?

11      A. No.

12      Q. And Mr. daRosa's termination didn't have

13  anything to do with his FMLA account as far as you were

14  concerned?

15      A. I wasn't aware of an FMLA account for

16  Mr. daRosa.

17      Q. And his termination didn't have anything to do

18  with medical leave and the amount of medical leave that

19  he is entitled to under the federal and state laws; is

20  that your understanding?

21      A. I don't know that federal and state laws

22  that -- as they have to do with how much medical leave

23  he can have.

24      Q. And that was never discussed between you and

25  Mr. daRosa, correct?

Aiken & Welch Reporters     M. Roper   8/28/08

54

1        A. If I don't know the federal and state laws,

2    no, we wouldn't have discussed it.

3        Q. And you didn't discuss with anybody else at

4    Kaiser about a time period for medical leave in

5    connection with Mr. daRosa's termination?

6        A. When this memo was prepared I discussed it

7    with our human resources department with Kaiser, and

8    when Mr. daRosa was terminated it was discussed with

9    our human resources department with Kaiser.

10        Q. When you said discussed with human resources,

11    did you specifically discuss the time period of medical

12    leave under the FMLA?

13        A. We did not discuss FMLA.  I really don't

14    recall.  My understanding, I don't believe Mr. daRosa

15    had been there a year, I'm not sure if he had been in

16    my department a year.  You'd have to be in your

17    position at least for a year for FMLA.  You know, I

18    really can't be clear on that, but I'm pretty sure he

19    hadn't been there a year, because when I approached

20    human resources with this issue, that would have been

21    something that would have been mentioned or touched on

22    by them or myself.

23        Q. So it was your understanding back then that

24    Mr. daRosa was not entitled to the FMLA because he

25    hadn't been there for a year?

Aiken & Welch Reporters     M. Roper   8/28/08

55

1    A. That's my guess.

2    Q. Sorry.  That's your what?

3    A. That's my guess.

4    Q. When you say "guess," what do you mean?

5    A. I'm thinking that's what happened, you know,

6  but I can't recall exactly.  I don't really recall

7  exactly.  But I know normally FMLA is something you

8  look at whenever somebody's out, and I may recall he

9  was not eligible for it.  And when I contacted the

10  human resources department prior to completing this and

11  terminating Mr. daRosa, if that had been an issue that

12  would have within something that our human resources

13  department would have advised me of.

14    Q. As you sit here today, do you have even a

15  general memory that that was the issue that Mr. daRosa

16  had not been there for a year?

17    A. I believe so.

18    Q. And it's fair to say that that's your best

19  memory as to why Mr. daRosa was -- -- why his medical

20  leave was not discussed with him in connection with his

21  termination?

22    A. Yes.

23    MR. MARTIN:  Objection.  Asked and answered.

24  BY MR. FRIEDMAN:

25    Q. When did Mr. daRosa tell you that he suffered

Aiken & Welch Reporters     M. Roper   8/28/08

56

1  from narcolepsy?

2      MR. MARTIN:  Objection.  Lacks foundation.

3      THE WITNESS:  I don't recall.

4  BY MR. FRIEDMAN:

5      Q. Was it around the time of the period that he

6  had his medical leave?

7      A. This medical leave?

8      Q. In July and August of 2000 --

9      A. July and August was not related to that

10  diagnosis to my understanding.  He did not have that

11  diagnosis until months after that.

12      Q. Okay.  Approximately when did he get --

13      A. I don't know.

14      Q. Approximately when did he tell you that he had

15  that diagnosis?

16      A. And I already answered that, I do not know.

17      Q. But you believe it was sometime after the

18  July, August 2005 leave?

19      A. Yes, yes, I do.

20      Q. What did you understand Mr. daRosa to be

21  saying to you when he told you about narcolepsy?

22      A. I understood him to say that he had a doctor's

23  appointment and that was his diagnosis.

