1       UNITED STATES DISTRICT COURT IN AND FOR THE

2              NORTHERN DISTRICT OF CALIFORNIA

3                    ---oOo---

4   FERNANDO DAROSA,

5        Plaintiff,

6   vs.                        No. C07-03114SI

7   KAISER FOUNDATION HEALTH PLAN,
    INC.,
8
        Defendants.
9                          /

10

11

12

13          DEPOSITION OF KENNETH U. AYERS

14

15

16

17

18        Taken before KIMBERLY R. JENSEN, RPR

19              CSR No. 12552

20              August 27, 2008

21

22

23

24

25

2

1                    I N D E X

2                                    PAGE

3    EXAMINATION BY MR. FRIEDMAN            4

4

5

6              E X H I B I T S

7    PLAINTIFF'S                    PAGE

8    3   5-page Personnel Action Request        9

9    10  2-page Visit Verification/Family      38
         Leave Health Care Provider
10       Certification dated 7/6/05

11   11  3-page Visit Verification/Family      43
         Leave Health Care Provider
12       Certification dated 7/29/05

13   2   6-page Case Status              47

14   12  15-page Guidelines for the        58
         Interactive Process
15
     4   Memorandum to File dated        73
16       December 7, 2005

17   6   3-page Visit Verification/Family     83
         Leave Health Care Provider Certificate
18       dated 1/24/06

19   5   5-page E-mail strand          109

20

21

22

23

24

25

3

1          DEPOSITION OF KENNETH U. AYERS

2

3      BE IT REMEMBERED, that pursuant to Notice, and on

4    the 27th day of August 2008, commencing at the hour of

5    9:34 a.m., in the offices of AIKEN & WELCH, One Kaiser

6    Plaza, Suite 505, Oakland, California 94612, before me,

7    KIMBERLY R. JENSEN, a Certified Shorthand Reporter,

8    personally appeared KENNETH U. AYERS, produced as a

9    witness in said action, and being by me first duly

10    sworn, was thereupon examined as a witness in said

11    cause.

12

13                    ---oOo---

14

15      JEREMY L. FRIEDMAN, Attorney at Law, 2801 Sylhowe

16    Road, Oakland, California 94602, appeared on behalf of

17    the Plaintiff.

18

19      DANA L. PETERSON, Seyfarth Shaw LLP, 560 Mission

20    Street, Suite 3100, San Francisco, California 94105,

21    appeared on behalf of the Defendant.

22

23

24

25

Aiken & Welch Reporters     K. Ayers   8/27/08

10

1  BY MR. FRIEDMAN:

2      Q. Are you aware of a fax of a visit verification

3  being received at Kaiser in connection with

4  Mr. daRosa's employment?

5      A. No.

6      Q. You're aware, through no discussions with any

7  employees at Kaiser, about the facts of the visit

8  verification?

9        MS. PETERSON:  Objection.  Vague and ambiguous

10  as to time.

11        THE WITNESS:  Not that I'm aware of.

12  BY MR. FRIEDMAN:

13      Q. At any time?

14      A. Not that I'm aware of.

15      Q. Are you aware of any efforts to search for

16  supervisory files of Margie Roper in connection with

17  this litigation?

18        MS. PETERSON:  Can you read back that

19  question, please.

20        (Record read.)

21        MS. PETERSON:  Objection.  Vague and

22  ambiguous.

23        THE WITNESS:  Any efforts to search -- Could

24  you repeat that one more time?  I'm sorry.

25        (Record read.)

Aiken & Welch Reporters     K. Ayers   8/27/08

11

1        THE WITNESS:  Yes.

2    BY MR. FRIEDMAN:

3        Q. What are you aware of?

4        A. I'm not sure of the dates, but when the first

5    case was apparently filed, and I say apparently because

6    I received communications and e-mail and had a

7    conversation with one of our attorneys --

8        MS. PETERSON:  That would be privileged so I

9    don't want you to divulge any of that information that

10   you received or discussed.

11   BY MR. FRIEDMAN:

12       Q. Well, the question doesn't ask for the

13   discussion of any substance of any communications.

14   However, if the timing of your search or your knowledge

15   is tied to the timing of discussions with Counsel, I'm

16   entitled to know dates, times, places, things like that

17   and even identities, but don't reveal the substance.

18       But again, tell me again what you know about

19   it.

20       MS. PETERSON:  And just to clarify, we're

21   talking about going back to the original question:  Is

22   he aware of any efforts to search for supervisory file

23   of Margie Roper's.

24       MR. FRIEDMAN:  Yes.

25       THE WITNESS:  Yes, when it came to my

Aiken & Welch Reporters    K. Ayers   8/27/08

12

1  attention and I was asked to see if we had any

2  documentation, I believe, though I don't know this,

3  that it may have been in response to the subpoena, but

4  I was never served with a subpoena, but I did go back

5  and see if there was any documentation in regards to

6  this particular case at that time.  That was well over

7  a year ago.

8  BY MR. FRIEDMAN:

9      Q. Where did you look for documentation?

10     A. I looked within my files on Margie Roper, and

11  then I also went to her office, and I don't recall if I

12  looked at that time or if I had one of the other staff

13  people look to see if there was any files in her

14  office.

15     Q. If you had somebody else in your office look,

16  would that person have reported to you?

17     A. Yes.

18     Q. And you would have relied upon the information

19  that that person gave you?

20     A. Correct.

21     Q. What did you find?

22     A. I found nothing.

23     Q. Did you find any supervisory files at all

24  belonging to Ms. Roper?

25     A. No.

14

1        Could I have the last question and answer read

2    back, please.

3        (Record read.)

4    BY MR. FRIEDMAN:

5        Q. Why not?

6        A. Because I had terminated Ms. Roper at the

7    time.  She was no longer an employee with Kaiser.

8        Q. Any other reasons?

9        A. No.

10       Q. Are you aware of any effort by Kaiser to

11   provide the EEOC with records in connection with

12   Mr. daRosa's termination?

13       A. No.

14       MS. PETERSON:  Objection.  Calls for

15   speculation.  Give me an opportunity to get my

16   objection on the record.

17       THE WITNESS:  No.

18   BY MR. FRIEDMAN:

19       Q. Are you aware of -- do you know who Frank

20   Mellon is?

21       A. Yes.

22       Q. Are you aware that he gave testimony in

23   connection with Mr. daRosa's employment at an EDD

24   hearing in March of 2007?

