1      IN THE UNITED STATES DISTRICT COURT

2      NORTHERN DISTRICT OF CALIFORNIA

3      ---O0O---

4  FERNANDO DAROSA,

5    Plaintiff,

6  vs.           No.  3:07-CV-3114

7  KAISER FOUNDATION HEALTH
   PLAN, INC.,

8

    Defendant.

9  _____/

10

11

12

13

14      DEPOSITION OF FRANK MELLON

15

16

17

18      Taken before CATHLEEN M. MEUTER

19        CSR No. 12950

20        August 22, 2008

21

22

23

24

25

2

1                    I N D E X

2                                        PAGE

3    EXAMINATION BY MR. FRIEDMAN              4

4

5

6

7

8            E X H I B I T S

9    PLAINTIFF'S                        PAGE

10   1        Mellon's calendar and notes        67

11   2        Khrmit records, Bates stamped      88
                K00656 to K00661
12
     3        daRosa Personnel Action Request,   101
13              final timesheet, faxes, and
                daRosa Unemployment Insurance
14              Termination Report

15   4        12-7-05 memo to File, Re: DaRosa   115

16   5        String of e-mails, Bates stamped   126
                K00493 to K00497
17
     6        da Rosa Visit Verification forms   164
18
     7        Notice to Employer of State        168
19              Disability Claim Filed

20   8        Notice of Charge of Discrimination 168

21   9        Fax confirmation with reduced      199
                document
22

23

24

25

Aiken & Welch Court Reporters    F. Mellon    8/22/08

3

1          DEPOSITION OF FRANK MELLON

2

3     BE IT REMEMBERED, that pursuant to Notice, and on

4   the 22nd day of August 2008, commencing at the hour of

5   1:05 p.m., in the offices of Aiken & Welch, One Kaiser

6   Plaza, Suite 505, Oakland, California, before me,

7   CATHLEEN M. MEUTER, a Certified Shorthand Reporter,

8   personally appeared FRANK MELLON, produced as a witness

9   in said action, and being by me first duly sworn, was

10   thereupon examined as a witness in said cause.

11

12              ---o0o---

13

14          JEREMY L. FRIEDMAN, Attorney at Law, 2801

15   Sylhowe Road, Oakland, California 94602, appeared on

16   behalf of the Plaintiff.

17

18          JONATHAN D. MARTIN, Seyfarth Shaw, 560 Mission

19   Street, Suite 3100, San Francisco, California 94105,

20   appeared on behalf of the Defendants.

21

22

23

24

25

4

1                    FRANK MELLON,

2              sworn as a witness,

3              testified as follows:

4    EXAMINATION BY MR. FRIEDMAN:

5      Q.  Would you please state and spell your name for

6    the record?

7      A.  My name is Frank Mellon.  The last name is

8    spelled M-e-l-l-o-n.  The first name is Frank,

9    F-r-a-n-k.

10     Q.  Mr. Mellon, have you given your deposition in

11   any other cases?

12     A.  Yes.

13     Q.  On how many occasions?

14     A.  I don't know.

15     Q.  Is it more than five?

16     A.  Yes.

17     Q.  Is it more than ten?

18     A.  Yes.

19     Q.  Can you give me an approximation?

20     A.  I don't know.

21     Q.  Okay.  Is it more than fifty?

22     A.  I don't think so.

23     Q.  Do you think it's more than thirty?

24     A.  I don't know.

25     Q.  So it could be somewhere between twenty and

5

1  forty?  Would that be a fair estimate?

2      A.  I don't know.

3      Q.  What kind of cases have you given depositions

4  in?

5      A.  Employment law -- employment cases, I should

6  say, and National Labor Relations Board cases.

7      Q.  Have you given testimony in situations other

8  than depositions?

9      A.  I don't think so.

10     Q.  Have you ever testified at trial?

11     A.  No.

12     Q.  Have you ever testified at unemployment

13  insurance hearings or any other sort of administrative

14  hearings?

15     A.  Yes.

16     Q.  And those are given under oath as well?

17     A.  Yes.

18     Q.  Approximately how many administrative hearings

19  have you given testimony under oath?

20     A.  I have no idea.

21     Q.  Do you think it's approximately the same number

22  that you've given depositions or a lot fewer or a lot

23  more?

24     A.  No.  It's going to be a large number.  I just

25  don't know.  It will be more than what I referenced in

Aiken & Welch Court Reporters    F. Mellon    8/22/08

6

1 the other instance.

2     Q. More administrative hearings than depositions?

3     A. Yes.

4     Q. Since you've given sworn testimony before, I'll

5 just briefly go over just a few of the admonitions.

6 You understand you've given the oath to tell the truth,

7 and that oath carries the same sanctity as if you were

8 giving testimony in a court of law even though this is

9 in a less formal setting, correct?

