1          UNITED STATES DISTRICT COURT IN AND FOR THE

2               NORTHERN DISTRICT OF CALIFORNIA

3                       ---oOo---

4   FERNANDO DAROSA,

5        Plaintiff,

6   vs.                        No. C07-03114SI

7   KAISER FOUNDATION HEALTH PLAN,
    INC.,
8
        Defendants.
9                       /

10

11

12

13           DEPOSITION OF GAIL KATO

14

15

16

17

18        Taken before KIMBERLY R. JENSEN, RPR

19             CSR No. 12552

20             August 27, 2008

21

22

23

24

25

2

1                    I N D E X

2                              PAGE

3    EXAMINATION BY MR. FRIEDMAN              4

4

5

6

7

8

9

10

11                    E X H I B I T S

12   PLAINTIFF'S                   PAGE

13   13  18-page KHRMIT file             89

14   8   4-page Notice of Charge of      118
         Discrimination

15

16

17

18

19

20

21

22

23

24

25

Aiken & Welch Reporters     G. Kato   8/27/08

3

1          DEPOSITION OF GAIL KATO

2

3      BE IT REMEMBERED, that pursuant to Notice, and on

4   the 27th day of August 2008, commencing at the hour of

5   1:28 p.m., in the offices of AIKEN & WELCH, One Kaiser

6   Plaza, Suite 505, Oakland, California 94612, before me,

7   KIMBERLY R. JENSEN, a Certified Shorthand Reporter,

8   personally appeared GAIL KATO, produced as a witness in

9   said action, and being by me first duly sworn, was

10   thereupon examined as a witness in said cause.

11

12                  ---oOo---

13

14      JEREMY L. FRIEDMAN, Attorney at Law, 2801 Sylhowe

15   Road, Oakland, California 94602, appeared on behalf of

16   the Plaintiff.

17

18      DANA L. PETERSON, Seyfarth Shaw LLP, 560 Mission

19   Street, Suite 3100, San Francisco, California 94105,

20   appeared on behalf of the Defendant.

21

22

23

24

25

      Aiken & Welch Reporters     G. Kato   8/27/08

21

1       Q. What is your current job title?

2       A. I'm a -- the practice leader for employee

3   labor relations consultant for northern California.

4       Q. What is practice leader?

5       A. I have responsibility for the employee and

6   labor relations program or function from HR that also

7   includes disability management.

8       Q. What is disability -- oh, disability

9   management, is that office?

10      A. Yes.

11      Q. So you have oversight over them?

12      A. Yes.

13      Q. How come you've never asked that disability

14   management look for records in connection with

15   Mr. daRosa?

16      A. Since there were other individuals who also

17   received the request, you know, as well.  I was looking

18   for documents that I was -- that I thought I had

19   some -- that I would have.

20      Q. Do you know whether anybody at disability

21   management has ever received the request to search for

22   records?

23      A. I don't know.

24      Q. Do you know if whether anybody at the WAM

25   office received any requests for search of records?

22

1    A. I don't know.

2    Q. If you wanted to look at the disability

3 management offices records, how would you go about

4 doing that?

5    A. As I said, I would request it. I would go

6 in -- and at that point, my office was in the McArthur

7 Broadway building or MB building, and the disability

8 management office was steps away from where my office

9 was.

10    Q. What about today, if you wanted to look for

11 those records, what would you do?

12    A. I would contact the consultant in employee

13 labor relations consultant to request the information,

14 or I would request it either by phone or by E-mail, or

15 drop by the office, if it's the Oakland Medical Center.

16    Q. Did you ever request a consultant to check

17 with the disability management office?

18    A. No.

19    Q. In connection with this case?

20    A. Yeah, no.

21    Q. And is there anything that would prevent you

22 from doing that search today?

23    A. No.

24    Q. When did you first start working with Kaiser?

25    A. In November of 1996.

Aiken & Welch Reporters    G. Kato   8/27/08

27

1      Q. And that's your current position?

2      A. Yes.

3      Q. What is a practice leader?

4      A. That's having overall responsibility for

5  employee labor relations, consulting, includes

6  disability management.

7      Q. Okay.  Are you familiar with Kaiser's

8  guidelines and policies and practices in connection

9  with employees who are experiencing attendance issues

10  in connection with their work?

11      MS. PETERSON:  Objection.  Vague and

12  ambiguous.  Compound.

13      THE WITNESS:  I'm familiar with the HR's

14  policies and practices relating to job accommodation

15  and attendance management.

