1  UNITED STATES DISTRICT COURT IN AND FOR THE

2   NORTHERN DISTRICT OF CALIFORNIA

3    ---oOo---

4 FERNANDO DAROSA,

5  Plaintiff,

6 vs.     No. C07-03114SI

7 KAISER FOUNDATION HEALTH PLAN,
  INC.,

8

  Defendants.

9     /

10

11

12

13  DEPOSITION OF KENNETH U. AYERS

14

15

16

17

18  Taken before KIMBERLY R. JENSEN, RPR

19   CSR No. 12552

20   August 27, 2008

21

22

23

24

25

2

1                    I N D E X

2                                    PAGE

3    EXAMINATION BY MR. FRIEDMAN            4

4

5

6              E X H I B I T S

7    PLAINTIFF'S                    PAGE

8    3   5-page Personnel Action Request      9

9    10  2-page Visit Verification/Family       38
         Leave Health Care Provider
10       Certification dated 7/6/05

11   11  3-page Visit Verification/Family       43
         Leave Health Care Provider
12       Certification dated 7/29/05

13   2   6-page Case Status              47

14   12  15-page Guidelines for the         58
         Interactive Process
15
     4   Memorandum to File dated         73
16       December 7, 2005

17   6   3-page Visit Verification/Family      83
         Leave Health Care Provider Certificate
18       dated 1/24/06

19   5   5-page E-mail strand           109

20

21

22

23

24

25

3

1          DEPOSITION OF KENNETH U. AYERS

2

3      BE IT REMEMBERED, that pursuant to Notice, and on

4  the 27th day of August 2008, commencing at the hour of

5  9:34 a.m., in the offices of AIKEN & WELCH, One Kaiser

6  Plaza, Suite 505, Oakland, California 94612, before me,

7  KIMBERLY R. JENSEN, a Certified Shorthand Reporter,

8  personally appeared KENNETH U. AYERS, produced as a

9  witness in said action, and being by me first duly

10  sworn, was thereupon examined as a witness in said

11  cause.

12

13              ---oOo---

14

15      JEREMY L. FRIEDMAN, Attorney at Law, 2801 Sylhowe

16  Road, Oakland, California 94602, appeared on behalf of

17  the Plaintiff.

18

19      DANA L. PETERSON, Seyfarth Shaw LLP, 560 Mission

20  Street, Suite 3100, San Francisco, California 94105,

21  appeared on behalf of the Defendant.

22

23

24

25

Aiken & Welch Reporters      K. Ayers    8/27/08

4

1                KENNETH U. AYERS,

2            sworn as a witness,

3            testified as follows:

4   EXAMINATION BY MR. FRIEDMAN

5        Q. Good morning.

6        A. Morning.

7        Q. Could you please state your name and spell it

8   for the record?

9        A. Kenneth Ayers, A-Y-E-R-S.  First name is

10  Kenneth, K-E-N-N-E-T-H.

11       Q. Mr. Ayers, have you ever had your deposition

12  taken before?

13       A. Yes, I have.

14       Q. Approximately how many times?

15       A. Four to six.

16       Q. What kind of cases did they involve?

17       A. Primarily premise liability issues.

18       Q. Were you employed at Kaiser at the time?

19       A. Yes.

20       Q. Did you have an opportunity to meet with

21  Counsel prior to those depositions?

22       A. Yes.

23       Q. Have you given any testimony in any

24  depositions involving employment issues?

25       A. I recall one, yes.

11

1        THE WITNESS:  Yes.

2    BY MR. FRIEDMAN:

3        Q. What are you aware of?

4        A. I'm not sure of the dates, but when the first

5    case was apparently filed, and I say apparently because

6    I received communications and e-mail and had a

7    conversation with one of our attorneys --

8        MS. PETERSON:  That would be privileged so I

9    don't want you to divulge any of that information that

10   you received or discussed.

11   BY MR. FRIEDMAN:

12       Q. Well, the question doesn't ask for the

13   discussion of any substance of any communications.

