1       UNITED STATES DISTRICT COURT IN AND FOR THE

2           NORTHERN DISTRICT OF CALIFORNIA

3                 ---oOo---

4   FERNANDO DAROSA,

5        Plaintiff,

6   vs.                      No. C07-03114SI

7   KAISER FOUNDATION HEALTH PLAN,
    INC.,
8
        Defendants.
9                         /

10

11

12           DEPOSITION OF MARGIE ROPER

13

14

15

16

17       Taken before KIMBERLY R. JENSEN, RPR

18             CSR No. 12552

19             August 28, 2008

20

21

22

23

24

25

2

1                    I N D E X

2                              PAGE

3   EXAMINATION BY MR. FRIEDMAN              4

4   EXAMINATION BY MR. MARTIN              109

5

6

7

8

9

10

11                    E X H I B I T S

12   PLAINTIFF'S                        PAGE

13   14  Memorandum to Margie Roper from      81
        Fernando daRosa

14

15

16

17

18

19

20

21

22

23

24

25

Aiken & Welch Reporters     M. Roper   8/28/08

3

1               DEPOSITION OF MARGIE ROPER

2

3       BE IT REMEMBERED, that pursuant to Notice, and on

4   the 28th day of August 2008, commencing at the hour of

5   9:09 a.m., in the offices of AIKEN & WELCH, One Kaiser

6   Plaza, Suite 505, Oakland, California 94612, before me,

7   KIMBERLY R. JENSEN, a Certified Shorthand Reporter,

8   personally appeared MARGIE ROPER, produced as a witness

9   in said action, and being by me first duly sworn, was

10   thereupon examined as a witness in said cause.

11

12                   ---oOo---

13

14       JEREMY L. FRIEDMAN, Attorney at Law, 2801 Sylhowe

15   Road, Oakland, California 94602, appeared on behalf of

16   the Plaintiff.

17

18       JONATHAN D. MARTIN, Seyfarth Shaw LLP, 560 Mission

19   Street, Suite 3100, San Francisco, California 94105,

20   appeared on behalf of the Defendant.

21

22

23

24

25

        Aiken & Welch Reporters     M. Roper   8/28/08

4

1                    MARGIE ROPER,

2                sworn as a witness,

3                testified as follows:

4     EXAMINATION BY MR. FRIEDMAN:

5        Q. Even though you just did it, would you mind

6     stating your name and spelling it for the record.

7        A. Margie Roper, M-A-R-G-I-E, R-O-P-E-R.

8        Q. Ms. Roper, have you ever had your deposition

9     taken before?

10       A. Yes, about 25, 30 years ago.

11       Q. 25 or 30 years?

12       A. Uh-huh.

13       Q. Was it one occasion?

14       A. Yes.

15       Q. Was it a case involving Kaiser?

16       A. No.

17       Q. What kind of case did it involve?

18       A. It was a disability case where I was the --

19    what was I called?  I went and interviewed someone that

20    was on long-term disability.

21       Q. Were you represented by an attorney back then?

22       A. No.

23       Q. Have you -- let me go over some of the ground

24    rules for deposition so that you know what this is

25    about.

Aiken & Welch Reporters     M. Roper   8/28/08

12

1     A. I don't know if I still have it.

2     Q. Do you have any documents that relate to any

3  of your direct reports at Kaiser?

4     A. No.

5     Q. And you have no documents at all that relate

6  or refer to Mr. daRosa?

7     A. No.

8     Q. When you left Kaiser, what did you do with

9  your supervisory files?

10     A. I left them at Kaiser.

11     Q. Where did you leave them?

12     A. Where they were in the filing cabinet.

13     Q. Where was the filing cabinet?

14     A. In my office.

15     Q. Was there more than one filing cabinet?

16     A. Oh, there was several in the office.

17     Q. And were your supervisory files in all of the

18  cabinets or just one?

19     A. Just one.

20     Q. Which cabinet?

21     A. The one to the right of the desk next to the

22  window.

