1      UNITED STATES DISTRICT COURT IN AND FOR THE

2           NORTHERN DISTRICT OF CALIFORNIA

3                ---oOo---

4   FERNANDO DAROSA,

5        Plaintiff,

6   vs.                    No. C07-03114SI

7   KAISER FOUNDATION HEALTH PLAN, INC.,

8

      Defendants.

9                      /

10

11

12

13           DEPOSITION OF GAIL KATO

14

15

16

17

18      Taken before KIMBERLY R. JENSEN, RPR

19           CSR No. 12552

20           August 27, 2008

21

22

23

24

25

2

1                    I N D E X

2                                    PAGE

3   EXAMINATION BY MR. FRIEDMAN              4

4

5

6

7

8

9

10

11                   E X H I B I T S

12  PLAINTIFF'S                      PAGE

13  13  18-page KHRMIT file              89

14  8   4-page Notice of Charge of        118
        Discrimination

15

16

17

18

19

20

21

22

23

24

25

Aiken & Welch Reporters     G. Kato   8/27/08

3

1          DEPOSITION OF GAIL KATO

2

3     BE IT REMEMBERED, that pursuant to Notice, and on

4   the 27th day of August 2008, commencing at the hour of

5   1:28 p.m., in the offices of AIKEN & WELCH, One Kaiser

6   Plaza, Suite 505, Oakland, California 94612, before me,

7   KIMBERLY R. JENSEN, a Certified Shorthand Reporter,

8   personally appeared GAIL KATO, produced as a witness in

9   said action, and being by me first duly sworn, was

10   thereupon examined as a witness in said cause.

11

12                    ---oOo---

13

14     JEREMY L. FRIEDMAN, Attorney at Law, 2801 Sylhowe

15   Road, Oakland, California 94602, appeared on behalf of

16   the Plaintiff.

17

18     DANA L. PETERSON, Seyfarth Shaw LLP, 560 Mission

19   Street, Suite 3100, San Francisco, California 94105,

20   appeared on behalf of the Defendant.

21

22

23

24

25

4

1                    GAIL KATO,

2                    sworn as a witness,

3                    testified as follows:

4    EXAMINATION BY MR. FRIEDMAN:

5        Q. Good afternoon.  Could you please state and

6    spell your name for the record.

7        A. It's Gail Kato, G-A-I-L, K-A-T-O.

8        Q. Ms. Kato, have you had your deposition taken

9    before?

10       A. Yes.

11       Q. On how many occasions?

12       A. Well, at least maybe six to ten times.

13       Q. When was the last time?

14       A. Probably several years ago.

15       Q. Were you employed at Kaiser during the time

16   period of your prior depositions?

17       A. Yes.

18       Q. Did any of the other cases involve employment

19   cases?

20       A. Yes.

21       Q. What kind or what was at issue?

22       A. Okay.  Termination.  Discrimination.

23       Q. Did any of these cases involve claims of

24   disability discrimination?

25       A. I don't remember.

Aiken & Welch Reporters     G. Kato   8/27/08

10

1 Q. Okay. Any time after he had gone from

2 pharmacy to member services, do you know what date that

3 was?

4 A. No.

5 Q. Okay. Any time beginning at least as early as

6 2005, January 2005, I believe, he had transferred over

7 in November or December, but -- so any time -- of 2004.

8 So any time beginning in that time period after he left

9 the pharmacy, do you recall looking at any of his

10 documents?

11 A. No.

12 Q. Did you ever recall searching for any of his

13 documents?

14 MS. PETERSON: Objection. Vague and

15 ambiguous.

16 THE WITNESS: Searching for -- during what

17 time frame?

18 BY MR. FRIEDMAN:

19 Q. Any time frame, ever -- well, let's talk about

20 only after he left the pharmacy.

21 So beginning in 2005 until present, have you

22 ever searched for records relating to Mr. daRosa?

23 A. Yes.

24 Q. When did you first search for records on that

25 time period?

Aiken & Welch Reporters G. Kato 8/27/08

11

1      A. When I was informed that a lawsuit had been

2  filed.

3      Q. Okay.  Where did you look for records?

4      A. I looked in my office.  Not my immediate

5  office, but the office -- HR -- HR offices.

6      Q. And would that include any records within HR?

7      A. No.

8      Q. Okay.  What records within HR did you look

9  for?

10      A. Employee and labor relations.

11      Q. Would that have included any records that were

12  with WAM department?

