1          IN THE UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3                  ---O0O---

4   FERNANDO DAROSA,

5      Plaintiff,

6   vs.                      No.  3:07-CV-3114

7   KAISER FOUNDATION HEALTH
    PLAN, INC.,

8

      Defendant.

9   _____/

10

11

12

13

14          DEPOSITION OF FRANK MELLON

15

16

17

18        Taken before CATHLEEN M. MEUTER

19            CSR No. 12950

20            August 22, 2008

21

22

23

24

25

2

1           I N D E X

2                               PAGE

3  EXAMINATION BY MR. FRIEDMAN            4

4

5

6

7

8           E X H I B I T S

9  PLAINTIFF'S                  PAGE

10  1      Mellon's calendar and notes        67

11  2      Khrmit records, Bates stamped      88
           K00656 to K00661

12
    3      daRosa Personnel Action Request,   101
13         final timesheet, faxes, and
           daRosa Unemployment Insurance
14         Termination Report

15  4      12-7-05 memo to File, Re: DaRosa   115

16  5      String of e-mails, Bates stamped   126
           K00493 to K00497

17
    6      da Rosa Visit Verification forms   164
18
    7      Notice to Employer of State        168
19         Disability Claim Filed

20  8      Notice of Charge of Discrimination  168

21  9      Fax confirmation with reduced      199
           document

22

23

24

25

Aiken & Welch Court Reporters    F. Mellon    8/22/08

3

1          DEPOSITION OF FRANK MELLON

2

3     BE IT REMEMBERED, that pursuant to Notice, and on

4   the 22nd day of August 2008, commencing at the hour of

5   1:05 p.m., in the offices of Aiken & Welch, One Kaiser

6   Plaza, Suite 505, Oakland, California, before me,

7   CATHLEEN M. MEUTER, a Certified Shorthand Reporter,

8   personally appeared FRANK MELLON, produced as a witness

9   in said action, and being by me first duly sworn, was

10   thereupon examined as a witness in said cause.

11

12               ---o0o---

13

14        JEREMY L. FRIEDMAN, Attorney at Law, 2801

15   Sylhowe Road, Oakland, California 94602, appeared on

16   behalf of the Plaintiff.

17

18        JONATHAN D. MARTIN, Seyfarth Shaw, 560 Mission

19   Street, Suite 3100, San Francisco, California 94105,

20   appeared on behalf of the Defendants.

21

22

23

24

25

Aiken & Welch Court Reporters     F. Mellon    8/22/08

4

1                    FRANK MELLON,

2                 sworn as a witness,

3                 testified as follows:

4   EXAMINATION BY MR. FRIEDMAN:

5      Q.  Would you please state and spell your name for

6   the record?

7      A.  My name is Frank Mellon.  The last name is

8   spelled M-e-l-l-o-n.  The first name is Frank,

9   F-r-a-n-k.

10      Q.  Mr. Mellon, have you given your deposition in

11   any other cases?

12      A.  Yes.

13      Q.  On how many occasions?

14      A.  I don't know.

15      Q.  Is it more than five?

16      A.  Yes.

17      Q.  Is it more than ten?

18      A.  Yes.

19      Q.  Can you give me an approximation?

20      A.  I don't know.

21      Q.  Okay.  Is it more than fifty?

22      A.  I don't think so.

23      Q.  Do you think it's more than thirty?

24      A.  I don't know.

25      Q.  So it could be somewhere between twenty and

60

1   terminated.

2   BY MR. FRIEDMAN:

3       Q.  It's only your role to give advice and

4   consultation?

5       A.  Yes.

6       Q.  In January of 2006, approximately how many

7   employees and managers were you speaking with on a

8   daily basis?

9       A.  Oh, God.  I couldn't hazard a guess.  I mean

10  we've got 5,000 employees at the Oakland Medical

11  Center.  And on any given day, it could be as few as a

12  half dozen managers and four or five employees.  It

13  could be as much as fifteen, twenty managers and a lot

14  of employees.  There's just no way to give you a clean

15  answer on that.

16      Q.  But the estimates that you just gave me are

17  fair estimates or at least the range?

18      A.  The range is a possibility, yeah.

19      Q.  And can you recall all of the conversations

20  that you have with those individuals given the number

21  that you were doing in that time period?

22      A.  Oh, no.

23      Q.  And so is it important to keep document of

24  discussions in case you have to refer back to them?

25      A.  No.

61

1    Q.  It's not important?

2    A.  It will depend upon the case.

3    Q.  What is your practice with respect to note

4  taking in that regard in that timeframe?

5    A.  It depends upon the case.

6    Q.  What did you do in January 2006 with respect to

7  employees or managers in calling you?

8    A.  It would depend upon the case.  I may take

9  notes; I may not take notes.