24      Q. Do you know what narcolepsy is?

25      A. Yes.

57

1    Q. Can you explain to me?

2    A. It's a problem where people not just get

3  sleepy, they can go to sleep at any time.  But

4  normally, he told me what his diagnosis was, I --

5  employees do not have to tell their supervisors what

6  their diagnosis is.  When somebody tells me what their

7  diagnosis is, I try not to get into detail, because I

8  don't want to even begin to give medical advice or

9  questions, anything like that.  He told me he had to go

10  to the doctor, that was his diagnosis, end of

11  discussion.  I didn't want to go into any more.

12    Q. But he was telling you that -- was it your

13  understanding that he was telling you the diagnosis so

14  that you would know that if he had a sleep attack at

15  work, that was why?

16    MR. MARTIN:  Objection.  Calls for

17  speculation.

18    THE WITNESS:  No, I don't know.  He just told

19  me to tell me.  He didn't say I'm telling you this

20  because I might have a sleep attack at work.

21  BY MR. FRIEDMAN:

22    Q. Had you ever seen Mr. daRosa sleeping?

23    A. No.

24    Q. Had you ever told him that he needs to stay

25  awake for work?

58

1    A. No.

2    Q. So you never spoke with Mr. daRosa about his

3   need to be in an awake state in order to perform his

4   job duties?

5    A. I would think that that would not be a

6   discussion I would have needed to have with him.  When

7   he told me he had that diagnosis, I advised him, you

8   know, you need to go to the doctor and do whatever they

9   say and take whatever.  And he said he was on

10   medication for it.

11    Q. When Mr. daRosa came back after the extended

12   leave there from July and August of 2005, did you

13   engage in any interactive process with him regarding

14   whether he would be able to perform his job duties

15   after the medical leave?

16    MR. MARTIN:  Objection.  Vague and ambiguous

17   as to the term "medical leave" and "interactive

18   process."  Also calls for a legal conclusion.

19    THE WITNESS:  No.

20   BY MR. FRIEDMAN:

21    Q. Did you ever speak with him about the

22   temperature in the room in the office where you guys

23   worked?

24    A. I'm not sure what you mean.

25    Q. Did he ever talk to you about the need to

Aiken & Welch Reporters    M. Roper   8/28/08

65

1  wouldn't have any idea.

2  BY MR. FRIEDMAN:

3      Q. This was a first level warning to Mr. daRosa?

4        MR. MARTIN:  Objection.  Vague and ambiguous.

5        THE WITNESS:  I'm not sure how you would

6  define "first level."  This is a memo that was prepared

7  and discussed with Mr. daRosa.  His attendance had been

8  discussed prior to this date.

9  BY MR. FRIEDMAN:

10      Q. Well, in the memo, do you see where it says

11  this was a first level warning?

12      A. That's what it says.

13      Q. What did you mean by that?

14      A. That this would be level one.  Level two would

15  probably be final warning or something like that.

16  Whatever the levels were as they were defined by Kaiser

17  at the time.

18      Q. So this was pursuant to Kaiser's progressive

19  disciplinary policies?

20      A. (Witness nods head.)

21        MR. MARTIN:  Objection.  Vague and ambiguous.

22        THE WITNESS:  Yes.

23  BY MR. FRIEDMAN:

24      Q. What's the purpose of writing a memo to the

25  file?

Aiken & Welch Reporters     M. Roper   8/28/08

66

1        MR. MARTIN:  Objection.  Vague and ambiguous.

2        THE WITNESS:  This memo was written so that I

3    could discuss the issue with Mr. daRosa and provide him

4    with a copy.

5    BY MR. FRIEDMAN:

6        Q. Have you ever been warned or disciplined at

7    work with respect to the failure to document

8    employment-related matters?

9        A. No.

10       Q. Now, from this memo and your memory, is it

11    true that Mr. daRosa on December 7th was given a first

12    level warning due to days that he was out on medical

13    leave?