25       A. No.

19

1      Q. Is that in Arizona or here?

2      A. No, it's here or -- it was actually in San

3  Francisco.  Actually my office was here in Oakland.

4  The corporate office -- we had two split offices.

5  Corporate office was in San Francisco, but my group

6  office was here in Oakland.

7      Q. When was it that you left Kaiser

8  approximately?

9      A. I've been back for five years now, so about

10  ten years ago.

11      Q. 1998 approximately?

12      A. Approximately then.

13      Q. And did you work there for five years?

14      A. I worked there for five years in a couple of

15  different positions in that period of time.

16      Q. And you returned to Kaiser approximately when?

17      A. I believe it was five years ago this past

18  July.  So last month was five years.

19      Q. So July of 2003?

20      A. That's approximately right.

21      Q. Why did you leave Kaiser in the first place?

22      A. I got recruited to move on to another offer I

23  couldn't refuse.

24      Q. And why did you return back to Kaiser?

25      A. Got recruited to come back to Kaiser.

20

1       Q. What was your position?

2       A. When I came back?

3       Q. Yes.

4       A. I was quality -- let me think about it.

5    Quality and Service Leader.

6       Q. And you were director?

7       A. I was -- no, I was on the leadership team at

8    that time.  Kaiser doesn't use the terminology at local

9    level VP, but it was a VP-level position.

10      Q. How long did you work in that position?

11      A. Still, in essence in, that position.  We

12   changed the titles of that position, and also about

13   three-and-a-half years ago split the responsibilities.

14   By that I mean when I was a quality service leader, I

15   had administrative accountability for those areas

16   across our Oakland and Richmond campuses and also

17   Hayward and Fremont campuses.

18      Q. And what --

19      A. And about three-and-a-half years ago, the

20   organization decided to make some changes to the

21   administrative structure of hospitals, and so they

22   divided things out.  And I chose to stay with Oakland

23   and Richmond, because that's where my -- I had grown up

24   there.  And there was positions created as an assistant

25   administrator for quality and member services at

21

1  Hayward, Fremont, and that position was filled by --

2      MS. PETERSON:  It's -- you're beyond the scope

3  of the question.  Just answer the question.

4  BY MR. FRIEDMAN:

5      Q. I did want get a little background.

6        So the position that they created that became

7  created after the split in duties about

8  three-and-a-half years ago, what did that involve?

9      A. It involves what I'm doing now, administrative

10  responsibility for a number of support departments.

11      Q. And so you've been in the same position

12  essentially for the last three-and-a-half years?

13      A. Yes.

14      Q. Okay.  When did Margie Roper begin her

15  reporting to you?

16      A. Her direct reporting to me approximately

17  three-and-a-half to four years ago when we did the

18  split.

19      Q. How many direct reports did you have at that

20  time?

21      A. Approximately eight.

22      Q. And she remained a direct report to you until

23  the time of her termination?

24      A. Correct.

25      Q. What was the date of her termination?

Aiken & Welch Reporters    K. Ayers   8/27/08

22

1    A. I don't recall.

2    Q. Do you recall whether or not -- well, I'm

3  going to delay that question.  Your counsel requested

4  that we designate what part of the deposition testimony

5  is about.  The -- Kaiser's production of you, pursuant

6  to the 30(b)6 deposition notice which seeks the person

7  with most knowledge about the circumstances leading up

8  to Ms. Roper's termination.

9     Mr. daRosa was terminated in January of 2006,

10  and then there were discussions in the human resources

11  department between Mr. Mellon and Gail Kato in August

12  of 2006.  By then, it says in the communication that

13  Ms. Roper was terminated.

14     Does that help you identify with any more

15  particularity where in time Ms. Roper was terminated?

16     MS. PETERSON:  I'm going to object to the

17  extent that it misstates facts or assumes facts not in

18  evidence, but you can answer the question.

19     THE WITNESS:  Yes.  You asked me if I can

20  remember the date.  I cannot. .

21  BY MR. FRIEDMAN:

22    Q. Okay.

23    A. But I would say it was in March, April of that

24  year.

25    Q. That year being 2006?

Aiken & Welch Reporters    K. Ayers  8/27/08

23

1    A. Correct.

2    Q. And in August of that year, and September of

3  that year, did you have any management or supervisory

4  authority over the human resources department?

5    A. No.

6    Q. Did you approve the decision to terminate

7  Mr. daRosa?

8    A. Yes.

9    Q. At the time that you approved his termination,

10  you did not review any records related to him?

11    MS. PETERSON:  Object.  It misstates facts.

12  BY MR. FRIEDMAN:

13    Q. Other than the ones that you testified to?

14    A. Reviewed documents, no.

15    Q. Okay.  Did you review any information?

16    A. I had discussions with Margie Roper.

17    Q. Did you have any discussions with anyone else?

18    A. Not that I recall specifically.  However, it

19  would have been my standard practice to involve HR in

20  any situations even close to termination of an

21  employee.

22    Q. How would you have held your discussions with

23  human resources pursuant to your practice?

24    MS. PETERSON:  Objection.  Vague and

25  ambiguous.

Aiken & Welch Reporters    K. Ayers  8/27/08

36

1        THE WITNESS:  In case we get into litigation,

2    in case it's appealed.  We have an appeals process for

3    terminations within Kaiser.

4    BY MR. FRIEDMAN:

5        Q. At the time that you went through Ms. Roper's

6    files, were you aware that Mr. daRosa was contesting

7    his termination?

8        A. No.

9        Q. When did you first become aware of that?

10        A. I don't recall the exact date.

11        Q. Did you -- in connection with Mr. daRosa's

12    termination, did you rely upon the information that was

13    provided to you by Ms. Roper?

14        A. I did.

15        Q. Did you conduct any independent investigation

16    beyond what she told you?

17        A. No.

18        Q. Did you also make a decision with respect to

19    Mr. daRosa's request that he come back and do his job

20    after his termination?

21        MS. PETERSON:  Objection.  Vague and

22    ambiguous.

23        THE WITNESS:  I was not aware that he had a --

24    BY MR. FRIEDMAN:

25        Q. At any time?

Aiken & Welch Reporters     K. Ayers   8/27/08

44

1  was also produced to the EEOC as Exhibit 8 to a letter

2  that Kaiser had sent to the EEOC.  It's a three-page

3  document.  Have you ever seen these documents before?

4        MS. PETERSON:  I'm going to object to the

5  preferatory statement to the question as it assumes

6  facts not in evidence and lacks foundation.