10     A. Yes.

11     Q. And you understood when you gave your oath to

12 tell the truth at the employment insurance hearing with

13 Mr. daRosa that you were -- that oath carried the same

14 sanctity as a court of the law too, correct?

15     A. At this point, I'm going to make a comment.

16 Matters involving unemployment cases, as I understand

17 California law, are not carried forward into any other

18 proceeding. As such, I will not comment on that case.

19     Q. Now, we're talking about Mr. daRosa's

20 unemployment insurance --

21     A. I understand. And under California law,

22 unemployment insurance cases are specifically their own

23 silo. And they are not used as findings of fact or

24 other purposes outside that specific silo. And given

25 that's the frame of the California law, I will not

Aiken & Welch Court Reporters     F. Mellon     8/22/08

7

1    comment on that.

2        Q.  Okay.  So tell me when you gave testimony at

3    Mr. daRosa's EDD unemployment insurance hearing, did

4    you understand that that oath carried the same sanctity

5    as if you were giving testimony --

6        A.  As I have advised you, I will not comment on

7    that hearing.

8        Q.  Are you refusing to answer my question?

9        A.  Yes, sir.

10       Q.  Are you doing that on the advice of counsel?

11       A.  No, sir.

12       Q.  You're doing that just on your own?

13       A.  I'm doing that as my understanding of

14   California law regarding unemployment compensation

15   hearings.

16       Q.  And it's your understanding that any of the

17   proceedings that happened in an administrative hearing

18   such as that is forbidden to even inquire for purposes

19   of this litigation completely?

20       A.  If it is going to be used in the context of the

21   litigation, it is forbidden to be used.

22           MR. FRIEDMAN:  Counsel, are you instructing him

23   not to answer this question?

24           MR. MARTIN:  I will agree with his assessment

25   unless you can cite otherwise.  I think it's in the

Aiken & Welch Court Reporters     F. Mellon     8/22/08

27

1  corrected your testimony.  You said that Kaiser doesn't

2  terminate people for medical leave.

3       Do I understand that?

4     A.  For taking a medical leave, that's correct.

5     Q.  Now, is that because it would be contrary to

6  Kaiser's policy to do so?

7       MR. MARTIN:  Objection.  Calls for speculation.

8  Incomplete hypothetical.  Calls for a legal conclusion.

9  Lacks foundation.

10       You can go ahead and answer if you know.

11       THE WITNESS:  As I understand the policy, if

12  someone has a legitimate leave of absence, they've done

13  the proper filing for the leave of absence and they

14  have exhausted their rights under either applicable law

15  or the collective bargaining agreement, then it would

16  be improper to terminate their employment.

17  BY MR. FRIEDMAN:

18     Q.  What if there's no collective bargaining

19  agreement, is it still proper to terminate an employee

20  who requires medical leave for that purpose alone?

21       MR. MARTIN:  Objection.  Calls for speculation.

22  Incomplete hypothetical.  Lacks foundation.  Calls for

23  a legal conclusion.

24       You can go ahead and answer if you know.

25       THE WITNESS:  There are laws and regulations

Aiken & Welch Court Reporters     F. Mellon     8/22/08

28

1  regarding leaves if someone is outside of the those

2  protected categories.  It may indeed be proper, but we

3  would not do so without first doing a counseling with

4  our legal department.

5  BY MR. FRIEDMAN:

6    Q.  Okay.  In fact, it's Kaiser's responsibility

7  once a manager knows that there are medical issues

8  involved that might interfere with an employee's

9  ability to work, it's Kaiser's responsibility --

10      THE REPORTER:  I need you to slow down.

11 BY MR. FRIEDMAN:

12    Q.  -- and the manager's responsibility to engage

13 that employee in a discussion prior to any termination,

14 correct?

15      MR. MARTIN:  Objection.  Calls for speculation.

16 Incomplete hypothetical.  Lacks foundation.  Calls for

17 a legal conclusion.

18      You can answer if you know.

19      THE WITNESS:  You know, you've asked so many

20 things in one piece that I'm not sure that I can answer

21 that question.  Can you kind of break it down?

22      MR. FRIEDMAN:  I'll ask the court reporter to

23 repeat it.

24      (Record read.)

25      MR. MARTIN:  Same objections.  It's also

63

1    Q. In December of 2005?

2    A. No. I did not.

3    Q. In January of 2006, did you speak with her

4  about Mr. daRosa?

5    A. Yes.

6    Q. And at that time, did you look through any

7  files?

8    A. No.

9    Q. And when Mr. daRosa called you in February of

10  2006, did you look through any files at that time?

11    A. She did not call me in February of 2006.

12    Q. In February of 2006, did you look through any

13  files with respect to Mr. daRosa?

14    A. No.

15    Q. In March of 2006, did you look through any

16  files for Mr. daRosa?