16  BY MR. FRIEDMAN:

17      Q. You said it much more artfully than I did.

18      That was a job accommodations and --

19      A. Attendance management.

20      Q. -- attendance management.

21      And it's true that under Kaiser's own

22  policies, Kaiser's obligated to accommodate employees

23  when their medical conditions interfered with their

24  ability to work?

25      MS. PETERSON:  I'm sorry.  Can you read back

Aiken & Welch Reporters     G. Kato   8/27/08

28

1    that question for me.

2        (Record read.)

3        MS. PETERSON:  Object to the extent it calls

4    for a legal conclusion.

5        THE WITNESS:  Kaiser has -- Kaiser enters into

6    the interactive process with an employee when it's been

7    notified that there's a need to do such.

8    BY MR. FRIEDMAN:

9        Q. Is it your understanding under Kaiser's

10   policies that they're obligated to engage in that

11   interactive process once that notification is provided?

12       A. Yes.

13       Q. Let's talk about the notice given to Kaiser

14   that is sufficient to trigger this interactive process.

15       A. Okay.

16       Q. Do they have to use specific words?  Does an

17   employee have to use a specific word?

18       A. No.

19       Q. Does he have to use the word "accommodation"?

20       A. No.

21       Q. Does he have to use the word "disability"?

22       A. No.

23       Q. It's true that Kaiser is given notice that an

24   employee needs to -- let me strike that.

25        It's Kaiser's policy that once it is given

Aiken & Welch Reporters    G. Kato   8/27/08

29

1 notice that an employee cannot perform his or her

2 duties as a result of a physical condition, that that

3 triggers their responsibility to engage this process?

4        MS. PETERSON:  Objection.  Incomplete

5 hypothetical.  Improper hypothetical, and to the extent

6 that it calls for a legal conclusion.

7        THE WITNESS:  Could I get the question read

8 back.

9        (Record read.)

10       THE WITNESS:  Yes.

11 BY MR. FRIEDMAN:

12       Q. Are you aware that this interactive process

13 was ever done in the case of Fernando daRosa?

14       A. I don't know.

15       Q. You have no knowledge that it ever was?

16       A. I have no knowledge that we received

17 information that would put us on notice that would

18 result in the interactive process for accommodation.

19       Q. Okay.  That wasn't quite my question.  My

20 question was, do you know whether or not that

21 interactive process was ever done?

22       A. No, no.

23       Q. And it's true that Kaiser is required to

24 document that interactive process?

25       MS. PETERSON:  Objection.  Vague and ambiguous

Aiken & Welch Reporters     G. Kato   8/27/08

34

1     A. Yes.

2     Q. Yes, you have no knowledge?

3     A. Yes, I have no knowledge.

4     Q. You're aware that reasonable accommodation can

5   include a leave or extensions of leave whether paid or

6   unpaid?

7     A. Yes.

8     Q. Do you recall any discussions with anyone at

9   Kaiser in connection with Mr. daRosa's termination or

10   subsequent discussions following his termination about

11   extended leaves or leaves of -- medical leaves?

12     A. No.

13     Q. Do you recall any discussions with anybody at

14   Kaiser with respect to Mr. daRosa's need for any

15   accommodations while he was employed at member

16   services?

17     A. No.

18     Q. Now, Kaiser is entitled to know that an

19   employee is -- has a covered disability for which he or

20   she is seeking a reasonable accommodation, correct?

21       MS. PETERSON:  Objection.  Incomplete

22   hypothetical.  Calls for legal conclusion.  Vague and

23   ambiguous.

24       THE WITNESS:  Kaiser has a right to know

25   whether the -- an employee has restrictions or

Aiken & Welch Reporters     G. Kato   8/27/08

38

1      Q. Were you aware that courts and agencies

2  readily find a request for accommodation based on the

3  circumstances including any request to return for work

4  after a period of leave?

5      MS. PETERSON:  Objection.  Calls for a legal

6  conclusion.  Incomplete hypothetical.  Improper

7  hypothetical.  Calls for speculation and lacks

8  foundation.

9      THE WITNESS:  I'm looking at the -- at Exhibit

10  12.  And it says -- it doesn't say exactly what your

11  question was.

12  BY MR. FRIEDMAN:

13      Q. But the answer to my question is what, though.

14       My question is, were you aware that a court or

15  an agency readily finds a request for accommodation

16  based on the circumstances, such as any request to

17  return for work after a period of leave?

18      A. Yes.

19      MS. PETERSON:  Objection.  Calls for legal

20  conclusion.  Improper hypothetical.  Vague and

21  ambiguous and calls for legal conclusion.

22  BY MR. FRIEDMAN:

23      Q. And are you also aware that -- you got the

24  answer?