14   However, if the timing of your search or your knowledge

15   is tied to the timing of discussions with Counsel, I'm

16   entitled to know dates, times, places, things like that

17   and even identities, but don't reveal the substance.

18       But again, tell me again what you know about

19   it.

20       MS. PETERSON:  And just to clarify, we're

21   talking about going back to the original question:  Is

22   he aware of any efforts to search for supervisory file

23   of Margie Roper's.

24       MR. FRIEDMAN:  Yes.

25       THE WITNESS:  Yes, when it came to my

Aiken & Welch Reporters    K. Ayers   8/27/08

12

1   attention and I was asked to see if we had any

2   documentation, I believe, though I don't know this,

3   that it may have been in response to the subpoena, but

4   I was never served with a subpoena, but I did go back

5   and see if there was any documentation in regards to

6   this particular case at that time.  That was well over

7   a year ago.

8   BY MR. FRIEDMAN:

9       Q. Where did you look for documentation?

10      A. I looked within my files on Margie Roper, and

11  then I also went to her office, and I don't recall if I

12  looked at that time or if I had one of the other staff

13  people look to see if there was any files in her

14  office.

15      Q. If you had somebody else in your office look,

16  would that person have reported to you?

17      A. Yes.

18      Q. And you would have relied upon the information

19  that that person gave you?

20      A. Correct.

21      Q. What did you find?

22      A. I found nothing.

23      Q. Did you find any supervisory files at all

24  belonging to Ms. Roper?

25      A. No.

Aiken & Welch Reporters     K. Ayers   8/27/08

13

1    Q. Even if it didn't belong to Mr. daRosa?

2    A. No.

3    Q. Has there ever been any attempt to contact

4  Ms. Roper and find out about her files?

5    A. No.

6    MS. PETERSON:  Objection.  Calls for

7  speculation.

8    THE WITNESS:  No.

9    MS. PETERSON:  Actually you're referring by

10  him.

11  BY MR. FRIEDMAN:

12    Q. Why not?

13    MS. PETERSON:  Again, calls for speculation.

14  Are you referring to, did he attempt to reach out to

15  Margie Roper or did anyone?

16    MR. FRIEDMAN:  Counsel, I request that you

17  restrict your objections to stating objections to the

18  form.

19    MS. PETERSON:  Well, it calls for speculation.

20  He can't answer on behalf of anyone.  He can only

21  answer on behalf of anyone -- he can only respond what

22  he did.

23    MR. FRIEDMAN:  I will also ask Counsel to

24  restrict your objections to the form not including

25  speaking objections.

Aiken & Welch Reporters    K. Ayers   8/27/08

14

1        Could I have the last question and answer read

2    back, please.

3        (Record read.)

4    BY MR. FRIEDMAN:

5        Q. Why not?

6        A. Because I had terminated Ms. Roper at the

7    time.  She was no longer an employee with Kaiser.

8        Q. Any other reasons?

9        A. No.

10       Q. Are you aware of any effort by Kaiser to

11   provide the EEOC with records in connection with

12   Mr. daRosa's termination?

13       A. No.

14       MS. PETERSON:  Objection.  Calls for

15   speculation.  Give me an opportunity to get my

16   objection on the record.

17       THE WITNESS:  No.

18   BY MR. FRIEDMAN:

19       Q. Are you aware of -- do you know who Frank

20   Mellon is?

21       A. Yes.

22       Q. Are you aware that he gave testimony in

23   connection with Mr. daRosa's employment at an EDD

24   hearing in March of 2007?

25       A. No.

15

1        MS. PETERSON:  Objection.  Assumes facts not

2   in evidence.

3   BY MR. FRIEDMAN:

4        Q. Have you ever discussed with Mr. Mellon his

5   participation in post-termination employment --

6   administrative hearings in connection with Mr. daRosa's

7   employment?

8        A. Not that I recall.

9        Q. You said you searched within your own files.

10   And you said your own file on Ms. Roper.  Did you also

11   look to see whether you had any files of your own

12   belonging -- that related at all to Mr. daRosa?