23     Q. Who else at Kaiser had knowledge of those

24  records that you maintained?

25        MR. MARTIN:  Objection.  Calls for

Aiken & Welch Reporters     M. Roper   8/28/08

13

1  speculation.

2      THE WITNESS:  No one that I know of.

3  BY MR. FRIEDMAN:

4      Q. When you left Kaiser, did you have any contact

5  with anybody there with respect to your records?

6      A. No.

7      Q. Did you talk to anybody about where your

8  records were?

9      A. No.

10      Q. Did anybody ask you any questions about where

11  you were going to leave your files?

12      A. No.

13      Q. How did you keep your records?  Did you have a

14  system or a practice in terms of what you do with your

15  records?

16      MR. MARTIN:  Objection.  Vague and ambiguous.

17  BY MR. FRIEDMAN:

18      Q. When I say "records," I mean the records we're

19  talking about, the supervisory files that you left in

20  the cabinet file.

21      A. What is your question again?

22      Q. How did you keep them?  What did you do?

23      MR. MARTIN:  Objection.  Vague and ambiguous.

24      THE WITNESS:  I'm not sure what you mean.

25  BY MR. FRIEDMAN:

Aiken & Welch Reporters    M. Roper  8/28/08

14

1      Q. Well, let's try it this way.  What kind of

2   records did you keep when an employee under your

3   supervision called in and said they were sick or unable

4   to attend work?

5         MR. MARTIN:  Objection.  Lacks foundation.

6         THE WITNESS:  I would indicate on the

7   time-keeping system that they were out that day.

8   BY MR. FRIEDMAN:

9      Q. Would you do anything else?

10     A. No.

11     Q. Did you keep a record of what employees told

12  you in advance whether they were going to be out?

13      A. I'm not sure what you meant.  When people told

14  you they were going to be out in advance, that would

15  mean they were taking vacation.  Yes, I took records of

16  a vacation calendar, who was scheduled to be on

17  vacation.

18      Q. How did you keep the records of people who

19  were going to be out on vacation?

20      A. It was a calendar, kept on a calendar, online

21  in Word.

22     Q. That's a word processing document on your

23  system?

24     A. Yes.

25     Q. And where was that when you left Kaiser, that

Aiken & Welch Reporters    M. Roper   8/28/08

15

1  document?

2      A. Should have still been on the hard drive.  I

3  believe all the staff had a copy of that document, too.

4  I sent it to them.  So they all had a copy.  I kept it

5  updated.

6      Q. What about when somebody called in sick, would

7  the only notation you would make would be an indication

8  on the system that he was out or she?

9      A. Yes.  Yes.

10      Q. Did you keep any records as to the reasons why

11  people had called in sick?

12      A. Not necessarily, because I did not ask them

13  their diagnoses when they called in sick.

14      Q. What about the work slips?  Have you ever seen

15  any work slips?

16      A. People would bring work slips when they were

17  out from work.

18      MR. MARTIN:  Objection.  Vague and ambiguous

19  as to the term "work slips."

20  BY MR. FRIEDMAN:

21      Q. What would they do, give you these work slips

22  when they were in?

23      MR. MARTIN:  Objection.  Vague and ambiguous

24  as to the term "work slips."

25  BY MR. FRIEDMAN:

Aiken & Welch Reporters    M. Roper  8/28/08

16

1     Q. They would hand these to you or leave them for

2  you?

3       MR. MARTIN:  Objection.  Vague and ambiguous,

4  compound.

5       THE WITNESS:  Kaiser physicians had a form

6  called verification of absence or something like that.

7  If employees were out sick, sometimes they would bring

8  me that form.

9  BY MR. FRIEDMAN:

10     Q. What would they do when they gave you that

11  form?

12     A. Place it in their file.

13     Q. Where -- when you say "place it in the file"?

14     A. The supervisory file.

15     Q. How were those supervisory files maintained in

16  terms of employees?  Did you have a separate file for

17  each employee?

18     A. Yes.

19     Q. And you had one file for each one of your

20  employees?