13      A. No.

14      Q. Would it have included any records relating to

15  any claim for disability that was opened on behalf of

16  Mr. daRosa?

17      A. No.

18      Q. Is there a separate disability office when

19  people need disability leave?  Is there separate groups

20  like the WAM people that deal with disability claims?

21      A. Yes.

22      Q. What are they called?

23      A. Disability management.

24      Q. Where are they located?

25      A. That particular function is located -- because

Aiken & Welch Reporters     G. Kato   8/27/08

12

1  there's disability management offices throughout

2  northern California and the one relating to Mr. daRosa

3  is at the Oakland Medical Center.

4      Q. Do you know how they maintain their records?

5      A. No.

6      Q. Have you ever requested any records in any

7  other cases involving disability management offices?

8      A. Yes.

9      Q. How did you request those records?

10     A. I walked into the office and requested the

11  information.

12     Q. Do you need to fill out forms to request

13  information?

14     A. No.

15     Q. You just verbally give it to somebody who's

16  working there?

17     A. Yes.

18     Q. Do you know who is in charge of maintaining

19  those records today?

20     A. His name is Guy Purks.  It's P-U-R-K-S.

21     Q. Are you aware of any attempt to either contact

22  Mr. Purks or anybody in the disability management

23  office with respect to Mr. daRosa's records in their

24  case?

25     A. No.

13

1      Q. When you searched your offices, the human

2  resources office for records relating to Mr. daRosa,

3  how did you go about that search?

4      A. I looked -- you know, I asked an assistant to

5  look through files, these are cabinets.

6      Q. What are the files?  What do they relate to?

7      A. Employee labor relations matters.

8      Q. How are they organized, by date or by name

9  or --

10      A. At the time, because there's been

11  reorganization, there's been different people there, at

12  the time by name.

13      Q. By name of the employee?

14      A. Yes.

15      Q. Any other -- any other matter -- ways of going

16  about searching other than going through the files that

17  relate to the ELR matters that you searched in human

18  resources?

19      A. For Mr. daRosa?

20      Q. Yes.

21      A. No, not that I'm aware of.

22      Q. So the extent of your search was to go through

23  the cabinets and have other people assist you in that

24  search for the ELR matters to look for records that

25  would have been filed under Mr. daRosa's name?

14

1    A. Yes.

2    Q. Were you able to find any?

3    A. No.

4    Q. The E-mail that you looked at today, did that

5  come from your computer?

6      MS. PETERSON:  Object to the extent it

7  misstates facts that she reviewed the E-mail today.

8  BY MR. FRIEDMAN:

9    Q. The E-mail that you reviewed prior to your

10  deposition?

11    A. Yes.

12    Q. Did you provide that string of E-mails for

13  production in this litigation?

14    A. No.

15    Q. Do you know who did?

16    A. No.

17    Q. Did you search your computer file for any of

18  those E-mails or any other E-mails that might relate to

19  a discussion of Mr. daRosa?

20    A. No.

21    Q. Why not?

22    A. Because I don't archive E-mail, so I would not

23  have had any E-mail exchanges during that time.

24    Q. Did you look for any records related to

25  Mr. daRosa after getting notice of the EEOC filing

15

1  prior to the lawsuit but when there was a filing with

2  the Equal Employment Opportunity Commission?

3      A. I don't know if I knew that there was a claim

4  that had been filed, so no.

5      Q. No.  At any time in connection with

6  Mr. daRosa's case, have you ever seen a copy of a

7  document that was faxed from Mr. daRosa or his

8  girlfriend to member services on January 25th, 2006?

9      A. No.

10     Q. Do you recall discussions with Mr. Melon about

11  that document?

12     A. I heard -- yes, I heard about it.

13     Q. You heard about it from Mr. Melon?

14     A. Yes.

15     Q. Did you hear about it from anyone else?

16     A. Let me backtrack on that.  I heard it from

17  Mr. -- Mr. daRosa.

18     Q. Mr. daRosa told you that he had sent in this

19  fax?

20     A. Yes.

21     Q. And did Mr. Melon also tell you about the fax?

22     A. Yes.

23     Q. Have you ever actually seen that fax?

24     A. No.

25     Q. Did you -- were you Mr. Melon's supervisor at

Aiken & Welch Reporters    G. Kato   8/27/08

16

1  the time you looked for records in connection with this

2  case?

3      A. Yes.

4      Q. Did you ask him what he did to search for

5  files in connection with this case?