10    Q.  Prior to the deposition today, you said you

11  reviewed some of the notes that you provided in this

12  litigation, correct?

13    A.  Uh-huh.

14    Q.  It needs to be verbal.

15    A.  I'm sorry.  Yes.

16    Q.  And so were those the notes that you were

17  taking at the time?  Was it your practice to take those

18  notes?

19    A.  In the fashion that I took them, yes.

20    Q.  Were there any other notes?

21    A.  No, sir.  I presented everything that I had.

22    Q.  And you don't have any other records that would

23  keep track of your phone conversations, result of any

24  document search, investigation conclusions,

25  consultations provided, or recommendations?

62

1    A.  I provided counsel with everything I have.

2    Q.  How do you keep track of any results of any

3  investigations that you conduct?

4    A.  If it's a formal investigation, then a file

5  will be opened and the materials be put into a file.

6  We don't have a formal filing system, although we're

7  working on that.

8        THE REPORTER:  Counsel, I'm going to need a

9  break when you get to a good point.

10        MR. FRIEDMAN:  Let's take a break.

11        (Break taken.)

12        MR. FRIEDMAN:  Back on the record.

13  BY MR. FRIEDMAN:

14    Q.  Beginning in December of 2005, have you ever

15  searched through any of Kaiser's records in connection

16  with Mr. daRosa?

17    A.  The only search that I did -- well, excuse me.

18  There was an EEOC filing.  I don't recall the exact

19  dates.  And so records were furnished to our counsel in

20  that matter.  And then subsequently Mr. daRosa asked

21  for his personnel file.  I did secure that for him.

22    Q.  In December of 2005 when you were speaking with

23  Ms. Roper about Mr. daRosa, did you look through any of

24  Kaiser's files at that time?

25    A.  I did not speak with her in 2005.

63

1     Q.  In December of 2005?

2     A.  No.  I did not.

3     Q.  In January of 2006, did you speak with her

4   about Mr. daRosa?

5     A.  Yes.

6     Q.  And at that time, did you look through any

7   files?

8     A.  No.

9     Q.  And when Mr. daRosa called you in February of

10   2006, did you look through any files at that time?

11     A.  She did not call me in February of 2006.

12     Q.  In February of 2006, did you look through any

13   files with respect to Mr. daRosa?

14     A.  No.

15     Q.  In March of 2006, did you look through any

16   files for Mr. daRosa?

17     A.  No.

18     Q.  In July or August of 2006 when you were

19   engaging in e-mail communications with Ms. Kato about

20   Mr. daRosa, did you look through any files?

21     MR. MARTIN:  Objection.  Lacks foundation.

22     You can answer if you know.

23     THE WITNESS:  No.

24   BY MR. FRIEDMAN:

25     Q.  Did you search -- look at any of Mr. daRosa's

64

1  files prior to the EDD hearing in April of 2007?

2     A.  Excuse me, Counselor.  Do you want to

3  correct -- and it's only because I don't recall the

4  specific dates.  There was a searching of the files for

5  purposes of providing those to legal counsel in the EEO

6  case.  So I don't want to be misunderstood.  But those

7  files were searched out then and simply forwarded on.

8     Q.  When was it that you did that?

9     A.  You know, I just don't remember when the EEO

10  case was.  And my recollection is that it was in 2006,

11  but I may be off on that.

12     Q.  Did you ever see the letter that the counsel

13  for Kaiser wrote to the EEOC about this case?

14     A.  No.

15     Q.  Did your provision of records to the EEO

16  division, was that before the EDD hearing in March of

17  2007?

18     MR. MARTIN:  Objection.  Misstates the

19  testimony.  Lacks foundation.  He didn't say that he

20  provided documents to the EEOC or anyone else, I don't

21  think.

22     THE WITNESS:  No.  I believe you said to my

23  EEOC counsel.

24  BY MR. FRIEDMAN:

25     Q.  That's what I meant, yes.  I know you didn't

65

1    provide it to EEOC, but you had attorneys representing

2    Kaiser in the EEO matter.

3        A.  Yes.

4        Q.  And you provided them with documents?

5        A.  Yes.

6        Q.  And you searched for Mr. daRosa's records in

7    connection with that provision?

8        A.  Yes.

9        Q.  And I was asking whether that was before the --

10   I think I misspoke.  I think I said March 2007, but it

11   was April 2007 was the EDD hearing.

12          Was it before then or after then?

13       A.  I believe before then, but I do not remember

14   specifically.

15       Q.  And how about after the EDD hearing that you

16   participated in, did you search for records at that

17   time -- any other time?

18       A.  No.

19       Q.  Okay.  And did you search for any documents in

20   connection with this litigation?

21       A.  No -- excuse me.  I furnished counsel, as I

22   said before, with the documents that I had.