14        MR. MARTIN:  Objection.  Vague and ambiguous

15    as to the term "medical leave."  Calls for speculation.

16    Also calls for a legal conclusion.

17        THE WITNESS:  This document merely states the

18    days that he was out.

19    BY MR. FRIEDMAN:

20       Q. And that your --

21       A. The reasons are not indicated.

22       Q. But even though the reasons weren't indicated,

23    it is true that he was disciplined for those days?

24       A. For being out those days.

25       Q. And those days he was out due to medical

Aiken & Welch Reporters     M. Roper   8/28/08

67

1  reasons?

2      MR. MARTIN:  Objection.  Misstates the

3  testimony.  Calls for speculation.  Calls for a legal

4  conclusion.  Lacks foundation.

5  BY MR. FRIEDMAN:

6      Q. Is that correct?

7      MR. MARTIN:  Same objections.

8      THE WITNESS:  I already answered that -- I

9  already answered saying what this document is.  I'd

10  have to have something telling me what he was out for

11  each day, but these are the days he was out and missed

12  work.

13  BY MR. FRIEDMAN:

14      Q. Well, we just talked about the July to August,

15  and there was medical documentation for that.  So at

16  least those first 32 days you knew that there were

17  medical documentation for those absences?

18      A. Uh-huh.

19      MR. MARTIN:  Objection.  Vague and ambiguous

20  as to the term "medical documentation."  Calls for a

21  legal conclusion.  Misstates the testimony.

22  BY MR. FRIEDMAN:

23      Q. The answer has to be verbal.  Is that a "yes"?

24      MR. FRIEDMAN:  Can I ask you to read that?

25      (Record read.)

68

1          MR. MARTIN:  Same objections.

2          THE WITNESS:  What I knew is he gave me a work

3    slip saying he was out those days and he could return

4    to work.

5    BY MR. FRIEDMAN:

6          Q. And it also included the discipline that you

7    were giving him, the December 6th and 7th dates that we

8    already talked about, correct?

9          A. What also included?  What are you saying?

10         Q. He was being disciplined for unscheduled

11   absences?

12         A. Those were missed times from work.

13         Q. And December 6th and 7th --

14         A. Correct.

15         Q. -- were days that he had called you and said

16   he wasn't feeling well and said he was in his car and

17   called you and told you he was not able to return to

18   work and then he called you the next day saying he was

19   able to return to work midday?

20         MR. MARTIN:  Objection.  Misstates the

21   testimony.

22   BY MR. FRIEDMAN:

23         Q. Isn't that correct?

24         A. Yeah.  It's -- it's already written down what

25   it was.

          Aiken & Welch Reporters     M. Roper  8/28/08

71

1   work he would call me and tell me, "I'm not coming to

2   work because," period.

3   BY MR. FRIEDMAN:

4       Q. Were --

5       A. I would not have to say, when he came back,

6   say, "What was wrong with you?  Why were you out?"  I

7   would not ask him that.

8       Q. Okay.  Now, this memo is about unscheduled

9   time away?

10      A. Uh-huh.

11      Q. Were you giving him a first level warning

12  about absences that were without justification or just

13  unscheduled absences?

14      MR. MARTIN:  Objection.  Vague and ambiguous.

15      THE WITNESS:  This is about unscheduled.

16  BY MR. FRIEDMAN:

17      Q. So in this memo, you weren't giving him a

18  first level warning about whether there was sufficient

19  justification for the absences?

20      A. That was not an issue.

21      Q. And also -- at least in this memo for this

22  first level warning, it wasn't about the lack of prior

23  notice to you for those absences.  It was just

24  unscheduled absences?

25      A. Which would be the lack of prior notice.

Aiken & Welch Reporters     M. Roper   8/28/08

72

1      Q. Okay.  Other than a prior notice because it's

2   an absence that happens -- let me rephrase that.