7        THE WITNESS:  Have I ever seen this specific

8  document before?

9  BY MR. FRIEDMAN:

10       Q. Yes.

11       A. No.

12       Q. Do you have any knowledge as to how these

13  records were made part of the file with the EEOC by

14  Kaiser?

15       MS. PETERSON:  Object.  It calls for

16  speculation.  Lacks foundation.

17       THE WITNESS:  No.

18  BY MR. FRIEDMAN:

19       Q. It's a -- these are more Visit Verification

20  Forms, correct?

21       A. Correct.

22       Q. And if you had seen these forms during an

23  employment, you would understand them to be forms that

24  an employee has where he gets a signature from his

25  doctor documenting that he needs to take time off?

Aiken & Welch Reporters     K. Ayers   8/27/08

45

1        MS. PETERSON:  Objection.  Incomplete

2   hypothetical.  Lacks foundation.  Calls for

3   speculation.

4        THE WITNESS:  Yes.

5   BY MR. FRIEDMAN:

6        Q. Were you aware that Mr. daRosa's medical leave

7   of absence in July as exemplified in Exhibit 10 was

8   extended to September 1st and then to September 6th?

9        A. No.

10       MS. PETERSON:  Objection.  Compound.  Lacks

11   foundation.  Calls for speculation.

12       THE WITNESS:  No.

13   BY MR. FRIEDMAN:

14       Q. Do you know where in Kaiser's files these

15   Visit Verifications are maintained?

16       MS. PETERSON:  Objection.  Calls for

17   speculation.  It's vague and ambiguous.  Referring to

18   the specific ones that have been marked Exhibit or in

19   general?

20       MR. FRIEDMAN:  He said he doesn't know about

21   these.  So these are just questions that have to do

22   with his answers.  And if we listen to the questions

23   and the answers from before, then the clarifications

24   that you continuously request are unnecessary.

25   BY MR. FRIEDMAN:

Aiken & Welch Reporters     K. Ayers   8/27/08

46

1      Q. So do you know where these records are

2   normally maintained at Kaiser?

3      A. Several locations.

4      Q. What several locations?

5      A. By that I mean one is given to the patient.

6   One is put into the medical record of the patient, the

7   out-patient medical record.  And one the patient --

8   excuse me, the employee, in this case the patient,

9   would share one with their supervisor.

10      Q. What does the supervisor do, or what is the

11   supervisor supposed to do with these Visit

12   Verifications when they receive them?

13      A. Maintain copies.

14         MS. PETERSON:  Objection.  Calls for

15   speculation.  Vague and ambiguous.

16         THE WITNESS:  Maintain copies of them.

17   BY MR. FRIEDMAN:

18      Q. So if -- where do they maintain copies?

19         MS. PETERSON:  Objection.  Calls for

20   speculation.  Vague and ambiguous.

21         THE WITNESS:  In the personnel file for the

22   employee.

23   BY MR. FRIEDMAN:

24      Q. Have you ever looked through Mr. daRosa's

25   personnel file?

47

1     A. No.

2        (Plaintiff's Exhibit No. 2 marked for

3           identification.)

4   BY MR. FRIEDMAN:

5     Q. Mr. Ayers, I am handing you what has been

6   previously marked as deposition Exhibit 2, and it is a

7   collection of pages that were produced from Kaiser's

8   records, I believe, relating to human resources.  Have

9   you ever seen this document before?

10    A. No.

11    Q. Are you aware of any records at Kaiser that

12  contain case numbers, case status, case summaries

13  involving employee contacts with human resources or

14  request for files, things like that at Kaiser?

15    A. No.

16    Q. Have your ever heard of KHRMIT, K-H-R-M-I-T?

17    A. KHRMIT.  I have a recollection of KHRMIT.

18  There's a series of reports or a series of programs, I

19  believe, that comes out of our occupational medicine

20  departments.  And they have funny names to them, like

21  KHRMIT or Flintstone and so forth.  I recall that from

22  my time when I was a director here, but that's my

23  recollection of KHRMIT, but it may not be exactly part

24  of that, but I recall something along those lines.

25    Q. If you could turn to the second to the last

Aiken & Welch Reporters     K. Ayers   8/27/08

48

1    page of this document, Bates-stamped 660.

2        A. Okay.

3        Q. There's a reference on August 19, 2005, Case

4    Number 15265850.  Do you see that?

5        A. Yes, I do.

6        Q. Do you know what that refers to?

7        A. No.

8        Q. Counsel, do you have any additional documents

9    for production during this deposition?

10        MS. PETERSON:  No, I do not.  And you received

11    our objections, written objections, correct.

12        MR. FRIEDMAN:  But you don't have any

13    documents with you?

14        MS. PETERSON:  We do not, no.

15    BY MR. FRIEDMAN:

16        Q. Mr. Ayers, if you turn to the first page of

17    this document, there's an entry April 4, 2007 entitled

18    inquiry of medical leave?

19        A. April 4, 2007.  Are you referring to 267 --

20    last three digits 267 the Case Number.

21        Q. "Yes"?

22        A. Yes, I have it here.

23        Q. And the way I understand this document, in the

24    case description, the information runs up rather than

25    down.  Do you know what I'm saying?

49

1    A. You read it this way (indicating).

2    Q. Yes, in term of any information that would be

3  related to that case would be on the line, and the

4  lines above rather than the lines below.

5        Can you read to yourself the case description?

6    A. Starting with NLVS?

7    Q. Yes.

8    A. And reading downward?

9    Q. Just read it to yourself, sir.

10    A. All right.

11    Q. You've had an opportunity to review?

12    A. Yes.

13    Q. Do you know what is referred to with respect

14  to a disability in the entry there on case description?

15        MS. PETERSON:  Objection.  Vague.

16        MR. FRIEDMAN:  Sorry.

17  BY MR. FRIEDMAN:

18    Q. A case had been opened due to he had been out

19  of disability.  Do you see that?

20    A. I see that.

21    Q. Do you know what references "out on

22  disability" means?

23        MS. PETERSON:  Objection.  Vague and

24  ambiguous.  Also objection to the extent it calls for a

25  legal conclusion.

Aiken & Welch Reporters     K. Ayers   8/27/08

50

1      THE WITNESS:  I can assume.

2      MS. PETERSON:  We don't want you to guess or

3  speculate.  You're asking him if he knows what this

4  means, right?

5      MR. FRIEDMAN:  Counsel, please don't interrupt

6  your witness.  The objections can be preserved on the

7  record.  There's no need for you to coach or interrupt

8  an answer.