17    A. No.

18    Q. In July or August of 2006 when you were

19  engaging in e-mail communications with Ms. Kato about

20  Mr. daRosa, did you look through any files?

21        MR. MARTIN: Objection. Lacks foundation.

22        You can answer if you know.

23        THE WITNESS: No.

24  BY MR. FRIEDMAN:

25    Q. Did you search -- look at any of Mr. daRosa's

64

1   files prior to the EDD hearing in April of 2007?

2       A.  Excuse me, Counselor.  Do you want to

3   correct -- and it's only because I don't recall the

4   specific dates.  There was a searching of the files for

5   purposes of providing those to legal counsel in the EEO

6   case.  So I don't want to be misunderstood.  But those

7   files were searched out then and simply forwarded on.

8       Q.  When was it that you did that?

9       A.  You know, I just don't remember when the EEO

10  case was.  And my recollection is that it was in 2006,

11  but I may be off on that.

12      Q.  Did you ever see the letter that the counsel

13  for Kaiser wrote to the EEOC about this case?

14      A.  No.

15      Q.  Did your provision of records to the EEO

16  division, was that before the EDD hearing in March of

17  2007?

18      MR. MARTIN:  Objection.  Misstates the

19  testimony.  Lacks foundation.  He didn't say that he

20  provided documents to the EEOC or anyone else, I don't

21  think.

22      THE WITNESS:  No.  I believe you said to my

23  EEOC counsel.

24  BY MR. FRIEDMAN:

25      Q.  That's what I meant, yes.  I know you didn't

Aiken & Welch Court Reporters    F. Mellon    8/22/08

65

1    provide it to EEOC, but you had attorneys representing

2    Kaiser in the EEO matter.

3        A.  Yes.

4        Q.  And you provided them with documents?

5        A.  Yes.

6        Q.  And you searched for Mr. daRosa's records in

7    connection with that provision?

8        A.  Yes.

9        Q.  And I was asking whether that was before the --

10   I think I misspoke.  I think I said March 2007, but it

11   was April 2007 was the EDD hearing.

12          Was it before then or after then?

13       A.  I believe before then, but I do not remember

14   specifically.

15       Q.  And how about after the EDD hearing that you

16   participated in, did you search for records at that

17   time -- any other time?

18       A.  No.

19       Q.  Okay.  And did you search for any documents in

20   connection with this litigation?

21       A.  No -- excuse me.  I furnished counsel, as I

22   said before, with the documents that I had.

23       Q.  So in furnishing those documents, did you

24   search records in order to find the documents to

25   provide to counsel?

69

1     A.  I had no conversations with Mr. daRosa in

2  January or February.

3     Q.  But did you have telephone records reflecting

4  work that you did or phone calls that you made in those

5  time periods?

6     A.  Yes.

7     Q.  And do they still exist today?

8     A.  Yes.

9     Q.  And is it your testimony that there are no

10  records from -- other than this page that have any

11  reference to Mr. daRosa?

12     A.  Yes.

13     Q.  Did you provide those records to counsel even

14  though they, in your mind, didn't have any of those

15  daRosa references?

16     A.  I provided to counsel records that I had that

17  would have reference to Mr. daRosa.

18     Q.  So did you provide counsel with records from

19  February of 2006?

20     A.  I had no records on Mr. daRosa in February of

21  2006.

22     Q.  Did you provide counsel with your phone records

23  from 2006?

24     A.  No, I did not.

25     Q.  And did you provide counsel with your phone

114

1    Q.  Your call with Mr. daRosa in March of 2006.

2  You told him it was a month and a half past his

3  termination, and it was too late, correct?

4    A.  I don't know if it was in that conversation.  I

5  know in one conversation I had with him I said

6  something to that effect.

7    Q.  You don't know if it was in March?

8    A.  I'm not sure.

9    Q.  What did you say to him in March?

10    MR. MARTIN:  Objection.  Asked and answered.

11    You can answer again.

12    THE WITNESS:  What I recall is when he called

13  on the March 15th date and I did a return call was that

14  initial conversation with him about his disability and

15  that he had a doctors note.  Subsequent, there were a

16  couple other calls.  I don't remember the dates.  I

17  didn't write them down.  But I know at one point I did

18  tell him this that is awfully late and it's too late.

19  BY MR. FRIEDMAN:

20    Q.  In your prior testimony just now, I asked you

21  what you said to him.  And you said to him where has he

22  been all of this time, over a month and a half has

23  passed, and you're not aware of a doctors note.

24    A.  That's correct.

25    Q.  And you told him it was too late then?

133

1     Q.  I must have misspoken.  Thank you.

2         In fact, you testified that at the EDD hearing

3   in April of 2007 that at that time you had never seen

4   confirmation or any evidence of any fax that Mr. daRosa

5   had sent to member services with this visit

6   verification?  You testified to that, right?

7     A.  The hearing was in 2007, correct?

8     Q.  Yes.

9     A.  I don't remember my testimony on that, sir.

10    Q.  Okay.  And pursuant to your prior objection, if

11  I play it for you, that's something you're not going to

12  answer questions on?