25      THE REPORTER:  Yes.

Aiken & Welch Reporters      G. Kato   8/27/08

39

1  BY MR. FRIEDMAN:

2      Q. -- also aware that the interactive process has

3  been triggered and that Kaiser's supposed to engage in

4  the discussion whenever there is a request for an

5  extension of a leave?

6      MS. PETERSON:  Objection.  Calls for legal

7  conclusion.  Incomplete hypothetical.

8      THE WITNESS:  No.

9  BY MR. FRIEDMAN:

10     Q. Are you aware that courts and agencies readily

11  find a request for accommodation when an employee

12  requests an extension of leave?

13     MS. PETERSON:  Object.  Assumes facts not in

14  evidence.  Lacks foundation.  Calls for legal

15  conclusion.  It's an incomplete hypothetical.

16     THE WITNESS:  That's what it says in the

17  guidelines, Exhibit 12.

18  BY MR. FRIEDMAN:

19     Q. Do you disagree with that?

20     MS. PETERSON:  Objection.  Calls for legal

21  conclusion and speculation.  Incomplete hypothetical.

22     THE WITNESS:  The -- I'm sorry.  Say the

23  question again.

24  BY MR. FRIEDMAN:

25     Q. Do you disagree with what it says here in the

Aiken & Welch Reporters    G. Kato   8/27/08

45

1      MS. PETERSON:  Objection.  Incomplete

2   hypothetical.  Calls for a legal conclusion.  Improper

3   hypothetical and vague and ambiguous.

4      THE WITNESS:  No.

5   BY MR. FRIEDMAN:

6      Q. But it's true that any statement by the

7   employee that he's having difficulty performing his or

8   her position because of a medical condition, that would

9   trigger the discussion, correct?

10      MS. PETERSON:  Objection.  Incomplete

11   hypothetical.  Improper hypothetical and calls for

12   legal conclusion.

13      THE WITNESS:  Based on what I'm thinking

14   you're asking, yes.

15   BY MR. FRIEDMAN:

16      Q. Well, I want to make sure I know what -- I

17   think -- you know what I'm asking.

18      So why don't you just put it in your own

19   words.  Don't let me -- I'm not trying to put words in

20   your mouth.

21      A. Okay.  Again, what's the question?

22      Q. The question has to do with the fact that

23   Kaiser's obligated under its policies and practices to

24   engage in an interactive process under certain

25   circumstances, and those circumstances would include an

Aiken & Welch Reporters    G. Kato   8/27/08

46

1  employee who expresses that he's having difficulty

2  because of a medical condition performing the job?

3      MS. PETERSON:  Objection.  Incomplete

4  hypothetical.  Improper hypothetical.  Calls for a

5  legal conclusion.

6      THE WITNESS:  Yes.

7      MS. PETERSON:  Can we take a quick break.

8      MR. FRIEDMAN:  Sure.

9      (Break taken.)

10  BY MR. FRIEDMAN:

11      Q. This is in reference to question 16.  Is it

12  true that unpaid leave is a form of reasonable

13  accommodation when it's necessitated by an employee's

14  disability?

15      MS. PETERSON:  Objection.  Calls for a legal

16  conclusion.  Incomplete and improper hypothetical.

17      THE WITNESS:  Yes.

18  BY MR. FRIEDMAN:

19      Q. And that's true with respect to Kaiser's

20  policies and practices?

21      A. Yes.

22      Q. Okay.  Had you ever discussed with Margie

23  Roper anything with respect to keeping Mr. daRosa's job

24  open while he was out on leave?

25      A. No.

47

1     Q. Did you ever discuss anything with Ms. Roper

2  with respect to Mr. daRosa?

3     A. No.

4     Q. Did you ever discuss with Mr. Melon anything

5  about keeping Mr. daRosa's job open while he was out on

6  medical leave?

7        MS. PETERSON:  Objection.  Assumes facts not

8  in evidence.

9        THE WITNESS:  No.

10  BY MR. FRIEDMAN:

11     Q. Did you have any knowledge of any discussion

12  with respect to a reassignment for Mr. daRosa?

13     A. No.

14     Q. Is it your understanding that the right to

15  retain the position that an employee has while he is

16  out on medical leave is governed by Federal and State

17  Medical Leave Act?

18        MS. PETERSON:  Objection.  Calls for legal

19  conclusion.  Incomplete hypothetical.

20        THE WITNESS:  Yes.

21  BY MR. FRIEDMAN:

22     Q. And it's your understanding that Kaiser's

23  policies are to comply with those laws?