13        A. My practice is always -- would have been and

14   is still to -- Mr. daRosa did not report directly to

15   me.  Reported to Ms. Roper.  My practice would have

16   been any documentation that would have been pertinent

17   to her employees would have gone within her file.  And

18   that that's the file I searched.

19        Q. Are you aware of an e-mail communication that

20   was sent to you involving this claim?

21        A. No.

22        MS. PETERSON:  Objection.  Vague and

23   ambiguous.

24   BY MR. FRIEDMAN:

25        Q. Did you search whether or not you had any

29

1      Q. Do you believe your conversations with

2   Ms. Roper happened sometime between -- the first

3   conversation with Ms. Roper, did it happen between the

4   time that he was out in July and August and the

5   December time period when he was disciplined on

6   scheduled absences?

7          MS. PETERSON:  I'm going to object to the

8   extent it assumes facts not in evidence and misstates

9   facts.  It lacks foundation.

10         THE WITNESS:  I believe that I was in

11  conversation with Ms. Roper prior to coming to the

12  conclusion -- or prior to the termination.  And know I

13  was in conversation with her.  I can't tell you that it

14  happened on the third.

15  BY MR. FRIEDMAN:

16     Q. Is it your practice to document your

17  conversations with your direct reports regarding --

18     A. Yes, it is.

19     Q. How do you do that?

20     A. I keep notes much as you're doing now.

21     Q. Fortunately I have a court reporter, or we

22  have a court reporter, that can keep better notes than

23  I can.

24         How do you keep notes?

25         MS. PETERSON:  Objection.  Vague and

Aiken & Welch Reporters    K. Ayers   8/27/08

30

1    ambiguous.

2         THE WITNESS:  Yes, can you explain that?

3    BY MR. FRIEDMAN:

4         Q. Well, you said you keep notes.  I asked you

5    how you documented.  You said you keep notes.  So I

6    asked you how you keep notes.

7         A. As I have a conversation during our one-on-one

8    meetings, we talk about a lot of things, and I keep

9    notes as to what the conversation was, particularly any

10   action items.

11        Q. What do you do with those notes?

12        A. I put them in a file I have on each of my

13   direct reports.

14        Q. Did you do that in this case with Ms. Roper in

15   connection with Mr. daRosa's termination?

16        MS. PETERSON:  Objection.  Vague and

17   ambiguous.

18        THE WITNESS:  I believe I did.

19   BY MR. FRIEDMAN:

20        Q. Do you know where those notes are located?

21        A. I do.

22        Q. Where would they be located?

23        A. What notes I have would be located in my

24   office.

25        Q. Have you ever made any effort to produce those

Aiken & Welch Reporters     K. Ayers   8/27/08

31

1  records in connection with this litigation?

2      A. There was nothing in there referring to

3  daRosa.

4      Q. Do you believe you didn't take any notes in

5  connection with your discussions with Ms. Roper about

6  Mr. daRosa?

7      A. No.

8      Q. Can you explain why there are no notes?

9      A. I have a practice of going through it from

10  time to time and thinning out what I have in the files.

11      Q. Do you have any memory of going through

12  Ms. Roper's files to thin out her -- thin out notes in

13  connection with her?

14      A. Yes.

15      Q. Approximately when did you do that?

16      A. Post-termination.  Her termination.

17      Q. Do you recall thinning out her files after her

18  termination in this particular case?

19      MS. PETERSON:  Objection.  Vague and

20  ambiguous.

21  BY MR. FRIEDMAN:

22      Q. Maybe I'm asking the same question, and I'm

23  just trying to understand.

24      Do you have a memory of thinning out

25  Ms. Roper's files after her termination?

32

1      A. Yes.

2      Q. Do you know what you took out?

3      A. No.

4      Q. Do you know what you left in?

5      A. I don't know what I left in.  My belief is I

6  left nothing in.

7      Q. So as...

8      A. That related to this case.

9      Q. How about that didn't relate to this case?

10  Approximately how many pages of notes did you keep on

11  Ms. Roper?

12      MS. PETERSON:  Just so that we're clear, I

13  think that misstates the -- it misstates facts and it

14  lacks foundation.  I think it mischaracterizes the

15  documents that we're referring to.