21     A. Yes.

22     Q. And if somebody brought in a work slip, your

23  testimony is that you would put it into that file?

24     A. Yes.

25     Q. What else would you do with that work slip, if

Aiken & Welch Reporters     M. Roper   8/28/08

17

1  anything?

2      A. Nothing.

3      Q. What about records related to disciplinary

4  warnings given to employees under your supervision?

5  Did you have any records relating to that?

6      A. That would be in the supervisory file if there

7  was one.

8      Q. How would you maintain those kinds of records?

9  How would you track when you gave disciplinary

10  warnings?

11      A. I would put a copy in their supervisory file

12  and the employee would receive a copy.

13      Q. A copy of what?

14      A. The memo.  I thought that was your question.

15      Q. So if there was a written memo --

16      A. Correct.

17      Q. -- you would put a copy in the file.  Did you

18  make any notations at all about conversations in your

19  direct reports in connection with those written memos?

20  Did you keep a file where you kept track of your

21  conversations of your direct reports in connection with

22  disciplinary warnings?

23      A. I kept record of their absences in there, in

24  the supervisory file.

25      Q. You kept record of absences.  Would you also

Aiken & Welch Reporters    M. Roper    8/28/08

18

1  keep record of discussions that you had with employees

2  regarding their employment?

3      A. Yes.

4      Q. And those records were maintained where?

5      A. In the supervisory file.

6      Q. Did you have any other computer records like

7  you had with your calendar where you'd keep a computer

8  record of conversations, say a file?

9      A. No.

10     Q. Per employee?

11     A. No.

12     Q. If you wanted to look at anything that you

13  said or that one of your employees said to you relating

14  to years ago, how would you go about finding out

15  whether somebody said something or you said something

16  back to them?

17     A. I'd look in the supervisory file.

18     Q. Where in the supervisory file would you find

19  that kind of information?

20     A. Just in the file.

21     Q. What kind of information would you find?

22     A. The information you just asked me about.

23     Q. Would that include discussions with employees,

24  like you would make notations?

25     A. If I made notations, it would be there.

Aiken & Welch Reporters    M. Roper   8/28/08

19

1    Q. Okay.  Did you have a place where you would

2  maintain records regarding any of the employees who you

3  discussed accommodations for disabilities?

4    MR. MARTIN:  Objection.  Calls for legal

5  conclusion as to "accommodations" and "disabilities."

6    THE WITNESS:  I can't answer that.  I don't --

7  I did not discuss -- I'm not sure what your question

8  is.  I'm not sure that I've ever discussed

9  accommodations for disability.

10  BY MR. FRIEDMAN:

11    Q. Okay.  In your employment at Kaiser you don't

12  recall ever discussing with any employee reasonable

13  accommodations for disabilities?

14    A. No.

15    Q. Do you ever recall discussing reasonable

16  accommodations for medical conditions?

17    A. No.  I'm not -- I may not be understanding

18  what your question is.

19    Q. Okay.  Is that because you don't know what it

20  means to provide reasonable accommodations in

21  connection with disabilities or health conditions?

22    MR. MARTIN:  Objection.  Calls for a legal

23  conclusion.

24  BY MR. FRIEDMAN:

25    Q. Sorry.  I was trying to understand.

Aiken & Welch Reporters    M. Roper   8/28/08

20

1     A. I'm trying to understand what you mean.

2     Q. Well, I was asking you why you didn't -- what

3   part of my question you didn't understand.

4     A. Your question was did I discuss

5   accommodations.

6     Q. Have you ever discussed with an employee a

7   reasonable accommodation for a disability or a health

8   condition?

9       MR. MARTIN:  Objection.  Calls for legal

10  conclusion.

11       THE WITNESS:  If an employee told me they were

12  sick and they weren't feeling well and they needed to

13  go sit in their car or lay down for some time, if you

14  consider that an accommodation, those things happened.

15  BY MR. FRIEDMAN:

16     Q. Did you maintain any records with respect to

17  those types of discussions?