6      A. No.

7      Q. Were you aware of Mr. Melon's testimony at the

8  unemployment insurance hearing in March of 2007 about

9  Mr. daRosa?

10     A. No.

11     Q. He didn't report to you about his testimony at

12 the EDD hearing?

13     A. No.

14     Q. Do you keep a file about Mr. daRosa in your

15 offices?

16     A. No.

17     Q. And in searching for any records related to

18 Mr. daRosa's employment, did you look at an area where

19 documents would have existed back in the time of his

20 termination?

21     MS. PETERSON: Objection. Vague and

22 ambiguous.

23     THE WITNESS: I looked -- as I stated, it

24 asked the assistant to look in the cabinets for any

25 files that might be, you know, titled, you know, Mr. --

Aiken & Welch Reporters    G. Kato  8/27/08

17

1   Fernando daRosa.

2   BY MR. FRIEDMAN:

3       Q. What kind of records go into that file?  You

4   said they involve ELR matters.  What kind of records go

5   in there?

6       A. If there's any grievances or complaints.

7       Q. Any other kind of records in there?

8       A. Or any other documents relating to either a

9   complaint or an inquiry or a grievance.

10      Q. Any other records that would be in those

11  files?

12      A. Probably a disciplinary action.

13      Q. So if there was any documentation of

14  disciplinary action by a supervisor involving one of

15  his or her employees, those disciplinary actions are

16  copied to the file?

17      A. It may be.

18        MS. PETERSON:  Objection.  Incomplete

19  hypothetical.

20        THE WITNESS:  Sorry about that.  It's maybe.

21  BY MR. FRIEDMAN:

22      Q. Under what circumstances are they copied to

23  the ELR files?

24      A. When the manager sends us a copy.

25      Q. Does the human resources division ever ask

Aiken & Welch Reporters    G. Kato   8/27/08

18

1  managers to provide documentation in connection with

2  discipline of its employees?

3      A. Yes.

4      Q. How does it ask for those documents?

5      A. Either by phone or E-mail.

6      Q. Under what circumstances do you ask for

7  documentation from the supervisor in connection with

8  disciplinary conduct?

9      A. If it's a case involving progressive

10  discipline, then we would want to look at prior

11  disciplinary action.

12      Q. Do you have any information if that was ever

13  done in connection with Mr. daRosa's termination,

14  whether there was ever any files or documents provided

15  to the -- asked of a supervisor to provide to human

16  resources?

17      A. I don't know.

18      Q. Do you know whether there were ever any

19  documents asked for or received by the human resources

20  department in connection with the discipline that

21  Mr. Fernando received before his termination?

22      MS. PETERSON:  Objection.  Vague and

23  ambiguous.

24      THE WITNESS:  The first -- in his -- in his

25  employment -- in pharmacy or in the latter employment.

Aiken & Welch Reporters    G. Kato  8/27/08

19

1  BY MR. FRIEDMAN:

2      Q. Only the latter employment, member services?

3      A. Yeah, no, I don't know.

4      Q. Mr. Ayers was here for deposition this morning

5  and he testified that it's the practice of Kaiser that

6  whenever an employee gets disciplined, especially as it

7  gets close to termination, that it's the practice of

8  Kaiser to include human resources people in a

9  discussion and potentially review of the documents

10  prior to that.

11      Do you know whether that ever occurred in this

12  case with respect to Mr. daRosa's termination for

13  member services in January 2006?

14      MS. PETERSON:  I just want to object to the

15  extent it misstates Mr. Ayers' deposition testimony.  I

16  think that he said this is his understanding of what

17  the practice is.

18      MR. FRIEDMAN:  Please don't make speaking

19  objections.

20      MS. PETERSON:  I want the record to be clear.

21      MR. FRIEDMAN:  If you have an objection to the

22  question, you can say it misstates the testimony.  It's

23  improper for you to have the speaking objection where

24  you state what the evidence might show or might have

25  been.  You preserve your objection by stating for the

20

1  record, and then anything beyond that is really just

2  coaching the witness.  So I'd ask that you please not

3  do that anymore.

4      Can I have my last question read back, please.

5      (Record read.)

6      THE WITNESS:  I don't know.

7  BY MR. FRIEDMAN:

8      Q. Okay.  If a human resources representative or

9  consultant is involved in the discipline of an

10  employee, would that -- is that human resources

11  representative supposed to document his involvement?