23       Q.  So in furnishing those documents, did you

24   search records in order to find the documents to

25   provide to counsel?

Aiken & Welch Court Reporters    F. Mellon    8/22/08

66

1    A. Yes.

2    Q. What records did you search?

3    A. The ones that I gave to counsel.

4    Q. Where were they maintained?

5    A. They were items -- there were some items that

6 were in my possession.

7    Q. Where did you keep them in your possession?

8    A. In a file drawer because they were general

9 items.

10    Q. Do you have a label on your file drawer?

11    A. No.  It's a desk drawer.

12    Q. It's a desk drawer?

13    A. Yes.

14    Q. And what kind of information do you keep in

15 there?

16    A. The information which I've specifically kept in

17 there was my calendar -- my calendars which were Lotus

18 notes and my writing down of telephone calls.

19    Q. Didn't you keep some sort of file like daRosa

20 file or a file for documents related --

21    A. I believe I did, but I gave all those to

22 counsel.

23    Q. Do you recall approximately how many pages were

24 in the daRosa file?

25    A. No.

67

1     Q.  Was it more than five?

2     A.  I don't know.

3         MR. FRIEDMAN:  We'll mark the first exhibit as

4   Exhibit 1.

5         (Plaintiff's Exhibit No. 1 marked for

6             Identification.)

7         MR. FRIEDMAN:  Counsel, I'll be using these

8   same exhibits with the same exhibit numbers in the

9   depositions coming this week.  I'd ask that you please

10  hold on to your copies.

11        MR. MARTIN:  Okay.  In other words, this

12  document will be Plaintiff's Exhibit 1 in all the other

13  depositions?

14        MR. FRIEDMAN:  If I need to add any others in

15  the other depositions, I'll make them different

16  numbers.  I'll continue to sequence, but I won't

17  necessarily make these an exhibit in every deposition.

18        MR. MARTIN:  All right.

19        MR. FRIEDMAN:  Saving trees.

20  BY MR. FRIEDMAN:

21    Q.  Okay.  Mr. Mellon, there is a top page which

22  has a calendar.  This is Bates stamped 104 to 109K, and

23  the first page has some dates on it.

24        Is that your handwriting?  I mean the second

25  page.  Sorry.

68

1      A.  Yes.

2      Q.  That's your handwriting?

3      A.  Yes.

4      Q.  And that's -- and the whole document is your

5    handwriting, correct?

6      A.  Yes.

7      Q.  Now, can you tell me what K105 is?

8      A.  It's notes I took regarding phone messages that

9    I had received.

10     Q.  And was this page in the daRosa file, or was

11   this in a separate file for all of your telephone

12   communications?

13     A.  Separate file for all of my telephone

14   communications.

15     Q.  Where did you keep the separate file for all

16   telephone communications?  In that desk drawer?

17     A.  In that desk drawer.

18     Q.  Where did you keep the daRosa file?

19     A.  In a separate file.

20     Q.  Where was that one kept?

21     A.  In a filing cabinet that I have otherwise next

22   to my desk.

23     Q.  Okay.  And when you produced this in March of

24   2006, did you have any records of any other discussions

25   in February or January or --

Aiken & Welch Court Reporters     F. Mellon     8/22/08

69

1        A.  I had no conversations with Mr. daRosa in

2    January or February.

3        Q.  But did you have telephone records reflecting

4    work that you did or phone calls that you made in those

5    time periods?

6        A.  Yes.

7        Q.  And do they still exist today?

8        A.  Yes.

9        Q.  And is it your testimony that there are no

10    records from -- other than this page that have any

11    reference to Mr. daRosa?

12        A.  Yes.

13        Q.  Did you provide those records to counsel even

14    though they, in your mind, didn't have any of those

15    daRosa references?

16        A.  I provided to counsel records that I had that

17    would have reference to Mr. daRosa.

18        Q.  So did you provide counsel with records from

19    February of 2006?

20        A.  I had no records on Mr. daRosa in February of

21    2006.

22        Q.  Did you provide counsel with your phone records

23    from 2006?

24        A.  No, I did not.

25        Q.  And did you provide counsel with your phone

70

1   records from January of 2006?

2      A.  No, I did not.

3      Q.  And did you take any notes in your discussions

4   with Ms. Roper?

5      A.  No.

6      Q.  And you went over to Ms. Roper's office,

7   correct?

8      A.  I chatted with her.

9      Q.  You went over there to her office, correct?

10     A.  Are you talking January 2006, sir?

11     Q.  Yes.

12     A.  I believe that we mainly dealt on the

13   telephone.  I don't recall going over to her office.  I

14   might have.  I just don't recall.

15     Q.  Do you recall going over to her office to look

16   for a fax?

17     A.  I never went to her office to look for a fax in

18   January of 2006.

19     Q.  Do you recall testifying at the unemployment

20   insurance hearing that you went over to her office to

21   look for a fax?