3          An employee is expected to give you advanced

4   notice of an absence when he or she knows it and

5   requests it, correct?

6          MR. MARTIN:  Objection.  Vague and ambiguous.

7   Calls for speculation.

8          MR. FRIEDMAN:  I didn't say it very well.

9   BY MR. FRIEDMAN:

10     Q. An employee -- how much notice is an employee

11  supposed to give you when there's an absence?

12     A. Normally employees are not absent unless it is

13  a scheduled vacation time.

14     Q. And when they're not absent -- when they're

15  not present not because of vacation but because of sick

16  leave, how much advanced notice are they supposed to

17  give you?

18         MR. MARTIN:  Objection.  Incomplete

19  hypothetical.

20         THE WITNESS:  One normally doesn't receive

21  advanced notice just from an employee saying, "I'm

22  going to have a cold next Friday so I'll be off."

23  Normally one wakes up with a cold and they call in and

24  say "I'm not coming in."

25  BY MR. FRIEDMAN:

Aiken & Welch Reporters      M. Roper   8/28/08

73

1    Q. So the discipline that was given on December

2  7th didn't have to do with the advanced notice, it just

3  had to do with unscheduled absences?

4    A. (Witness nods head.)

5      MR. MARTIN:  Objection.  Misstates the

6  testimony.  Also vague and ambiguous.

7      MR. FRIEDMAN:  You nodded.

8      THE WITNESS:  Yes, yes.  Sorry.

9  BY MR. FRIEDMAN:

10    Q. If you could look at Exhibit 6.

11    A. Can I ask you a question?  How long is this

12  going to have to go on?  I'm going to have to call my

13  employer.

14    Q. It's 10:42.  I imagine it will go to noon at

15  least.  Did you want to take a break?

16    A. No, we can keep going.

17    Q. I promise you, I'll go as quickly as I can.

18      This Exhibit 6, I handed you also a document

19  produced by Kaiser in this litigation.  And there is

20  a -- it's a three-page document.  Have you ever seen

21  this before?

22    A. No.  Well, this gentleman showed me a copy of

23  this once.

24    Q. The Attorney Martin showed you a copy of this?

25    A. Yes, yes.

Aiken & Welch Reporters    M. Roper   8/28/08

77

1    Q. But do you have any knowledge of that?

2    A. I'm going by this document.

3    Q. But do you have any personal recollection?

4    A. No, I do not.  No, I do not.

5    Q. And you don't have any recollection of when

6  Josephine redirected this to you?

7    A. No.

8    Q. And you don't recall Fernando calling you on

9  the morning of the 25th and leaving a message saying

10  that his doctor had taken him off?

11    A. When was Fernando terminated?

12    Q. On the 27th.

13    A. No, no.  I recall calling Fernando when he

14  didn't come to work on several occasions and leaving

15  voicemails for him, and he never called me back at all.

16    MR. MARTIN:  By the way, that question

17  misstated the evidence.

18  BY MR. FRIEDMAN:

19    Q. I'll return to the question -- to questions

20  about your calls in a second.

21    Looking at Exhibit 3, is -- are these the

22  documents that you prepared in connection with

23  Mr. daRosa's termination?

24    A. Yes.

25    Q. And you put these documents in -- well,

Aiken & Welch Reporters    M. Roper  8/28/08

78

1   looking at the first page, you signed off on the first

2   page of this document on January 27th?

3       A. Uh-huh.

4       Q. Is that "yes"?

5       A. Yes.

6       Q. And on January 27th you made a personal action

7   request in connection with Mr. daRosa's termination,

8   looking at the third page?

9       A. The third page is a fax cover sheet.

10      Q. And it says that you were attaching a personal

11  action request?

12      A. Okay.  Is that this form?  Oh, that's the

13  first form is the personal action request, so this is

14  the form I faxed on that day.

15      Q. In the third page, the fax cover, it says,

16  "Re:  Same-day termination."  Was this a same-day

17  termination for Mr. daRosa?