9      THE WITNESS:  I can take this as I read it.

10      MR. FRIEDMAN:  Yes.

11      THE WITNESS:  Case was opened due -- doesn't

12  read correctly due to he had been out on disability.

13  BY MR. FRIEDMAN:

14      Q. Do you know what that means?  He had been out

15  on disability?

16      MS. PETERSON:  Objection.  Calls for

17  speculation and calls for a legal conclusion.

18      THE WITNESS:  I can.  I can take it for how it

19  reads.

20  BY MR. FRIEDMAN:

21      Q. Yes, only what you understand?

22      A. That he has been out on disability.

23      Q. And after that it says and TC coding was

24  needed.  Have you ever heard of timecard coding in

25  respect to a disability claim?

51

1    A. Yes.

2    Q. What would be the connection?

3    A. Disability is covered as other paid time --

4  other than paid time, regular paid time.  So we code

5  our time cards when they're a patient.

6    Q. Had you ever discussed with Ms. Roper that

7  Mr. daRosa had been out on disability and Ms. Roper

8  needed a timecard coding for him in August of 2005?

9    A. No.

10    MS. PETERSON:  Objection.  Lacks foundation.

11  Assumes facts not in evidence and it's compound.

12  BY MR. FRIEDMAN:

13    Q. And the answer was?

14    A. Not that I recall.

15    Q. Have you ever been aware that Fernando had

16  opened up a disability claim or that Ms. Roper had?

17    A. No.

18    Q. How was the disability claim opened?

19    MS. PETERSON:  Object that it calls for

20  speculation.  Vague and ambiguous.  Overbroad.  Also to

21  the extent that the term disability calls for a legal

22  conclusion.

23    THE WITNESS:  Typically work with HR to open a

24  claim.  Follow policy and procedure to open a claim

25  with their direction.

57

1   in connection with medical orders to take time off

2   work.

3         MS. PETERSON:  Objection.  Incomplete

4   hypothetical.  Calls for speculation.  Vague and

5   ambiguous.

6         THE WITNESS:  Can you repeat that?

7         MR. FRIEDMAN:  I'll ask the court reporter to

8   repeat that.

9         (Record read.)

10        MS. PETERSON:  Can you read back my

11  objections, please.

12        (Record read.)

13        THE WITNESS:  One of the roles of a manager is

14  to address the attendance and absence of an employee.

15  I would expect that to be the case here.  In fact, I

16  know it was the case here.  Each employee's reasons are

17  different, and depending on those reasons, I think

18  action would be taken based on those.

19  BY MR. FRIEDMAN:

20        Q. What is a manager-supervisor supposed to do

21  when the absences are related to medical orders to take

22  time off?

23        MS. PETERSON:  Objection.  Vague and

24  ambiguous.  Incomplete improper hypothetical.  Calls

25  for speculation.

Aiken & Welch Reporters    K. Ayers   8/27/08

58

1      THE WITNESS:  We note those.  We, of course,

2  honor the request for time off.  Depending compensation

3  is associated with that guided by HR.  And the manager

4  would work with the employee to get that employee back

5  to work.

6      MR. FRIEDMAN:  Mark the next Exhibit please --

7  it will be 12.

8      (Plaintiff's Exhibit No. 12 marked for

9       identification.)

10  BY MR. FRIEDMAN:

11      Q. I've handed you a document produced by Kaiser

12  in this litigation entitled "guidelines for the

13  interactive process."  Have you ever seen a document

14  like this?

15      MS. PETERSON:  Take a second to review.  It's

16  very long.

17      THE WITNESS:  I can't say that I've -- that

18  I'm reviewed -- or I've seen this particular document

19  before, no.

20  BY MR. FRIEDMAN:

21      Q. Are you familiar with Kaiser's policies and

22  procedures in connection with the interactive process

23  as it's used?

24      A. Typically when I hear interactive process, I

25  don't associate it with what this is associated with.

Aiken & Welch Reporters     K. Ayers   8/27/08

59

1  I associate it with a process we have in one of your

2  unions around disciplinary processes.

3      Q. Okay.

4      A. I am familiar -- so --

5      Q. Okay.  Are you familiar in general with

6  Kaiser's policies about the role of the supervisor to

7  interact with the employee regarding accommodations for

8  disabilities?

9      A. Yes, I am.

10      Q. And looking at the section one here, is it

11  true that Kaiser has an obligation to accommodate

12  employees when their medical conditions interfere with

13  their ability to work?

14      MS. PETERSON:  Object that it calls for a

15  legal conclusion.  He's not a lawyer.

16      THE WITNESS:  Yes.

17  BY MR. FRIEDMAN:

18      Q. Do -- and employees don't have to use specific

19  words to request accommodation, correct?

20      MS. PETERSON:  And I'm going to object to the

21  extent it calls for a legal conclusion.

22  BY MR. FRIEDMAN:

23      Q. This is in reference to a question number two

24  or a perception section number two, sorry.

25      MS. PETERSON:  Same objection.  It calls for a

Aiken & Welch Reporters     K. Ayers   8/27/08

60

1  legal conclusion.  It's vague and ambiguous and calls

2  for speculation.

3      THE WITNESS:  Could you repeat that, please.

4  BY MR. FRIEDMAN:

5      Q. Well, when an employee is interacting with an

6  employer over -- and in this case Kaiser, the employer,

7  interacting over accommodations for disability, the

8  employee doesn't actually have to use the word, for

9  example, accommodation in order to trigger the

10  supervisor's responsibilities in this regard.

11      MS. PETERSON:  Object.  Incomplete

12  hypothetical.  Calls for speculation.  Calls for a

13  legal conclusion.

14      THE WITNESS:  I'm not sure I understand what

15  you're -- where you're trying to go with that.

16  MR. FRIEDMAN:

17      Q. I'm not trying to go anywhere.

18      A. I'm not sure I understand your question then.

19      Q. Okay.  Is it true that an employee can request

20  accommodation from Kaiser?

21      A. Yes.

22      Q. And in making that request, does he have to

23  use the word accommodation?

24      MS. PETERSON:  Objection.  Incomplete

25  hypothetical.  Calls for speculation, also calls for a

Aiken & Welch Reporters    K. Ayers  8/27/08

61

1    legal conclusion.

2        THE WITNESS:  Reading this here?  Having read

3    this?