13    A.  I'm going to ask counsel on that.

14        MR. MARTIN:  Go ahead and play it.  I don't

15  want to be before the Court again, although my concern

16  is that there are -- there is State law regarding the

17  use of findings of unemployment hearings.  So I'm not

18  waiving any objections with respect to what the law

19  provides.

20        But having said that for the purposes of this

21  deposition only, ask your questions, and we'll object

22  to them or not as appropriate.

23  BY MR. FRIEDMAN:

24    Q.  Okay.  Well, then you recall, Mr. Mellon, that

25  during the EDD hearing the judge asked you questions

Aiken & Welch Court Reporters     F. Mellon     8/22/08

148

1   verification of treatment.  However, my recollection

2   with regards to that is that one call was in February,

3   another call was substantially after the March 26th

4   date on the document he subsequently brought in.  But I

5   have a recollection or knowledge of him -- I have no

6   recollection or knowledge of him ever bringing in that

7   document prior to March 31.

8         The judge said, but he called you in February.

9         And you answered, in February.

10        Isn't that correct?

11        MR. MARTIN:  Objection.  Isn't what correct?

12   The fact that he testified to that or the --

13        MR. FRIEDMAN:  Yes.

14        MR. MARTIN:  Just that he testified.  Okay.

15        If you can recall that you said all that or

16   not, go ahead and answer.

17        THE WITNESS:  You know, I don't recall saying

18   that.  But if that's what the record shows, that's what

19   the record shows.

20   BY MR. FRIEDMAN:

21     Q.  Okay.  So you do -- you did tell the

22   administrative law judge under oath that he called you

23   in February, correct?

24     A.  Is that a question, or are you telling me what

25   I'm saying?

149

1    Q.  I'm asking you the question.  That's correct,

2  you testified to that, correct?

3    A.  I'm saying that I don't recall what I

4  testified.

5      MR. FRIEDMAN:  Okay.  Madame Court Reporter,

6  I'm going to play this, and if you can't hear it, then

7  you can put in just, you know, tape played, and I'll

8  repeat it to make sure that what's necessary is

9  evidence.  But if you can get it into the record,

10  that's fine.

11      THE REPORTER:  Off the record?

12      MR. FRIEDMAN:  Sure.

13      (Discussion off the record.)

14      (Recording played and transcribed as follows.)

15      SPEAKER ONE FROM AUDIO RECORDING:  "I did have

16  a couple of conversations, and those conversations had

17  to do with Mr. daRosa representing that he had the

18  verification of treatment.  However, my recollection

19  with regards to that is that one call was in February

20  and another call was substantially after the March 26th

21  date on the document he subsequently brought in.  But I

22  have no record or knowledge of him ever bringing that

23  document in to my office -- "

24      SPEAKER TWO FROM RECORDING:  "Hold on."

25      SPEAKER ONE FROM RECORDING:  " -- prior to

150

1    March 31."

2         SPEAKER TWO FROM RECORDING:  "So he called you

3    in February?"

4         SPEAKER ONE FROM RECORDING:  "In February."

5         SPEAKER TWO FROM RECORDING:  "Okay.  And he

6    said I have verification?"

7         SPEAKER ONE FROM RECORDING:  "And I advised him

8    that he needed to bring that in.  I did tell you that

9    (sic)."

10        MR. FRIEDMAN:  Okay.  Did you get that?

11        THE REPORTER:  As far as I know.

12   BY MR. FRIEDMAN:

13       Q.  Okay.  Mr. Mellon, did you hear that testimony?

14        MR. MARTIN:  Objection.  The recording that you

15   just played as far as I know has not been

16   authenticated.  I don't know what that is.  Also, I'll

17   renew my objection regarding the use of information

18   from an unemployment hearing.  There's State law that

19   relates to that.

20        Having said that, you can go ahead and answer

21   the question if you can, whatever the question is.

22   BY MR. FRIEDMAN:

23       Q.  Was that your testimony at the hearing?

24       A.  That's my voice.

25       Q.  And it is, in fact, true that the judge asked

Aiken & Welch Court Reporters    F. Mellon    8/22/08

151

1  you, but he you called you in February.

2      And you answered under oath, in February.

3      Correct?

4   A.  That's what I testified.

5   Q.  And the judge asked you, and he said I have a

6  verification and he told you that in February.

7      That's what you testified to, correct?

8      MR. MARTIN:  Vague and ambiguous also as to

9  February what of what year.  There's no indication

10  there as to what year is being discussed.

11      But if you can still answer the question, go

12  ahead.

13      THE WITNESS:  I heard my voice.  I heard what I

14  said.  It wasn't what I recalled after all this time.