24     A. Yes.

25     Q. Now, is the manager and human resources at

Aiken & Welch Reporters     G. Kato   8/27/08

67

1      Q. Do you recall any discussions with Mr. Melon

2  about Mr. daRosa's medical leave?

3      A. No.

4      Q. Did you have any discussions with Mr. Melon

5  about a review of Mr. daRosa's personnel file to see

6  whether or not any such records existed?

7      A. No.

8      Q. I'm going to hand you Exhibit 2.  It's the

9  long one.  There it is.  There is an entry on the

10  second to the last page dated August 19th, 2005, case

11  number 15265850.

12      MS. PETERSON:  I'm sorry, which one are you

13  referring to?

14  BY MR. FRIEDMAN:

15      Q. Second to last page.

16      A. Second to last page.

17      Q. August 19th, 2005, 15265850.

18      A. Yes.

19      Q. Do you know what that refers to?

20      A. No.

21      Q. Do you know what it means when it says, "This

22  case has migrated from KHRMIT"?

23      A. No.

24      Q. Do you know what KHRMIT is?

25      A. Yes.

68

1    Q. What is that?

2    A. It was Kaiser's electronic personnel file

3  system.

4    Q. Did you have access to those records?

5    A. Yes.

6    Q. How would you access an entry that was in

7  KHRMIT?

8    A. It was available to certain HR professionals

9  online.

10    Q. Was it available to Mr. Melon at the time?

11    A. 2000 -- I believe so.

12    Q. Have you ever looked?

13      MS. PETERSON:  Didn't we say earlier that his

14  hire date was December '05?

15      MR. FRIEDMAN:  Very good.  Thank you.

16  BY MR. FRIEDMAN:

17    Q. Was it available to Mr. Melon in December of

18  2005 that he could have looked at data that was entered

19  or in January of 2006?  Was it available to him then?

20    A. It may have been available to him.

21    Q. Okay.  Now, have you ever looked at -- I know

22  you said you don't recall looking at his personnel

23  file.  Have you ever recalled any discussion with

24  anybody at Kaiser about an August 19th entry in the

25  electronic human resources file?

Aiken & Welch Reporters     G. Kato   8/27/08

69

1      A. No.

2      Q. If you look on the first page of this

3   document, there's an April 4th, 2007 entry.

4          Do you know what NLVS stands for?

5      A. I'm sorry.  You said August 4th, 2007?

6      Q. No, April 4th.

7      A. April 4th, I'm sorry, 2007?

8      Q. Yeah.  And just so you can tell after looking

9   at this document for many hours, the data that is

10   associated with an entry runs up rather than down.

11      A. (Witness nods head.)

12      Q. So that line directly across --

13      A. Okay.

14      Q. -- would be part, but then the rest of it

15   would be above it.

16      A. Okay.  Yeah.  I don't know what's NLVS, that

17   was the question?

18      Q. That was the question.

19      A. I don't know what that is.

20      Q. Okay.  There's testimony by Mr. daRosa, and it

21   reflected in this record that he had called and asked

22   to find out information about the reasons why a manager

23   had given to close the FMLA, and he had told the

24   employee that he was talking to, that he had been told

25   by somebody else that his manager had requested FMLA,

70

1  but -- and he had called to find out if it had been

2  closed.  And it says, "Advise per case 15265850, a case

3  was opened due to he had been out on disability and TC

4  coding was needed.  And the case had been closed due to

5  EE had RTW."

6        Were you aware of any disability claim that

7  had been opened up on Mr. daRosa's behalf in August of

8  2005?

9      A. No.

10     Q. And to your knowledge, nobody at Kaiser has

11  ever produced any information with respect to these

12  inquiries, meaning April 4th, 2007 and August 19th,

13  2005 in connection with this litigation?

14       MS. PETERSON:  Objection.  Calls for

15  speculation.

16       THE WITNESS:  The question again.

17  BY MR. FRIEDMAN:

18     Q. To your knowledge, nobody has ever produced

19  any information about these contacts in this

20  litigation?

21       MS. PETERSON:  Objection.  Calls for

22  speculation, "to my knowledge."

23  BY MR. FRIEDMAN:

24     Q. Were you aware that a disability claim had

25  been opened for Mr. daRosa in July -- in August of 2005

Aiken & Welch Reporters    G. Kato   8/27/08

71

1   and then closed afterwards because he had returned to

2   work?

3       MS. PETERSON:  Objection.  Assumes facts not

4   in evidence.  Lacks foundation.

5       THE WITNESS:  No.

6   BY MR. FRIEDMAN:

7       Q. Do you have any information that would

8   contradict that?