16      THE WITNESS:  The document.

17  BY MR. FRIEDMAN:

18      Q. Let me rephrase it.  You testified that you

19  keep records of your conversations with your direct

20  reports?

21      A. Correct.

22      Q. And one of your direct reports was Ms. Roper?

23      A. Correct.

24      Q. And when you had discussions with Ms. Roper

25  about employees, especially action items like

33

1  termination, you documented those discussions?

2      A. That's my typical practice.

3      Q. And those notes would go into a file that you

4  kept in your office?

5      A. That's correct.

6      Q. And you did have a file in your office of

7  notes of conversations with Ms. Roper about

8  employment-related matters?

9      A. About all matters.

10     Q. About all matters?

11     A. Uh-huh.

12     Q. Well, would there be other matters besides

13  employment-related matters?

14     A. Yeah, there would be discussions about

15  performance, there would be discussions about other

16  issues we might have talked about.

17     Q. But they're employment issues?

18     A. Not necessarily, no.

19     Q. Well, if they have to deal with her

20  employment.  I mean, are they casual non-employment

21  related --

22     A. They were important issues that we discussed.

23         MS. PETERSON:  I object that the term

24  "employment issues" is vague and ambiguous.

25  BY MR. FRIEDMAN:

Aiken & Welch Reporters    K. Ayers  8/27/08

34

1    Q. Now, you have a memory of going through this

2   file that you kept on Ms. Roper after her termination

3   and throwing some documents out?

4    A. Correct.

5    Q. How big was the file before you went through

6   and thinned it out?

7    A. Twice the size of what you have there.

8    Q. So about 200 pages, 400 pages?

9    A. All I can tell you is about twice the size as

10   you have there.

11    Q. Well, unfortunately this one isn't numbered.

12   Let's see.

13    Okay. I pull out a stack. I know this is

14   just for estimation purposes. This is a stack of about

15   500 pages. Do you think it was larger than this?

16    A. It was approximately that.

17    Q. Okay. And how big is the file now? After

18   you -- how big was it after you thinned it out?

19    A. Let me back up. I don't recall how big it was

20   before I thinned it out. I do know what it looks like

21   approximately now.

22    Q. So currently it's about 500 pages,

23   approximately?

24    A. I would say approximately.

25    Q. And how many pages did you thin out?

35

1    A. I have no clue.

2    Q. Was it twice the size?

3    A. I have no clue.

4    Q. Was it only a few pages that you thinned out?

5    A. I can answer it and tell you it was anything

6  that did not pertain to her termination, Ms. Roper's

7  termination.

8    Q. Why did you keep records related to her

9  termination?

10    A. To have supportive documentation.

11    Q. Is it important to maintain documentation of

12  your direct reports who have been terminated?

13    A. Yes.

14    MS. PETERSON:  Object.  Vague and ambiguous.

15  Incomplete hypothetical.  Calls for speculation.

16    THE WITNESS:  No.

17    MR. FRIEDMAN:  Could you repeat?

18    (Record read.)

19    THE WITNESS:  In the event of any further

20  actions challenging the termination.

21  BY MR. FRIEDMAN:

22    Q. Why is it important to maintain records in the

23  event of a further challenge to the termination?

24    MS. PETERSON:  Objection.  Calls for

25  speculation.  Incomplete hypothetical.

Aiken & Welch Reporters    K. Ayers  8/27/08

36

1        THE WITNESS:  In case we get into litigation,

2   in case it's appealed.  We have an appeals process for

3   terminations within Kaiser.

4   BY MR. FRIEDMAN:

5        Q. At the time that you went through Ms. Roper's

6   files, were you aware that Mr. daRosa was contesting

7   his termination?

8        A. No.

9        Q. When did you first become aware of that?

10       A. I don't recall the exact date.

11       Q. Did you -- in connection with Mr. daRosa's

12   termination, did you rely upon the information that was

13   provided to you by Ms. Roper?

14       A. I did.

15       Q. Did you conduct any independent investigation

16   beyond what she told you?