18     A. No.

19     Q. Other than what you just said in terms of

20  somebody calling in sick or saying they needed to go

21  lay down in their car, are there any other discussions

22  that you can recall that you ever had with any of your

23  direct reports about reasonable accommodation for

24  either a medical condition or a disability?

25     A. No.

Aiken & Welch Reporters     M. Roper  8/28/08

21

1        MR. MARTIN:  Objection.  Calls for legal

2   conclusion.

3   BY MR. FRIEDMAN:

4        Q. And since you don't recall it, do you also

5   believe that there was no records other than what you

6   said about employees resting in their car or being home

7   sick?  There are no records about your direct reports

8   and any accommodation that you talked with them about;

9   is that correct?

10       A. You said "accommodations."  I indicated going

11   to their car for an hour or whatever.  Being home sick

12   is not an accommodation.  If you're home sick, you're

13   sick.  There's no discussion involved there.  If

14   they're sick, they're sick.

15       Q. Do you believe there's any records of

16   discussions of accommodations?

17       A. No.

18       Q. What about FMLA time?  Did you have any

19   records?  Did you ever maintain any records with

20   respect to your employees taking off medical leave

21   time?

22       A. No, I didn't have any employees that did that.

23       Q. What about records with respect to disability

24   leave?  Did you maintain any records with respect to

25   any employee who requested a disability leave?

Aiken & Welch Reporters     M. Roper   8/28/08

22

1      A. Normally employees don't request disability.

2   If they're disabled, they don't come in.  When they

3   come back they bring some kind of note from your doctor

4   indicating they can now return to work.

5      Q. What about opening up a disability claim with

6   disability management at Kaiser?

7      A. That I've done in the past.

8      Q. What kind of records are associated with that

9   kind of request, or that kind of case opening?

10      MR. MARTIN:  Objection.  Vague and ambiguous.

11      THE WITNESS:  I don't recall.  I know there

12   was a number that you called and reported it and you

13   have the employee sign a form.

14   BY MR. FRIEDMAN:

15      Q. Did you maintain any of those records in your

16   personnel --

17      A. The form that they signed.

18      Q. If -- did you maintain any other forms besides

19   the ones that they signed?

20      A. No.

21      Q. Where would you maintain those forms?

22      A. In their supervisory file.

23      Q. What other kind of records are in the

24   supervisory file other than the ones that we've spoken

25   about today?

Aiken & Welch Reporters    M. Roper   8/28/08

23

1      A. Their annual review, any letters of

2   accommodation from members.

3      Q. Anything else?

4      A. No, not that I can think of.

5      Q. You said you had opened up a disability claim

6   for some of your employees in the past.  Who do you

7   contact when you do that?

8      A. I don't recall.  It's an electronic document

9   that you open up and do.

10      Q. Is it -- do you recall the name of the

11   electronic document?

12      A. No, I don't.

13      Q. Do you contact people in the disability

14   management department?

15      A. The document may have went to that department.

16   I'm not sure.  I have that on one employee.

17      Q. Which employee was that?

18      A. I can't tell you that.

19      MR. MARTIN:  Yeah, objection.  Kaiser has an

20   obligation to assert the privacy rights of its

21   employees and we'll do so here.

22   BY MR. FRIEDMAN:

23      Q. Well, let me ask you this:  On how many

24   occasions did you open up a disability claim on behalf

25   of one of your direct reports?

Aiken & Welch Reporters     M. Roper   8/28/08

24

1       A. It wasn't a disability claim, someone got hurt

2   on the job and that's when I filled out the report.  I

3   don't open up disability claims.

4       Q. Have you ever contacted disability management

5   in connection with one of your direct reports?

6       A. Now, I'm not sure -- when you're saying

7   "disability management."  I know there was a department

8   called WAM.  I believe -- I contacted that department

9   in reference to completing time cards so employees

10  could be paid properly.

11      Q. But what about the disability management

12  department that's also within the human resources?