12      MS. PETERSON:  Objection.  Incomplete

13  hypothetical.  Improper hypothetical.

14      THE WITNESS:  Usually, yes.

15  BY MR. FRIEDMAN:

16      Q. How?

17      A. By putting in some sort of notes for the file.

18      Q. And those notes would be in the ELR files you

19  spoke of?

20      A. Yes.

21      Q. And you were unable to locate any notes

22  specifically dealing with any human resources

23  involvement in Mr. daRosa's termination in January of

24  2006?

25      A. Yes.

21

1    Q. What is your current job title?

2    A. I'm a -- the practice leader for employee

3    labor relations consultant for northern California.

4    Q. What is practice leader?

5    A. I have responsibility for the employee and

6    labor relations program or function from HR that also

7    includes disability management.

8    Q. What is disability -- oh, disability

9    management, is that office?

10    A. Yes.

11    Q. So you have oversight over them?

12    A. Yes.

13    Q. How come you've never asked that disability

14    management look for records in connection with

15    Mr. daRosa?

16    A. Since there were other individuals who also

17    received the request, you know, as well.  I was looking

18    for documents that I was -- that I thought I had

19    some -- that I would have.

20    Q. Do you know whether anybody at disability

21    management has ever received the request to search for

22    records?

23    A. I don't know.

24    Q. Do you know if whether anybody at the WAM

25    office received any requests for search of records?

Aiken & Welch Reporters    G. Kato   8/27/08

22

1    A. I don't know.

2    Q. If you wanted to look at the disability

3  management offices records, how would you go about

4  doing that?

5    A. As I said, I would request it.  I would go

6  in -- and at that point, my office was in the McArthur

7  Broadway building or MB building, and the disability

8  management office was steps away from where my office

9  was.

10    Q. What about today, if you wanted to look for

11  those records, what would you do?

12    A. I would contact the consultant in employee

13  labor relations consultant to request the information,

14  or I would request it either by phone or by E-mail, or

15  drop by the office, if it's the Oakland Medical Center.

16    Q. Did you ever request a consultant to check

17  with the disability management office?

18    A. No.

19    Q. In connection with this case?

20    A. Yeah, no.

21    Q. And is there anything that would prevent you

22  from doing that search today?

23    A. No.

24    Q. When did you first start working with Kaiser?

25    A. In November of 1996.

Aiken & Welch Reporters     G. Kato   8/27/08

69

1    A. No.

2    Q. If you look on the first page of this

3    document, there's an April 4th, 2007 entry.

4        Do you know what NLVS stands for?

5    A. I'm sorry.  You said August 4th, 2007?

6    Q. No, April 4th.

7    A. April 4th, I'm sorry, 2007?

8    Q. Yeah.  And just so you can tell after looking

9    at this document for many hours, the data that is

10   associated with an entry runs up rather than down.

11   A. (Witness nods head.)

12   Q. So that line directly across --

13   A. Okay.

14   Q. -- would be part, but then the rest of it

15   would be above it.

16   A. Okay.  Yeah.  I don't know what's NLVS, that

17   was the question?

18   Q. That was the question.

19   A. I don't know what that is.

20   Q. Okay.  There's testimony by Mr. daRosa, and it

21   reflected in this record that he had called and asked

22   to find out information about the reasons why a manager

23   had given to close the FMLA, and he had told the

24   employee that he was talking to, that he had been told

25   by somebody else that his manager had requested FMLA,

70

1   but -- and he had called to find out if it had been

2   closed.  And it says, "Advise per case 15265850, a case

3   was opened due to he had been out on disability and TC

4   coding was needed.  And the case had been closed due to

5   EE had RTW."

6          Were you aware of any disability claim that

7   had been opened up on Mr. daRosa's behalf in August of

8   2005?

9       A. No.

10      Q. And to your knowledge, nobody at Kaiser has

11  ever produced any information with respect to these

12  inquiries, meaning April 4th, 2007 and August 19th,

13  2005 in connection with this litigation?

14         MS. PETERSON:  Objection.  Calls for

15  speculation.

16         THE WITNESS:  The question again.

17  BY MR. FRIEDMAN:

18      Q. To your knowledge, nobody has ever produced

19  any information about these contacts in this

20  litigation?

21         MS. PETERSON:  Objection.  Calls for

22  speculation, "to my knowledge."