22     A.  Again, you're going into the unemployment comp

23   hearing.  The only time that I am aware of any fax --

24   and I maintain my ongoing position regarding that

25   hearing.

Aiken & Welch Court Reporters    F. Mellon    8/22/08

71

1     Q.  I'm asking you, do you recall testifying

2  previously that you did, in fact, go over to

3  Ms. Roper's office to look for a fax in January 2006?

4     A.  No, I do not, sir.

5     Q.  You don't recall that testimony?

6        MR. MARTIN:  Objection.  Asked and answered.

7  He just said he didn't.

8  BY MR. FRIEDMAN:

9     Q.  I just want to make sure.

10        You don't recall that testimony?

11     A.  I don't recall saying that I went over in 2006.

12     Q.  Okay.  Would a transcript or listening to the

13  tape of the transcript refresh your recollection?

14     A.  I'm not --

15        MR. MARTIN:  Objection.  Calls for speculation.

16  Asked and answered.  He's already made his comment

17  about the use of that hearing which is inadmissible.

18  BY MR. FRIEDMAN:

19     Q.  So?

20     A.  I'm not going to answer about the hearing.

21     Q.  And so you won't answer the question about your

22  recollection of prior testimony on this particular

23  subject?

24        MR. MARTIN:  Objection.  Asked and answered.

25        THE WITNESS:  I've already answered you, sir.

72

1   BY MR. FRIEDMAN:

2       Q.  And the answer is you will not answer me,

3   correct?

4       A.  That's correct.

5           MR. MARTIN:  Objection.  Asked and answered.

6           MR. FRIEDMAN:  Your objections are repeating

7   themselves.  You can have standing objections if you

8   need on some of these topics, but I think it's

9   interfering with this testimony.

10          MR. MARTIN:  Just ask the questions, Counsel.

11          MR. FRIEDMAN:  No.  I'm going to try to conduct

12  the deposition in a way that I think it professionally

13  is required of us.  I've asked you a couple of times to

14  keep your objections from being speaking objections.

15  Now I'm offering to give you standing objections so

16  that you're not constantly interfering with the

17  witness' ability to testify.

18          MR. MARTIN:  Well, I'm not going to do standing

19  objections.  I'm going to object to each question as

20  appropriate.  That's the way you object in a

21  deposition.

22          MR. FRIEDMAN:  Could I please have my last

23  question reread?

24          (Record read.)

25  BY MR. FRIEDMAN:

Aiken & Welch Court Reporters     F. Mellon     8/22/08

73

1    Q.  Did you provide -- I'm sorry.  Back to the

2  Exhibit 1, the next page is K106.

3         This is from the same file of phone references?

4    A.  Yes.

5    Q.  And at this time had you created a daRosa file?

6    A.  I don't recall.

7    Q.  You don't recall?

8    A.  I don't recall.

9    Q.  In March of 2006, did you create a daRosa file?

10    A.  I don't believe so.

11    Q.  And in February of 2006, did you create a

12  daRosa file?

13    A.  No.

14    Q.  In January 2006, did you create a daRosa file?

15    A.  No.

16    Q.  Did you have a file for Ms. Roper?

17    A.  No.

18    Q.  Did you keep any of the records associated with

19  Mr. daRosa's termination from January 2006?

20        MR. MARTIN:  Objection.  Lacks foundation.

21        You can go ahead and answer if you know.

22        THE WITNESS:  What are you asking after,

23  Counsel?

24  BY MR. FRIEDMAN:

25    Q.  Did you keep any records?

Aiken & Welch Court Reporters     F. Mellon     8/22/08

74

1     A.  From the termination in 2006?

2     Q.  Yeah.

3     A.  In January 2006, I kept no records.

4     Q.  Okay.  And in January 2006, Ms. Roper provided

5  you with a draft of the termination letter prior to the

6  time that it went out, correct?

7     A.  That is correct.

8     Q.  And how did she provide that to you?

9     A.  I'm not sure if it was faxed over to me or

10  interoffice.

11     Q.  If it was faxed to you, would you have kept the

12  fax?

13     A.  No.  It was a draft document.

14     Q.  Are there any computer records that would

15  relate to this?

16     A.  Not that I'm aware of.

17     Q.  Did you have e-mail at the time?

18     A.  Yes.

19     Q.  Did you have any e-mail communications with

20  Ms. Roper?

21     A.  I might have, but I don't recall.

22     Q.  Did you look for any e-mail communications?

23     A.  Yes, I did.

24     Q.  When did you do that?

25     A.  When the records request was made.

75

1    Q.  In this litigation you mean?

2    A.  Yes.

3    Q.  Did you look for any e-mail communications with

4  Ms. Roper prior to the litigation, for example, in July

5  and August when you were speaking with Ms. Kato?