18      A. Uh-huh.

19      Q. I'm sorry.  Needs to be verbal.

20      A. Yes.

21      Q. And on the last page it states, "Involuntary

22  termination, job abandonment, no show, no call, January

23  25th, 26th, 27th, 2006.  Previous attendance issues,

24  which were discussed with employee."

25          Did you write that?

Aiken & Welch Reporters    M. Roper   8/28/08

79

1      A. Yes, I did.

2      Q. And were those the reasons for Mr. daRosa's

3  termination?

4      A. Yes, they were.

5      Q. Were there any other reasons for his

6  termination?

7      A. No.

8      Q. When you said previous attendance issues which

9  were discussed, which issues were those?

10     A. That would be referencing the memo of December

11  7th.

12     Q. Anything else?

13     MR. MARTIN:  Well, objection.  Vague and

14  ambiguous as to the term "anything else."

15     THE WITNESS:  I don't know what you mean.  As

16  mentioned before, I've talked -- I had previously had

17  other occasions that I talked with Mr. daRosa regarding

18  his attendance.  December 7th was not the only day.

19  BY MR. FRIEDMAN:

20     Q. Was the other occasions after December 7th or

21  before?

22     A. Before.

23     Q. Did you have any discussions with Mr. daRosa

24  after December 7th in connection with his attendance?

25     A. I probably did.  I probably did.

Aiken & Welch Reporters    M. Roper   8/28/08

85

1  for being a no-call, no-show?

2      MR. MARTIN:  Objection.  Calls for

3  speculation.  Lacks foundation.  Calls for a legal

4  conclusion.  Misstates the evidence.  Incomplete

5  hypothetical.

6      THE WITNESS:  I'm sorry.  Your question was if

7  I had received a fax copy on the whatever day it was,

8  would I have terminated him?  The answer would be no,

9  because he would not have been a no-call, no-show.  I

10  would have gotten some kind of documentation.  I did

11  not have any.

12  BY MR. FRIEDMAN:

13      Q. And you said "received."  My question was if

14  you had known that he had faxed this to member services

15  on the morning of the 25th would you have terminated

16  him?

17      MR. MARTIN:  Objection.  Calls for

18  speculation.  Lacks foundation.  Calls for a legal

19  conclusion.  Incomplete hypothetical.

20      THE WITNESS:  If I had known that he had faxed

21  this, would I have terminated him?

22  BY MR. FRIEDMAN:

23      Q. Correct.

24      A. If I had had this document in my hand, I would

25  not have terminated.

Aiken & Welch Reporters    M. Roper  8/28/08

86

1      Q. Or if you had known that he had faxed it?

2      A. If I had this document in my hand, I would not

3    have terminated him.

4      Q. What if you didn't have it in your hand but

5    you had known that he had faxed it to member services?

6        MR. MARTIN:  Objection.  Calls for

7    speculation.  Lacks foundation.  Calls for legal

8    conclusion.  Incomplete hypothetical.

9        THE WITNESS:  I have to restate what I said

10   before.  If I had it in my hand.  For me to know that I

11   had the document, I'd have to have the document, not

12   for me to hear that it was faxed to me.  That's -- I

13   just don't see that kind of scenario happening.

14   BY MR. FRIEDMAN:

15     Q. Do you blame Fernando -- as you sit here

16   today, do you blame Fernando for faxing it to member

17   services as opposed to some other way to make sure that

18   you had it in your hand?

19       MR. MARTIN:  Objection.  Vague and ambiguous.

20       THE WITNESS:  I don't blame Fernando for

21   anything.  I called Fernando and on several occasions,

22   two or three times, and he never called me back.

23   BY MR. FRIEDMAN:

24     Q. But in terms of the visit verification form

25   and the notice that he gave to you or that he faxed to

Aiken & Welch Reporters     M. Roper   8/28/08

87

1  member services on the 25th, do you fault him in any

2  way for faxing it as opposed to making some other way

3  that it got into your hand?