4    BY MR. FRIEDMAN:

5        Q. And to your knowledge?

6        A. Having read this now?

7        Q. Yes.

8        A. It's not necessary.

9        Q. Did you ever believe it was?

10       A. I believed that in past -- my experience with

11   this is that an employee comes in and asks for -- I've

12   got this disability, I've got information from my

13   physician and then accommodation discussion will occur.

14       Q. And in your understanding of it, prior to, did

15   you believe that the employee had to use the word

16   accommodation in order to trigger that event?

17       A. No.

18       Q. Did he have to actually say the word "I am

19   disabled" or those words?

20       MS. PETERSON:  Object.  Incomplete

21   hypothetical.  Calls for speculation.

22       THE WITNESS:  No.

23   BY MR. FRIEDMAN:

24       Q. And isn't it true under Kaiser's policies that

25   as long as Kaiser was on notice that the employee

62

1   cannot perform his or her duties as a result of a

2   physical condition that that would trigger the -- this

3   interactive process.  When I use interactive process,

4   I'm talking about in this context that we're talking

5   about today?

6       MS. PETERSON:  Object.  It's vague and

7   ambiguous.  It calls for a legal conclusion and it

8   calls for speculation, and I'm also going to object it

9   calls for a legal conclusion.

10      THE WITNESS:  I can't answer yes or no to

11  that.

12  BY MR. FRIEDMAN:

13      Q. Why not?

14      A. I just --  the way you phrased it, I'm just

15  not sure that that would occur.

16      Q. Okay.  Do you believe that as long as Kaiser's

17  supervisor is on notice that the employee has a health

18  problem and that that health problem is interfering

19  with the -- his ability to perform his jobs, do you

20  have an understanding that as long as Kaiser has

21  knowledge of that that the responsibility to engage in

22  the interactive process has been triggered?

23      MS. PETERSON:  Objection.  Incomplete

24  hypothetical.  Calls for a legal conclusion.  Calls for

25  speculation.  Vague and ambiguous.

63

1        THE WITNESS:  I understand that part of your

2    statement is true.  When you throw in interactive

3    process, I don't refer to it that.  I never have until

4    I saw this document.

5            But we have an obligation to reasonably

6    accommodate our employees, and that would have occurred

7    or should have occurred.

8    BY MR. FRIEDMAN:

9        Q. And the process of engaging in a discussion

10    with the employee about his needs and needs for

11    accommodation and what the work requires, that's what I

12    meant when I meant interactive process.  And for

13    purposes of today's deposition, if I say interactive

14    process, I'm referring to that as opposed to the union

15    setting you mentioned earlier.  Do you understand that?

16        A. Yes.

17        Q. So is it your understanding then the

18    responsibility to engage in the interactive process is

19    triggered as long as Kaiser is aware of the presence of

20    a health condition that has interfered with the

21    employee's ability to perform the duties?

22        MS. PETERSON:  Object.  It calls for a legal

23    conclusion.  It's an incomplete hypothetical and calls

24    for speculation.

25        THE WITNESS:  Let me answer it this way.  An

64

1  employee comes to me and says, I cannot perform the

2  duties of my job.  I need some assistance here.  We

3  would get into a discussion about reasonable

4  accommodation.

5  BY MR. FRIEDMAN:

6     Q. And that should happen at Kaiser under any of

7  your -- under any of your direct reports?

8     A. Correct.

9     Q. Okay.

10     A. Again, based on the circumstances of what

11  their absences is related to.

12     Q. Were you aware that there was ever any

13  discussion with Mr. daRosa in this case regarding

14  accommodations?

15     A. No.

16     Q. Were you ever aware of any discussion that

17  Ms. Roper had with Mr. daRosa after his return from the

18  medical leave as shown in exhibits 10 and 11?

19     MS. PETERSON:  Objection.  Assumes facts not

20  in evidence.

21     THE WITNESS:  I was not aware of those

22  documents, so I could not be aware of any discussions

23  that she might have had following receipt of those

24  documents.

25  BY MR. FRIEDMAN:

Aiken & Welch Reporters     K. Ayers   8/27/08

65

1     Q. Turn to the second page, question number

2  three?

3     A. Uh-huh.

4     Q. And if you see the last bullet item?

5     A. Uh-huh.

6     Q. And --

7     A. The one that's underlined.

8     Q. Yes.

9     A. Uh-huh.

10     Q. And it's underlined and it says:  "Document

11  the interactive process, include written communication

12  to the employee confirming the actions taken or

13  agreements reached."

14        Did you understand that that was required of

15  Kaiser supervisors at the time of Mr. daRosa's

16  termination?

17        MS. PETERSON:  Objection.  Incomplete

18  hypothetical.  Calls for speculation.  Vague and

19  ambiguous.  And also object to the extent it calls for

20  a legal conclusion.

21        THE WITNESS:  No.  And I had no knowledge that

22  we had a situation of disability as I stated before.

23        MR. FRIEDMAN:  Can I have my question read

24  back to me.

25        (Record read.)

66

1  BY MR. FRIEDMAN:

2      Q. So my question to you is:  Did you understand

3  that Kaiser supervisors were supposed to document any

4  interactive process at that time, whether it happened

5  or not with Mr. daRosa, do you understand -- did you

6  know that this was an obligation at that time?

7      MS. PETERSON:  Objection.  Assumes facts not

8  in evidence.  It's an incomplete hypothetical and also

9  object to the extent it calls for a legal conclusion.

10     THE WITNESS:  As relates to the interactive

11  process, no, I was not.

12  BY MR. FRIEDMAN:

13     Q. Do you know why that line is underlined?

14     MS. PETERSON:  Objection.  Calls for

15  speculation.

16     THE WITNESS:  No.

17  BY MR. FRIEDMAN:

18     Q. Have you ever seen any documentation of any

19  interactive process between Ms. Roper and Fernando?

20     A. No.

21     Q. If you turn to the next page, section five.

22     A. Page three?

23     Q. Yes.  It talks about accommodations.  Is it

24  true that accommodations for employees with

25  disabilities can include leave or extension of leave

Aiken & Welch Reporters     K. Ayers   8/27/08

67

1  paid or unpaid?

2      MS. PETERSON:  Objection.  Incomplete

3  hypothetical.  Calls for a legal conclusion.  Compound.

4      THE WITNESS:  Yes.

5  BY MR. FRIEDMAN:

6      Q. Did you ever have any discussions with

7  Ms. Roper about leave of absences in connection with

8  Mr. daRosa?

9      A. Not that I recall.

10     Q. Did you ever hear anything from Ms. Roper in

11  connection with Mr. daRosa's employment other than his

12  absences?