15  But that is me that is testifying.

16  BY MR. FRIEDMAN:

17   Q.  So now you recall that he did not call you in

18  February?  But in March of 2007, you did think that he

19  called you in February?

20   A.  In March of 2007, apparently I thought he had

21  called me in February.

22   Q.  And today you don't believe he did?

23   A.  No.  I don't recall, sir.

24   Q.  Okay.  Thank you.  That's very helpful.

25      And then you testified at the hearing that you

152

1   did not hear from him for about another month.

2          The judge asked, and then he called again.

3          And you said, yes.  He wanted to know why he

4   was terminated.

5          Do you recall that?

6          MR. MARTIN:  Same objection as to the recording

7   is not authenticated.

8          And you can go ahead and answer if you can.

9          THE WITNESS:  As I recall, yes.

10  BY MR. FRIEDMAN:

11      Q.  Okay.  Do you think that's accurate that he

12  called you in February and then approximately a month

13  later?

14      A.  The time I remember the conversation was in

15  March.  That's because I had some notes to refresh me.

16  If he called me in February, fine.  But I know that --

17  I'm fairly clear in my mind that there was some

18  substantial time that went in between.  How much of

19  that time, I thought the March date that I had in these

20  notes was the date that I had the conversation about

21  the verification of treatment.

22      Q.  When did you think that?

23      A.  When I looked at the notes prior to getting

24  started today, I thought that the March date -- that

25  was these notes here (indicating), sir.

Aiken & Welch Court Reporters    F. Mellon    8/22/08

153

1    Q.  If you look at Exhibit 1, is there anything in

2  those notes that say anything about verifications on

3  the March date?

4    A.  No.  It's just that that's what I recalled

5  after taking a look at the notes at this point in time.

6    Q.  Okay.  So there's nothing in these notes that

7  indicate that that conversation took place in March?

8  In fact, you testified previously that that

9  conversation took place in February?

10    A.  According to the tape that you're playing, sir.

11    Q.  Which do you think is the accurate testimony?

12    A.  It's my voice.  I'm simply saying as I can best

13  recall it here August of 2008.

14    Q.  Okay.  Did you discuss with Ms. Roper the

15  importance of the documentation about the oral warning

16  in January that allegedly took place in January?

17    A.  I asked how certain -- I believe what I asked

18  her was how certain she was that she had the

19  conversation and what did they talk about.  And she

20  indicated that they talked about his ongoing attendance

21  issues.  I cannot tell you the specifics.  I just don't

22  remember.

23    Q.  But do you recall anything about a discussion

24  about the documentation on her file?

25    A.  No.  I don't remember if there was a specific.

Aiken & Welch Court Reporters    F. Mellon    8/22/08

154

1   She said she had consult with him.

2       Q.  But did you talk with her the importance of

3   documenting that discussion somewhere in his personnel

4   file?

5       A.  No.  I don't believe I did.

6       Q.  Did you talk with her about the importance of

7   documenting that anywhere in her files at all in

8   relation to Mr. daRosa?

9       A.  I don't believe so, sir.

10      Q.  And as of today, do you know of any effort by

11  anybody at Kaiser to locate her file?

12      MR. MARTIN:  Objection.  Calls for speculation.

13  Lacks foundation.

14      You can go ahead and answer if you know.

15      THE WITNESS:  I think I've said any number of

16  times the files that we were aware of that were in her

17  office were sent off to counsel.  Subsequent to that

18  date, there are no other files that I'm aware of that

19  were in Margie's office.

20  BY MR. FRIEDMAN:

21      Q.  But you testified at the EDD hearing that you

22  asked her if she had documentation to back it up, and

23  she said she did?

24      A.  If that's what it says on the tape, that's what

25  it says.

155

1    Q.  And do you believe that to be the case, that

2  you did, in fact, ask her if she had documentation and

3  she said she did?

4    A.  I believe I may have asked that, yes.

5    Q.  And you told the -- at the hearing, the judge

6  asked you about that documentation, and that was part

7  of the testimony, correct?

8    A.  I believe so.

9    Q.  And you told the judge that since Ms. Roper had

10  left Kaiser had been -- had not located that file?

11  That was your testimony?

12    A.  The file that would have had that document,

13  that's what I would have said in reference, not a total

14  file because files as I've continuously said had been

15  forwarded on.

16    Q.  Do you know whether Ms. Roper's file -- I mean

17  her supervisory file (sic)?

18    A.  That's the file I keep referring to, sir.

19    Q.  Okay.  You never called Mr. daRosa prior to his

20  termination?

21    A.  No, sir.

22    Q.  You had his phone number?

23    A.  Only after he called me.

24    Q.  It wasn't available to you in the human

25  resources department?

158

1      A.  I remember him saying that he wanted his job

2   back.

3      Q.  And you recall him at the EDD hearing saying he

4   wanted his job and wouldn't have done anything to

5   jeopardize it?

6      A.  He might have said that.  I don't remember that

7   specifically.