9       A. No.

10      Q. And it's true that the -- Ms. Roper as

11   Fernando daRosa's supervisor would have been the one to

12   open that disability claim if one had been opened?

13      MS. PETERSON:  Objection.  Calls for

14   speculation.  Assumes facts not in evidence and lacks

15   foundation.

16      THE WITNESS:  I don't know.

17   BY MR. FRIEDMAN:

18      Q. Well, in August of 2005, it was the

19   supervisor's responsibility to contact disability

20   management, fill out forms and open up a claim of

21   disability for an employee under her report?

22      MS. PETERSON:  Objection.  Incomplete

23   hypothetical and is compound.

24      THE WITNESS:  Yes.

25   BY MR. FRIEDMAN:

89

1    of 2006 requesting his job back and spoken to human

2    resources?

3        A. No.

4        Q. If you look at Exhibit 2 to the -- it's going

5    to be on the last page, June 29th, employee or PECLD,

6    which I take it means employee called to find out how

7    he could be rehired.  Employee was terminated.

8        Do you recall any discussions with Mr. Melon

9    or any knowledge on your part that Mr. daRosa had still

10   been seeking his job in June of 2006?

11       A. I did not know that.

12       Q. Did you ever search for Mr. daRosa's personnel

13   files in September of 2006?

14       A. Personally search for the personnel file?

15       Q. Yes.

16       A. I don't remember.  I don't recall.

17       MR. FRIEDMAN:  Mark the next exhibit in order.

18       (Plaintiff's Exhibit No. 13 marked for

19       identification.)

20   BY MR. FRIEDMAN:

21       Q. These are prints from the KHRMIT file.

22   Whenever on Exhibit 2, it states in the case summary

23   portion whenever it states "this case has migrated from

24   KHRMIT," every entry -- actually, every entry except

25   the August 26th -- I mean, the August 19th, 2005 entry

Aiken & Welch Reporters    G. Kato   8/27/08

90

1  has been recreated for us with page prints, everyone

2  except the August 2005.  I take it, you have no role in

3  the production of these KHRMIT screen prints?

4      A. No.

5      Q. And you have no knowledge as to why of all the

6  screen prints to leave out would be the one entry in

7  August of 2005?

8      A. No.

9      MS. PETERSON:  Are you referring to the entry,

10  "This case has been migrated from KHRMIT"?

11  BY MR. FRIEDMAN:

12      Q. Yes.  Every time you see "this case has been

13  migrated from KHRMIT," in this new Exhibit 13, we have

14  the page prints.  But the one time where it says "this

15  case has been migrated from KHRMIT where we were not

16  provided of print screens," was this very important

17  August 2005 entry, and I was asking the witness whether

18  she knows why of all the entries that one was removed?

19      MS. PETERSON:  I object that it assumes facts

20  not in evidence and lacks foundation.

21      THE WITNESS:  No.

22  BY MR. FRIEDMAN:

23      Q. Well, if you look at the last entry on Exhibit

24  2, there's a reference to September 29th, 2006, "this

25  case has migrated from KHRMIT," and it has a case

107

1    A. Yes.

2        MS. PETERSON:  Objection.  Assumes facts not

3    in evidence.  Lacks foundation.

4    BY MR. FRIEDMAN:

5        Q. Would that have been significant to you that

6    he had called within a week or two of his termination

7    to speak with the human resources representative?

8        A. Yes.

9        Q. Why?

10        MS. PETERSON:  I am going to object that it

11    calls for speculation.  It assumes facts not in

12    evidence.  Lacks foundation.

13        THE WITNESS:  Because then, at least, I would

14    have -- at least, I would have known that he did try

15    to -- try to make contact with HR person.

16    BY MR. FRIEDMAN:

17        Q. But to your memory, Mr. Mellon did not inform

18    you that that's when it occurred?

19        A. I don't remember him informing me.

20        Q. But you do recall him telling you that

21    Mr. Mellon had told Mr. daRosa that it was finished at

22    the time of those earlier phone calls?

23        A. Yes.

24        Q. And you were aware that when Mr. daRosa

25    contacted Mr. Mellon, he had told him that he had a

108

1    doctor's note for the period of time that he was being

2    charged with a "no call, no show," correct?

3        A. I don't know if it got that specific.  At

4    least, according to the E-mail, he did indicate there

5    was a doctor's note.

6        Q. Okay.  And you understood when Mr. Mellon told

7    you in the E-mail about a doctor's note that was

8    discussed in the earlier phone calls, that that meant

9    Mr. daRosa had told Mr. Mellon that he had some sort of

10   doctor's note in connection with his absences?