17       A. No.

18       Q. Did you also make a decision with respect to

19   Mr. daRosa's request that he come back and do his job

20   after his termination?

21        MS. PETERSON:  Objection.  Vague and

22   ambiguous.

23        THE WITNESS:  I was not aware that he had a --

24   BY MR. FRIEDMAN:

25       Q. At any time?

50

1        THE WITNESS:  I can assume.

2        MS. PETERSON:  We don't want you to guess or

3   speculate.  You're asking him if he knows what this

4   means, right?

5        MR. FRIEDMAN:  Counsel, please don't interrupt

6   your witness.  The objections can be preserved on the

7   record.  There's no need for you to coach or interrupt

8   an answer.

9        THE WITNESS:  I can take this as I read it.

10       MR. FRIEDMAN:  Yes.

11       THE WITNESS:  Case was opened due -- doesn't

12   read correctly due to he had been out on disability.

13   BY MR. FRIEDMAN:

14       Q. Do you know what that means?  He had been out

15   on disability?

16       MS. PETERSON:  Objection.  Calls for

17   speculation and calls for a legal conclusion.

18       THE WITNESS:  I can.  I can take it for how it

19   reads.

20   BY MR. FRIEDMAN:

21       Q. Yes, only what you understand?

22       A. That he has been out on disability.

23       Q. And after that it says and TC coding was

24   needed.  Have you ever heard of timecard coding in

25   respect to a disability claim?

51

1     A. Yes.

2     Q. What would be the connection?

3     A. Disability is covered as other paid time --

4  other than paid time, regular paid time.  So we code

5  our time cards when they're a patient.

6     Q. Had you ever discussed with Ms. Roper that

7  Mr. daRosa had been out on disability and Ms. Roper

8  needed a timecard coding for him in August of 2005?

9     A. No.

10     MS. PETERSON:  Objection.  Lacks foundation.

11  Assumes facts not in evidence and it's compound.

12  BY MR. FRIEDMAN:

13     Q. And the answer was?

14     A. Not that I recall.

15     Q. Have you ever been aware that Fernando had

16  opened up a disability claim or that Ms. Roper had?

17     A. No.

18     Q. How was the disability claim opened?

19     MS. PETERSON:  Object that it calls for

20  speculation.  Vague and ambiguous.  Overbroad.  Also to

21  the extent that the term disability calls for a legal

22  conclusion.

23     THE WITNESS:  Typically work with HR to open a

24  claim.  Follow policy and procedure to open a claim

25  with their direction.

Aiken & Welch Reporters    K. Ayers  8/27/08

52

1  BY MR. FRIEDMAN:

2      Q. What's the role of the supervisor in having an

3  employee out on disability?

4      A. The role of immediate supervisor?

5      Q. Yes.

6          MS. PETERSON:  Objection.  Vague and

7  ambiguous.

8          THE WITNESS:  It would be their responsibility

9  to work with HR and the employee.

10  BY MR. FRIEDMAN:

11      Q. Are there forms that are required of the

12  supervisor in connection with an employee going out on

13  disability?

14          MS. PETERSON:  Objection.  Vague and ambiguous

15  as to time.

16  BY MR. FRIEDMAN:

17      Q. I guess that is important.  Have you known the

18  rules regarding that to have changed over time?

19      A. That's what I'm trying to recollect right now.

20  I would say the forms have changed over time, but the

21  process, I don't believe, has.  But that's -- I don't

22  believe that.

23          MR. FRIEDMAN:  Okay.  So can I have my last

24  question read back.

25          (Record read.)

Aiken & Welch Reporters     K. Ayers   8/27/08

53

1   BY MR. FRIEDMAN:

2       Q. Are there forms required of the supervisor to

3   fill out?

4       A. Yes.

5       Q. Where do those forms go?

6       A. Again, they work with HR on that.  Whether or

7   not the supervisor fills them out or HR fills them out,

8   the supervisor -- in my mind the supervisor is

9   accountable.