13      A. I don't think I've contacted them.

14      Q. Do you know what KHRMIT is?

15      A. No.

16      Q. Never heard that word before?

17      A. I have, but not in relationship to work.

18      Q. Oh, not in relation to the Kaiser electronic

19  personnel files?

20      A. No.

21      Q. When did you first become a supervisor at

22  member services?

23      A. When I started.

24      Q. When was that?

25      A. Oh, God.  2000.  2001.  I don't remember.

Aiken & Welch Reporters     M. Roper   8/28/08

45

1  extended period, and that he wanted that person to call

2  me and let me know.

3      Q. Was it his physician?

4      A. I don't know.

5      Q. Do you know Dr. Dustin?

6      A. No.

7      Q. Was it somebody from the neurology department?

8      A. It wasn't the neurology department, it was

9  the -- I forget the name of the facility.  It was not

10  at the hospital.  It's a rehabilitation.  It's drug and

11  rehab center, the facility that called me.

12      Q. Did you make any notations of this discussion?

13      A. No, I just noted that I received the call that

14  someone had called me and he was going to be off.

15      Q. Did you make any record of that discussion?

16      A. No.

17      Q. You didn't include anything in your

18  supervisory files in connection with Mr. daRosa?

19      A. No, not that I recall. .  There was nothing

20  that I -- to include, to put that.

21      Q. Do you recall any other conversations with

22  anybody in connection with Mr. daRosa's leave of

23  absence in July and August?

24      A. No, other than calling WAM to fill out his

25  time card.

Aiken & Welch Reporters     M. Roper   8/28/08

46

1    Q. What does that mean?  What did you do?

2    A. I had to call and find out how to code his

3  absence.

4    Q. How were you to code?

5    A. I don't recall.  It would be -- they would

6  have told me, you know, code five hours, number 73109

7  or something like that.

8    Q. Did you provide WAM with any other records at

9  all in connection with Mr. daRosa?

10    A. I don't remember doing that.

11    Q. At the time that Mr. daRosa was out in July

12  and August of 2005, what was Kaiser's policies and

13  procedures to your understanding about contact between

14  supervisors and their direct reports while their direct

15  reports were out on medical leave?

16    MR. MARTIN:  Objection.  Lacks foundation.

17    THE WITNESS:  I don't know what you mean by

18  that question.  Was there a policy while they're off

19  on -- while they're off on medical leave?

20  BY MR. FRIEDMAN:

21    Q. What was -- to your understanding what was

22  Kaiser's policies and procedures about contact between

23  supervisors?

24    A. I wasn't aware of any policy.  I'm not sure

25  what you're referencing.

47

1        MR. MARTIN:  Objection.  Lacks foundation.

2  BY MR. FRIEDMAN:

3        Q. So is it fair to say then to your

4  understanding you didn't believe Kaiser had any

5  policies or procedures with respect to supervisory

6  contact with employees during the time that they're out

7  on leave?

8        A. I'm not aware of any.

9        Q. Had you ever been informed that it was the

10  supervisory's responsibility to have contact with their

11  employees while they were out on medical leave?

12        A. No.

13        Q. I'm showing you Exhibit 2.  This is a printout

14  that was provided to us in connection with Mr. daRosa's

15  employment at Kaiser.  And if you look at first on the

16  first page to the date 4/4/2007?

17        A. Where?

18        Q. It's in the -- if you look in the column, the

19  third column, 2007/04/04, inquiry of medical leave.

20          Do you see that line?

21        A. No.  Point to where.

22        Q. It's about ten from the bottom.

23        A. Okay.

24        Q. Do you see the date, 4/4 in the third column?

25        A. Yeah.

Aiken & Welch Reporters    M. Roper  8/28/08

91

1     Q. Anybody besides those two?

2     A. Those would have been the only two I needed to

3  talk to.

4     Q. Did you ever discuss any aspect of his

5  termination including just a statement that he had been

6  terminated to anybody else in the member services?

7     A. No.

8     Q. Did you have a fax machine in your office in

9  January of 2006?

10     A. Not physically in my office, but in our

11  department.