23  BY MR. FRIEDMAN:

24      Q. Were you aware that a disability claim had

25  been opened for Mr. daRosa in July -- in August of 2005

            Aiken & Welch Reporters     G. Kato   8/27/08

71

1  and then closed afterwards because he had returned to

2  work?

3      MS. PETERSON:  Objection.  Assumes facts not

4  in evidence.  Lacks foundation.

5      THE WITNESS:  No.

6  BY MR. FRIEDMAN:

7      Q. Do you have any information that would

8  contradict that?

9      A. No.

10     Q. And it's true that the -- Ms. Roper as

11  Fernando daRosa's supervisor would have been the one to

12  open that disability claim if one had been opened?

13     MS. PETERSON:  Objection.  Calls for

14  speculation.  Assumes facts not in evidence and lacks

15  foundation.

16     THE WITNESS:  I don't know.

17  BY MR. FRIEDMAN:

18     Q. Well, in August of 2005, it was the

19  supervisor's responsibility to contact disability

20  management, fill out forms and open up a claim of

21  disability for an employee under her report?

22     MS. PETERSON:  Objection.  Incomplete

23  hypothetical and is compound.

24     THE WITNESS:  Yes.

25  BY MR. FRIEDMAN:

Aiken & Welch Reporters    G. Kato  8/27/08

72

1    Q. So if, in fact -- that's okay.  Strike that.

2        Had you ever been aware that Mr. daRosa had

3  missed time from work in 2005 and 2006 due to a medical

4  condition?

5    A. No.

6    Q. Have you ever become aware of those facts?

7    A. Now?

8    Q. Now.

9    A. Now.

10    Q. That's what these documents, these records

11  that I've shown you today show.

12        MS. PETERSON:  Well, I'm going to object.  The

13  documents speak for themselves.

14  BY MR. FRIEDMAN:

15    Q. It needs to be a verbal answer.

16        MS. PETERSON:  I'm going to object to her

17  interpreting what the documents say.  The documents

18  speak for themselves.

19        MR. FRIEDMAN:  Your objection has already been

20  stated, but I need the response to be on the record.

21        THE WITNESS:  No.

22        MR. FRIEDMAN:  Now, I need my question asked

23  back.  I thought I was getting a nod, so I need to make

24  sure.

25        (Record read.)


Aiken & Welch Reporters     G. Kato   8/27/08

94

1        THE WITNESS:  I don't know how that would be

2  found.

3  BY MR. FRIEDMAN:

4        Q. When you looked for your own files, did you

5  search for Fernando files or daRosa files or neither or

6  both?

7        MS. PETERSON:  Objection.  Misstates facts not

8  in evidence.  Misstates her prior testimony.

9        THE WITNESS:  When I looked for the case file,

10  I looked for Fernando daRosa.

11  BY MR. FRIEDMAN:

12        Q. And you didn't check your own E-mails?

13        A. No, because I don't archive them.

14        Q. Is this E-mail still on your computer, any of

15  these E-mails?

16        MS. PETERSON:  Objection.  Calls for

17  speculation.

18        THE WITNESS:  I don't know.

19  BY MR. FRIEDMAN:

20        Q. And the only way to know really would be to

21  search; is that correct?

22        A. Yes.

23        Q. States here that Frank has the details.  Do

24  you see that?

25        A. Yes.

Aiken & Welch Reporters     G. Kato   8/27/08

136

1          (Whereupon, the deposition was concluded at

2     4:50 p.m.)

3

4

5

6
                    _____

7                   SIGNATURE OF WITNESS

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

137

1   STATE OF CALIFORNIA     )

2                           )

3   COUNTY OF ALAMEDA       )

4

5        I, KIMBERLY R. JENSEN, do hereby certify:

6        That GAIL KATO, in the foregoing deposition

7   named, was present and by me sworn as a witness in the

8   above-entitled action at the time and place therein

9   specified;

10       That said deposition was taken before me at

11  said time and place and was taken down in shorthand by

12  me, a Certified Shorthand Reporter of the State of

13  California, and was thereafter transcribed into

14  typewriting;

15       And that the foregoing transcript constitutes

16  a full, true, and correct report of said deposition and

17  of the proceedings that took place.

18       IN WITNESS WHEREOF, I have hereunder

19  subscribed my hand this 3rd day of September 2008.

20

21

22       KIMBERLY R. JENSEN, RPR, CSR No. 12552
23           State of California

24

25

Aiken & Welch Reporters     G. Kato   8/27/08