6    A.  I don't recall doing so.

7    Q.  And what did you do to look for e-mail

8  communications in connection with this case?

9    A.  Our computer system has a six-month clock on

10  it.  I don't know a better way to express it.  And if

11  you don't archive something, it drops off.  And I tried

12  to see if there had been something that still managed

13  to be saved.  I could not find anything because I did

14  not archive anything with regards to this.

15    Q.  Did you inquire with any of the tech people at

16  Kaiser with respect to backup tapes?

17    A.  No, I did not, sir.

18    Q.  Now, the following two pages, 108 and 109,

19  those are also your handwriting?

20    A.  Yes.

21    Q.  And what kind of files are these?

22    A.  My system is rather loose.  I will use what

23  is -- what I can put my notes onto.  So this would have

24  been from a notebook that I was using at that time.  I

25  switched to a notebook from just writing down on a pad

76

1  of paper.

2      Q. These are also phone calls then?

3      A. Yes.

4      Q. So these are the same records although in a

5  different form as the first two pages we were talking

6  about?

7      A. Yes, sir.

8      Q. Or first three pages.

9      A. Yes.

10     Q. But it's in a different type of notebook?

11     A. Yes.

12     Q. And that same thing is true for 109?

13     A. Yes.

14     Q. Now, there's a reference here on the last page

15  109, Fernando notes.

16         Do you see that?

17     A. Yes.

18     Q. What does that refer to?

19     A. You know, I've tried to figure out what it

20  refers to. I just cannot recall.

21     Q. So all of these pages would have been

22  maintained not in the daRosa file but in your drawer

23  next to your desk where you keep your telephone

24  records?

25     A. Yes.

77

1    Q.  Now, are any of these records also in your

2    daRosa file?

3    A.  I do not believe so.  I don't recall seeing

4    them in the file.

5    Q.  And what was in the daRosa file?

6        MR. MARTIN:  Objection.  Asked and answered.

7        You can answer again if you know.

8        THE WITNESS:  I gave to counsel everything that

9    I had in the daRosa file.  I can't tell you what

10   specifically was in it because I haven't looked in it

11   in a very long time.

12   BY MR. FRIEDMAN:

13   Q.  But it's not just these records that I have

14   before you now?

15   A.  That's correct.

16       MR. FRIEDMAN:  Well, Counsel, have they been

17   produced?

18       MR. MARTIN:  Well, without them in front of me,

19   I don't know how to tell you whether they've been

20   produced or not.  To the extent I've gotten them,

21   they've been produced.  As far as I know, they've been

22   produced.

23   BY MR. FRIEDMAN:

24   Q.  Describe for me what your files looked like in

25   the daRosa file as best as you can?

78

1       MR. MARTIN:  Objection.  Asked and answered.

2   Counsel, it's been asked several times.

3       You can answer one more time.

4       MR. FRIEDMAN:  I tell you I think is the first

5   time I've asked this question, and I'm going to stick

6   with it until I get an answer.

7       MR. MARTIN:  You asked about the daRosa file

8   several times and what's in it.

9       Go ahead.  You can answer one more time.

10      THE WITNESS:  I couldn't tell you what's in it.

11  I understand my obligation when there's a subpoena for

12  records.  I gave a copy of all the records I had to

13  counsel.  After that, I rely on counsel for what is

14  felt to be appropriate to your inquiry.

15  BY MR. FRIEDMAN:

16      Q.  Do you have an understanding that your file was

17  withheld from production to the plaintiff?

18      MR. MARTIN:  Objection.  Lacks foundation.  He

19  wasn't involved in the document production to

20  plaintiff, so he doesn't know that.  That's been

21  handled by counsel.  You know that.  This line of

22  questioning is getting very abusive.  I'm asking you to

23  reel it in, Counsel.

24      You can go ahead and answer.

25      THE WITNESS:  I don't know what counsel gave

79

1  you or didn't give you.

2  BY MR. FRIEDMAN:

3      Q.  So you don't have an understanding that these

4  documents were withheld from us?  As you sit here

5  today, you don't have any reason to believe they were

6  withheld from us?

7          MR. MARTIN:  Objection.  Lacks foundation.

8          You can go ahead and answer.

9          THE WITNESS:  I gave to counsel what I was

10  requested to give.  What they produced to you, I do not

11  know because I rely on counsel for such responses.

12  That's all I can give you as an answer.  I don't know

13  what was given you, what wasn't given you.  When you

14  start to use words like withheld, that implies

15  something that I have no knowledge of.  Counsel does

16  our representation.  They furnish you what they believe

17  is appropriate.

18  BY MR. FRIEDMAN:

19      Q.  Well, that's why I asked you if you had any

20  reason to know that they were withheld from us.