4      MR. MARTIN:  Objection.  Vague and ambiguous.

5      THE WITNESS:  I don't fault him.

6  BY MR. FRIEDMAN:

7      Q. And knowing that Mr. daRosa was out for

8  medical reasons on those unscheduled absences, that

9  didn't impact your determination to terminate him on

10  the 27th?

11      MR. MARTIN:  Objection.  Calls for

12  speculation.  Lacks foundation.  Assumes facts not in

13  evidence.  Incomplete hypothetical.

14      THE WITNESS:  My memo and my termination of

15  Mr. daRosa was based on the fact that he was not at

16  work.  While he was not at work, did not have -- I

17  didn't -- you know, that was not an issue that I could

18  deal with, because I did not need to know or could do

19  anything regarding his medical conditions.  This was

20  based on the fact that he was not at work.

21  BY MR. FRIEDMAN:

22      Q. And the fact that he's not at work due to

23  medical reasons did not interfere with your

24  determination to terminate him?

25      A. Correct.

Aiken & Welch Reporters    M. Roper  8/28/08

89

1  respect to you calling Fernando?

2      A. Other than Mr. Mellon, no.  I may have

3  mentioned it to Mr. Ayers.  I probably did.

4      Q. What number did you call from?

5      A. Work.

6      Q. So your office line?

7      A. Yes.

8      Q. Do you recall what number that was?

9      A. No.

10      Q. What number did you call to?

11      A. I was looking at my cell phone.  I don't have

12  it anymore.

13      Q. When you --

14      A. I would call his cell number.  I had his cell

15  number.  It used to be in my phone.

16      Q. Would you have used your cell phone to call

17  him?

18      A. No.

19      Q. So you would have used your cell phone to look

20  up the phone number and then called him.  Is that what

21  you did?

22      A. Probably.

23      Q. Had Fernando ever been a no-call, no-show

24  prior to this instance, to your memory?

25      A. No, huh-uh.

90

1    Q. And if he had been --

2    A. Well, the very first time that he was out,

3  when this person called me, he had already been out a

4  day or two.  So he was a no-call, no-show for a day

5  maybe.

6    Q. You didn't state that in any of your

7  disciplinary memos to him?

8    A. No.

9    Q. Why not?

10    A. I didn't feel the need to state it.

11    Q. Did you ever have any contact with Fernando

12  after his termination?

13    A. No, I don't think so.

14    Q. You never called him?

15    A. I don't think so.

16    Q. Did you receive any messages that he tried to

17  reach you?

18    A. No, I don't recall.  I dealt with Fernando on

19  a personal basis on other things so it could be a

20  little -- but I don't believe I talked to him after he

21  was terminated.

22    Q. Other than your discussions with Mr. Mellon,

23  did you have any discussions with anyone else regarding

24  Fernando and his termination?

25    A. Mr. Ayers.

113

1  STATE OF CALIFORNIA    )

2                )

3  COUNTY OF ALAMEDA    )

4

5      I, KIMBERLY R. JENSEN, do hereby certify:

6      That MARGIE ROPER, in the foregoing deposition

7  named, was present and by me sworn as a witness in the

8  above-entitled action at the time and place therein

9  specified;

10      That said deposition was taken before me at

11  said time and place and was taken down in shorthand by

12  me, a Certified Shorthand Reporter of the State of

13  California, and was thereafter transcribed into

14  typewriting;

15      And that the foregoing transcript constitutes

16  a full, true, and correct report of said deposition and

17  of the proceedings that took place.

18      IN WITNESS WHEREOF, I have hereunder

19  subscribed my hand this 3rd day of September 2008.

20

21

22      KIMBERLY R. JENSEN, RPR, CSR No. 12552
23          State of California

24

25

Aiken & Welch Reporters    M. Roper  8/28/08