13     A. No.

14     Q. Was there ever a discussion to your knowledge

15  about allowing him to take naps at work?

16     A. No.

17     Q. Was there ever a discussion to your knowledge

18  about changes in the temperature?

19     A. No.

20     Q. Had you ever had a discussion in connection

21  with Mr. daRosa -- sorry.  Strike that.

22      Have you ever had a discussion with Ms. Roper

23  in connection with Mr. daRosa about him being present

24  at work but not being engaged in productive activity?

25     A. I can vaguely recall some discussions around

Aiken & Welch Reporters    K. Ayers  8/27/08

70

1  accommodations.

2  BY MR. FRIEDMAN:

3      Q. And Kaiser can ask the employee to see

4  Kaiser's choice of a doctor when there is insufficient

5  information provided.  Is that your understanding?

6      MS. PETERSON:  Objection.  Calls for legal

7  conclusion.  Vague and ambiguous.  Incomplete

8  hypothetical.

9      THE WITNESS:  I have that understanding now

10  after having read that.

11  BY MR. FRIEDMAN:

12      Q. But you didn't understand that back then?

13      MS. PETERSON:  Objection.  Vague and ambiguous

14  as to time.

15      THE WITNESS:  No.

16  BY MR. FRIEDMAN:

17      Q. Do you know whether or not anybody at Kaiser

18  ever asked Mr. daRosa to submit to Kaiser's own

19  doctors' for medical examination?

20      A. No.

21      Q. If you turn to section 16.

22      A. All right.

23      Q. Must an employee -- must Kaiser keep the

24  disabled employee's job open during a medical leave?

25      MS. PETERSON:  Objection.  Vague and

Aiken & Welch Reporters    K. Ayers  8/27/08

71

1   ambiguous.  Incomplete hypothetical.  Calls for a legal

2   conclusion.

3        THE WITNESS:  Keep the position open.  Yes.

4   BY MR. FRIEDMAN:

5        Q. Unpaid?

6        A. And by that we can hire, and we have hired,

7   temporary people to come in and fill that job.  But

8   when the employee is able to return to work, depending

9   on the extent of the absence, we can move that person

10  back into that job or a similar job is my

11  understanding.

12       Q. Did you ever have any discussions with

13  Ms. Roper about keeping Fernando's job open?

14       A. No.

15       Q. Did you ever have any discussions with anybody

16  at Kaiser with respect to keeping Fernando's job open?

17       A. No.

18       Q. Do you have any recollection of any discussion

19  about reassignment of Mr. daRosa?

20       A. No.

21       Q. I'm referring to question 17, which starts at

22  the bottom of that page but goes over to the next.

23       A. Okay.

24       Q. Is it true that your direct reports are

25  supposed to take steps to avoid employees becoming lost

Aiken & Welch Reporters    K. Ayers   8/27/08

74

1  BY MR. FRIEDMAN:

2      Q. Mr. Ayers, I'm handing you a document which

3  has been marked as Deposition Exhibit 4.  It's the

4  December 7, 2005 memo to the file by Ms. Roper.

5      A. All right.

6      Q. Have you ever seen this document before?

7      A. I don't recall seeing this specific document.

8      Q. Do you recall having a discussion with

9  Ms. Roper about the information that's contained in

10  this document?

11      A. Somewhat.

12      Q. What do you recall?

13      A. The number of absences that Mr. daRosa had

14  over a period of time and actions of what we need to do

15  to manage those from a standpoint of continual absences

16  and so forth.

17      Q. Do you recall the discussion with her about 32

18  days being missed July 7th to August 22nd?

19      A. Not specifically, no.

20      Q. Did you ask her why Mr. daRosa had missed so

21  much time?

22      A. Yes.

23      Q. What did she say?

24      A. From my recollection she said she has -- he's

25  just out a lot.  Nothing related to medical leave.

92

1  termination?

2       MS. PETERSON:  I'm going to object that it

3  calls for speculation regarding what Kaiser has or has

4  not been able to locate.

5       THE WITNESS:  I can confirm that I have not

6  been able to locate anything that I had in my

7  possession.

8  BY MR. FRIEDMAN:

9       Q. And also you can confirm that you were not

10  able to find any documents that Ms. Roper left under

11  your authority and supervision?

12      A. That's correct.

13      Q. Are you aware that Mr. Mellon testified during

14  his deposition that he had spoken with Ms. Roper about

15  the documentation of verbal warnings, but never

16  actually saw any documents?

17      A. No.

18      Q. If you had known that Mr. daRosa's physician

19  had given him a medical leave on January 24th for the

20  25th until March of 2006, at the time that Mr. daRosa

21  was terminated for being a no-call/no-show, and the

22  medical documentation that he received from the doctor

23  stated that his medical condition interfered with his

24  ability to work, would that have changed your decision

25  to approve his termination?

Aiken & Welch Reporters    K. Ayers   8/27/08

93

1    MS. PETERSON: Objection. Incomplete

2  hypothetical. Calls for speculation. Vague and

3  ambiguous and compound.

4    THE WITNESS: I'm sorry to have to ask you,

5  but can you ask the question -- or repeat the question?

6    (Record read.)

7    THE WITNESS: It would have played in to a

8  decision around that. I cannot tell you whether it

9  would have changed that or not.

10  BY MR. FRIEDMAN:

11    Q. How would it have played in?

12    A. It would have factored in with the information

13  that was provided to me.

14    Q. And how would it impact on the other

15  information that was provided to you?

16    MS. PETERSON: Objection. Calls for

17  speculation. Incomplete hypothetical.

18    THE WITNESS: Again, I can only -- and I

19  can't -- I can only speculate. I don't want to do

20  that. But I would have factored that information into

21  all the other information we have about absences and so

22  forth and would have made a decision at that point

23  based on that additional information. I can't tell you

24  if it would have been any different, because I don't

25  recall all of the information that was -- because I

94

1    don't recall all the information that we were

2    addressing specifically.

3    BY MR. FRIEDMAN:

4        Q. Well, specifically, if you had known that

5    Mr. daRosa had delivered a copy of the medical leave,

6    which was Exhibit 11.  Oh, sorry.  The January here,

7    Exhibit 6?

8        A. All right.

9        Q. If you had known that Exhibit 6 had been

10   hand-delivered and faxed to member services prior to

11   January 27th, do you think it would have been

12   appropriate to terminate plaintiff for being a no-call/

13   no-show?