8      Q.  Do you recall in that conversation with him

9   that the doctor had put him out on disability for a

10  period of time from the date of his -- when he was

11  supposedly a no call, no show all the way up until

12  March?

13      A.  He represented that he was out on disability.

14  I don't remember him -- and he also represented that he

15  had a doctors note to that effect.

16      Q.  And it was a period of disability?  It wasn't

17  just for those 24 to 30th date, but it was all the way

18  until March?

19      A.  He didn't specify how long it was.

20      Q.  But you know now because you've seen the record

21  that the doctor had, in fact, put him out on disability

22  through to March?

23      MR. MARTIN:  Objection.  Calls for speculation.

24  Lacks foundation.

25      If you know, you can answer.

Aiken & Welch Court Reporters     F. Mellon     8/22/08

162

1    Q.  I'm asking after the first phone calls -- there

2    was one in February and then one approximately a month

3    later?

4    A.  Right.

5    Q.  And your notes indicate that the March calls

6    were in mid March?

7    A.  Yes.

8        MR. MARTIN:  Same objection, by the way.

9    You're referring to the February calls.  If you want to

10   have an understanding that there may have been some

11   testimony about that.  He's just not -- I don't want

12   him to be admitting that there was a February phone

13   call.  We've already talked about that.

14   BY MR. FRIEDMAN:

15   Q.  There was a February phone call, correct?

16   A.  I know only from what I heard there.  I don't

17   remember the February phone call.

18   Q.  Okay.  All right.

19       MR. MARTIN:  If you want to refer to it that

20   way, just as long as there's the understanding that

21   he's testified as he has so I don't have to keep saying

22   it over and over again.

23       MR. FRIEDMAN:  That's fine.  I'll accept that,

24   although I believe his testimony is -- well, it is what

25   it is.

166

1        You can answer if you know.

2        THE WITNESS:  I don't know.

3    BY MR. FRIEDMAN:

4        Q.  Okay.  You don't know that this was, in fact,

5    faxed on January 25th, 2006, at 8:48 a.m.?

6        A.  I don't know that.

7        Q.  Do you have any reason to doubt it since it has

8    a fax stamp on top?  And do you have any reason to

9    doubt it given that Mr. daRosa had provided you his fax

10   confirmation?

11       A.  If I remember correctly, the fax confirmation

12   that he provided me likewise had the date and time

13   across the top which I thought was somewhat peculiar.

14   Normally, when you get a fax confirmation, it's shrunk

15   down.  It shows from what phone something was sent

16   from.  And it also has whatever the document is if it's

17   a one-page document.  So I always thought that that was

18   peculiar and never really quite sure of what (sic).

19       Additionally, the document shows what number it

20   came from.  So when I see a document that shows where

21   it came from but doesn't show where it arrived to, I

22   have no idea where it was actually delivered to.  So I

23   can't speculate on that.  I can only look at what is on

24   the piece of paper.

25       Q.  When you say you thought it was peculiar, do

Aiken & Welch Court Reporters    F. Mellon    8/22/08

167

1    you mean you thought that perhaps it was manufactured?

2      A.  I don't know.

3      Q.  Well, what do you mean by peculiar?

4      A.  I explained that normally when a document is

5    faxed and you do a receipt of a document, then what a

6    fax machine normally prints out, and what I've seen on

7    Kaiser fax machines at least the areas that I work with

8    printout, is this document would be reduced essentially

9    about 50 percent size.  There would be a header on the

10   document that would show delivery time and so forth.

11         So when I see something like this -- this says

12   this was sent from the Kaiser optical sales, January

13   25th, 8:48 a.m.  That's what it says.  The telephone

14   number that it came from.

15         But for somebody to turn in a document that's

16   exactly like this, I thought was odd because it means

17   that they have the document from wherever it was

18   received at.  And that would imply that however

19   Mr. daRosa came to this document, he came to the whole

20   document not a receipt document, not a proof of

21   delivery document.  That's why I find it peculiar.

22     Q.  What did that mean to you, though, that it was

23   odd or peculiar?  I understand what you're saying about

24   how it appeared.

25         But what did you think given that it had these

Aiken & Welch Court Reporters     F. Mellon    8/22/08

168

1   oddities that you thought?

2       A.  As far as I was concerned, this document could

3   have been delivered to anyplace on the planet.  And I

4   had no way of validating that it was delivered to

5   member services.

6       Q.  Got you.  So did you doubt Mr. daRosa when he

7   was talking to you and you were looking at this

8   document?

9       A.  I didn't get into a conversation about that.

10  The document was dropped off.  I didn't get into a

11  conversation with him about the document when it was

12  dropped off.

13      Q.  Okay.  Now, let's turn to those e-mails,

14  Exhibit 5.

15          MR. MARTIN:  Can we take a short break at this

16  point since it's been about an hour?