11       MS. PETERSON:  Before you answer that, I might

12   have the question read back, please.

13       (Record read.)

14       THE WITNESS:  Yes.

15   BY MR. FRIEDMAN:

16       Q. And you were aware that in these prior

17   conversations, Mr. daRosa had told Mr. Mellon that he

18   had some sort of documentation to show?

19       MS. PETERSON:  Objection.  Assumes facts not

20   in evidence.

21       THE WITNESS:  I'm reading the E-mail.

22   BY MR. FRIEDMAN:

23       Q. Yes.

24       A. Yes.

25       Q. I mean, in this E-mail, he told you that in

Aiken & Welch Reporters    G. Kato   8/27/08

109

1  his prior conversations, when I say "he," Mr. Mellon,

2  told you in his prior conversations with Mr. daRosa,

3  that Mr. daRosa had claimed to have faxed in a doctor's

4  note to the supervisor?

5      A. Yes.

6        MS. PETERSON:  Where are you reading from?

7  Are you reading from the July 24th, 2006 E-mail?

8        MR. FRIEDMAN:  Yes.

9        MS. PETERSON:  Okay.

10  BY MR. FRIEDMAN:

11      Q. Did Mr. Mellon tell you at any time that he

12  had accused Mr. daRosa of back dating the doctor's

13  note?

14      A. No.

15      Q. Did -- were you aware that Mr. daRosa had

16  mailed a copy of this faxed confirmation to Mr. Mellon

17  after his initial conversation with him in February?

18      A. No.

19      Q. Would it have been significant for you to know

20  that?

21      A. Yes.

22      Q. Were you aware that -- but you were aware that

23  Mr. Mellon had told Mr. daRosa in the earlier

24  conversations that the termination was final?

25      A. It's according to the E-mail, it's stated in

Aiken & Welch Reporters    G. Kato   8/27/08

114

1      A. Right.

2      Q. Other than you not seeing a copy of the

3  document, was there any other reason for you not to

4  trust Mr. daRosa?

5      A. It was around the producing of the document.

6      Q. You did not trust Mr. daRosa, because as far

7  as your knowledge was concerned, you had not been shown

8  something to see that Mr. daRosa had provided it to

9  Ms. Roper on the 25th or had provided it to Mr. Mellon

10  at some other time?

11      A. That's correct.

12      Q. Any other reasons why you didn't trust him?

13      A. Not that I can think of.

14      Q. But you did believe that you needed to hear

15  him out on his claim, correct?

16      A. Yes.

17      Q. Who is that?

18      A. Because since he was raising this as a

19  concern, I did not believe that we should just dismiss

20  what Mr. daRosa was saying.

21      Q. And, in fact, you asked Mr. Mellon to check

22  with the policies and procedures of Kaiser?

23      A. Yes.

24      Q. Did you know whether any other policies

25  besides the, quote, dispute resolution policy might

115

1  come into play?

2      A. Based on the information that was provided to

3  me -- based on the available information to me, that

4  was the only complaint process that was available as a

5  nonunion employee.

6      Q. What does that mean?  Can you explain that to

7  me?

8      A. Meaning that Mr. daRosa had not indicated to

9  me that he believes that he was being discriminated

10  against or had been discriminated against.  And had he

11  done that, we -- there is another -- there's an

12  internal EEO complaint process that's available --

13  would be available to him.

14      Q. But he had told you that he had spoken to an

15  attorney?

16      A. Yes.

17      Q. And he had told you that he had medical

18  justification for his absences?

19      MS. PETERSON:  Object that that misstates

20  prior testimony.  Misstates the document.

21      THE WITNESS:  He stated he faxed a form, a

22  doctor's statement, a doctor's note.

23  BY MR. FRIEDMAN:

24      Q. And you understood doctor's note related to

25  his medical reasons in connection with his absences?

Aiken & Welch Reporters    G. Kato  8/27/08

116

1        MS. PETERSON:  And I'm objecting that it calls

2   for speculation.  Misstates prior testimony.  Assumes

3   facts not in evidence.

4        THE WITNESS:  I'm sorry.  The question.

5        (Record read.)

6        THE WITNESS:  I didn't know at the time.

7   BY MR. FRIEDMAN:

8        Q. You didn't know at the time?  I mean, he was

9   telling you he had a doctor's note.

10       A. Yeah, he was telling me.  I'm just saying I

11  did not review the documentation.

12       Q. Right.  In fact, nobody -- to your knowledge,

13  nobody ever reviewed the documentation?