10      Q. And at the time -- in August of 2005, was

11  Ms. Roper Mr. daRosa's supervisor, to your knowledge?

12      A. To my knowledge, yes.

13      Q. And if, in fact, a disability had been opened

14  and a timecard coding was needed, that would have been

15  Ms. Roper's responsibility at that time?

16      A. That's my belief.

17      Q. When you say work with HR, is there any

18  particular division within HR?

19      A. We have a number of different divisions.  I'll

20  use this example here.  HRSC that's listed here, is HR

21  Service Center, it's not located locally.  And then we

22  have -- locally we have our HR consultant that we're

23  working.

24      Q. Is there an organization WAM that you know of,

25  W-A-M?

54

1    A. There is a WAM group.

2    Q. Are they within human resources or are they

3  separate?

4    A. They're a component of human resources.

5    Q. And what does WAM do?

6      MS. PETERSON:  Objection.  Calls for

7  speculation.  Overbroad.

8  BY MR. FRIEDMAN:

9    Q. To your knowledge?

10    A. I'm trying to think what it stands for.

11    Q. Worker Absence Management, something like that

12  or Work Absence?

13    A. They -- they are the group that manages the

14  patients -- not patients -- employees that are out on

15  leave, on medical leave for a number of reasons.  It

16  could be occupational or nonoccupational.

17    Q. Is there another group that handles disability

18  claims within human resources separate from WAM?

19      MS. PETERSON:  Object.  Vague and ambiguous as

20  to time.  Calls for speculation.

21      THE WITNESS:  I don't know.

22  BY MR. FRIEDMAN:

23    Q. Have you ever obtained any information from

24  any of the components of human resources that are

25  responsible for maintaining records on disability leave

Aiken & Welch Reporters    K. Ayers  8/27/08

55

1  and medical leave in connection with Mr. daRosa?

2      A. No.

3      Q. To your knowledge, has any effort ever been

4  made with these groups in connection with this

5  litigation, to your knowledge?

6          MS. PETERSON:  Objection.  Calls for

7  speculation.  Vague and ambiguous.

8          THE WITNESS:  No.

9  BY MR. FRIEDMAN:

10      Q. And in January of 2006, when you approved

11  plaintiff's termination, you had not been aware that

12  there had been a prior disability claim opened in

13  August of 2005, correct?

14      A. That's correct.

15          MS. PETERSON:  Objection.  Assumes facts not

16  in evidence.  Lacks foundation.

17          THE WITNESS:  That's correct.

18  BY MR. FRIEDMAN:

19      Q. And at no time prior to the discussions more

20  recently after the litigation started, have you ever

21  been aware that Mr. daRosa had missed time in 2005 and

22  2006 due to any medical condition?

23          MS. PETERSON:  Object that it assumes facts

24  not in evidence and lacks foundation.

25          THE WITNESS:  I need to clarify that.

56

1  BY MR. FRIEDMAN:

2      Q. Yes?

3      A. I was aware that Mr. daRosa missed time and

4  that to the extent tied to a medical condition, no.

5      Q. What did you know about him missing time?

6          MS. PETERSON:  Objection.  Vague and ambiguous

7  as to time.

8          THE WITNESS:  I knew from my discussions with

9  Ms. Roper that he was absent from work a lot, that he

10  would not show up for work, that he would not call in,

11  that he in fact would have others call in for him, and

12  that she had met with him on multiple occasions to

13  reiterate our practice of requiring an employee to call

14  in.

15  BY MR. FRIEDMAN:

16      Q. Do you know what time frame those absences

17  occurred?

18      A. Prior to his termination.

19      Q. How long prior?

20      A. I can't give you an exact answer.

21      Q. How about a range.  Are we talking a few

22  months or are we talking years?

23      A. Not years.

24      Q. What is a manager or a supervisor supposed to

25  do when an employee experiences work attendance issues

Aiken & Welch Reporters    K. Ayers  8/27/08

76

1        THE WITNESS:  I don't know if this is her

2   first letter -- first warning of him or not.

3   BY MR. FRIEDMAN:

4        Q. Okay.  Well, why do supervisors write these

5   memos?