12     Q. There was one fax machine in your whole

13  department?

14     A. Two.

15     Q. Two?

16     A. One department, one side of the sheet where I

17  was had a fax machine and the department with Josephine

18  and the other three employees across the street in

19  another building, there was a fax machine over there

20  also.

21     Q. If somebody was faxing something into member

22  services which fax machine were they supposed to use?

23     A. They were supposed to use the department I was

24  in, in the office, but sometimes faxes would go over

25  there.

92

1      Q. Had you ever been disciplined in connection

2  with having two fax machines?

3      A. No.

4      Q. Which number did your direct reports have?

5        MR. MARTIN:  Objection.  Calls for

6  speculation.

7        THE WITNESS:  Which number?  To what kind of

8  number are we talking about?

9  BY MR. FRIEDMAN:

10      Q. Which fax number did your direct reports have?

11      A. Everyone in the department had the fax number

12  for both fax machines.

13      Q. Mr. Ayers terminated your employment?

14      A. Yeah.

15      Q. What were the circumstances leading up to your

16  termination?

17        MR. MARTIN:  At this point I'm going to make

18  an objection.  Kaiser has an obligation to protect the

19  privacy rights of its employees, and former employees,

20  so I will just assert that at this time, but the

21  witness I believe can make her own determination as to

22  whether she wishes to disclose that information or not.

23        THE WITNESS:  I don't really want to go into

24  all of that.

25  BY MR. FRIEDMAN:

Aiken & Welch Reporters     M. Roper   8/28/08

93

1      Q. Well, I have some questions for you --

2      A. Okay.

3      Q. -- on it.  And I'm -- I would like to know the

4   circumstances leading up to the termination, and the

5   timing of it and the bases for it.

6      A. It was in -- it was regarding job performance

7   in terms of meeting established goals within the

8   department.  Compliance goals.

9      Q. Was there any reference at all to the

10   performance of your direct reports in connection with

11   the job performance?  Was it your performance or the

12   performance of the entire department?

13      MR. MARTIN:  Objection.  Vague and ambiguous

14   and calls for speculation.

15      THE WITNESS:  I got a letter.  I would have to

16   have the letter in front of me to read what it said,

17   but my sense was the overall performance of the

18   department and not meeting the goals.

19   BY MR. FRIEDMAN:

20      Q. Did any of that relate to the direct reports

21   and their performance?

22      MR. MARTIN:  Objection.  Calls for

23   speculation.

24      THE WITNESS:  It was the overall performance

25   goals.

94

1   BY MR. FRIEDMAN:

2       Q. How were those goals set?

3       A. Set by Kaiser.

4       Q. What kind of goals are they?

5       A. Oh, I don't recall.  They have respond to

6   certain letters within five days, get another day out

7   within -- respond to a letter within 72 hours.

8   Respond -- send a follow-up letter within five days.

9   Close the case out within 30.

10      Q. Was -- and Mr. daRosa was one of your

11  employees during the time period that Kaiser was

12  critical of the performance of the department?

13      A. They were always critical of the performance

14  of the department.

15      Q. Well, in the criticism that led to your

16  termination?

17      A. He wasn't there.

18      Q. Was the time period that he was there included

19  within the review?

20      A. I don't think so.  He wasn't really in the

21  department that was making the goals, the goals were

22  referencing the performance in terms of responding to

23  grievances and complaints and he did not do that.

24      Q. What did he do?

25      A. He responded to face-to-face inquiries from

Aiken & Welch Reporters     M. Roper   8/28/08

110

1      (Discussion held off the record.)

2      MR. FRIEDMAN:  Before we close the record

3  here, I want to note for the record that we've asked

4  Kaiser to produce Josephine DeVilla for deposition.

5  We've noticed it for last week, and we still as of

6  today have not had confirmation as to when she will be

7  produced, tomorrow being the close of discovery.

8      We've also asked that the rule 30(b)6

9  deponents with persons most knowledgeable about Kaiser

10  records be produced in connection with this litigation.