21          MR. MARTIN:  Objection.  Lacks foundation --

22          THE WITNESS:  I'm not going to answer --

23          MR. MARTIN:  -- asked and answered.

24          You can answer again if you know.  Then we'll

25  move on to another line of questions.

Aiken & Welch Court Reporters     F. Mellon     8/22/08

80

1  BY MR. FRIEDMAN:

2      Q.  I think you said you're not going to answer

3  that question, correct?

4      A.  No.  I answered your question.  And why you

5  keep come being back to it, I don't know.  But I've

6  answered your question.

7      Q.  You said prior to the deposition today that you

8  looked through your notes in preparation for the

9  deposition today --

10     A.  No, I did not.

11     Q.  -- remember that testimony?

12         MR. MARTIN:  Objection.  Misstates the

13  testimony.  That is absolutely not what he said.

14         You can go ahead and answer.

15  BY MR. FRIEDMAN:

16     Q.  You said that prior to the deposition you

17  looked through notes that you had given to counsel.

18         Do you recall that testimony?

19     A.  Yes.

20     Q.  Did you look through notes other than these

21  pages that I've handed you with your telephone records?

22     A.  No.

23     Q.  So you did not review any other records other

24  than these six pages?

25         MR. MARTIN:  Objection.  Misstates the

Aiken & Welch Court Reporters     F. Mellon     8/22/08

81

1  testimony.  That is not what he said.

2       Go ahead and answer.

3       THE WITNESS:  I'm sorry.  The question again,

4  please?

5  BY MR. FRIEDMAN:

6       Q.  With respect to the notes and calendar

7  information that you provided counsel in connection

8  with this litigation, there are these six pages and no

9  more that you looked at prior to your deposition today,

10  correct?

11       A.  That's not correct.

12       Q.  Okay.  What other pages from your notes that

13  you looked at prior to your deposition today?

14       A.  From my notes, I looked through what has been

15  presented to you.  I looked at nothing else prior to

16  today.

17       Q.  These six pages?

18       A.  From my notes.

19       Q.  From your notes, these six pages?

20       A.  That's correct.

21       Q.  No other pages other than these six did you

22  review prior to your deposition from your notes?

23       A.  From my notes, no.

24       Q.  So the daRosa file that you gave to counsel you

25  did not look through today?

Aiken & Welch Court Reporters     F. Mellon     8/22/08

82

1   A.  That is correct.

2       MR. FRIEDMAN:  Well, Counsel, I will go on

3   record.  I have gone through the records.  I see no

4   other notes.  So if you know of any other documents

5   that were produced from Mr. Mellon's file, can you

6   identify them for me?

7       MR. MARTIN:  I'm not going to sit here and do

8   that right now.  Your job is to ask him questions and

9   for him to give you answers.  I'm not going to sit here

10  and talk about what's been produced and what's not

11  produced.  I believe he's answered your questions.

12  Let's move on.

13      MR. FRIEDMAN:  Well, it's important because

14  we're in the middle of a deposition with this witness,

15  and this witness has said he produced to you these

16  records, and I don't have them.

17      MR. MARTIN:  How do you know?

18      MR. FRIEDMAN:  Because I brought all the

19  records that you served us.

20      MR. MARTIN:  What records has he said he has

21  that you don't think you have?

22      MR. FRIEDMAN:  He had notes from the daRosa --

23  he had a whole daRosa file.

24      MR. MARTIN:  Okay.  And what part of that file

25  did he say he had that you haven't received?

Aiken & Welch Court Reporters    F. Mellon    8/22/08

83

1        MR. FRIEDMAN:  I haven't received anything with

2    a daRosa file.  There's no label that says daRosa file.

3    There's no documents that says anything.

4        MR. MARTIN:  Well, I think he's answered your

5    question.

6    BY MR. FRIEDMAN:

7        Q.  Do you know what other documents were in that

8    daRosa file other than -- well, these pages weren't in

9    the daRosa file.

10        What pages in the daRosa file?

11        MR. MARTIN:  Objection.  Asked and answered.

12        You can answer it again.

13        THE WITNESS:  I have not looked in that file in

14    a very long time other than when the request for

15    records.  I forwarded it on to counsel what I had in

16    that file.  I don't know whether there is any specific

17    other handwritten notes or the like.  It's been -- I

18    don't know whatever was the original date of the

19    request.  But it's been a very long time, and, frankly,

20    I just don't know what else would be there.  And I

21    don't have any idea what you've been given, so I can't

22    answer.

23    BY MR. FRIEDMAN:

24        Q.  Do you still have the daRosa file?

25        A.  Not with me.

Aiken & Welch Court Reporters    F. Mellon    8/22/08

84

1     Q.  But you still have it at your office?

2     A.  Yes.

3     Q.  And where is it located?

4     A.  At 235 West MacArthur Boulevard, Suite 420.

5     Q.  Were you informed to bring all relevant records

6  to this deposition?