14       MS. PETERSON:  Objection.  Incomplete and

15   improper hypothetical.  Calls for speculation.

16   Compound and vague and ambiguous.  Also assumes facts

17   not in evidence and lacks foundation.

18       THE WITNESS:  This would have not -- if I had

19   this information or my manager had this information,

20   this was three days prior to -- three days, two days

21   prior to his termination; is that correct?

22   BY MR. FRIEDMAN:

23       Q. Yes?

24       A. I would not have considered it a no-show.

25       Q. And if you had known that Fernando had been

Aiken & Welch Reporters    K. Ayers   8/27/08

95

1    taken off in July and August referring to Exhibits 10

2    and 11, due to a medical condition in 2005, would you

3    have approved his termination?

4         MS. PETERSON:  Objection.  Incomplete

5    hypothetical, assumes facts not in evidence, improper

6    hypothetical, lacks foundation.

7         THE WITNESS:  I cannot answer that yes or no,

8    again without the facts would factor in.

9    BY MR. FRIEDMAN:

10    Q.  Well, tell me, how would it factor in?  If you

11    had knowledge that Mr. daRosa had suffered from a

12    medical condition and the medical condition caused

13    uncontrolled sleep attacks at work and that his doctor

14    had taken him off work for a period of time in July and

15    August of 2005, and that he had returned to work on a

16    trial basis but continued to have absences around --

17    because of his medical condition and he had provided

18    with Ms. Roper the information related to that, do you

19    think it would be appropriate to have given him this

20    disciplinary warning on December 7th including those

21    days where he was off on -- as a result of medical

22    leave?

23         MS. PETERSON:  Objection.  Incomplete and

24    improper hypothetical.  Calls for speculation.  Lack of

25    foundation.

96

1        THE WITNESS:  If the way you laid it out, with

2    the assumptions that you made, I would have relooked at

3    the whole issue of his absences.

4    BY MR. FRIEDMAN:

5        Q. Do you think it would have been appropriate

6    for Ms. Roper to terminate Mr. daRosa if those facts

7    were known?

8        MS. PETERSON:  Objection.  Incomplete and

9    improper hypothetical.  Calls for speculation.  Vague

10   and ambiguous and lacks foundation.  Assumes facts not

11   in evidence.

12       THE WITNESS:  As you laid it out, as I sit

13   here today, I don't believe I would have approved

14   termination, if I had known those facts.

15   BY MR. FRIEDMAN:

16       Q. Would it have been appropriate for Ms. Roper

17   to keep those facts from you in connection with

18   Mr. daRosa's termination?

19       MS. PETERSON:  Objection.  Calls for

20   speculation.  Vague and ambiguous.  Incomplete

21   hypothetical.

22       THE WITNESS:  No.

23   BY MR. FRIEDMAN:

24       Q. Let me jump to the part of the deposition

25   where we've asked you to appear as the person with the

Aiken & Welch Reporters     K. Ayers   8/27/08

112

1  e-mail?

2      A. I could research it again, but I don't believe

3  I will find anything, because of the practice of

4  deleting things from our box.

5      Q. Is there any backup tapes?

6      A. That I don't know.

7      Q. You never made an inquiry with any of the tech

8  people at Kaiser about?

9      A. No.

10     Q. After looking at Exhibit 5, does this jog your

11 memory of any discussions you had with either

12 Mr. Mellon or Ms. Kato about Mr. daRosa?

13     A. By jogging my memory, do I recall that we had

14 a discussion or I received this e-mail, no.

15     Q. Do you have any general recollection of any

16 discussion with either of those individuals about Mr.

17 daRosa?

18     A. All I can state is that it would not be

19 unusual for me to involve these two individuals in

20 discussions about this gentleman.

21     Q. Mr. Mellon testified that he had spoken with

22 you about Mr. daRosa's request that his job be given

23 back to him and that you decided that it was no longer

24 available to him.  Do you have any memory of that?

25     A. No, I do not.

113

1    Q. So as you sit here today, you have no belief

2  that you were responsible for a decision that

3  Mr. daRosa was not rehirable?

4       MS. PETERSON: Objection. Misstates his prior

5  testimony.

6       THE WITNESS: I don't believe I had this

7  knowledge to even consider whether or not we would

8  rehire him or not.

9  BY MR. FRIEDMAN:

10    Q. And you were not aware that Fernando had

11  called Frank Mellon in mid-February, correct?

12    A. That Mr. daRosa had called him?

13    Q. Yes.

14    A. I was not aware of that.

15    Q. And you're not aware that Mr. Mellon told --

16  was told by Fernando that he had been terminated while

17  he was off on medical leave?

18       MS. PETERSON: Objection. Assumes facts not

19  in evidence. Lacks foundation.

20       THE WITNESS: No.

21  BY MR. FRIEDMAN:

22    Q. And you were unaware that Mr. daRosa told Mr.

23  Mellon that he had medical documentation from his

24  doctor for that absence?

25       MS. PETERSON: Objection. Assumes facts not

Aiken & Welch Reporters     K. Ayers   8/27/08

114

1   in evidence.  Lacks foundation.

2        THE WITNESS:  I don't recall that.

3   BY MR. FRIEDMAN:

4        Q. And you were unaware that Fernando had told

5   Mr. Mellon that he had provided that documentation to

6   Mrs. Roper prior to his termination?

7        MS. PETERSON:  Objection.  Lacks foundation.

8        THE WITNESS:  As I stated before, I was not

9   aware.

10  BY MR. FRIEDMAN:

11       Q. And you were unaware that Mr. Mellon had

12  accused Fernando daRosa of getting a false

13  documentation?

14       MS. PETERSON:  Objection.  Assumes facts not

15  in evidence.  Lacks foundation.

16       THE WITNESS:  I was not aware of the

17  discussions you've eluded to, if they occurred or not.

18  BY MR. FRIEDMAN:

19       Q. And that includes any discussion about

20  accusations that Mr. daRosa had backdated or gotten

21  false documentation?

22       A. That's correct.

23       Q. And you were unaware that plaintiff had called

24  Mr. Mellon in mid-March again to ask why his

25  termination happened while he was out on medical leave?

Aiken & Welch Reporters    K. Ayers   8/27/08

115

1       MS. PETERSON:  Objection.  Assumes facts not

2   in evidence.  Lacks foundation.

3       THE WITNESS:  I was unaware that that

4   discussion occurred.