17          MR. FRIEDMAN:  We can but if I could get

18  through this next -- off the record.

19          (Break taken.)

20          (Plaintiff's Exhibit Nos. 7 and 8 marked for

21          Identification.)

22  BY MR. FRIEDMAN:

23      Q.  Mr. Mellon, I've handed you two new exhibits,

24  Exhibit 7 and Exhibit 8.  Exhibit 7 is from the EDD,

25  and it's received DMC March 13th, 2006.

Aiken & Welch Court Reporters     F. Mellon     8/22/08

181

1     Q.  Okay.  And that was what you needed to follow

2  up about, correct?

3     A.  Yes.

4     Q.  And you wrote back on the same day, since it

5  was you he talked to, you should be the one to call him

6  back, correct?

7     A.  Yes --

8        MR. MARTIN:  You're paraphrasing?

9        MR. FRIEDMAN:  I'm paraphrasing.

10  BY MR. FRIEDMAN:

11     Q.  Then you said to Gail, "Even if he has 'proof'

12  it's too late, isn't it?  He's still had terrible

13  attendance and a 'note' for the last (as I remember

14  couple of days) day (sic) shouldn't change anything,

15  should it?"

16        You wrote that to Gail, didn't you?

17     A.  Yes.

18     Q.  And you believed that as you had said earlier

19  that it was too late and even if he did have proof,

20  it's too late?  That was what you believed and what you

21  said to Gail, correct?

22     A.  Yes.

23     Q.  And then Gail wrote you back and said that she

24  believed that we need to hear him about this, correct?

25     A.  Yes.

182

1      Q.  And that she asked you to check out the dispute

2   resolution policy to see if he still has rights under

3   the policy to file a formal complaint.

4          She said that, correct?

5      A.  That's what the document says.

6      Q.  And you remember reading that?

7      A.  Yes.

8      Q.  Did you check the dispute resolution policy?

9      A.  I believe I did.

10     Q.  What does it say?

11     A.  I don't remember at the moment.  I don't

12   believe he had any further rights.

13     Q.  Why was that?

14     A.  Because of the amount of time involved.

15     Q.  Up to that point in July?

16     A.  Yes.

17     Q.  Did you find out whether there would have been

18   sufficient time for the February and/or March?

19     A.  I don't recall.

20     Q.  You could give him your opinion as an HR

21   person, but you would not be making the decision

22   regarding his so-called evidence.

23          Did you see that sentence?

24     A.  Yes.

25     Q.  And do you remember seeing that back on July

183

1  25th, 2006?

2      A.  It's here.

3      Q.  You remember seeing it?

4      A.  I see it here.  If you ask me do I

5  remember -- this is the first time I've seen it in a

6  very long time.

7      Q.  Okay.  And it's true that you were to give him

8  an opinion, but you were not the one to make that

9  decision on this so-called evidence, correct?

10     A.  She said I could give him my opinion.

11     Q.  Correct, but you were not the decisionmaker?

12     A.  That's correct.

13     Q.  And that needs to be discusses with Ken Ayers

14  since Margie Roper is no longer with us?

15     A.  Yes.

16     Q.  Did you discuss it with Mr. Ayers?

17     A.  Yes.

18     Q.  When was that?

19     A.  After I received the document.

20     Q.  And what did you say to him?

21     A.  I asked him to review the document and what was

22  his opinion.

23     Q.  Did you give him your opinion at the time?

24     A.  I don't know if I did.  I don't think so.

25     Q.  Did you do it in writing?

184

1    A.  No.

2    Q.  What did Mr. Ayers say?

3    A.  Mr. Ayers felt it was way too late and where

4   has he been all this time.

5    Q.  Did you give him -- you didn't have the proof

6   at that time, correct, or did you?

7    A.  I was very clear in what I said to you.  I

8   spoke to Mr. Ayers after I got the document.

9    Q.  Okay.  Thank you for that clarification.

10       So did you provide Mr. Ayers anything in

11   writing?

12    A.  Just the document.

13    Q.  Just the thing that he had brought over and

14   dropped off on July 31st?

15    A.  Yes.

16    Q.  And nothing else?

17    A.  No.

18    Q.  Then the next e-mail is on the 28th when Gail

19   says to you, thanks.

20    A.  Yes.

21    Q.  And you had advised Fernando that you would

22   pass copies of whatever he dropped off on to

23   appropriate levels?

24    A.  Yes.

25    Q.  And that meant your supervisors?

216

1     Q.  Is she no longer?

2     A.  No.

3     Q.  Is she still employed at Kaiser?

4     A.  Yes.

5     Q.  How come you're no longer under her

6  supervision?

7     A.  Because she has been promoted, and another

8  person is my supervisor now.

9     Q.  Who is your immediate supervisor now?

10     A.  Carol A. Crawford.

11     Q.  Ms. Kato told you this was not a decision you

12  were authorized to make, correct?