14       A. I know I did not.

15       Q. Right.  But he was talking to you on the phone

16  about a doctor's note that he had provided that had

17  justified his absences when he was terminated for being

18  a no call, no show, you understood that, correct?

19       MS. PETERSON:  And I'm going to object that it

20  misstates her prior testimony and it assumes facts not

21  in evidence.  Lacks foundation.

22       THE WITNESS:  What I remember saying, and it's

23  based on what I said in the E-mail, because this was

24  several years ago, was that he indicated that he did

25  have a doctor's note that he sent, that he faxed to

Aiken & Welch Reporters     G. Kato   8/27/08

117

1  you.

2  BY MR. FRIEDMAN:

3      Q. And a doctor's note would relate to medical

4  justification for his absences?

5      A. Or reasons for his not -- yeah, for his

6  absences.

7      Q. Okay.  And why wouldn't that alone trigger an

8  inquiry into an internal EEO process?

9      A. At that point, I didn't think about that.

10     Q. Even when he said, "I had contacted an

11  attorney"?

12     A. Yes.

13     Q. You had, available to you, the personnel file,

14  and where you could have seen whether or not a claim

15  for discrimination had been filed at that point,

16  correct?

17     A. No.

18     Q. How would you have found out whether or not a

19  complaint had been filed with the EEOC and notice of

20  that complaint had been given to Kaiser as of the date

21  of your conversation?

22     A. I would have been provided a copy of the

23  notice or been informed that an investigation was

24  needed in order to investigate a claim.

25         MR. FRIEDMAN:  Let me show you Exhibit 8,

Aiken & Welch Reporters     G. Kato   8/27/08

118

1  which is a notice of charge of discrimination received

2  April 24th, 2006.

3       (Plaintiff's Exhibit No. 8 marked for

4        identification.)

5  BY MR. FRIEDMAN:

6       Q. Have you ever seen this document before?

7       A. I don't believe I have.

8       Q. But a copy of this would have been forwarded

9  to you; is that what you're saying?

10      A. No.

11      Q. How would you have been informed of a charge

12  of discrimination?

13      A. The -- an investigator might have contacted me

14  or the manager.

15      Q. Are there any other manners in which you could

16  have determined in -- on July 25th, 2006, whether or

17  not Mr. daRosa had filed a charge with the EEOC?

18      A. I'm sorry, any other form or any other --

19      Q. Yeah.  Other than them calling you, is there

20  any other way you could have obtained that information?

21      A. I might have been -- well, I was not sent this

22  notification, so I would not have received it from the

23  EEOC.

24      Q. Is there any other way you could have

25  determined whether or not the EEOC had received a

Aiken & Welch Reporters    G. Kato   8/27/08

119

1  complaint by Mr. daRosa about his termination when you

2  were talking with Mr. Mellon?

3       A. No.

4       Q. There's no way you could have checked the

5  files to see whether that had occurred?

6          MS. PETERSON:  Objection.  Vague and

7  ambiguous.  What files?

8          THE WITNESS:  What files, because this --

9  BY MR. FRIEDMAN:

10      Q. Any files.

11      A. The files of -- that were at the Oakland

12  Medical Center, no, I did not -- I did not look for it.

13  I did not -- so I did not know of this existence, the

14  complaint.

15      Q. But you could have looked if you wanted to?

16      A. At that time?

17      Q. Yes.

18      A. Yes.

19      Q. And Mr. Mellon was asked to gather the files

20  for the attorneys at EEOC to respond -- and the EEO

21  division to respond to the EEOC complaint.  Were you

22  aware of that?

23          MS. PETERSON:  Objection.  Assumes facts not

24  in evidence.  And that would be attorney-client

25  communication anyway.

Aiken & Welch Reporters      G. Kato   8/27/08

120

1        THE WITNESS:  No.

2    BY MR. FRIEDMAN:

3        Q. You weren't aware that Mr. Mellon had gathered

4    records for the EEO counsel?

5        A. That's correct.

6        Q. But at the time, you could have determined

7    whether or not there was an EEO complaint, correct?

8        MS. PETERSON:  Objection.  Calls for

9    speculation.

10        THE WITNESS:  Could have, yes.

11    BY MR. FRIEDMAN:

12        Q. What did the policies at Kaiser have to say

13    about this inquiry?

14        MS. PETERSON:  Objection.  Vague and

15    ambiguous.

16        MR. FRIEDMAN:  Maybe it was vague.

17    BY MR. FRIEDMAN:

18        Q. In this E-mail, you asked Mr. Mellon to check

19    the dispute resolution policies to see if Mr. daRosa

20    still had rights under the policy, correct?