6        MS. PETERSON:  Objection.  Calls for

7   speculation.

8        THE WITNESS:  Just a standard.  It's just

9   something I might have coached her on.  We document

10   absences or attendance through absences and are

11   concerned about numbers of occurrences of absences not

12   lengths of absences typically.

13   BY MR. FRIEDMAN:

14        Q. Why do they write the file, write these memos?

15        MS. PETERSON:  Objection.  Calls for

16   speculation.

17        THE WITNESS:  It could be for two reasons.  It

18   could be because they coached the employee, and they

19   want documentation of that.  And then in the

20   progressive disciplinary process, if performance does

21   not improve, it is used, if you will, for documentation

22   purposes to move forward.

23   BY MR. FRIEDMAN:

24        Q. And why is it important to document these

25   events?

Aiken & Welch Reporters     K. Ayers   8/27/08

77

1      A. So that you can support further actions.

2      Q. Have you ever known Ms. Roper to discipline

3  employees and not provide documentation?

4        MS. PETERSON:  Objection.  Vague and

5  ambiguous.

6        THE WITNESS:  I would expect any of my

7  directors to provide documentation.

8  BY MR. FRIEDMAN:

9      Q. Have you ever known Ms. Roper to not provide

10  that kind of documentation that you expect?

11      A. No.

12      Q. Have you ever disciplined Ms. Roper for not

13  documenting a file?

14      A. No.

15      Q. So you were aware that Ms. Roper had given

16  some amount of disciplinary counseling to Mr. daRosa

17  prior to his termination?

18      A. Yes.

19      Q. And were you aware of it around December 7th?

20      A. I can assume with his termination date being

21  as we discussed earlier in January, I believe, of '06,

22  that this was occurring for several periods before

23  then.

24      Q. So were you aware around December 7th?

25      A. I don't recall the specific date, but the

89

1  memory of when those conversations occurred?

2      MS. PETERSON:  Other than what he's already

3  testified to?

4      MR. FRIEDMAN:  Well, now I think we're talking

5  about something that he hadn't testified to.

6      THE WITNESS:  I have no memory that Ms. Roper

7  had specific discussions on what dates with this

8  individual.  I do recall discussions I had with

9  Ms. Roper to make sure that we are having these

10  discussions and documenting facts of the attendance.

11  BY MR. FRIEDMAN:

12      Q. Have you ever seen any of that documentation?

13  I know that you testified that you hadn't seen the

14  December 7.

15      A. I don't recall reviewing the documentation

16  with her.  Practice would have been to have her review

17  that documentation with HR.

18      Q. So under the Kaiser's policies and practice,

19  she should have reviewed the documentation supporting

20  any counseling that Mr. daRosa had about his attendance

21  with HR prior to his termination?

22      MS. PETERSON:  I'm going to object that it

23  calls for speculation.  I also want to point out this

24  individual is not the PMK regarding Kaiser's policy.

25  He can testify to his own personal knowledge with

90

1  experience and practices.

2      MR. FRIEDMAN:  I believe that your disclosure

3  includes the policies and practices of Kaiser, so I

4  don't think the objection is well taken.  But, at any

5  rate, it's inappropriate for the purposes of this

6  deposition.

7      MS. PETERSON:  I'm going to object that it

8  calls for speculation as to what Kaiser's policies are.

9      THE WITNESS:  I can tell you what my practice

10  is and has been.  And those -- that practice is based

11  on my understanding of the policies.

12  BY MR. FRIEDMAN:

13      Q. But your policies and practices about what

14  Ms. Roper was obligated to do in connection with

15  reviewing documentation, making documentation, is that

16  what you mean?

17      MS. PETERSON:  Objection.  Vague and

18  ambiguous.

19  BY MR. FRIEDMAN:

20      Q. Is that what you want to talk about?

21      A. Partial.

22      Q. Go ahead.  Tell me.

23      A. Standard practice is when I have an

24  employee -- a director that comes to me and says I have

25  an issue, a personnel issue -- is to make sure that we

Aiken & Welch Reporters     K. Ayers   8/27/08

91

1    are following our policies and procedures around

2    progressive discipline at that point.  So coaching

3    first, letter of warning, verbal warning, letter of

4    warning, and further on, up to including termination

5    based on continued performance.