11  That was supposed to take place on -- in June and still

12  counsel has not conferred with me to provide me any

13  dates for these witnesses.

14      MR. MARTIN:  And I'll just respond quickly to

15  this.  Number one, we're here for Ms. Roper's

16  deposition and Ms. Roper's deposition only, and that

17  deposition is now over.  Counsel and I have conferred

18  about the rule 30(b)(6) witness repeatedly.  There is

19  no need to repeat any of that here.  The issue is

20  before the court now, and I can presume that the court

21  will resolve it at some point.

22      As to Ms. DeVilla's deposition, I've indicated

23  to counsel that's something we're continuing to work on

24  in terms of scheduling.  I would also note for the

25  record that Ms. Roper's deposition was officially

Aiken & Welch Reporters     M. Roper   8/28/08

111

1  scheduled for tomorrow, and I personally rearranged my

2  schedule to accommodate Mr. Friedman's desire to change

3  the deposition to today, and he apparently is now

4  insisting that Ms. DeVilla's deposition occur tomorrow

5  on virtually no notice and that just isn't going to

6  happen.

7      MR. FRIEDMAN:  So counsel, is it my

8  understanding then that you're not going to produce 30

9  (b)(6) witness pursuant to the notice?

10     MR. MARTIN:  I've -- we've already had this

11  conversation.  I'm not going to extend this

12  communication any further.  The deposition is over.

13     MR. FRIEDMAN:  Well, we haven't had a

14  conversation about the 30(b)(6) witness that you keep

15  telling me you wish to schedule.  Are you not going to

16  make them available now?

17     MR. MARTIN:  I have not said that and this

18  conversation is over, and I'm not paying for a

19  transcript that does not relate to this deposition.

20  So --

21     MR. FRIEDMAN:  Well, I'll give you one more

22  opportunity on the record to verify whether or not

23  you're going to comply with 30(b)(6).

24     MR. MARTIN:  Counsel, we've already had this

25  communication.  If you want to know what our position

Aiken & Welch Reporters    M. Roper   8/28/08

112

1    is, you can review our court filings.  I believe

2    there's one that's scheduled to be filed by today or at

3    least by the end of this week.  We've already had our

4    communications about that.  I've never said that we are

5    not going to produce the witnesses.  So to the extent

6    you're claiming I said that, that is incorrect.

7         MR. FRIEDMAN:  Well, the only reason I said it

8    is because in your statement on the record you

9    indicated that this is an issue that the court is going

10   to decide.  Does that mean that you will not produce

11   the 30(b)(6) witnesses prior to the court's ruling?

12        MR. MARTIN:  I'm not saying that.  I never had

13   said that.  And this conversation is over.  Thank you.

14        MR. FRIEDMAN:  We'll close the record.

15        (Whereupon, the deposition was concluded at

16   11:42 a.m.)

17

18

19

20        _____

          SIGNATURE OF WITNESS

21

22

23

24

25

         Aiken & Welch Reporters    M. Roper   8/28/08

113

1  STATE OF CALIFORNIA    )

2                         )

3  COUNTY OF ALAMEDA      )

4

5       I, KIMBERLY R. JENSEN, do hereby certify:

6       That MARGIE ROPER, in the foregoing deposition

7  named, was present and by me sworn as a witness in the

8  above-entitled action at the time and place therein

9  specified;

10      That said deposition was taken before me at

11  said time and place and was taken down in shorthand by

12  me, a Certified Shorthand Reporter of the State of

13  California, and was thereafter transcribed into

14  typewriting;

15      And that the foregoing transcript constitutes

16  a full, true, and correct report of said deposition and

17  of the proceedings that took place.

18      IN WITNESS WHEREOF, I have hereunder

19  subscribed my hand this 3rd day of September 2008.

20

21

22      KIMBERLY R. JENSEN, RPR, CSR No. 12552
23          State of California

24

25

Aiken & Welch Reporters    M. Roper   8/28/08