7          MR. MARTIN:  Objection.  We've raised numerous

8  objections to the deposition notice and in particular

9  with the request for production of documents which was

10  improper in that it did not allow 30 days as required

11  by the Federal Rules of Civil Procedure.  There are

12  also other numerous objections made as to the

13  deposition request.

14          However -- well, at the next break, the witness

15  and I will discuss it further and see if there's

16  anything further to add.  In the meantime, why don't

17  you move on to your next question.

18          MR. FRIEDMAN:  Well, we are going to see a

19  motion on this anyway so I guess --

20          MR. MARTIN:  You haven't established any

21  grounds for a motion, Counsel.  So instead of bickering

22  about it, just ask your questions, and let's move on.

23          MR. FRIEDMAN:  As I was saying, we are going to

24  have a motion on the question of the EDD testimony.

25  So, Mr. Mellon, you'll have to come back if the Court

Aiken & Welch Court Reporters     F. Mellon     8/22/08

85

1  grants us any relief.

2      In connection with that, we are going to add to

3  it that you produce to us whatever is in your daRosa

4  file.  It makes sense to me -- it doesn't take a rocket

5  scientist to figure out that a daRosa file should have

6  been produced to us.

7      MR. MARTIN:  Ask a question, Counsel.

8  BY MR. FRIEDMAN:

9    Q.  Let's look at Exhibit 1.

10      How many references in April of 2007 to

11  Mr. daRosa?

12      MR. MARTIN:  Objection.  The document speaks

13  for itself.

14      You can go ahead and answer if you know.

15  BY MR. FRIEDMAN:

16    Q.  Well, any of the references that refer to

17  Mr. daRosa's case?  You know what these references

18  refer to.  I don't.  You can tell me if any of these

19  refer to Mr. daRosa.

20    A.  I see one on April 4th.  I see a UI hearing on

21  April 24th.  Unless you can see any others, Counsel,

22  those are the only two I see.

23    Q.  I didn't see any either, except there is a

24  reference to Kato on April 18th.

25      Is that a reference to Gail Kato?

Aiken & Welch Court Reporters     F. Mellon     8/22/08

154

1  She said she had consult with him.

2      Q.  But did you talk with her the importance of

3  documenting that discussion somewhere in his personnel

4  file?

5      A.  No.  I don't believe I did.

6      Q.  Did you talk with her about the importance of

7  documenting that anywhere in her files at all in

8  relation to Mr. daRosa?

9      A.  I don't believe so, sir.

10      Q.  And as of today, do you know of any effort by

11  anybody at Kaiser to locate her file?

12      MR. MARTIN:  Objection.  Calls for speculation.

13  Lacks foundation.

14      You can go ahead and answer if you know.

15      THE WITNESS:  I think I've said any number of

16  times the files that we were aware of that were in her

17  office were sent off to counsel.  Subsequent to that

18  date, there are no other files that I'm aware of that

19  were in Margie's office.

20  BY MR. FRIEDMAN:

21      Q.  But you testified at the EDD hearing that you

22  asked her if she had documentation to back it up, and

23  she said she did?

24      A.  If that's what it says on the tape, that's what

25  it says.

Aiken & Welch Court Reporters     F. Mellon     8/22/08

155

1     Q.  And do you believe that to be the case, that

2  you did, in fact, ask her if she had documentation and

3  she said she did?

4     A.  I believe I may have asked that, yes.

5     Q.  And you told the -- at the hearing, the judge

6  asked you about that documentation, and that was part

7  of the testimony, correct?

8     A.  I believe so.

9     Q.  And you told the judge that since Ms. Roper had

10  left Kaiser had been -- had not located that file?

11  That was your testimony?

12     A.  The file that would have had that document,

13  that's what I would have said in reference, not a total

14  file because files as I've continuously said had been

15  forwarded on.

16     Q.  Do you know whether Ms. Roper's file -- I mean

17  her supervisory file (sic)?

18     A.  That's the file I keep referring to, sir.

19     Q.  Okay.  You never called Mr. daRosa prior to his

20  termination?

21     A.  No, sir.

22     Q.  You had his phone number?

23     A.  Only after he called me.

24     Q.  It wasn't available to you in the human

25  resources department?

Aiken & Welch Court Reporters    F. Mellon    8/22/08

156

1       A.  I would have had to get it from either

2   Ms. Roper or through whatever was in the personnel file

3   area.  The answer is, it's not something that I had his

4   number until I needed to write it down.

5       Q.  And you didn't ask Ms. Roper for the phone

6   number?

7       A.  No, sir.

8       Q.  Do you recall now Mr. daRosa testifying at the

9   hearing that he had asked -- that he had -- strike

10  that.