5   BT MR. FRIEDMAN:

6       Q. Were you aware that Mr. daRosa had filed a

7   claim for disability in March of 2006?

8       MS. PETERSON:  Objection.  Assumes facts not

9   in evidence.  Lacks foundation.

10       THE WITNESS:  No.

11   BY MR. FRIEDMAN:

12       Q. Were you aware that he filed a claim with the

13   EEOC in April of 2006?

14       MS. PETERSON:  Objection.  Assumes facts not

15   in evidence.  Lacks foundation.

16       THE WITNESS:  No.

17   BY MR. FRIEDMAN:

18       Q. Were you aware that Mr. daRosa had filed a

19   claim for unemployment insurance stating that his

20   supervisor had fired him while his doctor had him out

21   on medical leave and that that claim was made in May of

22   2006?

23       A. No.

24       Q. Were you aware of Mr. daRosa making a phone

25   call in June of 2006 to Kaiser requesting that his job

116

1  be given back to him?

2      MS. PETERSON:  Objection.  Assumes facts not

3  in evidence.  Lacks foundation.

4      THE WITNESS:  No.

5  BY MR. FRIEDMAN:

6      Q. There is a -- some records indicating that a

7  search of the files were made -- was made by Gail Kato

8  in September of 2006.  Were you aware of anything about

9  Ms. Kato getting involved in reviewing Mr. daRosa's

10  personnel files in September?

11      A. No.

12      Q. After looking at Exhibit 5, these e-mails, do

13  you recall whether you did anything in response to any

14  communications that were provided to you with respect

15  to Mr. daRosa, in particular this communication?

16      A. No.

17      Q. You don't recall reviewing it or doing

18  anything about it?

19      A. I don't recall getting it or having it.

20      Q. Or doing anything about it?

21      A. Or doing anything about it.  I couldn't do

22  anything about it if I didn't receive it.

23      MR. FRIEDMAN:  I may be close to finishing up

24  for today.  Can we take a two minute break?

25      MS. PETERSON:  Sure.

Aiken & Welch Reporters     K. Ayers   8/27/08

117

1        (Break taken.)

2        MR. FRIEDMAN:  Back on the record.

3    BY MR. FRIEDMAN:

4        Q. Mr. Ayers, if you look at Exhibit 5 which is

5    the e-mail string?

6        A. Uh-huh.

7        Q. And if you look at the message from Gail Kato

8    to Frank Mellon on 7/25, which is at bottom of the

9    second page, and it states here that, the third

10   sentence -- yeah, third sentence, "You should give him

11   your opinion as an HR person, but you would not be

12   making the decision regarding his so-called evidence"?

13       MS. PETERSON:  I'm just going to object that

14   you misread that.  You said "should" instead of "you

15   could".

16       MR. FRIEDMAN:  I do want to read it correctly,

17   so let me rephrase that and restate it.

18   BY MR. FRIEDMAN:

19       Q. In the third sentence it says, "You could give

20   him your opinion as an HR person, but you could give

21   him the decision regarding his so-called evidence.

22   That needs to be discussed with Ken Ayers since Margie

23   Roper is no longer with us.  And of course you would be

24   giving her opinion and recommendation to Ken as well."

25   Do you see what I was pointing to and reading?

Aiken & Welch Reporters    K. Ayers   8/27/08

118

1    A. Yes.

2    Q. Do you recall reading that before?

3    A. No.

4    Q. Do you recall any discussion with either

5  Mr. Mellon or Ms. Kato about "so-called evidence" in

6  connection with Mr. daRosa?

7    A. No.

8    Q. Do you believe that Mr. Mellon ever did

9  discuss this with you and you just don't remember it?

10    A. I believe it could have happened.  I don't

11  remember it happening.

12    Q. Do you believe that if you were asked to rule

13  upon whether or not Mr. Fernando was -- or Mr. daRosa

14  was entitled to his job back and you did make a

15  decision about that, that you would remember it today?

16    A. Absolutely.

17    Q. So given that you don't remember the

18  discussion or making that decision, do you believe that

19  you didn't?

20    MS. PETERSON:  Object that it misstates his

21  prior testimony.  It's also vague and ambiguous and

22  compound.

23    MR. FRIEDMAN:  I can tell by the expression

24  that perhaps the question was unartfully worded.

25  BY MR. FRIEDMAN:

Aiken & Welch Reporters    K. Ayers  8/27/08

119

1    Q. Given what you do remember and what you don't

2   remember and what you probably would have remembered

3   had things occurred, do you believe that you were not

4   the person who made a decision about whether or not

5   Fernando was re-hirable?

6    A. At this particular point in time, yes.

7    Q. Could you state what the yes refers to, just

8   so that I'm sure of my answer.

9    A. This memo is dated 7/25/06, so around that

10   period of time I did not make a decision one way or the

11   other on rehiring him or not that I can recall.  And I

12   do believe as I stated earlier, if I had been asked for

13   that and had made a decision, I would have recalled it.

14    Q. And you would have documented it too, somehow?

15   In e-mails or in your files about actions taken?

16    A. Most likely, yes.

17    Q. I've asked you a lot of questions today about

18   your discussions with Ms. Roper and your knowledge of

19   Mr. daRosa and your knowledge about his termination.

20   Are there any areas or issues involving Mr. daRosa and

21   his termination that we haven't discussed today that

22   you feel -- that you think are important?

23    MS. PETERSON:  I'm going to object and

24   instruct the witness not to answer that question.  You

25   can ask him specific questions, but you can't ask an

Aiken & Welch Reporters    K. Ayers   8/27/08

122

1  STATE OF CALIFORNIA    )

2                         )

3  COUNTY OF ALAMEDA      )

4

5       I, KIMBERLY R. JENSEN, do hereby certify:

6       That KENNETH U. AYERS, in the foregoing

7  deposition named, was present and by me sworn as a

8  witness in the above-entitled action at the time and

9  place therein specified;

10       That said deposition was taken before me at

11  said time and place and was taken down in shorthand by

12  me, a Certified Shorthand Reporter of the State of

13  California, and was thereafter transcribed into

14  typewriting;

15       And that the foregoing transcript constitutes

16  a full, true, and correct report of said deposition and

17  of the proceedings that took place.

18       IN WITNESS WHEREOF, I have hereunder

19  subscribed my hand this 3rd day of September 2008.

20

21

22

         KIMBERLY R. JENSEN, RPR, CSR No. 12552
23            State of California

24

25

Aiken & Welch Reporters     K. Ayers   8/27/08