13     A.  That's correct.

14     Q.  And she told you to hear Mr. daRosa out and

15  give consult and recommendations, but the decision

16  belonged to Ken Ayers, correct?

17     A.  That's correct.

18     Q.  She asked you to get a copy of the medical

19  documentation that Fernando wanted to present, correct?

20     A.  Yes.

21     Q.  And she said she wanted you to check Kaiser's

22  policy to see if he had any rights, correct?

23     A.  Yes.

24     Q.  And in July or August of 2006, she told him he

25  was not re-hirable -- and he should -- he was not

Aiken & Welch Court Reporters     F. Mellon     8/22/08

217

1    re-hirable, correct?

2        A.  I told him he was not re-hirable, yes.

3        Q.  Did you talk to him anymore after that besides

4    the EDD hearing?

5        A.  I don't recall.

6        Q.  Did you talk with Mr. Ayers after -- what month

7    did you talk to Mr. Ayers?

8        A.  The last time I recall chatting with Ayers was

9    when I got the document and I sent it over to him.  So

10   it had to be sometime within several days after that

11   because Ayers, I thought, was out on vacation for a

12   while.

13       Q.  There's a notation here in the files showing

14   that Gail Kato had requested Fernando's personnel file

15   again in September, like late September, I think

16   September 26th.

17           Did you ever have any discussions around that

18   time?

19       A.  The only time I know that I made -- that a

20   personnel file was generated for Fernando was when I

21   spoke to him and I subsequently gave it to him.

22       Q.  But I was giving you this information about the

23   September file request to Gail Kato just to see if it

24   refreshes your recollection as to whether you had any

25   conversations in September with Mr. daRosa or

Aiken & Welch Court Reporters     F. Mellon     8/22/08

218

1  Mr. Ayers?

2      A.  I don't believe I did, but I don't remember.

3      Q.  And did you make any notations about your

4  discussions with Mr. daRosa at any time?

5         MR. MARTIN:  Objection.  Asked and answered.

6         You can answer.

7         THE WITNESS:  I produced all the documents I

8  had that --

9         MR. MARTIN:  You can just answer yes or no.

10         THE WITNESS:  But I am answering, and I'm

11  answering that I produced all the documents I have.

12  BY MR. FRIEDMAN:

13      Q.  But you did not take any notations of your

14  discussions with Gail Kato about it, correct?

15      A.  All I have is this.  So my answer to you is,

16  no, I didn't take any additional notations.

17      Q.  And you didn't take any notations when you

18  talked to Mr. Ayers about it, correct?

19      A.  No, I did not.

20      Q.  And you didn't make any notations when you

21  talked to Mr. daRosa when you told him that it was too

22  late, correct?

23      A.  No, I did not.

24      Q.  And you didn't make any notations when you

25  talked to him after you had spoken to Mr. Ayers and you

219

1   told him that he was not re-hirable, correct?

2       A.  No, I did not.

3           Are we about done for the sake of our court

4   reporter?

5       Q.  Let me ask you this.

6           Is there any other information that we haven't

7   talked about today that concerns Mr. daRosa's

8   termination or the reasons for it or the process of it

9   that is important to his claim that he was wrongfully

10  terminated?

11          MR. MARTIN:  Objection.  Vague and ambiguous.

12  Calls for a narrative.

13          You can answer if you know the answer.

14          THE WITNESS:  I don't know of anything that

15  hasn't been presented through today, sir.

16          MR. FRIEDMAN:  All right.  Then that will

17  complete it today.  Can't make any representations,

18  but, hopefully, I won't have to have you back.

19          MR. MARTIN:  Just for the record, we'd like to

20  request a copy of the transcript so that the deponent

21  can review it pursuant to his rights under the Federal

22  rules.

23          (Whereupon, the deposition was concluded at

24          5:52 p.m.)

25                          _____
                            SIGNATURE OF WITNESS


Aiken & Welch Court Reporters      F. Mellon    8/22/08

221

1   STATE OF CALIFORNIA     )

2                           )

3   COUNTY OF ALAMEDA        )

4

5      I, CATHLEEN M. MEUTER, do hereby certify:

6      That FRANK MELLON, in the foregoing deposition

7   named, was present and by me sworn as a witness in the

8   above-entitled action at the time and place therein

9   specified;

10     That said deposition was taken before me at said

11  time and place, and was taken down in shorthand by me,

12  a Certified Shorthand Reporter of the State of

13  California, and was thereafter transcribed into

14  typewriting, and that the foregoing transcript

15  constitutes a full, true and correct report of said

16  deposition and of the proceedings that took place;

17     IN WITNESS WHEREOF, I have hereunder subscribed my

18  hand this 28th day of August 2008.

19

20

21

22

23          CATHLEEN M. MEUTER, CSR No. 12950
24             State of California

25

Aiken & Welch Court Reporters     F. Mellon     8/22/08