21        A. Yes.

22        Q. What was the determination?

23        A. I don't know.

24        Q. Did you ever have any discussions with

25    Mr. Mellon about that?

Aiken & Welch Reporters     G. Kato   8/27/08

121

1      A. No.

2      Q. You told Mr. Mellon that it was not his

3  decision to -- over whether or not the evidence was

4  sufficient, correct?

5      A. That's correct.

6      Q. That was a decision for Mr. Ayers?

7      A. Yes.

8      Q. Now, Mr. Mellon had just informed you that

9  previously he had told Mr. daRosa that the termination

10  was final and that there was no further possibility to

11  review evidence; is that correct?

12      MS. PETERSON:  Objection.  Misstates the

13  documentation and communication.

14      THE WITNESS:  Well, it's what's in the E-mail

15  in terms of Mr. Mellon's conversation with Mr. daRosa.

16  BY MR. FRIEDMAN:

17      Q. So your -- did you say anything to Mr. Mellon

18  about how it was inappropriate for him to tell

19  Mr. daRosa that his termination was final and he had

20  exhausted his remedies?

21      A. I don't remember having a conversation with

22  Mr. Mellon about that.

23      Q. Well, you sent him an E-mail that told him it

24  was not his decision, and it was right after he had

25  told you that he had told Mr. daRosa that it was his

122

1  decision.

2      Did you ever discipline Mr. Mellon over this?

3      MS. PETERSON:  I'm objecting that you're

4  misstating the document here and what was said to whom.

5      THE WITNESS:  I did not discipline Mr. Mellon.

6  BY MR. FRIEDMAN:

7      Q. Why not?

8      A. I don't remember why not.

9      Q. As you sit here today, is it -- was it

10  appropriate for Mr. Mellon to tell Mr. daRosa in

11  February and March that it was too late and that his

12  job was terminated and that he had exhausted his

13  remedies?

14      MS. PETERSON:  I'm going to object that it

15  assumes facts not in evidence, that that was ever a

16  conversation between Mr. Mellon and plaintiff,

17  Mr. daRosa.

18      THE WITNESS:  And the question?

19      (Record read.)

20      MS. PETERSON:  Objection.  Assumes facts not

21  in evidence and lacks foundation that that conversation

22  ever occurred.

23      THE WITNESS:  So if that conversation did

24  occur, then it was -- it was not appropriate.

25  BY MR. FRIEDMAN:

Aiken & Welch Reporters    G. Kato  8/27/08

123

1      Q. You wanted Mr. Mellon to give Mr. Ayers his

2   opinion since Ms. Roper wasn't around, correct?

3      A. I wanted Mr. Mellon to consult with Mr. Ayers

4   since Mr. Ayers would be making the decision around

5   Mr. daRosa's information.

6      Q. So what did Mr. Mellon tell you about his

7   conversations with Mr. Ayers?

8      A. That he had talked to Mr. Ayers, and then

9   Mr. Ayers stated that the termination would stand.

10      Q. What were the reasons that Mr. Ayers gave for

11   that?

12      A. I don't remember.

13      Q. What were the opinions that Mr. Mellon gave to

14   Mr. Ayers at that time?

15      A. I think that's between Mr. Mellon and

16   Mr. Ayers.

17      Q. What did he tell you?

18      A. He just described the fact that the

19   conversation that he had with Mr. daRosa was that,

20   there was a doctor's statement that had been sent in.

21      Q. Did he say anything else?

22      A. I don't think so.  I don't remember.

23      Q. Did you ever see any documentation of this

24   discussion with Mr. Ayers?

25      A. No.

Aiken & Welch Reporters    G. Kato   8/27/08

137

1  STATE OF CALIFORNIA    )

2                         )

3  COUNTY OF ALAMEDA      )

4

5      I, KIMBERLY R. JENSEN, do hereby certify:

6      That GAIL KATO, in the foregoing deposition

7  named, was present and by me sworn as a witness in the

8  above-entitled action at the time and place therein

9  specified;

10     That said deposition was taken before me at

11 said time and place and was taken down in shorthand by

12 me, a Certified Shorthand Reporter of the State of

13 California, and was thereafter transcribed into

14 typewriting;

15     And that the foregoing transcript constitutes

16 a full, true, and correct report of said deposition and

17 of the proceedings that took place.

18     IN WITNESS WHEREOF, I have hereunder

19 subscribed my hand this 3rd day of September 2008.

20

21

22

23     KIMBERLY R. JENSEN, RPR, CSR No. 12552
          State of California

24

25


Aiken & Welch Reporters    G. Kato   8/27/08