6         I know I met with Ms. Roper, we had those

7    discussions.  Before we can take any action, we have to

8    have that information reviewed by HR.  Any action at

9    all from a disciplinary standpoint.  So below

10    termination also.  We would have that information

11    reviewed by HR and for them to come to an agreement

12    that yes or no, one way or the other, that we can

13    proceed forward.

14       Q. When you say that the information is reviewed

15    by HR, are you talking about review of the actual

16    review of the documentation?

17       A. That's my expectation, yes.

18       Q. And have you ever seen any documentation from

19    Ms. Roper in connection with Mr. daRosa's termination?

20       A. Other than termination letter, I recall that.

21    I don't recall the details and I recall the

22    discussions.  I don't recall specific documentation.

23       Q. And you can confirm that since Ms. Roper's

24    termination, Kaiser has not been able to locate any

25    records from her in connection with Mr. daRosa's

Aiken & Welch Reporters    K. Ayers   8/27/08

92

1  termination?

2      MS. PETERSON:  I'm going to object that it

3  calls for speculation regarding what Kaiser has or has

4  not been able to locate.

5      THE WITNESS:  I can confirm that I have not

6  been able to locate anything that I had in my

7  possession.

8  BY MR. FRIEDMAN:

9      Q. And also you can confirm that you were not

10  able to find any documents that Ms. Roper left under

11  your authority and supervision?

12      A. That's correct.

13      Q. Are you aware that Mr. Mellon testified during

14  his deposition that he had spoken with Ms. Roper about

15  the documentation of verbal warnings, but never

16  actually saw any documents?

17      A. No.

18      Q. If you had known that Mr. daRosa's physician

19  had given him a medical leave on January 24th for the

20  25th until March of 2006, at the time that Mr. daRosa

21  was terminated for being a no-call/no-show, and the

22  medical documentation that he received from the doctor

23  stated that his medical condition interfered with his

24  ability to work, would that have changed your decision

25  to approve his termination?

Aiken & Welch Reporters    K. Ayers   8/27/08

121

1  answer that question.  We can take it up with the judge

2  if you think that's a proper question to ask the

3  defendant.  We're going to be taking it up on the PMK

4  depositions anyway.

5      MR. FRIEDMAN:  I want to make sure if I lose

6  the PMK issue, I want to make sure that this is

7  reserved.

8  BY MR. FRIEDMAN:

9      Q. So are there any other facts in connection

10  with Mr. daRosa's termination that we have not talked

11  about today that you know of?

12      A. No.

13      MR. FRIEDMAN:  Okay.  Then that's all I have

14  for you today.  Thank you very much, Mr. Ayers.

15      (Whereupon, the deposition was concluded at

16  12:24 p.m.)

17

18

19

20      _____

21      SIGNATURE OF WITNESS

22

23

24

25

Aiken & Welch Reporters     K. Ayers   8/27/08

122

1  STATE OF CALIFORNIA    )

2                         )

3  COUNTY OF ALAMEDA      )

4

5      I, KIMBERLY R. JENSEN, do hereby certify:

6      That KENNETH U. AYERS, in the foregoing

7  deposition named, was present and by me sworn as a

8  witness in the above-entitled action at the time and

9  place therein specified;

10      That said deposition was taken before me at

11  said time and place and was taken down in shorthand by

12  me, a Certified Shorthand Reporter of the State of

13  California, and was thereafter transcribed into

14  typewriting;

15      And that the foregoing transcript constitutes

16  a full, true, and correct report of said deposition and

17  of the proceedings that took place.

18      IN WITNESS WHEREOF, I have hereunder

19  subscribed my hand this 3rd day of September 2008.

20

21

22

            KIMBERLY R. JENSEN, RPR, CSR No. 12552
23              State of California

24

25

Aiken & Welch Reporters    K. Ayers   8/27/08