11          Do you recall Mr. daRosa testifying at the

12  hearing that you had accused him of getting the doctors

13  note after the fact?

14      A.  I don't recall him accusing me of that, but you

15  want to play it, let's play it.

16      Q.  Okay.  Well, I want to make sure that you have

17  a memory of it.

18          MR. MARTIN:  You just asked him if he did, and

19  he said he didn't.

20          MR. FRIEDMAN:  Now I want to refresh it.

21          Off the record while I find the right location.

22          (Discussion off the record.)

23  BY MR. FRIEDMAN:

24      Q.  Back on the record.

25          During the EDD hearing -- I'm sorry.

Aiken & Welch Court Reporters     F. Mellon    8/22/08

163

1  BY MR. FRIEDMAN:

2     Q.  Let me try to ask that question so that I don't

3  have that issue with you.

4        There was the calls sometime after his

5  termination.  One might have been in February.  You

6  testified to that, and one was in March.

7     A.  Uh-huh.

8     Q.  After that call and before the time that he

9  contacted you in July, you had called Roper?

10    A.  Yes.

11    Q.  But you didn't talk to any other supervisor?

12    A.  There was no need to.

13    Q.  And you didn't make any inquiry with any of the

14  other employees in member services?

15    A.  No.

16    Q.  And you didn't ask to review his personnel

17  file?

18    A.  No.

19    Q.  And you didn't make any notations in any of

20  your records other than what you've produced today?

21    A.  That's correct.

22    Q.  And in the March conversation, you told him

23  that even if he did have the documentation, at this

24  point it's a little late because it should have been

25  presented long sooner.

Aiken & Welch Court Reporters    F. Mellon    8/22/08

164

1        Do you recall that?

2        A.  I believe that's correct.

3        Q.  And that is what you told him?

4        A.  Yes.

5        Q.  But it was not your job to make that decision,

6    correct?

7        A.  That's correct.

8        Q.  And at the EDD hearing in March of 2007 or

9    April -- I'm sorry -- April of 2007, you told the

10   administrative law judge that to your knowledge Kaiser

11   was unaware of the medical documentation until

12   Mr. daRosa brought it to your office July 31st, 2006?

13       A.  Yes, I did.

14       Q.  You said, by the way, to this date we still

15   have not found this document in our files?

16       A.  That's correct.

17       Q.  But now, in fact, that document does exist in

18   your files?

19       A.  I don't know that.

20          MR. FRIEDMAN:  Mark the next exhibit in order,

21   please.

22          (Plaintiff's Exhibit No. 6 marked for

23           Identification.)

24   BY MR. FRIEDMAN:

25       Q.  This was Exhibit 10 to the letter that Kaiser's

Aiken & Welch Court Reporters    F. Mellon    8/22/08

165

1   EEO counsel sent to the EEOC.  And it's a three-page

2   document.  The first page just shows that it was

3   Exhibit 10, and the second and third pages are the

4   same.  But the second page has that little stick-um

5   where it says, Margie, this was attached to the mbr

6   concern, Josephine.  Now --

7       A.  Excuse me.  It says was attached to an mbr.

8       Q.  A mbr.  What did I say?

9       A.  The.

10      Q.  I'm sorry.  I stand corrected.

11          This shows that Kaiser had, in fact, received

12   the fax and it was directed to Margie by Josephine?

13          MR. MARTIN:  Objection.  Calls for speculation.

14   Lacks foundation.

15          You can answer if you know.

16          THE WITNESS:  I don't know how this document

17   came to surface.

18   BY MR. FRIEDMAN:

19      Q.  I wasn't asking you that.

20          I was asking, it does show that, in fact,

21   Kaiser did receive the fax on January 25th, 2006, and

22   Josephine put Margie's name on it at some point?

23      A.  I will not speculate --

24          MR. MARTIN:  Objection.  Calls for speculation.

25   Lacks foundation.

221

1   STATE OF CALIFORNIA    )

2                        )

3   COUNTY OF ALAMEDA      )

4

5       I, CATHLEEN M. MEUTER, do hereby certify:

6       That FRANK MELLON, in the foregoing deposition

7   named, was present and by me sworn as a witness in the

8   above-entitled action at the time and place therein

9   specified;

10      That said deposition was taken before me at said

11  time and place, and was taken down in shorthand by me,

12  a Certified Shorthand Reporter of the State of

13  California, and was thereafter transcribed into

14  typewriting, and that the foregoing transcript

15  constitutes a full, true and correct report of said

16  deposition and of the proceedings that took place;

17      IN WITNESS WHEREOF, I have hereunder subscribed my

18  hand this 28th day of August 2008.

19

20

21

22

23              CATHLEEN M. MEUTER, CSR No. 12950

24                 State of California

25

Aiken & Welch Court Reporters    F. Mellon    8/22/08